**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ ) | Hon. Garrett E. Brown, Jr. |
| IN RE FORD MOTOR CO. E-350 ) | Civil Action No. 03-4558 (GEB) |
| VAN PRODUCTS LIABILITY ) | MDL No. 1687 |
| LITIGATION (NO. II) ) | |
| _____ ) | **MEMORANDUM OPINION** |

## TABLE OF CONTENTS

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
 I. California. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   1. Greater All Nation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   2. First United. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  B. Express Warranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   1. Plaintiffs' Express Warranty Theory. . . . . . . . . . . . . . . . . . . 12
   2. California Plaintiffs' Express Warranty Claims. . . . . . . . . . . . 16
  C. Implied Warranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   1. Plaintiffs' Implied Warranty Theory. . . . . . . . . . . . . . . . . . . 20
   2. Privity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
  D. California Statutory Consumer Fraud Claims. . . . . . . . . . . . . . . . . . . 25
  E. Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   1. Plaintiffs' Unjust Enrichment Theory. . . . . . . . . . . . . . . . . . 32
   2. California Plaintiffs' Restitution Claims. . . . . . . . . . . . . . . . . 33
  F. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
 II. Illinois. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
  B. ICFA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   1. Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   2. Actual Deception. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
  C. Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
  D. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
 III. New Jersey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   1. Macedonia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   2. Faith Tabernacle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
   3. Social Clubhouse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

|   |   | 4. | Bethany Baptist. | 51 |
|   | B. | | NJCFA. | 52 |
|   |   | 1. | Motion for Summary Judgment. | 52 |
|   |   | 2. | Motion to Strike. | 54 |
|   | C. | | Express Warranty. | 58 |
|   | D. | | Implied Warranty. | 60 |
|   | E. | | Unjust Enrichment. | 61 |
|   | F. | | Summary. | 63 |
| IV. | | | Georgia. | 64 |
|   | A. | | Material Facts. | 64 |
|   | B. | | Express and Implied Warranty. | 64 |
|   | C. | | Georgia FBPA. | 67 |
|   | D. | | Unjust Enrichment. | 70 |
|   | E. | | Summary. | 72 |
| V. | | | Pennsylvania. | 72 |
|   | A. | | Material Facts. | 73 |
|   |   | 1. | Bethel. | 73 |
|   |   | 2. | Hickman Temple. | 74 |
|   |   | 3. | Mt. Airy. | 74 |
|   | B. | | Express Warranty and Implied Warranty: Notice. | 74 |
|   | C. | | Express Warranty. | 77 |
|   | D. | | Implied Warranty. | 78 |
|   | E. | | Pennsylvania UTPCPL. | 81 |
|   | F. | | Unjust Enrichment. | 83 |
|   | G. | | Summary. | 86 |
| VI. | | | Florida. | 87 |
|   | A. | | Material Facts. | 87 |
|   |   | 1. | Blandon. | 87 |
|   |   | 2. | Diaz. | 88 |
|   |   | 3. | Mestre. | 89 |
|   | B. | | *Kia Motors* | 90 |
|   | C. | | Express Warranty. | 91 |
|   | D. | | Implied Warranty. | 92 |
|   | E. | | FDUTPA. | 93 |
|   | F. | | Unjust Enrichment. | 97 |
|   | G. | | Summary. | 98 |
| VII. | | | Texas. | 99 |
|   | A. | | Material Facts. | 99 |
|   | B. | | *Inman*. | 99 |
|   | C. | | Express and Implied Warranty. | 102 |
|   | D. | | DTPA. | 103 |
|   | E. | | Unjust Enrichment. | 107 |
|   | F. | | Summary. | 108 |

VIII.    Missouri. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
  B. *Briehl* and *O'Neil*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
  C. Express and Implied Warranty. . . . . . . . . . . . . . . . . . . . . . . . . 115
  D. MMPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
  E. Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
  F. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
IX. Michigan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
  B. *Hendricks* and *Henry*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
  C. Express Warranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
  D. Implied Warranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
  E. MCPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127
  F. Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130
  G. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
X. New York. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
    1. Bishop Anderson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
    2. Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133
  B. *Frank* as Applied to Bishop Anderson. . . . . . . . . . . . . . . . . . 136
  C. *Frank* as Applied to Barrett. . . . . . . . . . . . . . . . . . . . . . . . . . 139
  D. Bishop Anderson's Express and Implied Warranty Claims: Notice . . . . 141
  E. Bishop Anderson's Express Warranty Claim. . . . . . . . . . . . . . 142
  F. Bishop Anderson's Implied Warranty Claim. . . . . . . . . . . . . . 143
  G. Bishop Anderson's GBL Claims. . . . . . . . . . . . . . . . . . . . . . . . 145
  H. Bishop Anderson's Unjust Enrichment Claim. . . . . . . . . . . . . 146
  I. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
XI. Massachusetts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
  A. Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
  B. *Iannacchino*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149
  C. Express Warranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
    1. Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153
    2. No Express Warranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
  D. Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156
  E. Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

**BROWN**, Chief Judge:

This matter comes before the Court on the motions for summary judgment filed by Defendant Ford Motor Company ("Ford") in this multidistrict litigation. Ford has filed a total of 21 summary judgment motions in this putative class action. This Court previously granted two of these motions. In the remaining 19 motions, Ford requests that summary judgment be granted in its favor with respect to all 20 remaining named Plaintiffs, pursuant to the laws of the 11 states wherein Plaintiffs reside. This Opinion will address all of Ford's remaining summary judgment motions, with respect to Plaintiffs from California (Doc. No. 188), Illinois (Doc. No. 226), New Jersey (Doc. Nos. 210, 212, 214, and 216), Georgia (Doc. No. 221), Pennsylvania (Doc. Nos. 228, 230, and 232), Florida (Docs. No. 190, 194, and 197), Texas (Doc. No. 219), Missouri (Doc. No. 202), Michigan (Doc. No. 223), New York (Docs. No. 204 and 206), and Massachusetts (Doc. No. 208). In this Opinion, this Court will also decide Ford's motion to strike Plaintiffs' August 7, 2009 letter and affidavit (Doc. No. 272).

For the following reasons, Ford's remaining motions for summary judgment will be granted in part, granted without prejudice in part, and denied in part. Ford's motion to strike the August 7, 2009 letter and affidavit will be granted.

### *Background*

On June 16, 2005, the Judicial Panel on Multidistrict Litigation transferred five actions[1] to this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re Ford*

---

[1] *New Bethlehem Baptist Church v. Ford Motor Co.*, No. 2:05-519 (N.D. Ala.); *Eleventh Street Baptist Church v. Ford Motor Co.*, No. 4:05-4020 (W.D. Ark.); *Greater All Nation Pentecost Church of Jesus Christ v. Ford Motor Co.*, No. 2:05-1765 (C.D. Cal.); *Pentecostal Temple Church of God in Christ v. Ford Motor Co.*, No. 1:05-1340 (N.D. Ill.); *Social Clubhouse, Inc. v. Ford Motor Co.*, No. 2:03-4558 (D.N.J.).

*Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 374 F. Supp. 2d 1353 (J.P.M.L. 2005).

Following the transfer to this Court, Plaintiffs filed a Consolidated Amended Class Action

Complaint ("Complaint").  In the Complaint, Plaintiffs allege that their Ford E-350 "15-

passenger" vans were defectively designed due to a high center of gravity that leads to an

unusually high rollover rate and, consequently, an increased risk of death or injury.  No Plaintiffs

or members of the proposed class have actually suffered a rollover.  Plaintiffs claim economic

harm because the alleged defect purportedly makes the E-350 vans unsuitable and unfit for

transporting 15 passengers.  The Complaint asserts claims on behalf of Plaintiffs and a putative

nationwide class that includes: "all persons and entities who purchased or otherwise lawfully

acquired E350 '15-passenger' vans (a/k/a E350 Super Club Wagons, Econoline '15-passenger'

vans, or E350 Super Duty Extended Length passenger vans) manufactured by Defendant Ford

Motor Company . . . model years 1991-2005, and who reside in the fifty states and/or the District

of Columbia."  (Compl. ¶ 1.)  This class includes persons or entities who purchased new or used

model years 1991-2005 Ford E-350 vehicles between January 1, 1991 and the date of the filing of

the Complaint, inclusive.   The proposed class, however, specifically excludes those who claim

damages for personal injury as a result of purchasing or leasing a Ford E-350 van.  (Compl.

¶ 63.)

Each named Plaintiff asserts four causes of action: (1) breach of express warranty; (2)

breach of implied warranty; (3) unjust enrichment; and (4) violation of the state consumer fraud

statutes applicable to each Plaintiff.  Specifically, Plaintiffs seek damages for the alleged

diminution in value of their vehicles as a result of the vehicles' alleged defects; the cost of

purchasing or leasing additional vehicles and of training drivers; equitable relief requiring Ford

5

to correct the alleged defect and enjoining Ford from distributing any E-350 van until the alleged

defect is corrected; restitution; disgorgement of revenues; and applicable statutory damages.

The Complaint initially asserted claims on behalf of various named Plaintiffs from five

states: Alabama, Arkansas, California, Illinois, and New Jersey.  Ford moved to dismiss the

entire Complaint.  In an Opinion and Order dated September 2, 2008, Senior United States

District Judge Harold A. Ackerman granted in part and denied in part Ford's motion.[2]  *In re Ford

Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, No. 03-4558, MDL No. 1687, 2008 WL

4126264, at *29 (D.N.J. Sept. 2, 2008) (hereinafter "MTD Opinion").[3]  Judge Ackerman applied

the law of the Plaintiffs' home states to their respective claims, except where no material

difference existed between the various states' laws.  *Id.* at *3.  The court granted Ford's motion

to the extent that Judge Ackerman: 1) dismissed the Alabama, Arkansas, and Illinois Plaintiffs'

express warranty claims; 2) dismissed the Alabama, Arkansas, and Illinois Plaintiffs' implied

warranty claims; 3) dismissed the Alabama and Arkansas Plaintiffs' respective state consumer

fraud statutory claims; and 4) dismissed one of the three state consumer fraud statutory claims

advanced by the California Plaintiff.  *Id.* at *29-30.  Judge Ackerman denied the remainder of

Ford's motion.  In the previous summary judgment opinion, this Court granted summary

judgment in Ford's favor on the sole remaining claim of unjust enrichment asserted by the

Alabama and Arkansas Plaintiffs (Doc. No. 286).  Therefore, the following claims brought by the

initially named Plaintiffs in the Complaint remain pending: 1) the California and New Jersey

---

[2]In August 2009, this matter was reassigned to the undersigned.

[3]Judge Ackerman issued an Amended Opinion and Order on September 3, 2008 (Doc. No. 142) that made no substantive revisions to the initial Opinion and Order issued one day earlier.

Plaintiffs' express warranty claims; 2) the California and New Jersey Plaintiffs' implied warranty claims; 3) the California, New Jersey, and Illinois Plaintiffs' unjust enrichment claims; 4) the Illinois and New Jersey Plaintiffs' respective state consumer fraud statutory claims; and 5) two of the California Plaintiff's state consumer fraud statutory claims.  *Id.*

After Judge Ackerman resolved Ford's motion to dismiss, the parties in November 2008 agreed to the joinder of newly named Plaintiffs from many new jurisdictions.  (Doc. No. 150.) Following extensive discovery, Ford filed 21 separate motions for summary judgment, seeking judgment against all named Plaintiffs on all claims.  This Court previously granted two of Ford's motions.  At present, this case includes 20 named Plaintiffs from 11 states.  These states include the three remaining initial states – California, Illinois, and New Jersey – and eight additional states: Georgia, Pennsylvania, Florida, Texas, Missouri, Michigan, New York, and Massachusetts.[4]

### *Analysis*

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably

---

[4]On April 8, 2010, Ford filed a Notice of Supplemental Authority Regarding Summary Judgment Motions.  Plaintiffs ask this Court to strike this filing, or allow them to file a response. Plaintiffs note that several of the cases cited by Ford in this filing were decided prior to the filing of Ford's reply brief.  While the Court takes note in its own research and analysis of any relevant cases recently decided, it has not relied upon Ford's Notice of Supplemental Authorities, and will not allow Plaintiffs to file any response to that Notice.

be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The substantive law will identify which facts are "material." *Anderson*, 477 U.S. at 247-48. Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994). It is inappropriate for a district court to resolve factual disputes or make credibility determinations at the summary judgment stage. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

This does not mean, however, that a district court may ignore the weight of the evidence. *Id.* "[I]f the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court should enter summary judgment in favor of the moving party." *Peterson v. AT&T*, No. 99-4982, 2004 WL 190295, at *3 (D.N.J. Jan. 9, 2004) (quoting *Anderson*, 477 U.S. at 249). To raise a genuine issue of material fact, the summary judgment opponent "'need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the

8

[nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].").

As Judge Ackerman did in the MTD Opinion, this Court will apply the law of each Plaintiff's home state to that Plaintiff's claims.  MTD Opinion at *3.

## I.     California

This Court will first address Ford's motion for summary judgment as to the two California Plaintiffs in this action, Greater All Nation Pentecost Church of Jesus Christ ("Greater All Nation") and First United Methodist Church of Santa Barbara ("First United").  In the MTD Opinion, the Court dismissed Greater All Nation's claim under California's Consumers Legal Remedies Act for lack of standing, but allowed the remainder of Greater All Nation's claims – express warranty, implied warranty, unjust enrichment, and claims under two other California consumer fraud statutes – to proceed.  The parties added California Plaintiff First United to this case after the Court's resolution of the motion to dismiss, and therefore the Court has not yet addressed any of the claims asserted by First United.  For the following reasons, this Court will grant Ford's motion in its entirety as to Greater All Nation.  Ford's motion as to First United will be granted with regard to the warranty claims and granted without prejudice with regard to the statutory and unjust enrichment claims.

A.     Material Facts

1.     Greater All Nation

James P. Jennings, Jr., a deacon at Greater All Nation, testified at deposition on behalf of Greater All Nation that he personally purchased a used 1996 model E-350 van with his own funds in 1999, with the intention to donate the van to the church.  (Jennings Dep. at 41:13, 53:2-

23.)[5]   The church did not ask Deacon Jennings to donate the van, and while Jennings consulted

with officials at Greater All Nation (*id.* at 53:10-25), those officials offered no guidance "because

it wasn't their money" (*id.* at 57:10).   Deacon Jennings purchased the vehicle from Fox Leasing

for $11,687.15, which included an optional $1,100 extended service agreement.   (*Id.* at 82:12-

83:8.)   At the time of purchase by Deacon Jennings, the Greater All Nation vehicle had traveled

154,486 miles.   (*Id.* at 81:9-14.)

Deacon Jennings testified that in buying a van to donate to the church, he "was looking to

fill like 15 people in a van that we can go around [and] just pick up."   (*Id.* at 54:25-55:1.)   When

he purchased the E-350 van from Fox Leasing, he asked for a 15-passenger van, and the

salesperson represented to Deacon Jennings that the E-350 was a 15-passenger van.   (*Id.* at

117:17-22.)   Aside from this representation, however, no one at Fox Leasing or the other

dealerships Deacon Jennings visited made any statements about steering, handling, or stability,

and no one presented Deacon Jennings with any materials or brochures issued by Ford or anyone

else.   (*Id.* at 58:22-25; 60:7-13.)   Deacon Jennings also had not viewed any Ford or government

websites regarding 15-passenger vans, seen any press releases, advertisements, or media

coverage regarding E-350 vans, or had any discussions with Ford officials.   (*Id.* at 63:9-64:6.)

Deacon Jennings purchased the E-350 based on price, stating that he got "the best deal."   (*Id.* at

56:17.)

Greater All Nation's E-350 has traveled approximately 20,000 miles over an eight-year

---

[5]Differing portions of Deacon Jennings's deposition transcript are attached as exhibits to
Ford's Certification of Meridyth M. Andresen No. 2 (Ex. 1) and Plaintiffs' Certification of
Daniel R. Lapinski (Ex. 35).   For simplicity, the Court will cite to the deposition transcript
without reference to which party's exhibit contains the specific lines discussed.   The Court will
adhere to the same practice with regard to other depositions referenced in this Opinion.

period, transporting members to and from church.  (*Id.* at 105:15-106:5.)  Deacon Jennings

testified that the church has never carried more than 12 passengers in the van because the seats

are too small for more than 12 people.  (*Id.* at 45:14-22; 110:24-111:12.)  He further testified that

on two occasions, while he was driving the van, he felt the van might roll over, but he maintained

control and did not actually roll over.  (*Id.* at 69:7-72-17.)  Deacon Jennings stated at deposition

that he had some difficulty obtaining automobile insurance on Greater All Nation's behalf for the

E-350, but he ultimately secured insurance connected to his personal insurance policy.  (*Id.* at

77:17-80:22.)  Deacon Jennings conceded that the church can presently fit as many people into

the van as it could when he first purchased it (*id.* at 110:4-6), and that the church has not sought

to sell the van (*id.* at 110:7-8).  When asked why Greater All Nation has not sold the van, he

explained, "It's serving the purpose of – I won't say it's serving the purpose but it's doing the job

that we need [it] to do.  It's transporting people."  (*Id.* at 110:10-12.)

### 2. *First United*

Sue Zilotto, chair of First United's Board of Trustees, testified at deposition on behalf of

First United.  Ford alleges that Boy Scout Troop 1 (the "Troop") purchased a new 1995 model E-

350 in 1995 for approximately $26,000 from the Mel Clayton Ford dealership, and that the Troop

sold the van to the church for $1.00 with the understanding that the Troop could use the van as

needed.  (Ford's Statement of Undisputed Material Facts ("SUMF") No. 2 at ¶¶ 23, 29.)  Zilotto

conceded these facts as stated in Plaintiffs' Responses to Interrogatories.  (Zilotto Dep. at 28:3-

29:14.)  However, Plaintiffs now contend that First United purchased the van directly from the

Ford dealership, as supported in the record by the Retail Buyers Order for the church's E-350.

(Lapinski Certif., Ex. 34 at FUM000004.)  Zilotto agreed at deposition that First United

11

purchased the van, after previously stating that the Troop did.

Zilotto asserted that the church believed, based on the van's window sticker, that the van was safe for carrying 15 passengers, but was unsure whether church officials had viewed other materials regarding the van. Zilotto further stated that the church acted based on advertisements that Ford sent directly to many churches. (Zilotto Dep. at 33:1-35:17; 111:3-5.) Zilotto claimed that the church purchased the van because it was safe to carry 15 passengers. (*Id.* at 33:1-5.) The church used the van to transport up to 15 passengers at a time from 1995 until approximately January 2003, when the church, after learning through the news media of rollover issues, followed the advice of its automobile insurer to remove the last row of seats from the van. (Pls.' Supp. Statement of Disputed Material Facts ("Pls.' Supp. Statement") at ¶¶ 445-451; Ford's SUMF No. 2 at ¶¶ 31-35.) First United's insurer did not *require* this change as a condition of continued coverage. (Zilotto Dep. at 61:4-20.) First United also adopted other recommendations made by its insurer, including that the van not be driven in excess of 60 miles per hour, that only trained, Class 2-licensed drivers be used, and that heavy baggage not be piled in the back area of the van. (*Id.* at 24:15-21.) Zilotto testified that the removal of the back row of seating limited First United's use of the van by restricting the number of people it could transport to retreats or out-of-town meetings. (*Id.* at 26:17-22.)

B.   Express Warranty

1.   *Plaintiffs' Express Warranty Theory*

As do the other Plaintiffs, Greater All Nation and First United (collectively the "California Plaintiffs") allege in their First Causes of Action a breach of express warranty by Ford under Section 2-313 of the Uniform Commercial Code ("UCC"), as codified under

12

California law by Cal. Com. Code § 2313.  In the Complaint, Plaintiffs assert that Ford

"expressly warranted by its representations, advertisements and statements, including Ford's

labeling the E350 as a '15-passenger' van, that the E350 van was fit to safely accommodate and

transport '15 passengers,' and that the E350 could legally and practically be used for that

purpose."  (Compl. ¶ 78.)  Ford allegedly breached this express warranty by distributing a

"defective vehicle which could not be safely, legally, or practically used to accommodate and

safely transport 15 passengers."  (*Id.* ¶ 79.)  Before addressing the express warranty claims of the

individual Plaintiffs, this Court will first consider the general express warranty theory asserted by

all Plaintiffs.

As discussed in the MTD Opinion, UCC § 2-313 recognizes that a seller may create an

express warranty by three general classes of statements or representations:

> (a)   Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b)   Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> (c)   Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See, e.g.*, Cal. Com. Code § 2313(1); 810 Ill. Comp. Stat. § 5/2-313(1); N.J.S.A. § 12A:2-313(1).

The UCC stipulates that, to create an express warranty, a seller need not "use formal words such

as 'warrant' or 'guarantee'" or "have a specific intention to make a warranty."  Cal. Com. Code

§ 2313(2); *see also, e.g.*, 810 Ill. Comp. Stat. § 5/2-313(2); N.J.S.A. § 12A:2-313(2).  However,

"affirmation merely of the value of the goods or a statement purporting to be merely the seller's

13

opinion or commendation of the goods does not create a warranty." Cal. Com. Code § 2313(2); *see also, e.g.*, 810 Ill. Comp. Stat. § 5/2-313(2); N.J.S.A. § 12A:2-313(2).

Judge Ackerman held in the MTD Opinion that at that stage of this litigation, all Plaintiffs sufficiently alleged the existence of an express warranty, and breach thereof, in claiming Ford's "core description" of the E-350 van as a 15-passenger van constituted an express warranty.[6] MTD Opinion at *4. The Court reasoned that "accepting Plaintiffs' allegations as true, Ford's representation that the E-350 van was capable of transporting 15 people was not a subjective statement relating to the good's value, but rather an objective representation warranting the van's design and safety." *Id.* The court ultimately determined that several factual issues precluded a ruling as a matter of law on the merits of all Plaintiffs' express warranty claims at the motion to dismiss stage, including "whether Ford's description of the E350 van as a '15-passenger' van or Ford's outfitting the vans with seats for 15 passengers independently supports an express warranty; if so, whether any such warranty was the basis of the bargain between Plaintiffs and Ford; and whether Ford breached any such warranty." *Id.* at *5.

In opposing Ford's motions for summary judgment, Plaintiffs evince significant confusion regarding the basis for their express warranty claims. In one passage in their brief, Plaintiffs appear to disclaim any reliance on an *express* warranty of safety:

> Although Ford attempts to paint Plaintiffs' express warranty claims as grounded in representations of 'safety,' Plaintiffs do not claim that Ford *expressly* represented that its vehicles were safe. Instead, Plaintiffs allege, and Ford cannot deny, that Ford affirmatively represented and described the vehicle as being able to transport 15-

---

[6]The Court dismissed the Alabama, Arkansas, and Illinois Plaintiffs' express warranty claims not because Plaintiffs failed to allege the existence of an express warranty sufficiently, but for lack of pre-litigation notice under the laws of those jurisdictions.

> passengers. While Ford expressly warranted the vehicle as being
> capable of transporting 15 passengers, it is *implied* in Ford's
> representation that the vehicle is able to do so safely.

(Pls.' Omnibus Br. at 50 (emphases added).) The Court construed Plaintiffs' express warranty

claim in the MTD Opinion as alleging that Ford made an "objective representation warranting

the van's design and safety" in describing the E-350 van in its advertisements and on its labels as

a "15-passenger van." MTD Opinion at *4. Yet in the above-quoted argument, Plaintiffs now

appear to discard this theory that Ford *expressly* warranted the safety of the E-350 van in carrying

15 passengers, and instead assert that Ford only expressly warranted the E-350 van as being

*capable* of transporting 15 passengers, and that any representation of safety in that capability is

merely implied. As Ford contends, Plaintiffs appear to argue that Ford breached an "implied

express" warranty of safety. By legal definition, an express warranty must be express; an implied

warranty might give rise to a claim for breach of implied warranty, a claim which each Plaintiff

also pursues. Therefore, based on this rendition of Plaintiffs' argument, this Court would be

inclined to conclude that all of Plaintiffs' express warranty claims fail as a matter of law.

The Court cannot rely entirely on Plaintiffs' apparent concession, however, due to

Plaintiffs' shifting descriptions of its express warranty theory. In the paragraph immediately

preceding the above-quoted language, Plaintiffs state that "[i]t is obvious from the evidence

presented to this Court that Plaintiffs were induced to purchase E-350 vans based upon the

*express* warranty that the vehicles were capable of *safely* transporting 15 passengers." (Pls.'

Omnibus Br. at 49 (emphases added).) Thus, in one breath Plaintiffs contend that Ford *expressly*

warranted safety in the carrying of 15 passengers, but in the next breath Plaintiffs argue that such

safety was only *implied* by Ford. Because on these motions, this Court must view the underlying

facts and draw all reasonable inferences in the light most favorable to Plaintiffs as the

non-moving parties, *see Matushita*, 475 U.S. at 587, this Court will not summarily conclude that

Plaintiffs have foresworn an actionable express warranty theory.  This Court must examine the

record relevant to each Plaintiff and consider the law regarding express warranty in each relevant

jurisdiction, beginning with the California Plaintiffs.  For the following reasons, this Court will

grant Ford's motion for summary judgment as to the California Plaintiffs' express warranty

claims.

>      2.      *California Plaintiffs' Express Warranty Claims*

Determining whether a statement by a seller constitutes an express warranty under

California law involves three inquiries:

> First, the court must determine whether the seller's statement
> constitutes an "affirmation of fact or promise" or "description of the
> goods" under [§ 2313(1)(a) or (b)], or whether it is rather "merely the
> seller's opinion or commendation of the goods" under [§ 2313(2)].
> Second, assuming the court finds the language used susceptible to
> creation of a warranty, it must then be determined whether the
> statement was "part of the basis of the bargain."  Third, the court
> must determine whether the warranty was breached.

*Keith v. Buchanan*, 220 Cal. Rptr. 392, 395 (Cal. Ct. App. 1985).

Under California law, an express warranty arises only from "specific and unequivocal"

statements or "explicit guarantees."  *See Maneely v. General Motors Corp.*, 108 F.3d 1176, 1181

(9th Cir. 1997) (citing *Hauter v. Zogarts*, 534 P.2d 377, 379 (Cal. 1975); *Keith*, 220 Cal. Rptr. at

396-97).  For example, in *Hauter*, the Supreme Court of California construed a label on a golf

training device "COMPLETELY SAFE BALL WILL NOT HIT PLAYER" as a statement of fact

creating an express warranty of complete safety from the ball hitting the user.  534 P. 2d at 380-

383 & n.10.  Similarly, in *Keith*, the descriptions of a sailboat in sales brochures as "a picture of sure-footed seaworthiness" and "a carefully well-equipped and very seaworthy vessel" constituted an express warranty of seaworthiness.  220 Cal. Rptr. at 396-97.  The Ninth Circuit in *Maneely*, applying California law, concluded that a visual depiction of people sitting in the cargo bed of pickup trucks did not create an express warranty because "no reasonable jury could find that GMC promised that riding in the back of a moving truck was safe simply by depicting people in the beds of pickup trucks."  108 F.3d at 1181.

Here, Ford's description of the E-350 van as a "15-passenger van" goes beyond the mere visual depictions at issue in *Maneely*, but does not rise to the level of an express warranty of safety as found in *Hauter* and *Keith*.  As Plaintiffs ultimately appear to recognize, the statement that the E-350 is a "15-passenger van" does not explicitly, specifically, and unequivocally include a representation of safety.  California law does not allow for an express warranty claim in the absence of such a specific "affirmation or promise made by the seller to the buyer which . . . becomes part of the basis of the bargain."  Cal. Com. Code § 2313(1)(a); *see Pisano v. Am. Leasing*, 194 Cal. Rptr. 77, 79-80 (Ct. App. 1983).  It is undisputed that no Ford representative, let alone any other person involved in the sale of the vehicles to the California Plaintiffs, made an express representation of *safety* with regard to the transport of 15 passengers.  While the precise understandings of the sellers and exactly what the California Plaintiffs knew about the safety risks of the E-350 van remain in dispute, Ford has established that no one *explicitly* represented to the California Plaintiffs that the E-350 van was safe for carrying 15-passengers.  After extensive discovery, Plaintiffs point to no evidence to the contrary, nor do they identify any specific, unequivocal statement made to the California Plaintiffs, or those affiliated with them,

17

regarding safety.  Plaintiffs allege in their Complaint that in promotional materials and press

releases, Ford made certain representations regarding safety, such as that the E-350 van was

"very safe" or "America's Most Trustworthy."  (Compl. ¶¶ 48-55.)   However, as the Court ruled

in the MTD Opinion, these statements and similar allegations in the Complaint are non-

actionable opinion, or puffery, and cannot constitute an express warranty.  MTD Opinion at *4.

Plaintiffs do not pursue any such theory in opposing Ford's motion for summary judgment, and

instead rely on Ford's "core description" that lacks any specific, explicit reference to safety.

A description of goods that becomes part of the basis of the bargain "creates an express

warranty that the goods shall conform to the description," Cal. Com. Code § 2313(1)(b), but the

only description alleged and supported in the record here is that the E-350 van is a "15-passenger

van."  This bare description, while it certainly can be interpreted to *imply* that the van can safely

carry 15 passengers, does not contain the explicit guarantee found in cases such as *Hauter* and

*Keith*.  Plaintiffs argue that an "express warranty by description not only promises that the

product is that it is described to be, but also that the product works as described."  (Pls.' Omnibus

Br. at 49.)  However, the cases Plaintiffs cite in support of this proposition involve clear

statements that make their promises explicit, and are dissimilar to the purported express warranty

here.  For example, one case cited by Plaintiffs involved a defendant's description of a camera as

an "electronic color camera."  *See Metowski v. Traid Corp.*, 104 Cal. Rptr. 599, 600-01 (Ct. App.

1972) (reversing trial court's dismissal of express warranty claim).  The court in *Metowski*

reversed the trial court's dismissal of the express warranty claim without analysis of the content

of the express warranty, and instead based its holding on its finding that plaintiff had provided

timely notice of its claim.  *Id.* at 602-04.  In any event, the description amounting to an express

18

warranty in *Metowski* stipulated only that the camera took color pictures, and did not warrant anything further. Similarly, another case cited by Plaintiffs concerned a seller's description of a gear as a "36-tooth gear." *See Square Deal Mach. Co. v. Garrett Corp.*, 275 P.2d 46, 49 (Cal. Ct. App. 1954). That case, however, involved a claim for *implied* warranty, not express warranty. *Id.* at 51. Even accepting Plaintiffs' description of that case that a "'36-tooth gear' promises gear with 36 teeth,'" such a warranty says nothing affirmatively about safety or any other characteristic.

Just as defendant only expressly promised a 36-tooth gear in *Square Deal*, Ford here explicitly promised only a 15-passenger van. Plaintiffs do not dispute that the E-350 van can hold 15 passengers, and based upon this undisputed record, Ford has not breached any warranty that the vehicle can transport 15-passengers.[7] Plaintiffs instead contend that the E-350 van cannot transport 15-passengers safely, and is not fit for such a purpose. On these facts, such a contention might lie in implied warranty, but not in express warranty. As Plaintiffs ultimately concede, "Ford expressly warranted the vehicle as being capable of transporting 15 passengers," and it is only "implied in Ford's representation that the vehicle is able to do so safely." (Pls.' Omnibus Br. at 50.) Based on the undisputed record and pursuant to California law, Ford's statement that the E-350 van is a "15-passenger van" does not create an express warranty of the safety of the vehicle in transporting 15 passengers. This Court will grant summary judgment in

---

[7]First United used its vehicle to transport up to 15 passengers from 1995 to January 2003, and Zilotto agreed at deposition that the van could accommodate 15 passengers based on its seating capacity. (Ford's SUMF No. 2 at ¶¶ 31-35; Pls.' Supp. Statement at ¶¶ 445-451; Zilotto Dep. at 103:19-23.) Greater All Nation never used its van to carry more than 12 passengers because the seats were too small (Jennings Dep. at 45:14-22; 110:24-111:12), but Plaintiffs do not allege breach of an express warranty of comfort or seat size based on the description of the vehicle as a "15-passenger van."

favor of Ford on the California Plaintiffs' claims for breach of express warranty.

      C.     <u>Implied Warranty</u>

Ford moves for summary judgment on the California Plaintiffs' Second Causes of Action, breach of implied warranty, on two grounds.  First, Ford contends that California law requires that a plaintiff asserting a breach of implied warranty must stand in privity with the defendant, and that here the California Plaintiffs are not in privity with Ford.  Second, Ford renews the argument first made on its motion to dismiss that the California Plaintiffs have not shown actual injury sufficient to maintain an implied warranty claim.  This Court agrees with Ford's privity argument and will grant Ford's motion for summary judgment as to the California Plaintiffs' implied warranty claims.

          *1.*    *Plaintiffs' Implied Warranty Theory*

As do the other Plaintiffs, the California Plaintiffs in their Second Causes of Action assert that Ford breached the implied warranty of merchantability pursuant to UCC § 2-314, as codified under California law by Cal. Com. Code § 2314.  Before addressing the implied warranty claims of the individual Plaintiffs, this Court will first consider the general implied  warranty theory asserted by all Plaintiffs.  Plaintiffs allege that Ford impliedly warranted "that the E350 vans were merchantable and was [*sic*] fit for the ordinary purposes for which a 15-passenger van is used." (Compl. ¶ 83.)  Plaintiffs contend that Ford breached this implied warranty because the vehicles were "totally unfit to accommodate and safely transport 15 passengers."  (Compl. ¶ 84.)

Section 2-314 of the UCC provides generally that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  *See, e.g.*, Cal. Com. Code § 2314; 810 Ill. Comp. Stat. § 5/2-314; N.J.S.A. §

12A:2-314.  To be merchantable, goods must, among other things, be "fit for the ordinary

purposes for which such goods are used" and "conform to the promises or affirmations of fact

made on the container or label if any."  Cal. Com. Code § 2314(2)(c), (f); *see also, e.g.*, 810 Ill.

Comp. Stat. § 5-214(2)(c), (f).

       2.       *Privity*

With regard to the California Plaintiffs, Ford first argues that these Plaintiffs cannot

maintain an implied warranty claim against Ford because discovery has established that they do

not stand in vertical contractual privity with Ford.  Unlike courts in some other jurisdictions,

California courts have retained the traditional privity requirement.  *See, e.g.*, *Cardinal Health

301, Inc. v. Tyco Elecs. Corp.*, 87 Cal. Rptr. 3d 5, 23 (Cal. Ct. App.  2008) ("Vertical privity is a

prerequisite in California for recovery on a theory of breach of the implied warranty of fitness,

unless an exception applies."); *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017,

1023-24 (9th Cir. 2008) (applying California law).  "Vertical privity means that the buyer and

seller were parties to the sales contract."  *Cardinal Health*, 87 Cal. Rptr. 3d at 23.  To stand in

privity, a buyer and seller must be "in adjoining links of the distribution chain."  *Clemens*, 534

F.3d at 1023; *see also Osborne v. Suburu of Am., Inc.*, 243 Cal. Rptr. 815, 820 n.6 (Cal. Ct. App.

1988) (quoting Clark and Smith, The Law of Product Warranties (1984) ¶ 10.01 [1], p. 10-3).

Therefore, an "end consumer . . . who buys from a retailer is not in privity with a manufacturer."

*Clemens*, 534 F.3d at 1023.

Here, Deacon Jennings purchased a used E-350 van with his own funds from Fox

Leasing, and Deacon Jennings donated the van to Greater All Nation.  Disputed facts exist

regarding from whom First United acquired its vehicle.  At one point during her deposition, in

accordance with Plaintiff's Responses to Interrogatories, Zilotto testified that Troop 1 purchased

the van from the Mel Clayton Ford dealership and sold the vehicle to First United for $1.00.

Later in her deposition, Zilotto asserted, based on the Retail Buyers Order for the van, that First

United purchased the van directly from Mel Clayton Ford.  In the cases of both California

Plaintiffs, however, it undisputed that neither church, let alone a church member or other

affiliated group, acquired its vehicle directly from the manufacturer, Ford.  The vans were

purchased from an independent leasing company and a retail Ford dealership, respectively.

Because the California Plaintiffs are separated from Ford by at least one link in the chain of

distribution, they are not in privity with Ford.  *See, e.g.*, *Osborne*, 243 Cal. Rptr. at 820 n.6 ("For

example, the distributor is normally in vertical privity with the manufacturer, and the ultimate

retail buyer is normally in vertical privity with the dealer.  But if the retail buyer seeks warranty

recovery against a manufacturer with whom he has no direct contractual nexus, the manufacturer

would seek insulation via the vertical privity defense." (quoting Clark and Smith, The Law of

Product Warranties (1984) ¶ 10.01 [1], p. 10-3)).  Therefore, unless an exception to the privity

requirement applies, the California Plaintiffs cannot establish implied warranty claims against

Ford because they do not stand in the requisite privity with Ford.

The California Plaintiffs do not contest that they fail to meet the strict requirements of

vertical privity.  Instead, they argue that the privity requirement does not apply to their implied

warranty claims.  The California Plaintiffs point to an exception referenced by the Ninth Circuit

in *Clemens*, namely "when the plaintiff relies on written labels or advertisements of a

manufacturer."  *Clemens*, 534 F.3d at 1023 (citing *Burr v. Sherwin Williams Co.*, 268 P.2d 1041,

1048-49 (Cal. 1954)).  Here, the California Plaintiffs contend that they relied on the van's

window sticker and other written labels identifying the E-350 van as a "15-passenger van." However, the California Plaintiffs ignore *Burr*, the Supreme Court of California case cited by the Ninth Circuit in *Clemens*. *Burr* makes clear that this exception only excuses the privity requirement for *express* warranty claims. *Burr*, 268 P.2d at 1048-49. This Court has already concluded that Ford is entitled to summary judgment on the California Plaintiffs' express warranty claims, therefore this exception to the privity requirement does not save their implied warranty claims. Other exceptions to the privity requirement, such as where the case involves "foodstuffs, pesticides, and pharmaceuticals," or "where the end user is an employee of the purchaser" also do not apply. *Clemens*, 534 F.3d at 1023 (collecting cases).

The California Plaintiffs further contend that the privity requirement does not apply to their implied warranty claims based on *Atkinson v. Elk Corp. of Texas*, 48 Cal. Rptr. 3d 247, 257-58 (Cal. Ct. App. 2006). In *Atkinson*, the court acknowledged that generally, privity must be established to maintain an implied warranty claim, but commented that the privity rule "should be relaxed" based in the case before it. *Id.* at 257. The implied warranty of quality at issue in *Atkinson* derived from a express warranty with specific terms of guarantee and duration contained in the defendant manufacturer's brochure for the goods. *Id.* at 258. The *Atkinson* court concluded that the defendant "brought itself into privity of contract with the ultimate consumer, [plaintiff], by extending this express warranty." *Id.*; *see also id.* ("It would be inconsistent to recognize privity existing for breach of express quality warranties under Magnuson-Moss and to reach the opposite conclusion in the same transaction for breach of the implied warranty of merchantability.").

*Atkinson* has no applicability here for several reasons. First, as discussed above, no

express warranty may be found here, and therefore any rationale for relaxing the privity requirement in *Atkinson* is wholly absent here. *See Zabit v. Ferretti Group, USA*, No. 06-1252, 2006 WL 3020855, at *6 (N.D. Cal. Oct. 23, 2006) (distinguishing *Atkinson* in case where defendant did not issue written express warranty because "[t]he *Atkinson* court's holding was based upon the fact that the manufacturer had issued a written warranty on the product in question . . . and based upon the fact that the plaintiff relied on that warranty"). More broadly, several courts have deemed the *Atkinson* court's discussion of privity to be *dicta* both because the court ultimately dismissed the implied warranty claim as time-barred, and because those claims arose under the federal Magnuson-Moss act and did not directly involve state implied warranty law. *See Hartless v. Clorox Co.*, No. 06-2705, 2007 WL 3245260, at *2 (S.D. Cal. Nov. 2, 2007) ("The *Atkinson* case provides no support for plaintiff's contention because the court merely indicated, in *dicta*, that the privity requirement might be relaxed if the dismissed implied warranty claim were brought alongside a related express warranty claim."); *see also Ward v. IPEX, Inc.*, No. 08-6370, 2009 WL 2634842, at *4 (C.D. Cal. Feb. 4, 2009). Courts have consistently rejected *Atkinson*-based challenges to California's privity requirement for implied warranty claims and, without fail, have recognized the continued viability of the privity requirement as established in *Burr*. *See, e.g.*, *Wolph v. Acer Am. Corp.*, No. 09-1314, 2009 WL 2969467, at *3 (N.D. Cal. Sept. 14, 2009). "*Atkinson* appears to be an anomaly in that it contravenes the well-established principle under California law that privity is required in cases alleging breach of an implied warranty." *Postier v. Louisiana-Pacific Corp.*, No. 09-3290, 2009 WL 3320470, at *6 (N.D. Cal. Oct. 13, 2009) (citing *Burr*, 268 P.2d at 1048; *Blanco v. Baxter Healthcare Corp.*, 70 Cal. Rptr. 3d 566, 582 (Cal. Ct. App. 2008)).

24

While the Ninth Circuit observed in *Clemens* that other states have discarded the privity requirement for implied warranty claims, and that the requirement "may be an archaism in the modern consumer marketplace," the court concluded that "California courts have painstakingly established the scope of the privity requirement under California Commercial Code section 2314, and a federal court sitting in diversity is not free to create new exceptions to it." *Clemens*, 534 F.3d at 1024 (citations omitted).  This Court agrees.  Because the undisputed facts demonstrate that the California Plaintiffs do not stand in privity with Ford, this Court must grant summary judgment in Ford's favor on the California Plaintiffs' breach of implied warranty claims.

Because the lack of privity requires this Court to rule in favor of Ford on the California Plaintiffs' implied warranty claims, this Court need not address Ford's contention that the undisputed facts show that the California Plaintiffs have not suffered sufficient actual injury to prove a breach of any implied warranty.

D.    California Statutory Consumer Fraud Claims

In the Complaint, Greater All Nation asserts in its Fourth Cause of Action[8] claims under three California consumer fraud statutes: the California Unfair Competition Law ("California UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; the California False Advertising Law ("California FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; and the California Consumers Legal Remedies Act ("California CLRA"), Cal. Civ. Code § 1750, *et seq.*  In the MTD Opinion, the Court dismissed Greater All Nation's California CLRA claim, but denied Ford's motion to dismiss as to the California UCL and the California FAL.  Ford now moves for summary

---

[8]Although Plaintiffs style their state consumer fraud claims as the "Fourth Cause of Action," the parties address these claims third in their respective briefs.  This Court will follow the parties' example.

judgment on all California state consumer fraud statute claims brought by both California Plaintiffs.

At the outset, this Court will grant summary judgment in favor of Ford on First United's California CLRA claim for the same reasons that it dismissed Greater All Nation's CLRA claim. The Court has not formally addressed First United's California CLRA claim because First United was added to this matter after the MTD Opinion. As Judge Ackerman held in the MTD Opinion, the California CLRA applies only to individuals who seek or acquire goods or services for personal, family, or household purposes; commercial entities and nonprofit organizations do not qualify as "consumers" with standing to sue under the California CLRA. MTD Opinion at *26 (citing Cal. Civ. Code §§ 1770(a), 1761(d)). Like Greater All Nation, First United is a nonprofit church organization and, therefore, lacks standing to assert a California CLRA claim.

Ford advances two theories as to why the California Plaintiffs' California UCL and FAL claims fail, but both rely on the same underlying assertion: that the California Plaintiffs did not suffer any injury or lose any money or property because they did not pay (or only paid nominally) for their E-350 vans. In their first argument, Ford contends that although the California Plaintiffs state that they seek restitution as their remedy for the statutory violations, they actually seek a form of legal damages because Ford took no money or property from the California Plaintiffs. Because the California UCL and FAL only allow for equitable relief, Ford concludes that the California Plaintiffs cannot recover such legal damages under these statutes. Ford additionally argues that the California Plaintiffs lack standing to assert these statutory claims because they have not suffered injury-in-fact or lost money or property due to any proscribed unfair competition. As support, Ford again relies upon the assertion that neither Greater All Nation nor

First United paid any substantial value for their vans and, therefore, cannot be deemed to have lost any money due to Ford's alleged conduct.

Ford correctly states that the California UCL and FAL do not allow for recovery of legal damages. Both the California UCL and FAL authorize injunctive relief, along with "such orders or judgments" that " may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of" the statutory violation. Cal. Bus. & Prof. Code §§ 17203 (UCL); 17535 (FAL). California courts have held that legal damages may not be awarded under the California UCL. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003); *Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 712 (Cal. 2000); *see also, e.g.*, *Stearns v. Select Comfort Retail Corp.*, No. 08-2746, 2009 WL 1635931, at *17 (N.D. Cal. June 5, 2009). "A plaintiff may not recover non-restitutionary disgorgement of profits under the UCL." *Trew v. Volvo Cars of N. Am., LLC*, No. 05-1379, 2006 WL 306904, at *2 (E.D. Cal. Feb. 8, 2006). Similarly, the California FAL only allows for equitable relief, i.e. injunction and restitution. *See Buckland v. Threshold Enterps., Ltd.*, 66 Cal. Rptr. 3d 543, 558 (Cal. Ct. App. 2007).

Assuming that the California Plaintiffs may prove a violation of the California UCL and/or FAL, they cannot recover if the damages they seek are purely legal in nature. Ford concedes that the California Plaintiffs nominally seek restitution, but Ford argues that such restitution in this case would be compensatory and therefore legal, not equitable. The object of equitable restitution is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply*, 29 Cal. 4th at 1149. If the plaintiff "does not have an ownership interest in the money it seeks to recover from [a] defendant[]," the remedy

27

that plaintiff seeks is not restitutionary under the California consumer fraud statutes. *Id.* In the alternative, restitution encompasses the recovery of money or property in which the plaintiff has a "vested interest." *Id.* To qualify as equitable restitution under this theory, the money sought by the plaintiff must be "identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession." *Id.* at 1150 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002)).

In contending that the restitution the California Plaintiffs seek as remedies for the alleged California UCL and FAL violations amounts to disgorgement of profits and not equitable restitution, Ford seizes upon the Supreme Court of California's reasoning in *Korea Supply* that "[a]ny award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took *directly* from plaintiff." *Korea Supply*, 29 Cal. 4th at 1149 (emphasis added). Subsequent courts have construed *Korea Supply* to permit restitutionary recovery by a plaintiff who paid a defendant only indirectly, as "it was clear in *Korea Supply* that the plaintiff did not pay any money, even indirectly, to the defendant." *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1103 (N.D. Cal. 2007). Thus, *Korea Supply* may be read to preclude recovery under the California UCL and FAL if the plaintiff did not pay any money, directly or indirectly, to the defendant.

The undisputed record shows that Greater All Nation did not pay any money to Ford. Deacon Jennings donated a used E-350 van to Greater All Nation. Deacon Jennings purchased that van with his own money from Fox Leasing. Thus, Greater All Nation had no ownership interest in any money Ford might have made by its allegedly unfair business practices in selling the E-350 vans. The California Plaintiffs argue that restitution under the California UCL

28

includes an order compelling a defendant to return money to those persons "who had an ownership interest in the property *or those claiming through that person*." *Kraus v. Trinity Mgmt. Servs., Inc.*, 999 P.2d 718, 725 (Cal. 2000) (emphasis added). The California Plaintiffs thus seem to contend that Greater All Nation claims restitution through Deacon Jennings, even though the undisputed record shows that Greater All Nation paid no money directly or indirectly to Ford. (Pls.' Omnibus Br. at 13.) However, the California Plaintiffs undermine any such theory one page later, where they simply assert that they need not trace their funds to Ford and that they "have a vested or ownership interest in the restitutionary relief sought." (*Id.* at 14.) Neither in their Complaint nor elsewhere do Plaintiffs seek to recover restitution on behalf of another (as opposed to other prospective class members similarly situated).

Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant. *See, e.g., Ditropan*, 529 F. Supp. 2d at 1105 (concluding that "as long as Indirect Purchaser Plaintiffs are ultimately able to prove traceability, California law authorizes this Court to award them restitution under the UCL"). Here, Greater All Nation cannot do so, as Deacon Jennings donated the van to the church, and no funds of Greater All Nation were paid directly or through intermediaries to Ford. The California Plaintiffs concede that the Supreme Court of California held in *Korea Supply* that plaintiff in that case could not recover because it never had any possession or ownership interest in the money sought to be restored, regardless of to whom the money was paid. (Pls.' Omnibus Br. at 14 n.9.) Here too, Greater All Nation paid no money to Ford or an intermediary, and has no vested interest or prior ownership interest in any funds Ford might have ultimately obtained from the purchase of the van by Deacon Jennings. Furthermore, Greater All Nation has not alleged or presented any

evidence to support the implication that Fox Leasing was an agent of Ford, and Greater All Nation has not otherwise shown that Ford received money from anyone with regard to the purchase of the Greater All Nation vehicle. Even if Greater All Nation had bought the vehicle itself, the undisputed record lacks any evidence that Ford received any funds from the Greater All Nation vehicle transaction. Greater All Nation's damages claims under the California UCL and FAL, therefore, depend upon precluded legal damages, rather than equitable restitution. For these reasons, this Court will grant Ford summary judgment on Greater All Nation's California UCL and FAL claims.

First United stands in a different position than Greater All Nation. It is *not* undisputed that First Nation paid no money directly or indirectly to Ford for its vehicle. The record contains evidence supporting either that Troop 1 purchased the van from the Mel Clayton Ford dealership and sold the vehicle to First United for $1.00, or that First United purchased the van directly from Mel Clayton Ford. If First United can prove the latter theory, it could show that Ford, through the intermediary dealership, ultimately took money at least indirectly from First United. However, First United points to no evidence in the record showing that even if First United purchased the vehicle, that the money it paid to Mel Clayton Ford ultimately made its way to Defendant Ford. While "[g]enerally, the existence of an agency relationship and the extent of the authority of an agent are questions of fact," the party asserting an agency relationship bears "the burden of proving agency." *Inglewood Teachers Ass'n v. Public Employment Relations Bd.*, 278 Cal. Rptr. 228, 234 (Cal. Ct. App. 1991).

In their Complaint, Plaintiffs state that Ford "manufactures and sells motor vehicles, including cars, vans and trucks, through retail dealers throughout North America" and appear to

30

allege that the dealers are agents of Ford.  (Compl. ¶ 13.)  Plaintiffs – the California Plaintiffs and all other individual Plaintiffs – bear the burden of producing some evidence sufficient to at least create a dispute of material fact in opposing Ford's motion for summary judgment.  In its brief, Plaintiffs contend that the Ford dealerships are agents of Ford as a matter of law, but do not support their assertion with any evidence.  Plaintiffs observe in their brief that Ford generally "does not sell its vehicles directly to the general public," "relies exclusively upon its dealer network to sell vehicles," "distributes its literature relating to E-350 vehicles through its dealerships," and "advertises its vehicles with the intent that sales will occur through the dealerships."  (Pls.' Omnibus Br. at 61.)  These assertions in their argument are not supported by any evidence in the record.  Plaintiffs argue that if their "inability to prove a transfer of money from Ford dealerships to Ford, alone, were sufficient to dismiss a claim against Ford, the extension of this doctrine would prevent any actions against manufacturers who sell their products primarily through retail outlets or other such agents; such an outcome is anathematic to both statutory and common law principles."  (*Id.* at 62.)

Even if this may be true, those statutory and common law principles still require some proof of the relationship between the dealers and Ford beyond mere assertion in their brief. Without some evidence of the relationship between the dealer and Ford, this Court declines to take judicial notice of the relationship such that it will assume that Ford benefits every time one of its dealers sells a new or used vehicle.  Furthermore, many courts have strongly suggested that "automobile dealerships generally are not agents of automobile manufacturers regarding the selling of vehicles."  *Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 845 (W.D. Pa. 2007) (collecting cases).  Although a plaintiff seeking to show such an agency relationship faces an

"uphill battle," the inquiry is fact-specific and no per se rule bars such a finding on an appropriate factual basis. *Id.* at 846. Here, Plaintiffs have presented no such factual basis whatsoever.

Under the California UCL and FAL, a plaintiff may only recover restitution if it can trace its lost money or property to the defendant. *See, e.g.*, *Ditropan*, 529 F. Supp. 2d at 1105. First United does not do so here, either with regard to the money it might have paid or more generally with regard to the financial relationship between the dealers and Ford. This Court will grant Ford's motion for summary judgment without prejudice on First United's California UCL and FAL claims. First United shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the California UCL and FAL claims. Ford shall have until September 13, 2010 to file a response to First United's submission.

E.    Unjust Enrichment

Finally, Ford next seeks summary judgment on the California Plaintiffs' unjust enrichment claims. Ford contends that the California Plaintiffs cannot show either that Ford received a benefit from them or that any benefit Ford received was unjust or at the expense of the California Plaintiffs.

1.    *Plaintiffs' Unjust Enrichment Theory*

Plaintiffs allege generally in their Third Causes of Action that Ford "extracted significant payments" from individual Plaintiffs "who would not have purchased the E350 vans or who would only have agreed to purchase the E350 vans at greatly reduced prices" if they knew of the potential rollover problems. (Compl. ¶ 88.) Essentially, all Plaintiffs contend that their vans suffered diminution in value relative to their purchase prices due to the alleged defect and Ford's

32

conduct.  Plaintiffs further assert that Ford secured additional payment for necessary repairs to E-350 vans after the expiration of the "90-day 'Limited Warranty.'" (Compl. ¶ 89.)  Thus, all Plaintiffs claim that "Ford has been unjustly enriched, having retained the benefits of its sales of defective E350 vans and payment for repair services," and all Plaintiffs seek restitution and disgorgement of "all sums by which Ford has been unjustly enriched."  (Compl. ¶¶ 90, 91.)

> ### 2.   *California Plaintiffs' Restitution Claims*

In the MTD Opinion, the Court acknowledged the uncertainty that exists regarding whether California law recognizes an independent claim for unjust enrichment.  MTD Opinion at *21 (citing *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006)).  The Court agreed with the district court in *Nordberg* that a claim for unjust enrichment under California law may be understood as a claim for restitution.  *Id.*  As the court in *Nordberg* concluded, it is clear that California Plaintiffs seek restitution.  (Compl. ¶ 91 (seeking remedies of "rescission, *restitution*, and disgorgement of all sums by which Ford has been unjustly enriched").)  The semantic difference between "unjust enrichment" and "restitution" does not foreclose California Plaintiffs' claim as a matter of law.  *See Nordberg*, 445 F. Supp. 2d at 1100; *RaceRedi Motorsports, LLC v. Dart Machinery, Ltd.*, 640 F. Supp. 2d 660, 667 (D. Md. 2009) ("Generally, a party asserting a claim of unjust enrichment is simply seeking the remedy of restitution, and that is certainly the case here."); *see also Lauriedale Assocs., Ltd. v. Wilson*, 9 Cal. Rptr. 2d 774, 780 (Cal. Ct. App. 1992) ("The phrase 'Unjust Enrichment' does not describe a theory of recovery . . . .  What appellants actually seek is restitution." (citations omitted)).

"Generally, to claim unjust enrichment, a plaintiff must allege that '(1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for

defendant to retain benefit without paying for it.'"  MTD Opinion at *21 (quoting *In re K-Dur*

*Antitrust Litig.*, 338 F.Supp.2d 517, 544 (D.N.J. 2004)).  The elements for showing unjust

enrichment under California law mirror this general standard.  *See Ghirardo v. Antonioli*, 924

P.2d 996, 1003 (Cal. 1996); *County of Solano v. Vallejo Redevelopment Agency*, 90 Cal. Rptr. 2d

41, 52 (Cal. Ct. App. 1999).  The benefit received by the defendant may be "any form of

advantage."  *County of Solano*, 90 Cal. Rptr. 2d at 52 (quoting Restatement of Restitution § 1

cmt. (b), p. 12)).  While "[f]or a benefit to be conferred, it is not essential that money be paid

directly to the recipient by the party seeking restitution," the benefit must nonetheless be received

at the expense of the plaintiff.  *California Fed. Bank v. Matreyek*, 10 Cal. Rptr. 2d 58, 62 (Cal.

Ct. App. 1992).

        This Court will grant summary judgment in Ford's favor on Greater All Nation's

restitution claim.  Greater All Nation points to no evidence whatsoever in the record that Ford

received any benefit at their expense.  Rather, the California Plaintiffs contend that their

"*predecessors in interest* were parted with their money due to Ford's conduct and Ford was

unjustly enriched as a result."  (Pls.' Omnibus Br. at 64 (emphasis added).)  As support for this

theory, the California Plaintiffs only state that "[i]t is *axiomatic* that Ford ultimately received the

victims' money for the unsafe E-350 vans which Ford illegally marketed in California."  (*Id.*

(emphasis added).)  This purported "axiom" is mere assertion, not evidence.  Furthermore, if the

"victims" from whom Ford allegedly received an unjust benefit were the California Plaintiffs'

predecessors in interest, then any restitution claim belongs to those parties, not the California

Plaintiffs.  Money need not be paid directly to a defendant by a plaintiff seeking restitution, but

that money must still have been received by a defendant at a plaintiff's expense.  The record is

34

devoid of any evidence that Ford derived any benefit from the Greater All Nation vehicle that was purchased used from Fox Leasing, and it is undisputed that Greater All Nation did not pay any money for the vehicle because the vehicle was donated to the church by Deacon Jennings.  In opposing summary judgment, an unsupported "axiom" does not exceed the mere scintilla standard.  The record also contains no evidence that Greater All Nation made any other payments to Ford, such as payment for repair services.

With regard to First United, while a factual dispute exists regarding who purchased the First United vehicle, there is no evidence in the record that if First United indeed purchased the vehicle, Ford ultimately received First United's payment.  As with First United's statutory claims, this Court declines to take judicial notice of any "axiomatic" agency or other relationship between Mel Clayton Ford and Ford in the absence of even a mere scintilla of evidence produced by Plaintiffs to show that the Ford ultimately benefitted from the purchase of the van from the Ford dealership.  This Court will grant Ford's motion for summary judgment without prejudice on First United's unjust enrichment claim.  First United shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claim.  Ford shall have until September 13, 2010 to file a response to First United's submission.

F.    Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all claims brought by Greater All Nation.  This Court will grant Ford's motion for summary judgment on the express and implied warranty claims and California CLRA claims asserted by First United, and grant the motion without prejudice with regard to First United's California

UCL, California FAL, and unjust enrichment claims.  First United shall have until August 13,

2010 to show cause to cure the evidentiary deficiency regarding the relationship between Mel

Clayton Ford and Ford and demonstrate that summary judgment should not be granted in Ford's

favor on the California UCL, California FAL, and unjust enrichment claims.  Ford shall have

until September 13, 2010 to file a response to First United's submission.

## II.    Illinois

In the MTD Opinion, the Court dismissed the express and implied warranty claims

brought by Illinois Plaintiff Pentecostal Temple Church of God in Christ ("Pentecostal Temple").

The Court denied Ford's motion to dismiss as to Pentecostal Temple's statutory consumer fraud

claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill.

Comp. Stat. § 505/1, *et seq.*, and Pentecostal Temple's unjust enrichment claim.  Ford now

moves for summary judgment on these remaining claims.  For the following reasons, the Court

will grant Ford's motion.

### A.    Material Facts

Pastor Samuel Edwards gave deposition testimony on behalf of Pentecostal Temple.  The

Illinois Plaintiff purchased two Ford E-350 vans and, therefore, asserts an ICFA and unjust

enrichment claim on each of its vehicles.  Pentecostal Temple first purchased a new 1994 model

vehicle sometime in 1993 or 1994 from Currie Motors, a Ford dealership.  (Edwards Dep. at

55:7-24.)  Pastor Edwards could not recall how much Pentecostal Temple paid for the 1994 van.

(*Id.* at 60:21-24.)  Pentecostal Temple sold the 1994 van in or about 1998 due to mechanical

difficulties with the engine and other issues not involving the handling-related claims in this

litigation.  (*Id.* at 57:20-58:5.)  Pastor Edwards also had no recollection regarding how much

36

Pentecostal Temple received when it sold the 1994 van, although he did state that "we ended up just kind of almost giving it away" due to the mechanical problems unrelated to this litigation. (*Id.* at 28:21-22.)  Pastor Edwards expressed no concerns regarding the handling of the 1994 van. (*Id.* at 80:24-81:3.)  On April 10, 1999, Pentecostal Temple purchased its second E-350 van, a used 1998 model, for $24,227.  (Andresen Certif. No. 3, Ex. 1 at 1.)  It continues to use this vehicle.

Prior to purchasing both vehicles, Pentecostal Temple did not receive any representations from Ford regarding the vehicle as a 15-passenger van, either by way of Ford brochures, salesperson statements, advertisements, media reports, or other written or verbal information. (Edwards Dep. at 79:4-11; 93:2-9; 95:20-97:1; 98:16-99:6.)  As Ford stresses, Pastor Edwards conceded that Pentecostal Temple did not observe that the vans purported to be 15-passenger vehicles.  (*Id.* at 95:5-8.)  According to Pastor Edwards, when purchasing the vehicles, Pentecostal Temple was looking for "something that would take more than four or five members at a time" and that would have ease of access for seniors and young people.  (*Id.* at 56:16-17; 57:1-19.)

Pentecostal Temple contests Ford's reading of Pastor Edwards's testimony, and contends that it purchased the vehicles "in reliance on Ford's representations concerning the safety and 15-passenger capacity of the E350."  (*See, e.g.*, Pls.' Supp. Statement ¶ 333.)  However, the deposition excerpts upon which the Illinois Plaintiff relies simply do not support its reading of the undisputed facts in the record.  None of the excerpts referenced by Pentecostal Temple, or any other portion of the transcript provided to the Court, discusses any purported misrepresentation that Pentecostal Temple received from Ford, or any recognition by Pentecostal

Temple that Ford advertised or represented the vehicles to be 15-passenger vans.  Pastor Edwards stated that the church sought to transport "10 to 15" people in the vans, but knew the vehicle would be too crowded to fit 15 full-size adults.  (Edwards Dep. at 59:20-60:10.)  Pentecostal Temple first noticed difficulties with the handling of the 1998 vehicle in 1999 or 2000 (*id.* at 85:10-21), and those issues caused it to decrease the number of trips it made with the van and forced its drivers to operate the vehicles more carefully (*id.* at 84:4-87:11).  No one observed any handling problems with the 1994 van that Pentecostal Temple sold sometime in 1998.  (*Id.* at 85:22-24.)  According to Pastor Edwards, Pentecostal Temple's automobile insurance carrier indicated that it would no longer provide insurance for E-350 vans after the policy in effect at the time of the deposition expired in January 2007.  (*Id.* at 23:14-24:7.)  Pastor Edwards testified that Pentecostal Temple was encountering difficulties in securing insurance on the van from another company.  (*Id.* at 26:4-14.)

B.    ICFA

Pentecostal Temple asserts two ICFA claims arising from its two purchases of E-350 vans.  The ICFA provides protection against deceptive acts or practices in the conduct of trade or commerce, including the use of any "misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."  815 Ill. Comp. Stat. § 505/2.

1.    *Statute of Limitations*

Ford first contends that this Court should grant summary judgment in its favor on Pentecostal Temple's ICFA claims because they run afoul of the ICFA's statute of limitations. An action under the ICFA must be brought within three years after the cause of action accrues.

38

815 Ill. Comp. Stat. § 505/10a(e).  Ford asserts that a cause of action "generally"  accrues when

the plaintiff suffers injury, and assumes without providing authority that Pentecostal Temple's

claims accrued here at the time of purchase of each van.  (Ford Br. No. 3 at 3-4.)  If true,

Pentecostal Temple's claims would be untimely.  Pentecostal Temple filed its initial class action

complaint in this matter in state court on January 27, 2005.  It purchased its first vehicle

sometime in 1993 or 1994, and its second vehicle in 1999.  Both purchases lie well outside the

ICFA's three-year limitations period.

 However, Illinois state and federal courts have consistently applied a version of the

discovery rule to ICFA claims.  An ICFA claim accrues "when the plaintiff 'knows or reasonably

should know of his injury and also knows or reasonably should know that it was wrongfully

caused.'" *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 441 (7th Cir. 1994) (quoting *Knox*

*College v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1982)); *see also, e.g., Kopley Group V., L.P.*

*v. Sheridan Edgewater Props., Ltd.*, 876 N.E. 2d 218, 231 (Ill. App. Ct. 2007); *Bradley v. Alpine*

*Constr. Co.*, 586 N.E.2d 653, 655 (Ill. App. Ct. 1991) (collecting cases).[9]

 Instead of discussing when Pentecostal Temple's causes of action accrued under the

discovery rule, the parties focus primarily on whether Ford fraudulently concealed Pentecostal

Temple's causes of action such that the statute of limitations should be tolled.  Pentecostal

Temple insists that the Court already rejected Ford's statute of limitations defense in the MTD

---

 [9]In *Hermitage Corp. v. Contractors Adjustment Co.*, the Supreme Court of Illinois
recognized that for most tort claims, the cause of action accrues when the plaintiff suffers injury.
651 N.E. 2d 1132, 1135 (Ill. 1995).  Ford cites *Hermitage Corp.* as its sole authority for the
notion that this general rule applies to ICFA claims.  However, the *Hermitage* court ultimately
*rejected* the general rule for the claims before it, and instead applied the discovery rule.  *Id.* at
1135-1140.

Opinion, where, in a footnote, the Court stated that Ford's limitations argument "lack[s] merit" because Plaintiffs alleged a viable theory of fraudulent concealment.  MTD Opinion at *26 n.14.  However, that ruling arose in the context of a Rule 12(b)(6) motion on which the Court assumed the truth of Pentecostal Temple's allegations.  Indeed, the Court denied Ford's motion with regard to the statute of limitations "because 'the bar is not apparent on the face of the [C]omplaint.'" MTD Opinion at *19 (quoting *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002)).  At this summary judgment stage, where the Court assesses undisputed facts based on the extensive record developed during discovery, the Court's prior ruling on a motion to dismiss that Pentecostal Temple sufficiently *alleged* fraudulent concealment to defeat Ford's limitations defense does not automatically preclude a conclusion, based on the undisputed record, that Pentecostal Temple's ICFA claims are time-barred.

Pursuant to 735 Ill. Comp. Stat. § 5/13-215, if a defendant fraudulently conceals a cause of action from the plaintiff,  the statute of limitations is tolled until the plaintiff "discovers that he or she has such cause of action" and runs for five years from that discovery.  To constitute fraudulent concealment under § 5/13-215, a defendant's conduct must consist of "affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim.  Mere silence on the part of the defendant is insufficient." *Orlak v. Loyola Univ. Health Sys.*, 885 N.E.2d 999, 1009 (Ill. 2007).  Here, a finding of fraudulent concealment would extend the statute of limitations under the ICFA from three years to five years, but determination of whether Pentecostal Temple timely filed its claims still depends upon when it discovered or reasonably should have discovered that it had causes of action, i.e. that it was injured and that such injury was wrongfully caused.  Pentecostal Temple's

ICFA claims did not necessarily accrue when its alleged injuries actually occurred – the date of purchase of the vehicles – but when Pentecostal Temple knew or reasonably should have known of the injuries and that they were wrongfully caused by Ford's allegedly deceptive practices.

In a footnote, Ford argues that even if the discovery rule applies, Pentecostal Temple knew or reasonably should have known of its alleged injury before January 27, 2002, three years before it filed its claim.  Ford lists various events recited in the Complaint that occurred prior to January 2002 and that should had given Pentecostal Temple actual or constructive knowledge of its cause of action, including government agency reports and media reports regarding the dangers of E-350 vans.  (Ford Br. No. 3 at 4 n.3.)  Pentecostal Temple labels Ford's chosen "'should have known' date" as "fictional" and "untenable."  (Pls.' Omnibus Br. at 21 n.12.)  Yet Pentecostal fails to respond substantively to the notion that before January 27, 2002, it knew that its 1998 van had handling difficulties, and had adjusted its usage accordingly.

Pastor Edwards testified at deposition that he and others at Pentecostal Temple first recognized issues with the handling of its 1998 van when filled to capacity in 1999 or 2000.  No one noticed any rollover-related difficulties with regard to the 1994 vehicle.  Pentecostal Temple's ICFA claims arise from Ford's alleged misrepresentations and omissions that "deceive[d] consumers into believing that they were purchasing a vehicle that could be used safely, legally and practically to accommodate and transport 15 passengers."  (Compl. ¶ 93.)  Its cause of action accrued with regard to the 1998 van when it first discovered, after purchasing the vehicle, problems regarding its ability to transport 15 passengers. Viewing the undisputed facts in the light most favorable to Pentecostal Temple, this discovery date occurred by December 31, 2000, at the latest, because Pastor Edwards testified that the handling issue was first brought to

41

his attention in "'99, [or] 2000."  (Edwards Dep. at 85:18.)  Pentecostal Temple filed its initial

complaint in this matter in January 2005, more than three years past this latest discovery date.

With regard to the claim based on the purchase of the 1994 vehicle, Pentecostal Temple sold that

van in 1998 due to mechanical problems unrelated to the rollover-related concerns at issue in this

matter (*id.* at 57:20-58:5), and Pastor Edwards testified that no one at the church had observed

any problems regarding driving the 1994 fully loaded with passengers (*id.* at 85:22-24).  If

Pentecostal Temple suffered any injury arising from its purchase of the 1994 van, it reasonably

should have discovered that injury at the latest when it sold the vehicle in 1998.  Therefore, both

of Pentecostal Temple's ICFA claims are time-barred as they accrued under the discovery rule

more than three years prior to its filing of the initial complaint.

 Furthermore, Pentecostal Temple cannot establish fraudulent concealment sufficient to

toll or extend the statute of limitations.  To constitute fraudulent concealment, Ford's conduct

must have consisted of affirmative acts or representations that caused Pentecostal Temple to

delay filing its claims or prevent it from discovering its claims; mere silence or omissions are not

enough.  *Orlak*, 885 N.E.2d at 1009.  Furthermore, "fraudulent misrepresentations which form

the basis of the cause of action do not constitute fraudulent concealment under section 13-215 in

the absence of a showing that the misrepresentations tended to conceal the cause of action."

*Foster v. Plaut*, 625 N.E. 2d 198, 203 (Ill. App. Ct. 1993).  To do so, Pentecostal Temple must

show that Ford's misrepresentations were made with the intent to deceive Pentecostal Temple

and, crucially, that Pentecostal Temple detrimentally relied upon such misrepresentations.  *Id.* at

203.  Here, Pastor Edwards testified that before, during, and after the church purchased the

vehicles, no one at Pentecostal Temple received any representations from Ford, saw any Ford

marketing materials or media reports, or even observed that the E-350 purported to be a 15-passenger van.  (Edwards Dep. at 79:4-11; 93:2-9; 95:5-8; 95:20-97:1; 98:16-99:6.)  Even if Ford made the misrepresentations Plaintiffs allege, the undisputed record establishes that Pentecostal Temple did not detrimentally rely on any of these representations.

While Pentecostal Temple satisfactorily alleged fraudulent concealment sufficient to withstand a motion to dismiss, there is no genuine dispute of material fact at this stage, based on the full record, regarding the lack of detrimental reliance by Pentecostal Temple.  Nor does equitable estoppel aid Pentecostal Temple.  Equitable estoppel "comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations."  *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990).  Pentecostal Temple presents no evidence of any actions taken by Ford specifically to prevent Pentecostal Temple from filing a timely claim; indeed, Pentecostal Temple received no representations from Ford and did not rely on any statements or conduct of Ford.  For these reasons, Pentecostal Temple cannot avail itself of the tolling afforded by fraudulent concealment or equitable estoppel, and its ICFA claims are barred by that statute's three-year statute of limitations.

### 2.    *Actual Deception*

Even if Pentecostal Temple's ICFA claims were timely filed, they fail on the merits because Pentecostal Temple cannot show that it was actually deceived by Ford's conduct.  Under the ICFA, a plaintiff must establish "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5)

proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E. 2d 801,

850 (Ill. 2005); *see also First Midwest Bank, N.A. v. Sparks*, 289 Ill. App. 3d 252, 257 (Ill. App.

Ct. 1997) ("Concealment is actionable where it is employed as a device to mislead and the

concealed fact must be such that had the other party been aware of it, he would have acted

differently.").  Reliance is not an element of an ICFA claim, because "the Act is intended to

provide broader consumer protection than the common law action of fraud." *Harkala v.

Wildwood Realty, Inc.*, 558 N.E. 2d 195, 199 (Ill. App. Ct. 1990).  Still, "a valid claim must show

that the consumer fraud proximately caused plaintiff's injury." *Connick v. Suzuki Motor Co.*,

675 N.E. 2d 584, 593 (Ill. 1996).  The Supreme Court of Illinois has held that "to maintain an

action under the Act, the plaintiff must actually be deceived by a statement or omission that is

made by the defendant.  If a consumer has neither seen nor heard any such statement, then she

cannot have relied on the statement and, consequently, cannot prove proximate cause." *De

Bouse v. Bayer*, 922 N.E. 2d 309, 316 (Ill. 2009); *see also Avery*, 835 N.E. 2d at 861.

As discussed above, the undisputed record shows that Pentecostal Temple never received

or observed any misrepresentations by Ford.  "If plaintiff never saw the alleged

misrepresentations, he cannot have been deceived by them and any misrepresentation cannot

have proximately caused him injury." *Gredell v. Wyeth Labs., Inc.*, 854 N.E. 2d 752, 757 (Ill.

App. Ct. 2006).  Thus, any Ford misrepresentations cannot form the basis for Pentecostal

Temple's ICFA claims.  The same principle applies to Ford's alleged omissions.  With regard to

Ford's omissions regarding the safety of E-350 vehicles when fully loaded with 15 passengers,

Pentecostal Temple could not have been deceived by such omissions because it did not observe

the vans to be 15-passenger vehicles.  At most, Pastor Edwards acknowledged that Pentecostal

Temple sought to transport "10 to 15" people in the vans (Edwards Dep. at 59:20-22), but did not state that Pentecostal Temple purchased the vans because they were advertised or represented to be capable of carrying 15 passengers.  As the Supreme Court of Illinois has observed, "in a consumer fraud action, the plaintiff must actually be deceived by a statement or omission.  If there has been no communication with the plaintiff, there have been no statements and no omissions.  In such a situation, a plaintiff cannot prove proximate cause." *De Bouse*, 922 N.E. 2d at 316.  Even if Pentecostal Temple's ICFA claims were timely filed, there is no genuine issue of material fact with regard to actual deception and proximate cause, and Ford is entitled to judgment as a matter of law on those claims.  This Court will grant Ford's motion for summary judgment with regard to Pentecostal Temple's ICFA claims.

> C.    Unjust Enrichment

Under Illinois law, to state a claim of unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E. 2d 672, 679 (Ill. 1989).  Where a plaintiff did not give money directly to a defendant, but that benefit was transferred by plaintiff to defendant by a third-party, retention of the benefit would be unjust if "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." *Id.* at 161-62 (internal citations omitted); *see also Independent Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1047-48 (N.D. Ill. 2008).

45

Here, Pentecostal Temple purchased its two E-350 vans from Currie Motors, a Ford dealership.  Just as California Plaintiff First United presented no evidence regarding the relationship between the dealer-seller and Ford, here Pentecostal Temple can point to no evidence in the record even suggesting that the money it paid to Currie Motors ultimately made its way to Ford.  Even if it could be described as "axiomatic" that Ford would receive money paid to a dealer for the purchase of a new Ford vehicle, this does not satisfy a party's evidentiary burden.  Nor has Pentecostal Temple shown any agency relationship between Ford and Currie Motors, thus establishing some relationship whereby benefits conferred upon Currie Motors may be considered to be conferred upon Ford.  As discussed with regard to the California Plaintiffs, Pentecostal Temple has not pointed to any evidence in the record whatsoever that would permit this Court to find any kind of agency relationship.  Ford contends that Pentecostal Temple has not shown the essential element of Ford's retention of a benefit to Plaintiff's detriment, and Pentecostal Temple has not met its burden to produce evidence in support of its position.

Furthermore, even if Pentecostal Temple could raise a genuine issue of material fact as to whether Ford has retained a benefit to Pentecostal Temple's detriment, its unjust enrichment claim fails for the same substantive flaw that dooms its ICFA claim: it cannot show deception or other wrongful conduct directed at Pentecostal Temple.  Of the three types of indirect unjust enrichment discussed above, only the second – "the defendant procured the benefit from the third party through some type of wrongful conduct" – applies here.  Under Illinois law, unjust enrichment of this type "is not descriptive of conduct that, standing alone, will justify an action for recovery. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of

action based upon that improper conduct." *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. Ct. App. 1995) (quoting *Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 484 N.E.2d 349, 354 (Ill. App. Ct. 1985)).  "It is not enough to show that the defendant, at some point in time, behaved 'wrongfully'; rather, the plaintiff must show that the defendant 'procured the benefit . . . through some type of wrongful conduct.'" *Indep. Trust Corp.*, 577 F. Supp. 2d at 1051 (quoting *HPI*, 545 N.E. 2d at 679).  Pentecostal Temple's unjust enrichment claim cannot stand where it depends upon improper conduct but cannot show such conduct.

It is undisputed, based on Pastor Edwards's deposition testimony, that no one at Pentecostal Temple received any representations from Ford, saw any Ford marketing materials, or even observed that the E-350 purported to be a 15-passenger van.  Pentecostal Temple sold its first E-350 van for reasons unrelated to the handling issues giving rise to this litigation, and it purchased the 1998 van based on the desire for "something that would take more than four or five members at a time" and that would have ease of access for seniors and young people. (Edwards Dep. at 56:16-17; 57:1-19.)  While other Plaintiffs in this action might have acquired their E-350 vans based on Ford's representations or labeling of the vehicles as 15-passenger vans, the undisputed record shows that Pentecostal Temple did not.  Pentecostal Temple cannot show the required "causal link between the wrongful conduct and the acquisition by the defendant of the benefit." *Indep. Trust Corp.*, 577 F. Supp. 2d at 1051.

Pentecostal Temple attempts to distinguish *HPI* and *Independent Trust Corp.* by observing that "each of those cases concern the transfer of money by a third party to the defendant, not payments by Plaintiffs that benefit the third-party (Ford dealers) and Defendant Ford."  (Pls.' Omnibus Br. at 63.)  However, this is a distinction without a difference.  The

47

additional element of wrongful conduct required under these circumstances applies where
"someone other than the plaintiff transfers the benefit to the defendant." *Independent Trust
Corp.*, 577 F. Supp. 2d at 1047 (citing *HPI*, 545 N.E. 2d at 679).  Pentecostal Temple recognizes
that Currie Motors is a "third-party," and contends that this third-party transferred the payments
by Pentecostal Temple to Ford.  On these undisputed facts, the wrongful conduct requirement
outlined in *Independent Trust* and *HPI* applies.  "[I]n the absence of any deception on the part of
the defendant[], the requisite violation of 'fundamental principles of justice, equity, and good
conscience' is not present."  *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 943 (7th Cir. 2001)
(dismissing unjust enrichment claim because plaintiff did not state a claim under ICFA or other
cause of action) (citing *Alliance Acceptance Co.*, 648 N.E.2d at 976-77).  Because there is no
genuine issue of material fact with regard to any deception of Pentecostal Temple by Ford, this
Court will grant Ford's motion for summary judgment on Pentecostal Temple's unjust
enrichment claim.

> D.   Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on
the ICFA and unjust enrichment claims brought by Pentecostal Temple.  None of Pentecostal
Temple's claims remain in this matter.  Therefore, this Court will dismiss Pentecostal Temple as
a party in this case.

**III.   New Jersey**

In the MTD Opinion, the Court denied Ford's motion to dismiss the claims brought by
New Jersey Plaintiffs Macedonia Free Will Baptist Church ("Macedonia"), Faith Tabernacle
Church ("Faith Tabernacle"), and Social Clubhouse, Inc ("Social Clubhouse").  New Jersey

Plaintiff Bethany Baptist Church ("Bethany Baptist") was added to this litigation after Judge

Ackerman decided Ford's motion to dismiss.  Ford now moves for summary judgment as to all of

the New Jersey Plaintiffs' claims: violation of the New Jersey Consumer Fraud Act ("NJCFA"),

N.J. Stat. Ann. § 56:8-1 *et seq.*, breach of express warranty, breach of implied warranty, and

unjust enrichment.  Ford also moves to strike a letter and affidavit filed by Plaintiffs on August 7,

2009.

    A.    <u>Material Facts</u>

        *1.    Macedonia*

Macedonia purchased two new 2002 E-350 vans from Dayton Ford in Dayton, New

Jersey on February 18, 2002, for $21,878.30 each.  (Andresen Certif. No. 4, Ex. 1 at 10; Phillips

Dep. (3/27/07) at 36:2-7.)  Roy Phillips, a deacon at Macedonia, was responsible for purchasing

the 2002 vans.  (Phillips Dep. (3/27/07) at 32:16-24.)  Phillips recalled seeing brochures for the

E-350 van that stated that the E-350 van was a 15-passenger van with an 8-cylinder engine.  (*Id.*

at 30:8-16.)  Phillips did not recall looking at any other materials from Ford regarding the vans.

(*Id.* at 36:21-25.)  Phillips stated that the salespeople at Dayton Ford told him the vans were

"good for what [he] need[ed] it for" and that "a lot of people [were] buying them for church."

(*Id.* at 34:6-13.)  Phillips could not remember anything else about the conversations with the

salespeople at Dayton Ford.  (*Id.* at 34:14-16.)  Macedonia continues to use both 2002 vans

(Ford's SUMF No. 4 at ¶ 2); however, Phillips stated that he "tr[ies] not to put more than ten" in

the vans because he "just feel[s] less people it's safer" (Phillips Dep. (3/27/07) at 73:24-74:5).

        *2.    Faith Tabernacle*

Faith Tabernacle purchased a used 2000 E-350 van on August 30, 2001, from Giant

Liccardi Auto Group in Green Brook, New Jersey for $23,521. (Andresen Certif. No. 5, Ex. 1 at 9; Bright Dep. at 17:23-18:23.) Bishop Herbert Bright testified that Faith Tabernacle was specifically seeking a vehicle that could carry 15 passengers. (Bright Dep. at 20:10-12.) Bright did not recall hearing any statements from Ford regarding the safety of the E-350 vans (*id.* at 95:14-24), and testified that Faith Tabernacle "ha[d] no direct contact with Ford regarding th[e] vehicle" (*id.* at 103:4-12). Faith Tabernacle ceased using the van to transport members because members began using alternative methods of transportation and because of increases in the cost of gasoline. (*Id.* at 63:3-17.) After learning of the alleged safety concerns, the church continued to use the van "without filling it to capacity." (*Id.* at 58:20-22.) Faith Tabernacle continues to use the van to "pick up the food from the food bank. And once, maybe, per month may use it to take the kids out." (*Id.* at 60:24-61:2.)

### 3. Social Clubhouse

Social Clubhouse purchased a total of five used E-350 vans from 1995 through 2003, which were all subsequently sold in 2003. (Ford's SUMF No. 6 at ¶ 1; Andresen Certif. No. 6, Ex. 1 at 8-9.) Prior to August 1999, Social Clubhouse purchased a used 1993 E-350 van and a used 1994 E-350 van, which were both later sold by Social Clubhouse in 2003. (Andresen Certif. No. 6, Ex. 1 at 8.) Social Clubhouse has not identified where the 1993 and 1994 vans were purchased or to whom they were sold. (*Id.*) In November 2001, Social Clubhouse purchased a used 1997 E-350 van from Craig Auto Sales in Brooklyn, New York, and in June 2002, Social Clubhouse purchased a second used 1997 E-350 van from an unidentified used auto dealer in Philadelphia, Pennsylvania. (*Id.* at 9.) In 2003, Social Clubhouse sold both of the 1997 E-350 vans to M&R Auto Sales in Plainfield, New Jersey. (*Id.*) In April 2003, Social Clubhouse

50

purchased a used 2002 E-350 van from Autoland in Springfield, New Jersey. (*Id.* at 8.)  Social

Clubhouse sold the 2002 Van four months later to Williamsburg Leasing of Brooklyn, New

York.  (*Id.* at 8-9.)  Michael Samet, a vice-president of Social Clubhouse, did not recall reading

any brochures or viewing any advertisements prior to purchasing any of the vans, nor did he

recall any representations made by salespersons relating to van characteristics other than that they

were 15-passenger vans that held 15 people.  (Samet Dep. at 20:12-14; 64:6-66:10; 75:8-76:2.)

Samet testified that, when purchasing the vans, he only knew that a 15-passenger van "was the

largest vehicle that [Social Clubhouse] could purchase to carry the most amount of people

without having a CDL license."  (*Id.* at 69:8-19.)  Social Clubhouse used the vans to "provide

door to door transportation to its facilities and transportation for social/recreational services

including bi-weekly outings and trips."  (Andresen Certif. No. 6, Ex. 1 at 13.)

     *4.*    *Bethany Baptist*

Bethany Baptist purchased a new 2001 van in 2001 from Holman Ford in Stratford, New

Jersey for approximately $28,000.  (Andresen Certif. No. 11, Ex. 1 at 2; Ford's SUMF No. 11 at

¶ 1.)  Bethany Baptist purchased a new 2003 van in 2003 from Princeton Ford in New Jersey for

approximately $28,000.  (Andresen Certif. No. 11, Ex. 1 at 2; Ford's SUMF No. 11 at ¶ 1.)

Bethany Baptist also owns a 1993 van and a 1994 van, but it has not provided any information

regarding the purchases of those vehicles.  (Congleton Dep. at 16:3-19; 49:17-50:9; Ford's

SUMF No. 11 at ¶ 1.)  Bethany Baptist does not know if anyone at the Ford dealerships made any

statements concerning the vans at the time of purchase and does not know if it looked at any

advertising material.  (Congelton Dep. at 32:21-33:2, 35:14-17, 59:4-9.)  James Congleton, the

director of the transportation ministry at Bethany Baptist, testified that around 2006 he began

limiting the number of passengers in the vans to ten or eleven people "[b]ecause [the church] heard that they became unsafe for carrying more people or a lot of cargo, that they were top heavy." (*Id.* at 18:14-19:6.)  Prior to that time, the church typically carried the full capacity on Sundays, but did not do so for services during the week.  (*Id.* at 45:8-23.)

      B.     <u>NJCFA</u>

          1.     *Motion for Summary Judgment*

Ford contends that this Court should grant summary judgment with respect to the New Jersey Plaintiffs' NJCFA claims because the New Jersey Plaintiffs have failed to establish an "ascertainable loss" as required by N.J. Stat. Ann. § 56:8-19.  This Court agrees and will grant summary judgment with respect to those claims.  The NJCFA provides that

> [a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.

N.J. Stat. Ann. § 56:8-19.  The New Jersey Supreme Court has held that to give effect to the "ascertainable loss" requirement of the NJCFA, "a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss." *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248 (2005).  "To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory," and in order to avoid summary judgment, the evidence "must be presented with some certainty demonstrating that it is capable of calculation."  *Id.*  "The certainty implicit in the concept of an 'ascertainable' loss is that it is quantifiable or measurable."  *Id.*; *see also Arcand v. Brother Int'l Corp.*, 673 F.

Supp. 2d 282, 300 (D.N.J. 2009) (stating that plaintiff must, "[a]t the very least, . . . be able to

quantify or measure what loss he has suffered or will suffer").  Furthermore, "by the time of a

summary judgment motion, it is the plaintiff's obligation to be able to make such a

demonstration or risk dismissal of the cause." *Thiedemann*, 183 N.J. at 249.

 The Court in *Thiedemann* recognized that "[t]he ascertainable loss requirement operates

as an integral check upon the balance struck by the NJCFA between the consuming public and

sellers of goods." *Id.* at 251.  The Court acknowledged the importance of that balance by noting

that "[d]efects can, and do, arise," and that "[t]he mere fact that [a] . . . defect arises does not

establish, in and of itself, an actual and ascertainable loss to the . . . purchaser." *Id.*; *see also Solo*

*v. Bed Bath & Beyond, Inc.*, Civ. No. 06-1908, 2007 WL 1237825, at *3 (D.N.J. Apr. 26, 2007)

(holding that plaintiff, alleging that a sheet set purchased from defendant contained a thread

count less than half of what was advertised, nonetheless failed to set forth a measurable loss

sufficient to satisfy the ascertainable loss requirement).  Thus, even though a product may be

defective, a subjective assertion of a diminution in value or loss of a benefit-of-the-bargain will

be insufficient to support a quantifiable loss; rather, the plaintiff must produce specific proofs.

*Thiedemann*, 183 N.J. at 252; *see also Parker v. Howmedica Osteonics Corp.*, Civ. No. 07-

02400, 2008 WL 141628, at *4 (D.N.J. Jan. 14, 2008) ("When a plaintiff fails to give particulars

regarding their ascertainable loss, and when they offer broad and conclusory allegations, the

ascertainable loss requirement has not been met.").

 In this case, the New Jersey Plaintiffs have failed to establish an ascertainable loss.  The

New Jersey Plaintiffs repeatedly assert that they have suffered various losses, but fail to establish

any of those losses with any degree of certainty.  The allegations set forth by the New Jersey

Plaintiffs are replete with generalized statements concerning loss; however, the evidence submitted by the New Jersey Plaintiffs contains no specific proofs such that the losses could be quantified or measured.  It was the New Jersey Plaintiffs' obligation to show an ascertainable loss in opposition to Ford's motion for summary judgment, and because the New Jersey Plaintiffs have failed to provide particularized evidence of such calculable losses, this Court will grant Ford's motions for summary judgment with respect to the New Jersey Plaintiffs' NJCFA claims.

2.    *Motion to Strike*

Ford filed its motions for summary judgment on March 24, 2009.  The New Jersey Plaintiffs filed their opposition brief on May 22, 2009, and Ford filed its reply brief on July 10, 2009.  Nearly one month later, on August 7, 2009, Plaintiffs submitted a letter to the court expressing several additional arguments in opposition to Ford's summary judgment motion with respect to the New Jersey Plaintiffs, along with an affidavit pursuant to Federal Rule of Civil Procedure 56(f) requesting additional time for discovery.  On August 21, 2009, Ford filed a motion to strike Plaintiffs' August 7 letter and affidavit as improper sur-replies and as insufficient to comply with Rule 56(f).  For the following reasons, this Court will grant Ford's motion to strike.

Local Rule 7.1(d)(6) provides that "[n]o sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned."  A court may strike a party's sur-reply if filed without permission from the court.  *See, e.g., Hailstalk v. Antique Auto Classic Car Storage, LLC*, Civ. No. 07-5195, 2008 WL 4192275, at *8 (D.N.J. Sept. 9, 2008); *Niyogi v. Intersil Corp.*, Civ. No. 05-4685, 2006 WL 1128725, at *3 (D.N.J. Apr. 27, 2006).  This Court finds that Plaintiffs' letter and affidavit, filed without permission from the Court, constitute

54

improper sur-replies. *See Cooper v. Cape May County Bd. of Soc. Servs.*, 175 F. Supp. 2d 732, 741-42 (D.N.J. 2001) (concluding that letter submitted by plaintiff after conclusion of summary judgment briefing constituted improper sur-reply). Therefore, this Court will grant Ford's motion to strike Plaintiffs' August 7 letter and affidavit.

Even if the Court were to consider the arguments raised in Plaintiffs' letter and accompanying affidavit, Plaintiffs' arguments are nonetheless unavailing. As discussed above, Ford argued, and this Court agrees, that the New Jersey Plaintiffs have failed to submit any evidence, such as expert testimony, that would establish an ascertainable loss with regard to the New Jersey Plaintiffs' NJCFA claims. In their August 7 letter, Plaintiffs contend that the Court should deny Ford's summary judgment motion because Plaintiffs are not yet required to submit such expert testimony. Plaintiffs base their argument on the contention that the Fifth Amended Pretrial Scheduling Order, filed on April 19, 2007, did not require the parties to disclose experts until 45 days after the Court issued a ruling on class certification. Plaintiffs' argument is without merit. The Fifth Amended Pretrial Scheduling Order has been inconsistent with subsequent scheduling orders since October 18, 2008, when the Eighth Amended Pretrial Scheduling Order was adopted. That Order provided a January 12, 2009 deadline for Ford's summary judgment motions and a March 13, 2009 deadline for Plaintiffs' motion for class certification. The deadlines regarding depositions of experts in that Order relate to the experts Plaintiffs would rely on for their class certification motion.

Plaintiffs contend, however, that the Eighth Amended Pretrial Scheduling Order contemplates that experts would be disclosed, and expert testimony taken, after a decision on Plaintiffs' motion for class certification, which was after the deadline set for Ford's summary

55

judgment motions.  Plaintiffs rely on a clause in the fourth paragraph of the Eighth Amended Pretrial Scheduling Order that provides that "[p]laintiffs will not waive any arguments that expert discovery is required precluding summary judgment."  Plaintiffs, however, fail to quote the entire sentence, which provides more context to the clause.  The sentence in its entirety reads: "Plaintiffs will not waive any arguments that expert discovery is required precluding summary judgment, *but plaintiffs will continue bearing the burden under Federal Rule of Civil Procedure 56(f) in this regard*." (emphasis added).  Thus, the Eighth Amended Pretrial Scheduling Order explicitly provides that although Plaintiffs did not waive their arguments regarding expert discovery, the Plaintiffs were still required to comply with the requirements of Rule 56(f) with regard to Ford's motions for summary judgment.

Pursuant to Rule 56(f), if a party cannot at the time of a summary judgment motion present facts essential to justify its opposition to the summary judgment motion, and the party believes that additional time for discovery is needed, that party must file an affidavit setting forth why the additional time is needed and what information is sought.  *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 510-11 (3d Cir. 1994).   The Third Circuit has made clear that "in all but the most exceptional cases, failure to comply with Rule 56(f) is fatal to a claim of insufficient discovery." *Bradley v. United States*, 299 F.3d 197, 207 (3d Cir. 2002).[10]

It is undisputed that Plaintiffs did not file a Rule 56(f) affidavit in response to Ford's motions for summary judgment.  Plaintiffs, however, contend that their brief in opposition to

---

[10]An example of an exceptional case can be found in *Miller v. Beneficial Management Corp.*, 977 F.2d 834, 846 (3d Cir. 1992), where the magistrate judge issued an order that a formal Rule 56(f) affidavit would not be required.  Thus, in that case, the failure to file a Rule 56(f) affidavit was not fatal to plaintiff's claim of insufficient discovery.  This case presents no similar exceptional circumstances to warrant relaxing the Rule 56(f) requirements.

Ford's summary judgment motions is sufficient to meet the affidavit requirement of Rule 56(f).

The Third Circuit has expressly rejected that argument.  In *Pastore*, the Third Circuit held that

> Rule 56(f) clearly requires that an affidavit be filed.  The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition.  An unsworn memorandum opposing a party's motion for summary judgment is not an affidavit.

24 F.3d at 511 (citation omitted).  Thus, this Court will not accept Plaintiffs' brief in opposition

to the summary judgment motions as a replacement for Rule 56(f)'s affidavit requirement.

Moreover, Plaintiffs' failure to submit a Rule 56(f) affidavit is fatal to the arguments in their

August 7 letter that they should be allowed additional time to submit expert testimony to oppose

Ford's summary judgment motions.

In an attempt to remedy their failure to submit a timely Rule 56(f) affidavit, Plaintiffs

included a Rule 56(f) affidavit with their August 7 letter to the Court.  This affidavit, like the

letter, constitutes an improper sur-reply.  Even if the Court were to consider the Rule 56(f)

affidavit, it fails to meet the substantive content requirements of Rule 56(f).  In order for an

affidavit to comply with requirements of Rule 56(f), the affidavit must "identify[] 'with

specificity what particular information is sought; how, if uncovered, it would preclude summary

judgment; and why it has not previously been obtained.'"  *Bradley*, 299 F.3d at 206-07 (quoting

*St. Surin v. V.I. Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994)).  A court need not grant a

Rule 56(f) request "when the party opposing the [summary judgment] motion simply relies on

vague assertions that additional discovery will produce needed, but unspecified facts, particularly

when 'ample time and opportunities for discovery have already lapsed."  *SEC v. Chester*

*Holdings, Ltd.*, 41 F. Supp. 2d 505, 517 (D.N.J. 1999) (citation omitted).

Plaintiffs' August 7 affidavit simply contains a portion of the procedural history of the case and then states that "[b]ecause Plaintiffs are not scheduled to disclose experts to be relied upon until forty-five (45) days after the Court's ruling on Plaintiffs' Motion for Class Certification, Plaintiffs cannot present expert facts essential to justify its Opposition to Ford's Motions for Summary Judgment." Plaintiffs' affidavit does not specify what information the Plaintiffs are seeking or how that information, if uncovered, would preclude summary judgment. Thus, not only have Plaintiffs failed to timely file a Rule 56(f) affidavit, but the untimely affidavit, filed as an improper sur-reply, does not even meet the requirements that would allow the Court to grant a Rule 56(f) request.

In summary, this Court will grant Ford's motion to strike Plaintiffs' August 7 letter and affidavit. These documents constitute improper sur-replies, and moreover, the arguments presented in the letter and affidavit are without merit and are insufficient to satisfy the requirements of Rule 56(f).

C.     Express Warranty

Ford also contends that this Court should grant its summary judgment motions with respect to the New Jersey Plaintiffs' express warranty claims. Under New Jersey law, an express warranty can be created by the following:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform

to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J. Stat. Ann. § 12A:2-313.  Thus, "an express warranty is created when a promise is made by a seller to a buyer which relates to a good and becomes the basis of the bargain." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818, 824 (3d Cir. 1999).

In *Simmons v. Stryker Corp.*, the defendants were manufacturers of a device referred to as a "pain pump" that delivered infusions of anesthetics to surgical patients.  Civ. No. 08-3451, 2008 WL 4936982, at *1 (D.N.J. Nov. 17, 2008).  The plaintiff alleged that the manufacturer expressly warranted that the pain pump was fit and safe for the purpose for which it was to be used.  *Id.*  The plaintiff argued that the manufacturer breached the express warranty because the pain pump was not safe and caused injuries to users.  *Id.*  The court concluded that the plaintiff's breach of warranty claim was "devoid of any 'factual matter' to support the existence of an express warranty," and the court dismissed the plaintiff's claims because the plaintiff "identifie[d] no source whatsoever of any alleged warranty."  *Id.* at *2.

In this case, the New Jersey Plaintiffs have failed to identify a source for the alleged warranty regarding the safety level of transporting 15 passengers in the E-350 van.  Although the van was marketed as a "15-passenger" van, New Jersey Plaintiffs have not submitted any evidence that Ford or any Ford representatives made any representations concerning the "safety" of transporting 15 passengers.  Ford's advertisements and brochures described the E-350 van as a "15-passenger van."  Although that description could be interpreted to *imply* a certain level of safety with regard to carrying 15 passengers, the description alone does not form the basis for an

59

express warranty.  Thus, the New Jersey Plaintiffs have failed to establish that Ford made an express representation regarding the safety of the E-350 vans and, therefore, this Court will grant Ford's motions for summary judgment with respect to the New Jersey Plaintiffs' express warranty claims.

 D. <u>Implied Warranty</u>

 Ford also seeks summary judgment on the New Jersey Plaintiffs' implied warranty claims, arguing that summary judgment is required because the New Jersey Plaintiffs cannot show an actual injury or ascertainable loss.  Ford's argument is based on the assertion that the New Jersey Supreme Court's decision in *Thiedemann*, discussed above with regard to the New Jersey Plaintiffs' NJCFA claims, also applies to warranty claims.  Ford repeatedly asserts simply that *Thiedemann* requires summary judgment on the New Jersey Plaintiffs' "CFA and warranty claims," but Ford fails to offer any explanation as to how *Thiedemann* applies to warranty claims. In *Thiedemann*, the Court focused only on the plaintiffs' claims brought under the NJCFA.  The Court expressly noted that the "appeal focus[ed] on the [NJCFA's] enigmatic requirement of an 'ascertainable loss,'" and that certification was granted "to review whether plaintiffs had made out a case that could withstand defendant's motion for summary judgment in respect of the issue of ascertainable loss."  *Thiedemann*, 183 N.J. at 238, 240.  Ford has not cited any authority to support its contention that the NJCFA's "ascertainable loss" requirements apply equally to claims involving breaches of an implied warranty, and this Court is unaware of any case that extends the Court's holding in *Thiedemann* to such claims.  Absent any other argument from Ford to support its motions for summary judgment on this issue, this Court will deny Ford's motions with respect to the New Jersey Plaintiffs' implied warranty claims.

E.        Unjust Enrichment

In New Jersey, "[t]o establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 110 (2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" *Id.* (quoting *VRG Corp.*, 135 N.J. at 554). Moreover, "[a] claim of unjust enrichment also requires that the plaintiff allege a sufficiently direct relationship with the defendant to support the claim." *Nelson v. Xacta 3000 Inc.*, Civ. No. 08-5426, 2009 WL 4119176, at *7 (D.N.J. Nov. 24, 2009) (citing *Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 505-06 (D.N.J. 2009). Furthermore, "it is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496 (D.N.J. 1998). For example, in *Cooper v. Samsung Electronics America, Inc.*, the plaintiff filed a claim for unjust enrichment against Samsung Electronics after purchasing an allegedly defective Samsung television from a retailer, Ultimate Electronics. Civ. No. 07-3853, 2008 WL 4513924, at *10 (D.N.J. Sept. 30, 2008). The court concluded that despite the fact that the television was manufactured by Samsung, there was no relationship conferring any direct benefit on Samsung through the plaintiff's purchase from the retailer, and that therefore plaintiff failed to establish unjust enrichment. *Id.*

Here, several of the New Jersey Plaintiffs purchased used vehicles. Faith Tabernacle purchased its used 2000 van from Giant Liccardi Auto Group. Social Clubhouse purchased a

used 2002 van from Autoland, a used 1997 van from Craig Auto Sales, a used 1997 van from an unidentified used car dealer in Philadelphia, Pennsylvania, and failed to identify where the 1993 and 1994 used vans were purchased.  Bethany Baptist has not identified from whom it purchased its 1993 and 1994 Ford vans.  With respect to the sale of these eight vans, the New Jersey Plaintiffs have failed to establish any relationship between these dealers and Ford.  They point to no evidence that Ford received any benefit from the sales at the New Jersey Plaintiffs' expense. Therefore, this Court will grant Ford's motions for summary judgment with respect to the unjust enrichment claims of Faith Tabernacle and Social Clubhouse, and with respect to the unjust enrichment claims of Bethany Baptist that are based on the 1993 and 1994 Ford vans.

The remaining unjust enrichment claims are based on new van purchases from Ford dealerships.  Macedonia purchased two new 2002 vans from Dayton Ford, and Bethany Baptist purchased a new 2001 van from Holman Ford and a new 2003 van from Princeton Ford. Like other Plaintiffs in this matter, these New Jersey Plaintiffs point to no evidence in the record regarding the relationship between these dealerships and Ford and whether money paid to these dealerships was ultimately conferred upon Ford.  This Court will not take judicial notice of an agency relationship based solely upon conclusory assertions that such a relationship is "axiomatic."  *See Westerdale v. Kaiser-Frazer Corp.*, 6 N.J. 571, 574 (1951) ("While courts will take judicial notice of facts of common knowledge relating to business and occupations, such as the general course of business and the usual method of transacting it, we are unable to agree . . . that it is common knowledge that a manufacturer of automobiles supervises and controls its dealers . . . .").  These New Jersey Plaintiffs, by failing to present any evidence of a sufficiently direct relationship between Ford and the dealerships such that Ford received a

62

benefit from these New Jersey Plaintiffs' purchases, have failed to satisfy their evidentiary burden.  This Court will grant Ford's motions for summary judgment, without prejudice, with respect to the unjust enrichment claims of Macedonia and those of Bethany Baptist that are based on the vans purchased from the Ford dealerships.  Macedonia and Bethany Baptist shall have until August 13, 2010 to show cause to cure this evidentiary deficiency and demonstrate that summary judgment should not be granted in Ford's favor on these unjust enrichment claims.  Ford shall have until September 13, 2010 to file a response to Macedonia's and Bethany Baptist's submissions.

 F. <u>Summary</u>

 For the foregoing reasons, this Court will grant Ford's motions for summary judgment with regard to the New Jersey Plaintiffs' NJCFA and express warranty claims and deny Ford's motions for summary judgment with regard to the implied warranty claims.  The Court will grant Ford's motion for summary judgment with respect to the unjust enrichment claims of Faith Tabernacle and Social Clubhouse, and with respect to the unjust enrichment claims of Bethany Baptist that are based on the 1993 and 1994 vans.  The Court will grant Ford's motions for summary judgment without prejudice with respect to the unjust enrichment claims of Macedonia and those of Bethany Baptist that are based on the new 2001 and 2003 vans purchased from the Ford dealerships.  Macedonia and Bethany Baptist shall have until August 13, 2010 to show cause to cure the evidentiary deficiency identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor on the implicated unjust enrichment claims.  Ford shall have until September 13, 2010 to file a response to Macedonia's and Bethany Baptist's submissions.  Finally, this Court will grant Ford's motion to

strike the New Jersey Plaintiffs' August 7 letter and affidavit.

## IV.    Georgia

Georgia Plaintiff Allen Temple AME Church ("Allen Temple") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for summary judgment as to all of Allen Temple's claims: breach of express warranty; breach of implied warranty; violation of the Georgia Fair Business Practices Act ("Georgia FBPA"), Ga. Code Ann. § 10-1-392 *et seq.*; and unjust enrichment.

### A.    Material Facts

Allen Temple purchased two Ford E-350 vans.  It purchased a new 2001 vehicle in June 2001 for $27,834.25 from Beaudry Ford.  (Andresen Certif. No. 8, Ex. 3 at ATA0003.)  In July 2002, Allen Temple bought a new 2002 E-350 from Lou Sobh Ford for $27,771 through a no-interest financing agreement with Ford Motor Credit.  (*Id.* at ATA0005-06.)  At deposition, Henry Adams testified on behalf of Allen Temple and responded in the affirmative to the question "Is it your understanding that Ford represented to you that this was a safe 15-passenger vehicle?"  (Adams Dep. at 124:12-15.)  Yet, Adams earlier testified that Allen Temple had no communication with Ford prior to its purchases (*id.* at 29:16-20; 43:17-19) and saw no advertisements by Ford "that had to deal with the reliability and safety of the vehicle" (*id.* at 96:21-24).  Allen Temple continues to use the vehicles, but has elected to not carry more than 12 persons at one time in each vehicle since 2002 or 2003, after it purchased the second van, based on media reports about the van's rollover propensity.  (*Id.* at 26:7-23.)

### B.    Express and Implied Warranty

Ford argues that this Court should grant summary judgment in its favor on Allen

Temple's warranty claims because Allen Temple did not give notice of its claims as required by

UCC § 2-607(3)(a).  As codified under Georgia law, as a prerequisite to an express or implied

warranty claim, "[t]he buyer must within a reasonable time after he discovers or should have

discovered any breach notify the seller of breach or be barred from any remedy."  Ga. Code

Ann. § 11-2-607(3)(a).  Allen Temple contends that notice need not be given prior to filing suit,

but only must be given "at some point in time."  (Pls.' Omnibus Br. at 45.)  Therefore, Allen

Temple asserts that filing suit – here, by joining this litigation after resolution of the motion to

dismiss – satisfied the notice requirement.  While notice is a condition precedent to recovery for

breach of warranty, Georgia courts have concluded that under appropriate circumstances,

"[s]ervice of the original suit" can be reasonable notice.  *See Hudson v. Gaines*, 403 S.E. 2d

852, 854 (Ga. Ct. App. 1991).  However, in *Hudson* the court emphasized that the plaintiff filed

suit eight months after the event giving rise to the warranty claims.  *Id.*  Here, Allen Temple

joined this litigation in November 2008, more than six years after Allen Temple's purchases of

its E-350 vehicles and approximately five years after Allen Temple discovered potential

handling problems with the vehicles.  Ford argues that this lengthy delay was unreasonable as a

matter of law and therefore insufficient under § 11-2-607(3)(a).

In determining whether notice is reasonable, courts look to the purpose of the rule:

facilitation of settlement negotiations and minimization of prejudice by allowing the seller the

early opportunity to cure the defect or reduce damages.  *See, e.g.*, *Great Western Press, Inc. v.

Atlanta Film Converting Co.*, 479 S.E. 2d 143, 145 (Ga. Ct. App. 1996).  "Generally, whether

notice has been reasonably given presents a question of fact, but summary adjudication is

appropriate if the uncontroverted facts establish that notice was unreasonable as a matter of

law." *Wal-Mart Stores, Inc. v. Wheeler*, 586 S.E. 2d 83, 85 (Ga. Ct. App. 2003). Here, this Court cannot resolve the reasonableness question because, as the Georgia Court of Appeals held in *Wal-Mart*, for a consumer or retail breach of warranty claim, "delay alone without prejudice caused by such delay is insufficient to bar relief to the plaintiff under § 11-2-607(3)(a)." *Id.* at 86.[11] Even if Ford could establish based on undisputed facts that Allen Temple's delay in providing notice was unreasonable under the circumstances, this Court cannot preclude Allen Temple's warranty claims absent any evidence of prejudice to Ford from the delay. In *Wal-Mart*, the Georgia Court of Appeals affirmed the trial court's denial of defendant's motion for summary judgment because defendant did not present any evidence of prejudice to the trial court. *Id.* at 87. Ford likewise fails to present any evidence of prejudice. It fails even to mention the prejudice requirement and points to no evidence whatsoever in the record regarding any prejudice it might have suffered from Allen Temple's delay. Therefore, this Court cannot grant summary judgment in Ford's favor on Allen Temple's warranty claims on the basis of lack of notice.

While in many of its other summary judgment motions, Ford presents various other meritorious arguments against Plaintiffs' warranty claims, it relies solely on the notice theory in moving for summary judgment against Allen Temple. Absent any other argument from Ford to support its motion for summary judgment on Allen Temple's warranty claims, this Court will deny Ford's motion with regard to these claims.

---

[11] In so concluding, the court in *Wal-Mart* "disapproved" of a prior ruling that suggested that "a delay of two years, without more, is unreasonable as a matter of law." *Wal-Mart*, 586 S.E. 2d at 86 (citing *Buford v. Toys R' Us, Inc.*, 458 S.E. 2d 373, 375 (Ga. Ct. App. 1995)).

C.     Georgia FBPA

The Georgia FBPA bars "[u]nfair or deceptive acts or practices in the conduct of

consumer transactions and consumer acts or practices in trade or commerce."  Ga. Code

Ann. § 10-1-393(a).  The FBPA defines "consumer acts or practices" as "acts or practices

intended to encourage consumer transactions," Ga. Code Ann. § 10-1-392(a)(7), and defines

"consumer transactions" as "the sale, purchase, lease, or rental of goods, services, or property,

real or personal, primarily for personal, family, or household purposes," Ga. Code Ann. § 10-1-

392(a)(10).  Any "person" who suffers injury or damage from violation of the Georgia FBPA

may bring a claim under the statute.  Ga. Code Ann. § 10-1-399(a).  Allen Temple asserts FBPA

claims with regard to the two E-350 vehicles it purchased.

Ford argues that Allen Temple lacks standing to assert a claim under the Georgia FBPA

because it is not a "natural person" and it did not purchase the vans "primarily for personal,

family, or household purposes."  In the MTD Opinion, Judge Ackerman dismissed other state

consumer fraud statute claims because the churches were not natural persons and did not

purchase the vehicles for these consumer purposes.  Allen Temple argues that the purchases

took place "in the conduct of consumer acts or practices" and that a business may assert a

Georgia FBPA claim if it acted as a consumer.  (Pls.' Omnibus Br. at 19.)  Ford responds that

Allen Temple did not act as a consumer here because it did not purchase its vehicles for

personal, family, or household purposes.

Both parties fail to cite the statutory definition of "person."  The statute defines "person"

as "a natural person, corporation, trust, partnership, incorporated or unincorporated association,

or any other legal entity."  Ga. Code Ann. § 10-1-392(a)(24).  As opposed to other states'

67

consumer fraud statutes (such as California), the Georgia FBPA extends standing to corporations and does not limit standing to natural persons.  Ga. Code Ann. § 10-1-399(a) ("Any person who suffers injury or damage as a result of a violation . . . may bring an action."). Therefore, Allen Temple has standing to bring its Georgia FBPA claim as long as it complains of deceptive business practices "intended to encourage consumer transactions."

Allen Temple contends that Ford's selling of the E-350 vans to the public and its advertising representations were intended to encourage consumer transactions.  Ford argues that Allen Temple produced no evidence that the alleged injury suffered by Allen Temple stemmed from activity intended to encourage transactions for personal, family, or household purposes in that Ford marketed the vans to churches and other community groups.  The Court of Appeals of Georgia has held that in determining whether a defendant's actions took place within the context of the consumer marketplace under the Georgia FBPA, "two factors are determinative: (a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact."  *State ex rel. Myles v. Meredith Chevrolet, Inc.*, 244 S.E. 2d 15, 18 (Ga. Ct. App. 1978).  Deceptive advertisements to the general public triggers the protections of the Georgia FBPA, while those "even though in a public medium, addressed to the nonconsuming public are not in contravention of the Act if such advertisements cannot be said to reasonably tend to encourage consumer transactions."  *Id.* (stating that such advertisements "would not be violative if the medium chosen reasonably restricted the audience (i.e., market) to nonconsumers, even though the product so advertised were eventually to reach the hands of consumers").

Caselaw applying these standards is scarce.  In *Meredith Chevrolet*, defendant allegedly

rolled back the odometers on vehicles sold at a *private* auction to retail car dealers.  The court

concluded that while the deceptive act itself "can reasonably be said to tend to encourage a

consumer transaction (thus supplying the market impact factor), the medium chosen to introduce

that act into the stream of commerce, i.e., a private sale limited to nonconsumers, is outside the

context of consumer commerce." *Id.* at 19.  Non-consumers also may not bring suit under the

Georgia FBPA for misrepresentations made by their competitors to the general consuming

public. *Friedlander v. PDK Labs, Inc.*, 465 S.E. 2d 670, 671 (Ga. 1996).

Here, although Ford allegedly made misrepresentations to the public, Allen Temple

cannot maintain suit because Ford's purported conduct with regard to Allen Temple did not

occur in a consumer context.  Allen Temple did not purchase the vans primarily for personal,

family, or household use.  The court in *Meredith Chevrolet* stated that "[o]ffering a product for

sale by opening one's doors to the general public would trigger the prohibitions of the Act if

some deceptive act or practice were involved."  244 S.E. 2d at 18-19.  This principle would

seem to apply here, as Ford did not limit sales of the E-350 vans to "private offers for sale,

communicated between merchants." *Id.*  However, *Friedlander* instructs that the identity and

nature of the plaintiff also matters.  The competitor-plaintiff in *Friedlander* was not a consumer,

and neither is Allen Temple here under the statutory definition of "consumer transaction."

While a "person" with standing under the statute includes an unincorporated association, such a

plaintiff still must bring a claim alleging injury to itself based on consumer acts or transactions,

and Allen Temple cannot do so here.  All Plaintiffs allege that Ford marketed the E-350 to

church groups and other organizations (Compl. ¶ 16), and there is no evidence in the record that

Ford engaged in similar campaigns promoting the E-350 for "personal, family, or household

use."  Thus, the deceptive acts in which Allen Temple alleges Ford engaged did not involve

consumer transactions as defined by the Georgia FBPA or promote such transactions.  It is

undisputed that Allen Temple did not purchase the vans for any particular parishioner's or

employee's personal, family, or household use.  Rather, it bought the vans for use in the course

of church business, even though that business might have additionally benefitted individual

members personally.  Therefore, Allen Temple lacks standing to assert its Georgia FBPA

claims.

For these reasons, this Court will grant Ford's motion for summary judgment as to Allen

Temple's FBPA claims.

D.      Unjust Enrichment

Under Georgia law, an unjust enrichment claim may lie in the absence of a contract

"when the party sought to be charged has been conferred a benefit by the party contending an

unjust enrichment which the benefitted party equitably ought to return or compensate for."

*Wachovia Ins. Servs., Inc. v. Fallon*, 682 S.E. 2d 657, 665 (Ga. Ct. App. 2009) (citations and

quotations omitted).  "Inherent in the theory of unjust enrichment is the requirement that the

receiving party knew of the value being bestowed upon him by another and failed to stop the act

or to reject the benefit prior to its conferment."  *Hollifield v. Monte Vista Biblical Gardens, Inc.*,

553 S.E. 2d 662, 670 (Ga. Ct. App. 2001).

Allen Temple purchased its vehicles from Ford dealers, but just as other Plaintiffs have

failed to produce evidence regarding the relationship between the dealer and Ford, Allen Temple

presents no evidence to establish any such relationship by which Ford could have been unjustly

enriched by Allen Temple's purchases.  However, Ford does not raise this issue as a basis for

awarding it summary judgment, although it argues for summary judgment on unjust enrichment

claims brought by other Plaintiffs on this rationale.  Ford also fails to assert that Allen Temple

cannot recover under an unjust enrichment theory because it had contractual relationships with

the Ford dealers.  Instead, Ford only contends that Allen Temple cannot show that it purchased

its vans at higher than actual, fair market value, and therefore could not have conferred an undue

benefit on Ford.  (Ford Reply Br. at 52 ("Allen Temple purchased its two vans new from Ford

dealers.  Ford's only argument as to Allen Temple's unjust enrichment claim was that Allen

Temple could not prove that Ford was unjustly enriched at Ford's expense because it could not

prove that it purchased its van at an artificially inflated price.").)  Ford argues that Allen Temple

cannot show that it paid more than the fair market value for its vehicles and therefore cannot

show that it conferred a benefit on Ford.  In the Complaint, Plaintiffs allege that various events

occurring before June 2001 led to a "diminution in the value" of E-350 vans.  (Compl. ¶ 61.)

Ford alleges that Allen Temple purchased its first van after these events and therefore cannot

prove that its sale price did not already reflect the actual value of the van.  Additional events

between June 2001 and July 2002 also allegedly diminished the vans' value, and Ford claims

that Allen Temple's unjust enrichment claim as to its second van suffers from the same

infirmity.  Plaintiffs' Response Brief does not specifically address Allen Temple's unjust

enrichment claim.  Still, this Court cannot resolve Allen Temple's unjust enrichment claim as a

matter of law because disputed facts exist regarding the actual market value of the vehicles.

While some of the events listed in the Complaint might have occurred before Allen Temple

purchased either its first or second vehicle, there are disputes regarding when Allen Temple

learned of the problems with the vehicles and what, if any, representations Allen Temple

71

received from Ford.  Under the equitable theory of unjust enrichment, this Court cannot

conclude based on speculation that because certain facts regarding the vehicles might have been

made public prior to Allen Temple's purchases, the price paid by Allen Temple necessarily

reflected fair market value and no unjust enrichment.[12]  This Court will deny Ford's motion with

regard to the unjust enrichment claim.

     E.     <u>Summary</u>

For the foregoing reasons, this Court will deny Ford's motion for summary judgment

with respect to Allen Temple's breach of express warranty, breach of implied warranty, and

unjust enrichment claims.  This Court will grant Ford's motion for summary judgment as to

Allen Temple's Georgia FBPA claims.

**V.    Pennsylvania**

Pennsylvania Plaintiffs Bethel AME Church ("Bethel"), Hickman Temple AME Church

("Hickman Temple"), and Mount Airy Baptist Church ("Mt. Airy") were added to this litigation

after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for summary

judgment as to all of the Pennsylvania Plaintiffs' claims: breach of express warranty; breach of

implied warranty; violation of the Pennsylvania Unfair Trade Practices and Consumer

Protection Law ("Pennsylvania UTPCPL"), 73 Pa. Cons. Stat. § 201-1 *et seq.*; and unjust

---

[12]In their Responses and Objections to Ford's Second Set of Written Interrogatories, Plaintiffs stated that the purported "artificial demand" for E-350 vans that led to artificially inflated prices being paid by Plaintiffs "is believed to have fully eroded by April, 2004, when the [National Highway Traffic Safety Administration] reissued a safety warning concerning 15-passenger vans."  (*See, e.g.,* Andresen Certif No. 19, Ex. 5 at 22.)  Allen Temple purchased its vehicles before this date, and not after the time Plaintiffs concede that the claimed artificial demand eroded such that Ford could not have been unjustly enriched by artificially high sales prices for E-350 vans.

enrichment.

A.   Material Facts

1.   *Bethel*

Bethel owns two E-350 vans.  Its first vehicle, a new 2000 model, was purchased from Parkway East Ford by Amoore Health Systems, Inc. ("Amoore") in June 2000 for $30,800. Bethel effectively purchased the vehicle from Amoore by paying the salaries of handicapped drivers provided by Amoore.  The salaries "were equivalent to what it would have been to make a monthly payment."  (Miott Dep. at 33:12-14.)  Thus, Bethel "financed [the vehicle] through Amoore. . . [a]nd it was a criteria that after we reached the amount paid for the van, that the van would become Bethel's."  (*Id.* at 32:14-19.)  While Amoore negotiated the purchase price of the van, representatives of Bethel were present and consulted on the purchase.  (*Id.* at 37:3-9.) Bethel representatives indicated at deposition that Ford salespeople discussed the features of the E-350 van, but could not recall precisely what Bethel might have been told about its 15-passenger capacity.  (Ford SUMF No. 12 ¶¶ 4-10; Pls.' Responsive Statement of Material Facts for Bethel ¶¶ 4-10.)

Bethel purchased its second E-350 van, a new 2001 model, directly from Parkway East Ford in November 2001 for $29,530.[13]  Bethel has never instructed its drivers to not fill the vehicles to capacity, and Bethel sometimes uses the vans filled to capacity (Ingram Dep. at 110:14-24), but it has also experienced some difficulties in handling when driven with capacity seating (*see, e.g.*, Miott Dep. at 97:7-98:23; 101:19-102:4; 105:24-106:23).  Bethel has had no

---

[13]Bethel has also contended that it purchased a new 2005 vehicle, but now does not dispute that this third vehicle is not owned by Bethel but by an independent, non-profit organization.

difficulties procuring insurance for its vehicles.  It has not sold the vehicles and has no intention of doing so.

### 2.    *Hickman Temple*

Hickman Temple purchased a used 2001 E-350 van from Springfield Ford in 2003 for $17,133.87.  Hickman Temple does not recall viewing any Ford advertisements or other materials (Feaster Dep. at 32:5-14), but does recall that the salesman at the Ford dealership discussed the safety of the vehicle.  According to Johnnie W. Feaster, who testified on behalf of Hickman Temple, the salesman at Springfield Ford "talked about how safety was, that this would be the vehicle that you want to do the job because it was safe and it would deliver."  (*Id.* at 31:4-7).  Hickman Temple still uses the vehicle for transporting members, and does not limit the capacity of its vehicle and often drives it with 15 passengers.  (*Id.* at 59:14-19; 40:14-44:18.)

### 3.    *Mt. Airy*

Mt. Airy purchased a used 2004 E-350 van from Chapman Ford Sales for $19,998 in August 2005.  Mt. Airy does not recall if it viewed any Ford materials or relied on any Ford representations when buying the vehicle.  (W. Brown Dep. at 29:22-30:3; 56:5-11.)  The church requires qualified drivers to operate the vehicle and, based on requirements by its insurance company, requires that drivers take defensive driving courses.  (*Id.* at 51:21-52:1; 48:15-19.)  It has placed no limits on capacity, and it operates the vehicles fully-loaded on occasion.  (*Id.* at 38:17-19; 39:6-12; 42:11-14.)  It has experienced some stability and handling problems when operating the vehicle filled to capacity.  (*Id.* at 11:1-13.)

### B.    Express Warranty and Implied Warranty: Notice

Ford contends that the Pennsylvania Plaintiffs' express and implied warranty claims are

barred by those Plaintiffs' failure to give notice within a reasonable time.  UCC § 2-607, as

codified in Pennsylvania, provides that, to assert a warranty claim post-tender, "[t]he buyer must

within a reasonable time after he discovers or should have discovered any breach notify the

seller of breach or be barred from any remedy."   13 Pa. Cons. Stat. § 2607(c)(1).  The

Pennsylvania Plaintiffs argue that filing suit – here, by joining this litigation after resolution of

the motion to dismiss – satisfied the notice requirement.  The Pennsylvania Supreme Court has

not definitively addressed whether the filing of a complaint constitutes sufficient notice under

§ 2607.  However, a court in the Middle District of Pennsylvania has held that "nothing in

section 1201 or 2607 . . . specifically prohibits a civil complaint from serving as notice of a

breach of warranty."  *Bednarski v. Hideout Homes & Realty, Inc.*, 709 F. Supp. 90, 93 (M.D. Pa.

1988).  The court in *Bednarski* relied upon a prior ruling by the Pennsylvania Superior Court

that the filing of a complaint was sufficient for notice of rejection of goods, and reasoned that

there was no indication that the Pennsylvania Supreme Court would rule otherwise with regard

to notice of breach of warranty.  *Id.* at 93-94 (discussing *Yates v. Clifford Motors, Inc.*, 423 A.2d

1262, 1269-70 (Pa. Super. Ct. 1980)).

Ford attempts to distinguish *Bednarski* by pointing to the Illinois Supreme Court's

treatment of that case in applying Pennsylvania law.  In *Connick v. Suzuki Motor Co.*, the

Illinois Supreme Court reasoned that Pennsylvania law allows the filing of a complaint to satisfy

the notice requirement only where the plaintiff suffered personal injuries.  675 N.E. 2d 584,

590-91 (Ill. 1996).  The *Connick* court distinguished *Bednarski* because *Bednarski* involved a

plaintiff who suffered personal injuries, and Ford here similarly argues that, because the

Pennsylvania Plaintiffs did not suffer any personal injury, the Pennsylvania Supreme Court

would hold that the filing of the complaint fails to fulfill the notice requirement.  While Ford's interpretation of *Bednarksi* holds some appeal, two cases from the Pennsylvania Court of Common Pleas expressly reject Ford's theory.  In *Solarz v. DaimlerChrysler Corp.*, the court followed *Bednarski* and found defendant's reliance on *Connick* to distinguish *Bednarski* to be "misplaced."  No. 2033, 2002 WL 452218, at *12 (Pa. Com. Pl. Mar. 13, 2002).  The court in *Solarz* stated that "[n]owhere in the *Bednarski* opinion does the court expressly carve out an exception to the notice requirement for 'consumer buyers who suffer personal injury.'  In fact, the holding in *Bednarski*, based on Pennsylvania law, is quite clear and unambiguous."  *Id.* Several months later, another opinion from the Court of Common Pleas similarly held, relying on *Bednarski*, that "[t]he filing of a complaint has been held to satisfy the notice requirement for a breach of warranty claim."  *Precision Towers, Inc. v. Nat-Com, Inc.*, No. 2143, 2002 WL 31247992, at *5 (Pa. Com. Pl. Sept. 23, 2002).

In the absence of any contrary authority from the Pennsylvania Supreme Court, and in light of the approval of the federal court's holding by lower Pennsylvania courts, this Court will follow *Bednarski*.  The addition of the Pennsylvania Plaintiffs' to this litigation by joining the Complaint constitutes sufficient notice under Pennsylvania law for breach of warranty claims. The reasonableness of the time within which the Pennsylvania Plaintiffs gave notice, on this disputed record, is a question of fact and cannot be resolved on this motion.  *Rad Servs., Inc. v. Am. Refining Group, Inc.*, 479 A.2d 565 (Pa. Super. Ct. 1984) ("Whether a buyer discovers a breach and gives notice of it within a reasonable time is normally a jury question.  Only under the situation where the facts are undisputed and the buyer clearly ought to have known of the alleged defect does the question of reasonableness become one for the court." (citations

omitted)); *see also Bednarski*, 709 F. Supp. at 94.  Therefore, this Court will not grant summary judgment in Ford's favor on the Pennsylvania Plaintiffs' warranty claims for lack of notice.

    C.    <u>Express Warranty</u>

For the same reasons discussed previously with regard to other Plaintiffs, Ford's statement that the E-350 van is a "15-passenger van" does not create an express warranty of the safety of the vehicle in transporting 15 passengers.  According to Pennsylvania law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  13 Pa. Cons. Stat. § 2313(a)(1).  "Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."  13 Pa. Cons. Stat. § 2313(a)(2).  The Pennsylvania Plaintiffs assert that Ford made an express warranty of safety, but Ford's core description of the vehicle "contain[s] no language of promise, description, or affirmation of fact that conceivably could constitute an express warranty as to product safety."  *Kenepp v. Am. Edwards Labs.*, 859 F. Supp. 809, 817 (E.D. Pa. 1994).  It is undisputed that no Ford representative, let alone any other person involved in the sale of the vehicles to the Pennsylvania Plaintiffs, made an express representation of *safety* with regard to the transport of 15 passengers to the Pennsylvania Plaintiffs.  After extensive discovery, Plaintiffs point to no evidence to the contrary, and do not identify any specific, unequivocal statement made to these Plaintiffs, or those affiliated with them, regarding safety in the transport of 15 passengers.

With regard to the testimony of Hickman Temple's representative that the Springfield Ford salesman stated generally that the van was "the vehicle that you want to do the job because

it was safe and it would deliver" (Feaster Dep. at 31:6-7), Hickman Temple has not met its

burden to show that the salesman acted as Ford's agent such that his statements could be

attributable to Ford.  Even if this Court could find that these statements could be attributed to

Ford, the statements amount at most to non-actionable puffery.  13 Pa. Cons. Stat. § 2313(b)

("[A] statement purporting to be merely the opinion of the seller or commendation of the goods

does not create a warranty."); *County of Mercer v. UniLect Corp.*, 612 F. Supp. 2d 638, 650

(W.D. Pa. 2009) ("Opinion statements do not create express warranties.").  In other contexts,

courts in Pennsylvania have concluded that non-specific statements regarding the general safety

of a product were mere puffing.  *See Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 903

(Pa. 1975) (in misrepresentation tort action, finding that statements in brochure that "you are

assured of a safe, dependable helicopter" was non-actionable puffing); *see also Hoffman v. A. B.*

*Chance Co.*, 339 F. Supp. 1385, 1388 (M.D. Pa. 1972) (in misrepresentation tort action,

concluding that "[t]he general representation that a product 'offered unprecedented safety' is a

statement of opinion and is in the nature of seller's 'puffing'").  As a matter of law, the

Pennsylvania Plaintiffs' express warranty claims must fail.

     Accordingly, this Court will grant Ford's motion for summary judgment with respect to

the Pennsylvania Plaintiffs' express warranty claims.

     D.    <u>Implied Warranty</u>

     Pennsylvania courts have not directly addressed whether a plaintiff can recover under a

UCC implied warranty theory for an allegedly defective product that has not actually

malfunctioned or caused personal injury.  Ford asks this Court to predict that Pennsylvania

courts would apply the rule followed by other states that a plaintiff cannot recover under such

circumstances.  Ford contends that under UCC § 2-314, codified in Pennsylvania at 13 Pa. Cons. Stat. § 2314, the Pennsylvania Plaintiffs' vehicles are "merchantable" because they are fit for their ordinary purpose, and further argues that Plaintiffs' description of the vehicle as defective is not based on an objective, legally recognizable standard.

Pennsylvania law imposes an implied warranty of merchantability on all contracts for the sale of goods if the seller is a merchant.  13 Pa. Cons. Stat. § 2314(a).  To be merchantable, the UCC as codified in Pennsylvania provides that the goods, in relevant part, must "pass without objection in the trade under the contract description" and be "fit for the ordinary purposes for which such goods are used."  13 Pa. Cons. Stat. § 2314(b).  The Pennsylvania Supreme Court has held that "[t]he concept of merchantability does not require that the goods be the best quality or the best obtainable but it does require that they have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used."  *Gall v. Allegheny Cty. Health Dep't*, 555 A.2d 786, 789-90 (Pa. 1989) (internal citations omitted).

Ford devotes much of its argument with regard to the Pennsylvania Plaintiffs' implied warranty claims to an extended discussion of the potential policy repercussions of allowing Plaintiffs to proceed with their claims for purely economic injury while lacking a consistently expressed, internally consistent theory of the "defect" of the E-350 van.  Ford bemoans the possibility that "defect" could mean different things to different juries in different cases in different states.  (*See* Ford Br. No. 19 at 14 ("And it also follows that a product is not

unmerchantable simply because that plaintiff's lawyer, on a particular day before a particular jury opposed by particular defense lawyer, can actually prevail on such a claim, because on another day before another jury opposed by a different defense lawyer he or she could also lose.").)  Because no governmental entity has declared the vehicles to be defective, Ford contends that no objective standard for defect exists.  Ford urges this Court to conclude that Pennsylvania courts would follow the reasoning of the Supreme Judicial Court of Massachusetts in *Iannacchino v. Ford Motor Co.* that an implied warranty claim grounded solely on economic injury based on overpayment, not personal injury, cannot lie under such circumstances.  *See Iannacchino v. Ford Motor Co.*, 888 N.E. 2d 879, 888 (Mass. 2008) ("When the standard that a product allegedly fails to meet is not one legally required by and enforced by the government, a claim of economic injury based on overpayment lacks the premise that the purchase price entitled the plaintiffs to a product that met that standard.").

While the Pennsylvania Supreme Court might adopt *Iannacchino* in the future, it has not yet done so, and Ford points to no caselaw from lower courts in Pennsylvania suggesting any trend in that direction.[14]  Rather, Ford's emphasis on the contingent nature of the Pennsylvania Plaintiffs' claims only highlights that many disputed issues of fact exist that prevent this Court from being able to decide these Plaintiffs' implied warranty claims as a matter of law.  Ford notes that the risk-utility approach often applied by Pennsylvania courts requires balancing of

---

[14]Similarly, Ford contends that Pennsylvania courts would follow the decision of the Supreme Court of New Jersey in *Thiedemann* and conclude that the Pennsylvania Plaintiffs have presented no cognizable proof of their damages.  However, this Court has already held that *Thiedemann* does not apply to implied warranty claims, and Ford similarly fails to point to any Pennsylvania caselaw suggesting that Pennsylvania courts would adopt *Theidemann* even if applicable.

many factors that "cannot be known with precision," and "in the typical case, reasonable people can and do disagree about whether a design related risk of harm renders a product defective." (Ford Br. No. 19 at 13.)  Ford later reiterates that "[n]othing in plaintiffs' complaint suggests that this is anything other than a typical case where the issue of 'defect' is reasonably debatable. i.e., where reasonable people can reach different conclusions on the issue." (*Id.* at 14.)  This Court agrees, and absent definitive guidance from any Pennsylvania court that plaintiffs asserting economic harm and not personal injury must allege a defect based on a governmentally-required standard, the question of defect is reserved for the jury.

Ford raises no other alternative arguments against the Pennsylvania Plaintiffs' implied warranty claims.  This Court will deny Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' implied warranty claims.

E.    Pennsylvania UTPCPL

The Pennsylvania UTPCPL grants standing to sue to "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful." 73 Pa. Cons. Stat. § 201-9.2(a).  Ford contends that the Pennsylvania Plaintiffs lack standing to bring its Pennsylvania UTPCPL claim here because they purchased their vehicles for church purposes, not for personal, family, or household use.  Plaintiffs rely upon *Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, in which the Superior Court held that a non-profit association had standing to sue on behalf of its member condominium residents in a representative capacity with regard to the roof of the condominium building.  574 A.2d 641, 645

81

(Pa. Super. Ct. 1990).  The court in *Valley Forge* focused on the Pennsylvania UTPCPL's statutory definition of "person," which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities."  73 Pa. Cons. Stat. § 201-2(2).  The Pennsylvania Plaintiffs, presumably as unincorporated associations, and the incorporated association plaintiff in *Valley Forge* all qualify as a person under the statute.

However, the condominium association in *Valley Forge* was empowered by separate, specific statutory authority to act in a representative capacity on behalf of its members to sue, enter into contracts, and regulate the maintenance of common elements of its members' condominium homes.  *Valley Forge*, 574 A.2d at 645.  The court recognized that even in the absence of statutory authority, before Pennsylvania law clarified the representative standing of condominium associations, such condominium associations had such standing.  *Id.* (citing *1000 Grandview Ass'n, Inc. v. Mt. Washington Assocs.*, 434 A.2d 796, 797-98 (Pa. Super. Ct. 1981)).  However, these cases deal with the unique context of residential condominium associations suing on behalf of their members with regard to purchases related to common areas of its members homes, and thus the purchases undoubtedly were for "personal, family, or household use."  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1128-29 (N.D. Cal. 2008) (recognizing "the unusual facts of *Valley Forge*," and "not[ing] that it would be the rare exception that a business entity would have standing under the Pennsylvania statute").  Here, the Pennsylvania Plaintiffs have no recognized statutory or other authority to sue on behalf of its members, and did not purchase the van for the personal, family, or household use of

any of its members.[15]  The Pennsylvania Plaintiffs lack standing to assert Pennsylvania UTPCPL

claims.  This Court will grant Ford's motion for summary judgment as to these claims.

      F.      <u>Unjust Enrichment</u>

      To assert a claim of unjust enrichment under Pennsylvania law, a plaintiff must show

that "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by

defendant; and (3) acceptance and retention of such benefits under such circumstances that it

would be inequitable for defendant to retain the benefit without payment of value." *Williams*

*Twp. Bd. of Supervisors v. Williams Twp. Emerg. Co.*, 986 A.2d 914, 923-24 (Pa. Commw. Ct.

2009) (citations omitted).  Ford points out that none of the Pennsylvania Plaintiffs have

produced any evidence that they conferred a benefit on Ford.  All of the vehicles at issue were

purchased from Ford dealerships.  As discussed previously in this Opinion, Plaintiffs have

presented no evidence regarding the relationships between Ford and any of the Ford dealers at

issue and whether money paid to a dealership was ultimately conferred upon Ford.  "The burden

of establishing an agency relationship rests with the party asserting the relationship." *Basile v.*

*H&R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000).  Pennsylvania courts (as well as those in

many other states) have strongly suggested that automobile dealerships are generally not agents

of automobile manufacturers in the selling of vehicles, and that the inquiry is a fact-specific one

that must be supported by sufficient evidence in the record. *See, e.g.*, *Zeno*, 480 F. Supp. 2d at

845-46.  The Pennsylvania Plaintiffs, like other Plaintiffs in this matter, have failed to satisfy

their evidentiary burden.  Ford contends that the Pennsylvania Plaintiffs have not shown the

---

     [15]For example, in an internal document describing the purpose of the church's Ford vans, Bethel stated "<u>Church vans will not be used for PERSONAL use!!!!!!!</u>"  (Andresen Certif. No. 12, Ex. 4 at BAME0011.)

essential elements of a benefit conferred upon and retained by Ford, and the Pennsylvania Plaintiffs have not met their burden to produce evidence in support of their position.

Bethel claims unjust enrichment based on its two E-350 vans. With respect to its second vehicle, the 2001 model, this Court will grant Ford's motion for summary judgment on the unjust enrichment claim without prejudice and allow Bethel until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Parkway East Ford and Ford and demonstrate that summary judgment should not be granted in Ford's favor on this unjust enrichment claim. Ford shall have until September 13, 2010 to file a response to Bethel's submission. However, Bethel's first vehicle, the new 2000 model, was not purchased by Bethel, but rather by Amoore. The van was purchased for Bethel's benefit essentially under a financing arrangement whereby Bethel would pay for the van over a period of time by paying the salaries of handicapped drivers provided by Amoore. Still, Amoore purchased the vehicle, and Bethel did not confer any benefit upon Ford or even a Ford dealership in the acquisition of the 2000 van. Therefore, this Court will grant Ford's motion with regard to Bethel's unjust enrichment claim on the 2000 van.

Hickman Temple purchased a *used* E-350 van from Springfield Ford. This Court has already declined to take judicial notice of any benefit conferred upon Ford by the purchase of a *new* vehicle from a Ford dealership. Even if this Court could somehow conclude that Ford necessarily derives some benefit from the sale of new cars by its dealers, the record is devoid of any evidence that used car sales benefit Ford. This Court will grant Ford's motion for summary judgment on Hickman Temple's unjust enrichment claim without prejudice and allow Hickman Temple until August 13, 2010 to show cause to cure the evidentiary deficiency and demonstrate

that summary judgment should not be granted in Ford's favor on the unjust enrichment claim.

Ford shall have until September 13, 2010 to file a response to Hickman Temple's submission.

Finally, Mt. Airy's unjust enrichment claim fails not only due to the lack of evidence

regarding conferral of a benefit on Ford from a purchase from Chapman Ford Sales, a Ford

dealership, but due to Plaintiffs' admissions regarding the allegedly inflated value of E-350

vans.  Plaintiffs assert unjust enrichment based on 1) Ford's extraction of payments from

Plaintiffs who would not have purchased the vehicles, or would have done so at reduced prices;

and 2) Ford's revenues on repairs outside Ford's 90-day limited warranty.  (Compl. ¶¶ 88-89.)

Mt. Airy has pointed to no evidence of money paid to Ford for repairs, and therefore its unjust

enrichment claim rests upon the inflated value Ford allegedly received from Mt. Airy for the

allegedly defective vehicle.  Even if Mt. Airy could show a sufficient agency relationship

between Chapman Ford Sales and Ford, or produce other evidence showing that Mt. Airy

conferred a benefit upon Ford, all Plaintiffs admitted in their Responses and Objections to

Ford's Second Set of Written Interrogatories that "[t]he artificial demand for the E-350 15

passenger vans, as referred to in the Complaint, is believed to have eroded fully by April, 2004,

when the [National Highway Traffic Safety Administration] reissued a safety warning

concerning 15-passenger vans."  (Andresen Certif No. 19, Ex. 5 at 22; *see also, e.g.*, Pls.'

Responsive Statement of Material Facts for Blandon ¶ 24.)  Although the Complaint references

this claimed artificial demand in its pleadings regarding Plaintiffs' statutory consumer fraud

claims (Compl. ¶ 98), the same theory underlies Plaintiffs' unjust enrichment claims: Ford

received an unjust benefit in excess of the value of the "defective" vehicle received by Plaintiffs.

Mt. Airy purchased its used van in August 2005, well after Plaintiffs believed the claimed

"artificial demand" leading to artificially inflated prices "eroded fully." To determine whether a defendant in an unjust enrichment claim "enjoyed an appreciation of the benefits which were conferred . . . the issue is whether the value of the benefit conferred exceeds the value of the consideration he paid for the benefits." *Bouriez v. Carnegie Mellon Univ.*, No. 02-2104, 2005 WL 3006831, at *12 (W.D. Pa. Nov. 9, 2005). Here, if the claimed "artificial demand" for the vehicles fully eroded by April 2004, the market value of the vans similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle. Mt. Airy purchased its vehicle in August 2005, and therefore, on Plaintiffs' own admission, could not have paid an inflated, unjust value for its van. Therefore, this Court will grant Ford's motion for summary judgment as to Mt. Airy's unjust enrichment claim.

 G. <u>Summary</u>

 For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to the Pennsylvania Plaintiffs' express warranty and Pennsylvania UTPCPL claims. This Court will deny Ford's motion with respect to the Pennsylvania Plaintiffs' implied warranty claims. With regard to the Pennsylvania Plaintiffs' unjust enrichment claims, this Court will: 1) grant Ford's motion as to Bethel's claim based on its 2000 vehicle, and grant Ford's motion without prejudice as to Bethel's claim based on its 2001 van; 2) grant Ford's motion without prejudice as to Hickman Temple's claim; and 3) grant Ford's motion as to Mt. Airy's claim. For Bethel's unjust enrichment claim based on its 2001 van and Hickman Temple's unjust enrichment claim, these Plaintiffs shall have until August 13, 2010 to show cause to cure the evidentiary deficiencies identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to

file a response to Bethel's and Hickman Temple's submissions.

## VI.   Florida

Florida Plaintiffs Martha Blandon, Tania Diaz, and Jose Mestre were added to this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for summary judgment as to all of the Florida Plaintiffs' claims: breach of express warranty; breach of implied warranty; violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq*.; and unjust enrichment.

### A.   Material Facts

#### 1.   Blandon

Blandon worked for Maya's Carpool from 2004 to 2006, transporting students to and from school in Ford E-350 vans.  During that time, Blandon and her co-workers discussed the stability problems they experienced with driving Ford E-350 vans, and Blandon herself lost control of a Ford E-350 vehicle on one occasion.  (*See* Ford's SUMF No. 13 at ¶ 3.)  At deposition, Blandon acknowledged that she knew that the vehicles were unstable, but she stated that she "did not know that it was a factory defect that they had."  (Blandon Dep. at 31:23-24.) In 2006, Blandon stopped working at Maya's Carpool and opened her own business transporting students.  It is undisputed that in connection with this business, in June 2006, Blandon purchased a used, gold-colored 2000 Ford E-350 van (the "Gold Van") "from a dealership not affiliated with Ford."  (*Id.* at 6:19-7:5; Pls.' Responsive Statement of Material Facts for Blandon ¶ 4.)  She paid $8,500 for the Gold Van.  Blandon did not view any Ford advertising material or talk to any Ford representatives before purchasing the Gold Van.  (Blandon Dep. at 17:6-24.) Blandon purchased an E-350 because she wanted a van for 15 passengers, and she asserted that

she knew Ford E-350 vehicles from her time with Maya's Carpool.  Blandon encountered some

handling problems with the Gold Van, and restricted the capacity of the van to 13 passengers by

limiting usage of the last row of seats.  (*Id.* at 29:15-24.)

After experiencing engine problems with the Gold Van, Blandon sold it in 2008 for

$3,800; she had hoped to sell it for as much as $6,000, but thought that the engine problems

limited her ability to sell at that price.  (*Id.* at 36:6-38:3.)  In August 2008, Blandon bought a

used, blue-colored 2000 Ford E-350 van (the "Blue Van").  She bought the Blue Van for $3,000

from a private individual.  (*Id.* at 56:2-13.)  At deposition, Blandon stated that she bought a

second E-350 van despite the problems she encountered with her first vehicle because "it was

good, and [she] liked the comfort that they offer."  (*Id.* at 42:17-18.)  She removed the back seat

from the Blue Van to address disciplinary problems resulting from many students wanting to sit

in the back seat, but also testified that she would not reinstall the back seat due to the risk of

"accident or tip over."  (*Id.* at 65:5-66:3.)

2.      *Diaz*

Until approximately 2005, Diaz worked for a company that used Ford E-350 vans to

transport children to and from school.  Diaz and her coworkers discussed handling problems

with the vehicles (Diaz Dep. at 6:9-11:3), but according to Diaz, no one told her that Ford vans

were dangerous (*id.* at 11:4-6.)  Diaz started her own school transportation business in 2005, and

purchased for use in this business a used 1993 Ford E-350 van for $2,000.  Diaz purchased her

1993 vehicle from a private individual named "Manolo" or "Manuel."  (*Id.* at 13:16-22.)  Diaz

could not remember the individual's last name.  Diaz did not view any Ford advertising material

or talk to any Ford representatives before purchasing the 1993 vehicle.  (*Id.* at 27:3-13.)  Diaz

88

limited the capacity of her 1993 van to 13 passengers, but she would have filled it to capacity if she had enough paying customers to do so.  (*Id.* at 26:17-22.)  Diaz subsequently sold the 1993 van for $1,000 in 2006.  In March 2007, Diaz purchased a used 2003 Ford E-350 van from Maroone Chevrolet, a Chevrolet dealer.  (*Id.* at 37:8.)  Again, Diaz viewed no Ford advertising material and did not talk to any Ford representatives before making this purchase.  (*Id.* at 39:3-12.)  Diaz does not operate this vehicle at capacity because she does not have sufficient paying customers to do so, although she testified that she has noticed some handling issues when the van is close to full and obtained insurance coverage at rates perceived to be high.  (*Id.* at 52:14-53:5.)

### 3.  Mestre

For a commercial business transporting students to and from school, Mestre purchased a used 2000 Ford E-350 van in 2004.  He purchased this vehicle for $9,115 from Bonanza Auto Sales, a used car dealership not affiliated with Ford.  (Mestre Dep. at 55:22-23.)  Mestre did not speak to any Ford representatives or view any Ford advertising before the purchase.  (*Id.* at 55:25-56:5.)  Before purchasing the 2000 van, Mestre spoke to a potential customer for his driving services who told Mestre that 15-passenger vans were dangerous if they lacked additional stabilizers.  (*Id.* at 31:20-34:12.)  Mestre operates the 2000 vehicle filled to capacity, although he has encountered some handling and stability problems, including one occasion where the wheels came off the ground when turning.  (*Id.* at 35:4-9.)  Mestre purchased a second E-350 vehicle to be used by three other drivers working for him.  Mestre bought the second vehicle, a used 2001 van, in approximately 2006 from the Belen School, for whom Mestre worked, for $10,500.  Again, Mestre did not speak to any Ford representatives or view any Ford

promotional materials before buying the 2001 van.  (*Id.* at 34:13-18.)  The drivers filled the 2001 van to capacity almost every day during the school year.  Mestre sold the 2001 van in approximately 2007 or 2008 for $7,000.

   B.   *Kia Motors*

   As a general matter, the Florida District Court of Appeal has disapproved of claims involving alleged defects that have not yet manifested and caused personal injury, and where plaintiffs seek damages in the form of "risk of failure" and diminished resale value.  *See Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1139 (Fla. Dist. Ct. App. 2008) (denying class certification in case asserting claims for breach of express and implied warranty claims and for violation of FDUTPA).  The court stated that it aligned itself with the "majority jurisprudence" on this issue.  *Id.*  Ford relies upon *Kia Motors* to contend that because none of the Florida Plaintiffs experienced a rollover, they may not recover on any of their claims in this action.

   However, the court in *Kia Motors* rejected class certification primarily because of factual differences in the performance of the vehicles at issue that precluded the finding of a faulty common design and prevented proof of a defect on a class-wide basis.  *Id.* at 1138.  The court relied upon the inclusion in the class of those whose vehicles had performed satisfactorily and thus caused no injury as one of two "additional, readily apparent reasons" to deny class certification.  *Id.*  No court has applied the reasoning of the appellate court in *Kia Motors* to flatly preclude recovery for diminished resale value and other economic damages where personal injury has not occurred.  However, this Court need not apply *Kia Motors* as a blanket prohibition against the maintenance of any of the Florida Plaintiffs' claims, because each of their claims all fail under established Florida law governing those claims.

90

C.     Express Warranty

Ford contends that this Court should grant it summary judgment on the Florida

Plaintiffs' express warranty claims because the Florida Plaintiffs did not provide requisite notice

to Ford pursuant to Fla. Stat. § 672.607(3)(a), and because they did not engage in any justifiable

reliance upon Ford's affirmations or representations.  With regard to the notice argument, Fla.

Stat. § 672.607(3)(a) indeed codifies the UCC's requirement of notice by the buyer to the seller

to maintain a breach of warranty claim.  It is undisputed that none of the Florida Plaintiffs gave

actual notice to Ford prior to joining this litigation.  However, Florida law appears silent on

whether the filing of a complaint satisfies the notice requirement, and the parties do not address

this issue in their briefing on any of the Florida Plaintiffs.  This Court need not explore this

issue, as the Florida Plaintiffs express warranty claims fail for other reasons.

"Under Florida law, an express warranty may arise only where justifiable reliance upon

assertions or affirmations is part of the basis of the bargain."  *Hobco, Inc. v. Tallahassee

Assocs.*, 807 F.2d 1529, 1533 (11th Cir. 1987).  None of the Florida Plaintiffs purchased their

vehicles from Ford or even from those affiliated with Ford, and they had no interaction with any

Ford representatives and viewed no Ford materials.  Therefore, no express statements by Ford to

these Plaintiffs formed the basis of the bargain between the Florida Plaintiffs and their sellers.

Furthermore, under Florida law, "an express warranty is generally considered to arise only

where the seller asserts a fact of which the buyer is ignorant prior to the beginning of the

transaction, and on which the buyer justifiably relies as part of the 'basis of the bargain.'"

*Thursby v. Reynolds Metals Co.*, 466 So. 2d 245, 250 (Fla. Dist. Ct. App. 1984) (internal

citations omitted).  In *Thursby*, the court held that plaintiff did not rely on any affirmation of

particular fact because defendant "refus[ed] to make any specific factual guarantee regarding the [product]'s performance." *Id.* Similarly here, Ford made no explicit factual representation regarding the E-350 van's performance; as discussed above with regard to other Plaintiffs, any representation of safety was implied in Ford's description of the E-350 as a 15-passenger van. In addition, all of the Florida Plaintiffs testified that they were familiar with the Ford E-350 van and its potential problems, either from prior work experience (Blandon and Diaz) or a conversation with a potential customer (Mestre). These Plaintiffs nonetheless purchased the vehicles, and cannot be said to have relied upon an assertion of fact by Ford of which they were ignorant prior to the transaction. For these reasons, this Court will grant Ford's motion for summary judgment as to the Florida Plaintiffs' express warranty claims.

D.      Implied Warranty

"Under Florida law, privity of contract is required to maintain an action for breach of an implied warranty." *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 325 (Fla. Dist. Ct. App. 2008). None of the Florida Plaintiffs purchased their vehicles from Ford or even any dealer arguably affiliated with Ford: Blandon purchased used vehicles from a non-Ford dealership and a private individual; Diaz purchased used vans from a private individual and a Chevrolet dealer; and Mestre bought used E-350 vans from a non-Ford dealership and a school. Because none of the Plaintiffs are in privity with Ford, their implied warranty claims must all fail.

The Florida Plaintiffs contend that an older ruling by the Florida Supreme Court abolished the privity requirement for implied warranty claims. *See Manheim v. Ford Motor Co.*, 201 So. 2d 440, 441-42 (Fla. 1967). However, the Florida Supreme Court later held that "the doctrine of strict liability in tort supplants all no-privity, breach of implied warranty cases."

92

*Kramer v. Piper Aircraft Corp.*, 520 So. 2d 37, 39 (Fla. 1988).  In the absence of privity, Florida

law no longer recognizes a breach of implied warranty claim.  *Indemnity Ins. Co. of N. Am. v.*

*Am. Aviation, Inc.*, 891 So. 2d 532, 539 (Fla. 2004).  A federal court in Florida observed that

"[u]nder Florida law, to recover for breach of implied warranty, the plaintiff must be in privity

of contract with the defendant" and rejected any reliance on *Manheim* because *Manheim* only

applies to cases involving a disclaimer in a contract between a manufacturer and a dealer.

*Powers v. Lazy Days RV Ctr., Inc.*, No. 8:05-cv-1542T17EAJ, 2006 WL 373011, at *2 (M.D.

Fla. Feb. 16, 2006) (describing "limited scope" of *Manheim*).  Because none of the Florida

Plaintiffs have privity with Ford, this Court will grant Ford's motions for summary judgment as

to the Florida Plaintiffs' claims for breach of implied warranty.

    E.    FDUTPA

       The elements of a claim for damages under the FDUTPA are: "(1) a deceptive act or

unfair practice; (2) causation; and (3) actual damages."  *Kia Motors*, 985 So. 2d at 1140.  Ford

contends that the Florida Plaintiffs have suffered no damages because they have not experienced

a rollover and the FDUTPA does not allow for recovery of "consequential damages, such as

repair damages or resale damages."  *Id.*  However, Ford misconstrues the meaning of "actual

damages" under the FDUTPA, Fla. Stat. § 501.211.  Under this section, a consumer plaintiff

may recover damages "attributable to the diminished value of the goods or services received, but

does not authorize recovery of consequential damages to other property attributable to the

consumer's use of such goods or services."  *Schauer v. Morse Operations, Inc.*, 5 So.3d 2, 7

(Fla. Dist. Ct. App. 2009) (quotations and citations omitted); *see also Rollins, Inc. v. Heller*, 454

So. 2d 580, 585 (Fla. Dist. Ct. App. 1984) ("[T]he measure of actual damages is the difference

in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.").  While the Florida Plaintiffs cannot recover damages associated with repair costs, if they can show diminution in value due to deception or fraud, they may recover.  The defect need not have actually manifested itself in the form of a rollover; indeed, the FDUTPA does not apply to personal injury claims. *Schauer*, 5 So. 3d at 6.

Ford further argues that the Florida Plaintiffs cannot prove that they suffered any losses "as a result of" any allegedly deceptive Ford practice or act.  Central to an FDUTPA action in this context is whether the purchaser "had knowledge of the alleged [] defect and purchased the vehicle despite such knowledge." *Kia Motors*, 985 So. 2d at 1140 (denying class certification in part because common question of law did not predominate).  If the purchaser did so, she could not show she was actually deceived, or that any actual deception caused her damages. *See Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 685 (S.D. Fla. 2008) (rejecting class certification on FDUTPA claim because some class members who knew of the allegedly deceptive inclusion of an administrative fee in invoices for property taxes could not reasonably assert that they were likely to be deceived by the invoice).

The Florida Plaintiffs argue that even if they knew of the rollover risk of the vehicles, such knowledge is only relevant when obtained from the defendant, and their knowledge here was not derived from Ford.  The Florida Plaintiffs rely upon *Pop's Pancakes* for this proposition, noting that the court in *Pop's Pancakes* stated that consumers could not assert they were deceived by the inclusion of an administrative charge in an invoice where they were told about it by a defendant's representative or by reading the invoice itself.  251 F.R.D. at 685.

94

However, the court in *Pop's Pancakes* did not limit its holding that certain class members could assert an FDUTPA claim to where those members learned of the fee from defendant; rather, the factual context of that case dictated that such knowledge could only come from the defendant. Here, the Florida Plaintiffs had experience with Ford E-350 vans not limited to interactions with Ford itself, a scenario unavailable in *Pop's Pancakes*.  In any event, the court in *Pop's Pancakes* explicitly stated that the deceptiveness of the invoice "depends, in part, on the knowledge and/or understanding of each [defendant] customer."  *Id.* at 686.  Limiting the relevance of knowledge to that derived from the defendant would obviate the causation element for an FDUTPA claim; a defendant's deceptive practice must cause a plaintiff's injury, and if a plaintiff knew of the safety issues that Ford's allegedly deceptive sales practices attempted to conceal, her injuries could not have been caused by those practices.

Blandon and Diaz both drove Ford E-350 vehicles before starting their own transportation businesses and purchasing Ford E-350 vans themselves.  They asserted that they knew of the alleged handling problems with the vehicles and admitted experiencing those problems themselves.  They nonetheless purchased the vans, and never viewed any Ford promotional materials or had any discussions with Ford representatives.  Under these circumstances, Ford argues that any loss they have suffered, as a matter of law, could not have been the result of an allegedly deceptive Ford act.  With regard to Blandon, this Court agrees. Blandon testified that while working at Maya's Carpool, the drivers discussed the propensity of Ford vans to rollover "everyday" and that they warned each other to "be careful that you will – not to tip over because these vans are not stable."  (Blandon Dep. at 14:19-15:9.)  Blandon's supervisor at Maya's Carpool, after Blandon reported her loss of control of an E-350 van, told

95

her to be careful "because these vans were not safe." (*Id.* at 14:4-5.)  Thus, Blandon asserts that she knew not only that the vehicles could potentially have handling problems, but that they were not safe.  With regard to Blandon, Plaintiffs appear to contend that while she knew of the problems with some Ford vans, she did not know that the problems stemmed from an alleged "factory defect."  (Blandon Dep. at 31:23-24.)  This attempt to create a dispute of material fact does not negate the undisputed fact that Blandon assertedly knew that the vehicles were unsafe but nonetheless purchased two vehicles.  This Court will grant summary judgment in Ford's favor on Blandon's FDUTPA claims.

With regard to Diaz and Mestre, the record is not as clear.  Diaz drove Ford E-350 vans before purchasing his own vehicles, and discussed the vans' handling problems with his coworkers, but testified that no one ever told him that the vans were dangerous.  She did not explicitly acknowledge that she knew that the vehicles were unsafe.  Mestre did not operate any Ford vehicles before he purchased his first van, the 2000 van.  Mestre testified that he knew of some "swaying" problems with the vehicles before buying his second van, but bought the second van anyway because he "like[d] the vehicle."  (Mestre Dep. at 27:18-22.)  On the record before the Court, the degree of Mestre's knowledge regarding the safety of the vehicles is disputed and his feelings about the vans does not exclude the possibility that Ford's alleged omissions could have caused his injury.[16]  Because the nature and extent of Diaz's and Mestre's

---

[16]Ford does not move for summary judgment on the grounds of lack of actual reliance, and while reliance does not appear to be an express element of an FDUTPA claim, *see Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009), Florida courts have not spoken clearly on the topic and particularly regarding whether the causation requirement incorporates some notion of reliance, *Fitzpatrick v. General Mills, Inc.*, 263 F.R.D. 687, 694-95 (S.D. Fla. 2010).  Generally, "to satisfy the FDUTPA's causation requirement, each plaintiff is required to prove only that the deceptive practice would – in theory – deceive an

knowledge is disputed, this Court will deny Ford's motion for summary judgment on their FDUTPA claims.

> F.      Unjust Enrichment

This Court will grant summary judgment in Ford's favor on the Florida Plaintiffs' claims for unjust enrichment because none of the Florida Plaintiffs purchased their vehicles from Ford or any entity arguably affiliated with Ford.  Under Florida law, "[t]he essential elements of a claim for unjust enrichment are: (1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof."  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006) (quoting *Swindell v. Crowson*, 712 So. 2d 1162, 1163 (Fla. Dist. Ct. App. 1998)).  The Florida Plaintiffs have not met their burden to produce evidence showing that the Florida Plaintiffs conferred any benefit upon Ford.  Rather, it is undisputed that none of the Florida Plaintiffs conferred a benefit upon Ford.

Furthermore, as discussed above, a defendant enjoys the appreciation of the benefits which were conferred if the value of that benefit exceeds the value of the consideration given for that benefit.  The Florida Plaintiffs point to no evidence of money paid to Ford for relevant repairs, and therefore their unjust enrichment claims rest upon the inflated value Ford allegedly received from them for the allegedly defective vehicles.  As Plaintiffs concede, the claimed

---

objective reasonable consumer."  *Fitzpatrick*, 263 F.R.D. at 695.  Ford does not frame its argument for summary judgment based on the knowledge of the Florida Plaintiffs in these terms, and the Florida Plaintiffs do not oppose Ford's motion by arguing that their subjective knowledge is irrelevant; rather, they advance that the *source* of the knowledge makes the difference.  This Court will decide Ford's motion on the arguments advanced by the parties.

"artificial demand" for Ford E-350 vehicles fully eroded by April 2004, the market value of these post-April 2004 vans similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle.  Here, even if the Florida Plaintiffs had conferred a benefit upon Ford – which, based on the undisputed record, they did not – they cannot maintain most of their unjust enrichment claims because they stem from purchases made after April 2004, when the claimed artificial demand had eroded and the prices they therefore paid were not unjustly inflated.  Blandon and Diaz purchased their vehicles after April 2004, and Mestre purchased his 2001 van in 2006.  Therefore, unjust enrichment claims based on these vehicles fail.  While Mestre purchased his 2000 van in 2004, it is unclear when in 2004 he made that purchase.  In any event, even if he purchased the 2000 van prior to the full erosion of the purported artificial demand, this Court must enter summary judgment in Ford's favor on the unjust enrichment claim based on that purchase due to the fundamental evidentiary deficiency: that Mestre did not confer any benefit upon Ford in purchasing the 2000 van from a used car dealership not affiliated with Ford.  For these reasons, this Court will grant Ford's motions for summary judgment on the Florida Plaintiffs' unjust enrichment claims.

　　G.　　Summary

　　For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to the Florida Plaintiffs's claims for breach of express warranty, breach of implied warranty, and unjust enrichment, and with respect to Florida Plaintiff Blandon's FDUTPA claim.  The Court will deny Ford's motion with regard to the FDUTPA claims of Florida Plaintiffs Diaz and Mestre.  Florida Plaintiff Blandon shall be dismissed from this matter.

VII.   **Texas**

Texas Plaintiff St. Luke's Community United Methodist Church ("St. Luke's") was

added to this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now

moves for summary judgment as to all of St. Luke's claims: breach of express warranty; breach

of implied warranty; violation of the Texas Deceptive Trade Practices-Consumer Protection Act

("DTPA"), Tex. Bus. & Com. Code § 2.313 *et seq.*; and unjust enrichment.

A.   Material Facts

St. Luke's purchased two new model year 2001 Ford E-350 vans on April 28, 2001 from

Village Ford, a Ford dealership, for $25,000 each.  St. Luke's testifying representative, Evelyn

Kelly, was unaware whether St. Luke's viewed any Ford promotional materials or statements

prior to the purchase, but thought that Ford promised a 15-passenger van based on the van's

name and product specification.  (Kelly Dep. at 124:13-124:5.)  In approximately 2004, the

church started limiting the capacity of its vans to 12 passengers by removing the back seat.

(Kelly Dep. at 34:10-35:19.)  The church has had no reports of actual handling or stability

problems, and it asserts that it has avoided those problems by not overloading its vans, although

St. Luke's representative also did not remember any incidents during the period prior to when

the church began limiting the number of passengers in the vans.  (*Id.* at 64:13-65:19.)  It is

undisputed that St. Luke's encountered no difficulties in obtaining insurance on the vans.  (Ford

SUMF No. 21 ¶ 14; Pls.' Responsive Statement of Material Facts for St. Luke's ¶ 14.)

B.   *Inman*

Ford argues that the decision of the Supreme Court of Texas in *DaimlerChrysler Corp.*

*v. Inman*, 252 S.W. 3d 299 (Tex. 2008) dictates that St. Luke's lacks standing to bring its claims

99

under Texas law and therefore this Court should grant summary judgment in Ford's favor.

Plaintiffs in *Inman* asserted, in a purported class action, that certain vehicles manufactured by

defendant and employing a particular model of seatbelt buckle were defective because the

buckles were "dangerously subject to accidental release." *Id.* at 302.  None of the named

plaintiffs had suffered personal injury from accidental buckle unlatching; two had never

experienced any problem related to the buckle, and a third could not be sure.  Just as Plaintiffs

do in the instant case, plaintiffs in *Inman* asserted claims of breach of express and implied

warranty, and violations of the DTPA, among other claims.  The lower court in Texas certified

the purported class.  As Plaintiffs here concede, the Supreme Court of Texas reversed and

"dismissed plaintiffs['] claims for lack of standing because the plaintiffs themselves could not

prove that they had ever experienced buckle unlatching, but had only offered evidence

documenting instances in which other people experienced unlatching."  (Pls.' Omnibus Br. at 43

(citing *Inman*, 252 S.W. 3d at 302).)   The court concluded that the plaintiffs could not show

"more than the merest possibility of injury to themselves," and that to find that they had

standing "would drain virtually all meaning from the requirements that a plaintiff must be

'personally aggrieved' and that his injury must be 'concrete' and 'actual or imminent'." *Inman*,

252 S.W. 3d at 307.  The court did not exclude the possibility that some owners of the vehicles

with the allegedly defective seatbelt buckle could assert concrete injury, but found that the

plaintiffs at issue could not.  *Id.*

     Ford argues that the facts here are virtually identical to *Inman*, and therefore this Court

should find that St. Luke's lacks standing.  If the Court did find a want of standing, it could not

render judgment in Ford's favor, but could only dismiss St. Luke's claims.  *Inman*, 252 S.W. 3d

at 307-08.  St. Luke's responds that unlike the *Inman* plaintiffs, it has asserted evidence of actual injury in that it removed the back seats of its vans and had to rent additional vehicles due to the capacity limitations.  (Pls.' Omnibus Br. at 43.)  With regard to the latter contention, examination of the deposition testimony of St. Luke's representative reveals that St. Luke's occasionally rented additional vehicles to transport additional passengers to confirmation class.  However, St. Luke's in those instances sought to transport somewhere between 40 to 60 people at a time.  (Kelly Dep. at 70:8-17.)  If St. Luke's imposed no limitations on the capacity of its Ford E-350 vans, it could only carry 30 total passengers in the two vans, so additional vehicles would have been necessary nonetheless.  Still, St. Luke's points to evidence of some injury from its removal of the back seat.

Ford contends that Judge Ackerman, in applying Arkansas law, rejected "loss of use" and diminution in value as cognizable actual damage under Arkansas's consumer fraud statute, and contends that the same interpretation should apply here.  (MTD Opinion at *23 (citing *Wallis v. Ford Motor* Co., 208 S.W.3d 153 (Ark. 2005).)  Judge Ackerman's rejection of the Arkansas consumer fraud statute claim pursuant to *Wallis* does not directly control here, and *Inman* did not explicitly hold, as did the court in *Wallis*, that "actual damage or injury is sustained when the product has actually malfunctioned or the defect has manifested itself."  *Wallis*, 208 S.W. 3d at 161.  Indeed, the *Inman* court stated that "[w]e do not decide the degree to which a defect must manifest itself in a product before a warranty is breached," and based its holding solely on standing, concluding that plaintiffs' asserted injury was "extremely remote."  *Inman*, 252 S.W. 3d at 307.

Plaintiffs in *Inman* presented no plausible theory of actual injury at all.  As the Supreme

Court of Texas noted, the *Inman* plaintiffs did *not* contend that the allegedly defective "buckles made their vehicles worth less than they paid for them." *Inman*, 252 S.W. 3d at 302. Rather, they only sought damages for repair costs. *Id.* Here, St. Luke's seeks damages based on diminution in value and loss of use, and the *Inman* court did not have this kind of potential injury before it. Ford asserts that "[n]othing in *Inman* suggests that the Court would have found standing had the plaintiffs alleged that their 'fear of possible injury' led them to limit the use of their vehicles." (Ford Reply Br. at 77.) This might be true, and the Supreme Court of Texas could so rule in a subsequent case, but nothing in *Inman* expressly suggests that the Court would not have found standing under a different theory of injury and damages. This Court will decline to conclude that St. Luke's lacks standing.

C.    Express and Implied Warranty

Ford argues that St. Luke's express and implied warranty claims are barred for its failure to give notice within a reasonable time. UCC § 2-607, as codified in Texas, provides that, to assert a warranty claim post-tender, "[t]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Tex. Bus. & Com. Code § 2.607(c)(1). St. Luke's concedes that it did not provide any pre-litigation notice, but contends that filing suit by joining this litigation satisfied the notice requirement. However, under Texas law the filing of a complaint does not constitute sufficient notice; notice must be given pre-suit. *See, e.g.*, *Martin v. Home Depot U.S.A., Inc.*, 369 F. Supp. 2d 887, 893 (W.D. Tex. 2005) (granting summary judgment in favor of defendant because plaintiff did not provide "pre-suit notice as required by Texas law"); *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W. 3d 194, 202 (Tex. App. 2003) ("Neither did the commencement of

litigation satisfy this notice requirement.").  St. Luke's failure to provide pre-suit notice is fatal

both to its express and implied warranty claims.  *U.S. Tire-Tech*, 110 S.W. 3d at 201 ("The

notice requirement for both breach of implied warranty and breach of express warranty springs

from the same source – section 2.607(c)(1) of the Texas Business and Commerce Code.").  Any

generic notice Ford might have had regarding problems with E-350 vans generally does not

suffice under Texas law.  "The manufacturer must be made aware of a problem with a particular

product purchased by a particular buyer."  *Id.* at 202.  This Court will grant Ford's motion for

summary judgment as to St. Luke's express and implied warranty claims based on lack of

notice.

    D.    <u>DTPA</u>

      The DTPA bars "false, misleading, or deceptive acts or practices in the conduct of any

trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and provides a "laundry list" of

examples of such acts or practices, Tex. Bus. & Com. Code § 17.46(b).  St. Luke's claims that

Ford misrepresented or concealed certain facts regarding the safety of Ford E-350 vans

potentially falls under several provisions of the laundry list.  *See, e.g.*, Tex. Bus. & Com. Code §

17.46(b)(5), (7), and (9) (misrepresentations in advertising), and (24) (omissions leading

consumer to enter into transaction she would not have entered into had the information been

disclosed).  Reliance is an essential element of a DTPA claim under any of these theories.  Tex.

Bus. & Com. Code § 17.50(a)(1)(B); *see Morgan Bldgs. and Spas, Inc. v. Humane Society of*

*S.E. Texas*, 249 S.W. 3d 480, 490 (Tex. App. 2008) (citing *Henry Schein, Inc. v. Stromboe*, 102

S.W.3d 675, 693 (Tex. 2002)).  Ford contends that St. Luke's could not have relied upon any

Ford misrepresentation or omission to its detriment, as its only testifying representative did not

103

recall whether anyone at St. Luke's viewed any advertisements or other materials issued by Ford. St. Luke's, based on Kelly's testimony, argues that St. Luke's observed the "packaging" of the Ford E-350 van as a 15-passenger van and perceived those specifications as a promise of a safe 15-passenger van, one upon which St. Luke's relied by purchasing the vehicles.

Whether Ford's representation of the vehicle as a 15-passenger van constitutes a deceptive trade practice under the DTPA requires consideration of whether the representation was mere puffing or too vague to be actionable. In *Chandler v. Gene Messer Ford, Inc.*, 81 S.W. 3d 493 (Tex. App. 2002), plaintiff asserted a violation of § 17.46(b)(5) of the DTPA, which defines a deceptive trade practice as "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," Tex. Bus. & Com. Code § 17.46(b)(5). Plaintiffs in *Chandler* asserted that Ford's advertisements represented that air bags improve overall vehicle safety, and that a salesperson with the defendant Ford dealership told plaintiff that the Ford car they ultimately purchased was safer than a competitor's because it had dual air bags. After plaintiffs' child was injured while riding in the front seat, plaintiffs sought recovery under the DTPA based on these representations. The court in *Chandler* held that the salesperson's statements were mere puffery and therefore not actionable under the DTPA, and the advertisements were "too vague to support [plaintiffs'] claim of a misrepresentation under the DTPA." 81 S.W. 3d at 501.

Here, Ford's description of the vehicles as 15-passenger vans, as previously discussed, does not include an express representation of safety. Even the misrepresentations at issue in *Chandler* and found insufficient to serve as the basis for a DTPA violation expressly included representations of safety. Nonetheless, the Texas court found them wanting for vagueness.

104

"Although general or indefinite statements may support recovery under the DTPA, they must be examined in light of the particular facts of the case."  *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W. 2d 224, 230 (Tex. App. 1996).  An imprecise or vague representation amounts to mere opinion or puffing.  *Id.*  Here, under the particular undisputed facts of this case, Ford's description of the E-350 van as a 15-passenger van did not include any representation of safety, and does not rise to the level required for a violation of § 17.46(b)(5).

St. Luke's also asserts violations of §§ 17.46(b)(7) and (9).  Section 17.46(b)(7) bars the representation "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and § 17.46(b)(9) covers "advertising goods or services with intent not to sell them as advertised."  Ford limits its argument on St. Luke's DTPA misrepresentation theory to § 17.46(b)(5) and *Chandler*, which only involved § 17.46(b)(5).  However, the principles applied in *Chandler* apply equally to the other implicated misrepresentation provisions, and Texas courts often discuss these provisions together.  *See, e.g.*, *Douglas v. Delp*, 987 S.W. 2d 879, 886 (Tex. 1999) (analyzing §§ 17.46(b)(5) and (7) together); *Humble*, 933 S.W. 2d at 229-30 (same).  This Court will grant summary judgment in Ford's favor on St. Luke's DTPA claims to the extent that the claims are based on misrepresentations by Ford in its description of the E-350 van.

Section § 17.46(b)(24) of the DTPA prohibits the failure "to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."  A claim for failure to disclose under the DTPA requires that a plaintiff show that "(1) the defendant knew information

regarding the goods or services, (2) the information was not disclosed, (3) there was an intent to induce the consumer to enter into the transaction through the failure to disclose, and (4) the consumer would not have entered into the transaction had the information been disclosed." *Patterson v. McMickle*, 191 S.W. 3d 819, 827 (Tex. App. 2006).  St. Luke's presents claims under this section based on Ford's alleged omission of information regarding the stability of the vehicles.  Ford argues that because St. Luke's presented no evidence that it ever viewed any Ford promotional materials or other communications, it also cannot prove that it would have seen any disclosure Ford would have made, and therefore "it has no evidence that it would have relied upon any such unseen disclosure."  (Ford Br. No. 21 at 8.)

However, the deposition testimony of St. Luke's representative only demonstrates that she was not aware whether St. Luke's had seen any Ford materials prior to its purchases, and cannot be read to establish, as a matter of law, that St. Luke's would not have seen a disclosure regarding safety.  The elements of a non-disclosure claim under pursuant to § 17.46(b)(24) do not require St. Luke's essentially to prove a negative by showing that it would have seen a disclosure that never happened.  Rather, to satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to induce a transaction through failure to disclose, and that plaintiff would not have entered into the transaction if the information had been disclosed.  The record is not undisputed on these questions, and Ford has not conclusively shown, based on undisputed facts, that St. Luke's would have purchased the vehicles regardless of any disclosure Ford might have made.  This Court will deny Ford's motion with regard to St. Luke's DPTA claims to the extent they assert a violation based on non-disclosure.

106

E.      Unjust Enrichment

In Texas "[u]njust enrichment, itself, is not an independent cause of action but rather 'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay.'" *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W. 3d 694, 703 (Tex. App. 2008) (quoting *Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 832 (Tex. App. 2006)).  To recover under a theory of unjust enrichment in Texas, a party must prove that "one person has obtained a benefit from another by fraud, duress, or the other taking of an undue advantage." *City of The Colony v. N. Tx. Mun. Water Dist.*, 272 S.W. 3d 699, 731 (Tex. App. 2008).

Just as other Plaintiffs in this matter who purchased vehicles from a Ford dealership failed to present evidence that their purchase benefitted Ford, St. Luke's points to no evidence that Ford benefitted from the purchases from Village Ford.  "Under Texas law, an agency relationship must be affirmatively established, it may not be presumed."  *Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 677 (N.D. Tex. 1998) (citing *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994)).  Moreover, "[i]n Texas, the general rule is that a retailer or wholesaler is not an agent of a manufacturer."  *Coffey*, 24 F. Supp. 2d at 678.  St. Luke's, in response to Ford's motion for summary judgment, has failed to meet its burden to come forward with facts supporting its agency theory, and St. Luke's "burden is not satisfied by assertions unsupported by facts or a scintilla of evidence."  *Id.* at 679 (footnotes omitted).  Therefore, this Court will grant Ford's motion for summary judgment on St. Luke's unjust enrichment claims without prejudice and allow St. Luke's until August 13, 2010 to show cause to cure the evidentiary deficiency regarding the relationship between Village Ford and Ford and

107

demonstrate why summary judgment should not be granted in Ford's favor.  Ford shall have until September 13, 2010 to file a response to St. Luke's submission.

F.    Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment as to St. Luke's claims for breach of express warranty and implied warranty, and for violation of the DTPA under a misrepresentation theory.  This Court will deny Ford's motion with respect to St. Luke's DTPA claims to the extent that they are based upon non-disclosure.  This Court will grant Ford's motion without prejudice with regard to St. Luke's unjust enrichment claim.[17] St. Luke's shall have until August 13, 2010 to show cause to cure the evidentiary deficiency identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor on the unjust enrichment claims.  Ford shall have until September 13, 2010 to file a response to St. Luke's submission.

## VIII.  Missouri

Missouri Plaintiff St. James United Methodist Church ("St. James") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for summary judgment as to all of St. James's claims: breach of express warranty; breach of implied warranty; violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.*; and unjust enrichment.

---

[17]Ford also asks for summary judgment in its favor on any claims by St. Luke's with regard to two additional Ford E-350 vans it purchased, a 1990 model year and a 1991 model year. St. Luke's has excluded these vehicles from this suit, and indeed the 1990 van is outside Plaintiffs' purported class definition.  Therefore, St. Luke's does not present any claims on the 1990 or 1991 vehicles, and only asserts claims based on the two 2001 vans in this litigation.

A.    Material Facts

Randy Hall, Chairman of St. James's Board of Trustees, purchased a used 1997 Ford E-350 van on behalf of St. James in February 1998.  Hall purchased the used 1997 vehicle from South Town Ford, a Ford dealership.  (Andresen Certif. No. 20, Ex. 2 at 2.)  In August 2001, St. James purchased another Ford E-350 van, a used 2000 model, for approximately $23,000.  Hall, who testified at deposition on St. James's behalf, could not remember from whom St. James purchased the 2000 van.  (Hall Dep. at 96:17-97:2.)  St. James purchased both vehicles because they could carry 15 passengers, and James testified with regard to the 2000 van that the church viewed Ford brochures that stated that the van could carry 15 passengers.  (*Id.* at 79:4-80:4.)  The church purchased the vehicles to transport church members to and from services and events, and in connection with other church functions and programs.  St. James continues to use both vans.  At one time, St. James operated the vans with 15 passengers, but now limits capacity to 12 by not using the back row of seats.  (*Id.* at 66:15-67:18.)  St. James has driven each van approximately 13,000 miles per year.  (*Id.* at 97:17-98:9.)  While St. James has heard reports about the handling problems with the Ford E-350 van, Hall testified that St. James's drivers had only reported brake issues and other minor problems.  (*Id.* at 138:11-17.)  James did not testify that any drivers reported any handling problems.  (*Id.*)  Hall testified that he believed that St. James's insurance carrier alerted it to the reported handling problems with Ford E-350 vans and recommended that St. James use drivers with commercial drivers' licences for the vehicles.  (Hall Dep. at 34:17-35:10; 101:2-12.)  However, St. James never encountered any difficulty procuring insurance for the vehicles, and it reduced its rates when it switched carriers in approximately 2008.  (*Id.* at 35:23-37:23.)  St. James intends to sell the vehicles, but has made

109

no plans and conducted no research into a potential future sale.  (*Id.* at 113:22-114:25.)

> B.    *Briehl* and *O'Neil*

Ford primarily contends that the decision of the Eighth Circuit in *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir. 1999), dictates that under Missouri law, St. James's claims must be dismissed for failure to adequately plead damages because the alleged defect in its vans has not manifested itself.  In *Briehl*, the Eighth Circuit affirmed the dismissal by a district court in Missouri of a purported class's claims in multidistrict litigation for breach of implied and express warranties and various state consumer fraud statutes.  Plaintiffs in *Briehl* asserted that the anti-locking brake system in their vehicles were defective and that the defect resulted in diminution in value and lower resale value.  Just as here, the *Briehl* plaintiffs did not seek recovery for any personal injury or property damage.  *Briehl*, 172 F.3d at 626.  The Eighth Circuit agreed with the district court in Eastern District of Missouri that "[w]here, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies."  *Id.* at 628.  Because plaintiffs "failed to allege any manifest defect and their vehicles perform in a satisfactory manner," the Eighth Circuit affirmed the dismissal of all of plaintiffs' claims.  *Id.*  The court in *Briehl* did not limit its holding to Missouri law, and cited cases from several jurisdictions holding that a plaintiff in product liability cases cannot sufficiently plead damages if the alleged defect did not manifest itself.  *Id.* at 627-28 (collecting cases).  Ford concedes that the Missouri state courts have not spoken on this issue with regard to the types of claims asserted by St. James, although it points to a Missouri Court of Appeals decision that dismissed claims for strict liability and negligent failure to warn on similar reasoning that the product did not actually malfunction or fail.  *See Spuhl v. Spiley, Inc.*, 795 S.W. 2d 573, 580-81

110

(Mo. Ct. App. 1990).

Curiously, St. James ignores *Briehl* in responding to Ford's motion.  Plaintiffs argue generally that they have suffered "actual injury due to a present inability to use the E-350 for its ordinary purpose," and contend that other cases similar to *Briehl* that required manifestation of the defect are distinguishable because in those cases, the products served their ordinary purposes.  (Pls.' Omnibus Br. at 9.)  To show actual injury, Plaintiffs rely generally on various Plaintiffs' limitations on use and capacity of their vans and evidence that some Plaintiffs have incurred out-of-pocket costs associated with responding to handling problems, such as repair and insurance costs.  (*Id.* at 6-7.)

In *Briehl*, the plaintiffs did not assert such limitations on use or other out-of-pocket damages, and instead only sought damages for "(1) lost resale value and (2) overpayment for the vehicles at the time of purchase."  *Briehl*, 172 F.3d at 626.  With regard to the *Briehl* plaintiffs' claim for reduced resale value, the court commented that no plaintiff or purported class member actually sold their vehicle at a reduced value.  *Id.* at 628-29.  Here, St. James has not sold its vehicles, has no specific plan to do so, and has not identified any reduced resale value.  More fundamentally, St. James of course has not suffered a rollover, and did not produce evidence even of any significant handling complaints.  It is not clear how the *Briehl* court would have approached the plaintiffs' claims if plaintiffs also sought economic damages based on limitations on use, but the court's firm rejection of any claimed damages as too speculative absent manifestation of defect strongly suggests that such an alternate theory would not have made a difference.

Subsequent application of *Briehl* confirms that the limitation-on-use theory does not

provide the basis for a no-injury case to proceed.  In *O'Neil v. Simplicity, Inc.*, plaintiffs alleged that "they paid for a drop-side crib and now they do not use the crib because the drop-side is not safe . . . .  Thus, they contend that they have suffered an economic injury, and they seek to recover the difference in price between a crib with a functional drop-side and a crib without." 574 F.3d 501, 502 (8th Cir. 2009).  The Eighth Circuit affirmed the dismissal of plaintiffs' claims by a district court in Minnesota because plaintiffs' cribs had "not exhibited the alleged defect," and therefore "they have necessarily received the benefit of their bargain."  *Id.*

Plaintiffs in *O'Neil* limited their use of the crib, but the alleged defect never manifested itself and did not result in personal injury or other injury.  The Eighth Circuit affirmed the dismissal of all their claims, which included all the claims asserted by St. James here: breach of express and implied warranty, violation of the relevant state's consumer fraud statute, and unjust enrichment.[18]  While *O'Neil* concerned Minnesota law, it relied upon general principles propounded by the Eighth Circuit and did not refer to any doctrine specific to Minnesota law. The reasoning of *Briehl* and *O'Neil* applies equally here.  St. James has elected to limit its use of its vehicles by limiting capacity, but the defect has not manifested itself and therefore they have received the benefit of their bargain.  As in *O'Neil*, the manifestation of the alleged defect in vehicles purchased by others does not translate into a cognizable injury for a plaintiff whose product did not malfunction.  *See O'Neil*, 574 F.3d at 504 ("[Plaintiffs] purchased a crib with a

---

[18]In the opinion of the district court affirmed by the Eighth Circuit in *O'Neil*, the court concluded "[i]t is simply not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of that same product unsafe; the plaintiff must instead allege an actual manifestation of the defect that results in some injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment."  *O'Neill v. Simplicity, Inc.*, 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008).

functioning drop-side and that crib continues to have a functioning drop-side.  Their bargain

with [defendants] did not contemplate the performance of cribs purchased by other

consumers.").

A district court in Missouri recently distinguished *Briehl* and *O'Neil* and declined to

dismiss certain claims brought by plaintiffs who purchased baby products and later learned that

they contained Bisphenol-A (BPA), a chemical which has potentially negative health effects,

and either still retained the goods or replaced or disposed of them.  *In re Bisphenol-A (BPA)*

*Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897 (W.D. Mo. 2009).  The district

court concluded that unlike in *Briehl* and *O'Neil*, where only a "potential defect" existed and

had not yet manifested itself, the products at issue in *BPA* definitely contained BPA.  Thus, the

key for the *BPA* court was "not that someone was injured, but that consumers were not told of

BPA's presence and the corresponding health risks.  Perhaps no physical injuries resulted – but

a fraud claim does not depend on a showing of physical injury."  *Id.* at 911.  The court

concluded that for the plaintiffs whose claims survived, those claims "do not depend on proving

the products are defective," and thus the no-injury line of products liability cases do not apply.

*Id.* at 912.  The court accepted these plaintiffs' benefit-of-the-bargain argument, reasoning that

they "purchased a product they allege they would not have purchased had they known the true

facts.  Now that they know the true facts, they are unwilling to risk allowing their children to use

the product. They cannot obtain the intended bargain or benefit from the goods, so they incurred

damages."  *Id.*  In a subsequent opinion, the court clarified that "[a] person who buys a product

and is later told there is a substance in the product that might cause personal injury has a claim

for breach of implied warranty of merchantability; the consumer need not suffer personal injury

in order to assert a breach of contract/warranty claim." *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, No. 08-1967, 2010 WL 286428, at *1 (W.D. Mo. Jan. 19, 2010).  By the same token, "a person who buys a product and is not told that the product contains a substance that might cause personal injury when the product is used has a claim for fraud by omission; a personal injury is not required." *Id.*

This Court concludes that the instant case bears closer resemblance to *Briehl* and *O'Neil* than *BPA*.  Whereas the products in *BPA* undisputedly contained the chemical which could cause negative health effects, the vans at issue here, like the anti-lock braking system in *Briehl* and the cribs in *O'Neil*, only contain a potential defect in handling.  Just like plaintiffs in *O'Neil*, St. James here no longer uses the vehicle to carry 15 passengers and thus claims that it did not receive the benefit of its bargain.  However, absent manifestation of the defect, the vehicles "perform[] just as [they were] intended, and thus there is no injury and no basis for relief." *O'Neil*, 574 F.3d at 505.

The court in *BPA* relied upon *Coghlan v. Wellcraft Marine Corp.*, in which plaintiffs were promised an all-fiberglass boat but received a boat made of fiberglass and plywood, as an example of a case alleging loss of benefit-of-the-bargain that did not depend on manifestation of actual injury because the injury was the misrepresentations made to the buyer.  240 F.3d 449, 455 n.4 (5th Cir. 2001).  Because the claims in *Coghlan* were "rooted in basic contract law rather than the law of product liability" and the damages sought were "not rooted in the alleged defect of the product as such, but in the fact that they did not receive the benefit of their bargain," the *Goghlan* court allowed the claims to proceed, and the *BPA* court used *Coghlan* to distinguish *O'Neil*.  However, as the *BPA* court recognized, *O'Neil* cited *Coghlan* approvingly,

114

and acknowledged the difference between a no-injury suit and benefit-of-the-bargain suit. *O'Neil*, 574 F.3d at 504-05.  The Eighth Circuit in *O'Neil* concluded that the plaintiffs before it "attempted to refashion what is at its core a no-injury products liability suit into a suit based in contract" but could not succeed because defendants "ha[d] not failed to deliver what was promised."  *Id.* at 504.  Plaintiffs in *O'Neil* paid for a drop-side crib and limited their use of the crib because the drop-side was not safe; St. James here paid for 15-passenger vans and limited their use of the vehicles because use at full capacity allegedly is not safe.  While St. James's claims do not depend on products liability law, they still depend upon a showing that its vans did not perform as promised, and like the plaintiffs in *Briehl* and *O'Neil*, it cannot do so.  In the absence of definitive guidance from the Missouri state courts, this Court will follow the guidance of the Eighth Circuit's rulings under Missouri and other states' laws.  This Court will grant summary judgment in Ford's favor on all of St. James's claims because it has suffered no injury and no damages.

### C.   Express and Implied Warranty

While summary judgment is warranted for the reasons discussed above, Ford is entitled to summary judgment on some of St. James's claims for additional reasons.  Ford contends that St. James's warranty claims as to its 1997 vehicle, purchased in 1998, are barred by Missouri's four-year statute of limitations for breach of contract actions.  Mo. Rev. Stat. § 400.2-725(1).  A cause of action under this statute accrues when the breach occurs; a breach of warranty generally occurs when tender of delivery is made.  Mo. Rev. Stat. § 400.2-725(2).[19]  Plaintiffs filed this

---

[19]Section 400.2-725(2) provides for an exception to the rule that a breach of warranty occurs upon tender where the warranty expressly extends to future performance, a situation not present here.

115

action in 2003, and St. James joined this action in 2008.  Even based on the initial filing of this

action in 2003, St. James's claims are time-barred because they are outside the four-year

limitations period, unless the doctrine of fraudulent concealment applies to toll the statute.

"To constitute concealment of a cause of action within the general rule tolling the

statute of limitations on that ground the concealment must be fraudulent or intentional and, . . .

there must be something of an affirmative nature designed to prevent, and which does prevent,

discovery of the cause of action."  *Owen v. General Motors Corp.*, 533 F.3d 913, 919-20 (8th

Cir. 2008) (quoting *Hasenyager v. Bd. of Police Comm'rs of Kansas City*, 606 S.W.2d 468, 471

(Mo. Ct. App.1980) (internal marks omitted)).   The fraudulent concealment must involve

"more than mere silence on defendant's part" and usually requires the use of "some means or

device to prevent discovery."  *Owen*, 533 F.3d at 920 (quoting *Gilliam v. Gohn*, 303 S.W.2d

101, 107 (Mo. 1957)).  Although Illinois Plaintiff Pentecostal Temple contends that the statute

of limitations here was tolled by the doctrine of fraudulent concealment, St. James does not

present any such argument, or oppose Ford's motion with regard to the timeliness of the 1997

vehicle warranty claims in any way.  Under Missouri law, the burden of proving fraudulent

concealment rests with the plaintiff.  *See Tayborn v. Burstein*, 748 S.W.2d 824, 826 (Mo. Ct.

App.1988); *see also Nitro Distributing, Inc. v. Alticor, Inc.*, 565 F.3d 417, 427 (8th Cir. 2009);

*Hasenyager*, 606 S.W. 2d at 471-72.  St. James has failed to meet its burden here; indeed, it has

failed even to raise an argument as to why the warranty claims for the 1997 van should not be

time-barred.

### D.    MMPA

As it has with regard to other Plaintiffs' state consumer fraud statute claims, Ford

116

contends that St. James may not assert a claim under Missouri's consumer fraud statute, the MMPA, because it did not purchase its vans for personal, family, or household use.  The MMPA allows "any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss" as a result of an unlawful sales practice to bring suit.  Mo. Rev. Stat. § 407.025(1).  While St. James qualifies as a "person" under the statutory definition, *see* Mo. Rev. Stat. § 407.010(5), it purchased the vehicles for church purposes and not primarily for personal, family, and household use.  As this Court previously held with regard to Georgia Plaintiff Allen Temple, St. James did not purchase the vans for any particular parishioner's or employee's personal, family, or household use.  Rather, it bought the vans for use in the course of church business, even though that business might have additionally benefitted individual members personally.  *See Se. Mo. Hosp. v. C.R. Bard, Inc.*, No. 07-31, 2008 WL 199567, at *9 (E.D. Mo. 2008) (dismissing MMPA claim for purchases of catheters by hospital); *Saey v. CompUSA, Inc.*, 174 F.R.D. 448, 450 (E.D. Mo. 1997) (holding that plaintiff who purchased computer for business lacked standing under MMPA).  In addition to its failure to assert cognizable injury under *Briehl* and *O'Neil*, St. James lacks standing to assert its MMPA claims.

     E.     Unjust Enrichment

Under Missouri law, a plaintiff asserting a claim for unjust enrichment must show "(1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; [and] (3) that it would be unjust to allow the defendant to retain the benefit."  *Beeler v. Martin*, 306 S.W. 3d 108, 112 (Mo. Ct. App. 2010) (quoting *Miller v. Horn*, 254 S.W.3d 920, 924 (Mo. Ct. App. 2008)).  To establish unjust enrichment, a plaintiff show the

117

"conferral of a benefit on the defendant by the plaintiff."  *McCormick v. Cupp*, 106 S.W. 3d 563, 568 (Mo. Ct. App. 2003).

Here, St. James purchased its first vehicle used from a Ford dealership, and cannot recall from whom it purchased its second vehicle.  With regard to the first vehicle, for the same reasons as discussed above with regard to other Plaintiffs who purchased used vehicles from a Ford dealership, the record is devoid of any evidence that used car sales benefit Ford, and St. James does not point to any evidence whatsoever suggesting that Ford received any benefit from the sale of the used car by a Ford dealer to St. James.  Under Missouri law, a party relying on an agency relationship bears the burden of proof, *Elam v. Dawson*, 216 S.W. 3d 251, 254 (Mo. Ct. App. 2007), and as discussed previously with regard to other Plaintiffs, St. James has utterly failed to meet its burden to show an agency relationship here.  With regard to the second vehicle, in opposing summary judgment St. James has not pointed to any evidence regarding from whom it purchased the vehicle, and therefore has not met its burden to produce more than a mere scintilla of evidence to support a finding that St. James conferred a benefit upon Ford. Therefore, in addition to the reasons stated above, Ford is entitled to summary judgment in its favor on St. James's unjust enrichment claims.  In light of this Court's conclusion that St. James cannot maintain its action pursuant to *Briehl* and *O'Neil*, this Court sees no cause for St. James to be granted leave to cure its evidentiary deficiency regarding the 1997 van.

F.     Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all of St. James's claims.  St. James shall be dismissed from this matter.

118

IX.    **Michigan**

Michigan Plaintiff Conant Avenue United Methodist Church ("Conant Avenue") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for summary judgment as to all of Conant Avenue's claims: breach of express warranty; breach of implied warranty; violation of the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901 *et seq.*; and unjust enrichment.

A.    Material Facts

Elaine Hopkins, a Conant Avenue member and chairperson of the church's Administrative Board, was employed by Ford in its Fleet Services Department and held the responsibility to provide transportation to those doing business with Ford.  Hopkins learned that Ford Fleet Services was selling a used 2000 Ford E-350 van, looked at the van, and told Conant Avenue about it.  (Totty Dep. at 18:12-25.)  The church purchased the vehicle in February 2001 for $21,404.58.  (*Id.* at 24:6-25; Andresen Certif. No.15, Ex. 3 at CAUM 003.)  As a Ford representative, Hopkins told Conant Avenue that it was the largest capacity van and would hold 15 passengers.  (Totty Dep. at 21:3-7.)  Conant Avenue believed that Ford promised that the vehicle "would carry 15 passengers," (*id.* at 119:20) based on Hopkins's statements (*id.* at 19:13-23) and the VIN number indicating that it was a 15-passenger van (*id.* at 119:24-120:1).  However, Pastor Darryl Eugene Totty also testified on behalf of Conant Avenue that he was not aware of any Ford marketing or other printed materials, other than that which might have been provided by Hopkins.  (*Id.* at 108:21-109:11.)  The church purchased the vehicle to transport members to and from church events, and bought the van because it needed to carry a large number of people and the E-350 was "the maximum size van that they could get at the time."

119

(*Id.* at 18:4-8.)  Totty stated that in selling the van, Ford falsely represented that the van could carry 15 people safely.  (*Id.* at 115:2-4.)  Yet Totty also testified that Ford did not have the "intent at that time. . . to mislead or defraud the church in any way" (*id.* at 115:5-6), and that Ford did not conceal any information from the church when it sold the church the van (*id.* at 115:10-13).

The Retail Installment Contract for the vehicle lists Riverside Ford Sales, Inc. ("Riverside Ford"), a Ford dealership, as the seller.  (Andresen Certif. No. 15, Ex. 3 at CAUM 003.)  However, according to Totty, Riverside Ford was just a "pickup location," because one could not purchase the van "directly from the corporation," and Ford's policies dictated that "it had to go through a dealer."  (Totty Dep. at 38:25-39:3.)  Conant Avenue negotiated price and other terms of the contract with Ford Fleet Services, and the vehicle was delivered via Riverside Ford.  (*Id.* at 39:5-15.)  At deposition, Totty acknowledged that Conant Avenue had a direct contract with Ford for the purchase of its van.  (*Id.* at 119:2-9.)

Conant Avenue still owns its used 2000 Ford E-350 van.  Until October 2008, Conant Avenue often filled the vehicle to capacity with 15 passengers.  (Totty Dep. at 115:7-9.)  In October 2008, after reading the government report regarding the safety of the Ford E-350, the church removed the last row of seats to limit capacity to 12 passengers.  (*Id.* at 44:3-17.)  Conant Avenue never experienced a rollover (*id.* at 115:14-17), but Totty and others reported some swaying when the van was filled to capacity (*id.* at 52:22-53:16; 56:3-19).  Sometime in 2008, after a driver reported to the church that she had some concerns about the stability of the vehicle, Conant Avenue took its van to Jorgensen Ford to "check the tires and to check the vehicle out and just to make sure that it was safe."  (*Id.* at 56:23-24.)  The Ford dealership found

no problems with the vehicle, and merely rotated the tires and gave the van an oil change.  (*Id.* at 57:1-2.)  Conant Avenue has driven its vehicle over 57,000 miles.  (Andresen Certif. No. 15, Ex. 1 at 2.)

      B.    *Hendricks* and *Henry*

Ford first asks this Court to predict that the Supreme Court of Michigan would follow the rulings of other state courts in holding that a plaintiff cannot recover under breach of warranty or the MCPA where its claim is based upon an alleged product defect that has not manifested itself in personal injury or property damage.  A court in the Western District of Michigan has stated that it was "aware of no Michigan authority which recognizes, as injury in an action under the MCPA, recovery for a potential future loss which has not actually occurred." *Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F. Supp. 2d 775, 782 (W.D. Mich. 2006).  In *Hendricks*, plaintiff claimed that she suffered identity and data theft at the hands of the defendant, and only sought damages for "expenses which she has made to purchase a credit monitoring product, which she alleges will prevent future unauthorized use of her personal data." *Id.* at 779.  The court in *Hendricks* rejected plaintiff's claims, holding that "[t]here is no existing Michigan statutory or case law authority to support plaintiff's position that the purchase of credit monitoring constitutes either actual damages or a cognizable loss." *Id.* at 783.  Ford asks this Court to grant summary judgment in Ford's favor on all of Conant Avenue's claims based on the same reasoning.

Ford concedes that Michigan state courts have not yet directly addressed this issue, and relies also upon a decision of the Supreme Court of Michigan in a negligence case that refused to allow liability for potential future injury.  *Henry v. Dow Chemical Co.*, 701 N.W. 2d 684,

688-89 (Mich. 2005).  The court in *Henry* rejected tort liability where plaintiffs suffered no

present physical injury from a chemical allegedly released by the defendant, but where plaintiffs

sought damages for economic losses they had suffered and would continue to suffer by

monitoring  their health condition for symptoms based on exposure to defendant's chemical.  *Id.*

at 77.  Ford concedes that "<u>Henry</u> involved a claim based on negligence, and the holding of the

supreme court is by its terms limited to tort cases" (Ford. Br. No. 15 at 6) and thus not

controlling here.  However, Ford argues that extending this rationale would best serve the

underlying policy concerns that guided the *Henry* court.  The federal court in *Hendricks* relied

upon *Henry* in dismissing contract and MPCA claims, reasoning that "there is reason to believe

that Michigan's highest court would reject a novel legal theory of damages which is based on a

risk of injury at some indefinite time in the future."  *Hendricks*, 444 F. Supp. 2d at 783 (citing

*Henry*, 701 N.W. 2d at 692).  Conant Avenue argues that this Court should distinguish

*Hendricks* because Conant Avenue does not seek recovery "for the cost of protecting [itself]

against future injury," but asks for damages based on "the current loss of full use of [its]

vehicle[]," acknowledging that "reduced likelihood of future injury resulting from a rollover"

would be a 'secondary benefit.'  (Pls.' Omnibus Br. at 10-11.)  In *Henry*, the Supreme Court of

Michigan held with regard to plaintiffs' tort claims that their asserted economic losses for

medical monitoring "are wholly derivative of a *possible, future* injury rather than an *actual,*

*present* injury."  *Henry*, 701 N.W. 2d at 691 (emphasis in original).  Still, Ford itself concedes

that *Henry* is limited to tort claims, and this Court declines to extend *Henry* to the contract and

MCPA claims at issue here.  The court's reasoning in *Henry* does not allow this Court to

conclusively predict that the Supreme Court of Michigan would categorically rule that a plaintiff

in a non-tort case involving economic injury arising from loss of full use such as that asserted by Conant Avenue here could not recover.

    C.    <u>Express Warranty</u>

In addition to its broad argument that *Henry* should be extended to preclude Conant Avenue's claims, Ford asserts that it should win summary judgment on Conant Avenue's claims for breach of express warranty because Ford's description of the E-350 van does not amount to an actionable express warranty of safety in transporting 15 passengers.  Michigan has adopted the UCC's express warranty provisions.  "An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  Mich. Comp. Laws § 440.2313(1)(a).  In addition, "[a] description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."  Mich. Comp. Laws § 440.2313(1)(b).  This Court concludes, for the same reasons as discussed earlier with regard to other Plaintiffs, that Ford's statement that the E-350 van is a 15-passenger van does not create an express warranty of the safety of the van in carrying 15 passengers.  Similarly, Hopkins's statements on behalf of Ford that the van could carry 15 passengers and was the largest van they could get did not amount to an express warranty of safety.

Michigan courts have required that an express warranty include a specific promise or description with the intention that the goods conform to that specific promise.  For example, in *Guaranteed Constr. Co. v. Gold Bond Prods.*, the defendant represented a product as "corner bead," and plaintiff sued for breach of express warranty when this product suffered corrosion.  395 N.W. 2d 332, 334-35 (Mich. Ct. App. 1986).  The Court of Appeals of Michigan concluded

that the defendant had supplied "corner bead" as promised, and that plaintiff had not pointed to any express representation by the seller that the corner bead would not rust. *Id.* at 335. The court noted that if defendant's packaging had stated "noncorrosive corner bead," then plaintiff might have had a valid breach of express warranty claim. *Id.* Similarly here, Ford described the vehicle as a 15-passenger van, and Plaintiffs do not dispute that the E-350 van can transport 15 passengers; therefore, as a matter of law Ford has not breached any express warranty. Any representation of safety in carrying 15 passengers, if actionable, is only an implied warranty and not an express warranty based on the undisputed record. Indeed, the court in *Guaranteed Construction* observed that under plaintiff's theory of the case, to recover under warranty the plaintiff had to rely upon implied warranty. *Id.* Another court in Michigan found that a label on a water heater stating "SET DIAL D TO DESIRED TEMPERATURE" did not constitute an express warranty that dial could be *safely* set at the maximum temperature. *Ledesma ex rel. Hoffman v. Rheem Mfg. Co.*, No. 175457, 1997 WL 33354494, at *1 (Mich. Ct. App. Jan. 21, 1997). The court concluded that defendant's "instruction to set the dial to the desired temperature cannot be read as a warranty that any temperature setting would be safe for bathing." *Id.* The same reasoning applies here: Ford's description of the vehicle as a 15-passenger van and Hopkins's comments about the van's large capacity cannot be read to create an express warranty of safety.

An action for express warranty must rely upon express representations or statements made by defendant, and not on any understandings on plaintiff's part or mere implications. *Latimer v. William Mueller & Son, Inc.*, 386 N.W. 2d 618, 622 (Mich. Ct. App. 1986); *see also Heritage Resources, Inc. v. Caterpillar Financial Servs. Corp.*, 774 N.W. 2d 332, 342 n.11

124

(Mich. Ct. App. 2009) (citing *Latimer*, 386 N.W. 2d at 622).  Because Conant Avenue does not

point to any express, actionable representations of safety in transporting 15 passengers made by

Ford, this Court will grant summary judgment in Ford's favor on Conant Avenue's claim for

breach of express warranty.

    D.    Implied Warranty

    Beyond its general arguments pursuant to *Henry* and *Hendricks*, Ford moves for

summary judgment on Conant Avenue's breach of implied warranty claim only based on lack of

sufficient notice.  Ford does not present any other argument on the merits of Conant Avenue's

implied warranty claim.  Michigan has adopted the UCC's notice standard: "the buyer must

within a reasonable time after he discovers or should have discovered any breach notify the

seller of breach or be barred from any remedy."  Mich. Comp. Laws § 440.2607(3)(a).  As do

the other Plaintiffs, Conant Avenue argues that its joining of this lawsuit constitutes sufficient

notice.  Michigan law is silent on the precise question of whether the filing of a complaint

satisfies the requirements of § 440.2607(3)(a).  *See, e.g.*, *In re Bridgestone/Firestone, Inc. Tires

Prods. Liab. Litig.*, 155 F. Supp. 2d 1069, 1110 (S.D. Ind. 2001) (noting that no Michigan court

has addressed whether filing suit, at least in some instances, could satisfy the notice

requirement).  In a case involving a commercial transaction, the Court of Appeals of Michigan

concluded, based upon an extensive examination of undisputed facts and consideration of the

purposes for the UCC's notice requirement,[20] that a merchant plaintiff failed to provide

---

    [20]These purposes include: "(1) to prevent surprise and allow the seller the opportunity to
make recommendations how to cure the nonconformance, (2) to allow the seller the fair
opportunity to investigate and prepare for litigation, (3) to open the way for settlement of claims
through negotiation, and (4) to protect the seller from stale claims and provide certainty in
contractual arrangements."  *American Bumper & Mfg. Co. v. Transtechnology Corp.*, 652 N.W.

sufficient notice where plaintiff notified defendants of a problem but never notified defendants that they were in breach until it filed suit. *American Bumper & Mfg. Co. v. Transtechnology Corp.*, 652 N.W. 2d 252, 256 (Mich. Ct. App. 2002). However, the court's reasoning in *American Bumper* depended upon a commercial standard of reasonableness and involved consideration of plaintiff's subsequent investigation of the problem that exonerated defendant. *Id.* The court declined to resolve whether Michigan applies a "strict" or "lenient" standard with regard to the adequacy of notice, but determined under either approach, plaintiff's purported notice did not serve the purposes of the notice requirement. *Id.* at 255-56.

What constitutes reasonable notice and reasonable time for such notice "is to be determined under the facts of each case." *Eaton Corp. v. Magnavox Co.*, 581 F. Supp. 1514, 1531 (E.D. Mich. 1984); Mich. Comp. Laws § 440.1204(2). Michigan courts have only required that notice of breach "inform the seller that there are outstanding problems with the transaction" and that the transaction must be watched. *See Mich. Sugar Co. v. Jebavy Sorenson Orchard Co.*, 239 N.W. 2d 693, 696 (Mich. Ct. App. 1976); *see also Natron Corp. v. Hamilton/Avnet Elecs. of Ariz., Inc.*, No. 5:90-CV-60, 1991 WL 303604, at *2 (W.D. Mich. Nov. 1, 1991). One federal court concluded that nothing in Michigan law suggests that the Supreme Court of Michigan would hold that "the filing of a lawsuit can never satisfy the notice of breach requirement." *In re Bridgestone/Firestone*, 155 F. Supp. 2d at 1110. That court further reasoned that the policies underlying the UCC notice requirement – those policies analyzed by the Michigan state court in *American Bumper* – are not necessarily frustrated by if notice is given by filing suit. *Id.* at 1110-11 (stating that notice by filing suit promotes the

---

2d 252, 256 (Mich. Ct. App. 2002).

protection of defendants from stale claims and does not impede settlement negotiations because the prospect of going to trial presents a powerful incentive, and considering factor that defendants had ample actual notice of breach well before lawsuit was filed).  This Court agrees, and concludes that the Supreme Court of Michigan would not hold that notice by filing or joining suit does not constitute notice at all.  Disputed facts exist regarding such issues as Ford's actual notice, both of the potential handling problem with Ford E-350 vans generally and difficulties with Conant Avenue's vehicle specifically based on Conant Avenue's bringing of the vehicle to a Ford dealer for service.  Whether Conant Avenue gave notice by joining suit within a reasonable time is also a question of fact.  Because Ford presents no additional argument for granting summary judgment on Conant Avenue's implied warranty claim, this Court will deny Ford's motion with regard to that claim.

     E.     <u>MCPA</u>

The MCPA makes various "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" unlawful.  Mich. Comp. Laws § 445.903(1).  The act defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes."  Mich. Comp. Laws § 445.902(g).  Michigan state courts and most Michigan federal courts have held that under this statutory definition, "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection."  *Slobin v. Henry Ford Health Care*, 666 N.W. 2d 632, 634-35 (Mich. 2003); *Zine v. Chrysler Corp.*, 600 N.W. 2d 384, 393 (Mich. Ct. App. 1999); *see also Robertson v. State Farm Fire & Cas. Co.*, 890 F. Supp. 671, 680-81 (E.D. Mich. 1995).  The Court of Appeals in Michigan in *Zine* agreed with the federal court in

*Robertson* that "the proper focus was on the use to which the goods or services were put by the plaintiffs." *Zine*, 600 N.W. 2d at 393 (citing *Robertson*, 890 F. Supp. at 680).

Here, Conant Avenue used its vehicle for church purposes, and not for personal, family, or household use, as this Court has held with regard to other church Plaintiffs in this action. Conant Avenue seizes upon the MCPA's definition of a "person" who can bring suit as including a corporation or unincorporated association.  Mich. Comp. Laws § 445.902(d).  Thus, according to Conant Avenue, the statute contemplates a suit by a church organization.  While this statutory definition indeed does not bar an association from bringing a claim under the MCPA, that claim must still meet the standing requirement that the purchase be for a personal purpose.  As the court in *Robertson* observed, and as quoted with approval by the Court of Appeals of Michigan in *Zine*,

> "Person" is used in the MCPA in reference to those bringing actions (i.e., plaintiffs) and to those against whom actions will be brought (i.e., defendants).  Since defendant sellers will often be businesses and corporations, the Act would have to include such entities in its definition of "person" as long as the Act continued to refer to potential defendants as "persons."  Accordingly, inclusion of corporations and other business entities in the definition of "person" serves a broader purpose and does not really aid the definition of "personal."

*Robertson*, 890 F. Supp. at 679-680; *see also Zine*, 600 N.W. 2d at 392.

Conant Avenue notes that the court in *Robertson* conceded that "[t]he only scenario the court can envision is one wherein a corporation would buy its employees products as a holiday bonus, e.g., televisions, stereos, etc., which will be used by the employees in their respective homes.  In such a scenario, it is arguable that the corporation is buying goods for personal, family, or household purposes." *Robertson*, 890 F. Supp. at 679.  Here, however, the church did

128

not purchase the vehicle for personal use by its members, but to be used by the church for church business: to transport its members to and from church functions.  Such use is not actionable under the MCPA.  *See German Free State of Bavaria v. Toyobo Co.*, 480 F. Supp. 2d 958, 969 (W.D. Mich. 2007) (holding that purchase by German states of bulletproof vests to be worn personally by police officers was a purchase for public police business, not personal, family, or household purposes).  The inclusion of corporations and other associations in the statutory definition of "person" allows suit if the purchase is primarily intended for personal purposes

Some federal courts have rejected *Robertson* and held that, particularly in a false advertising case, a plaintiff need not have purchased the product primarily for personal, family, or household purposes as long as defendant generally was engaging in trade or commerce when it made the representations at issue.  *Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 848-850 (E.D. Mich. 2003); *Action Auto Glass v. Auto Glass Specialists*, 134 F. Supp. 2d 897, 899-901 (W.D. Mich 2001).  However, these cases did not cite *Zine*, which reflects the opinion of the Michigan courts on this question under Michigan law, and Michigan courts have reaffirmed *Zine* on many occasions and have held that the MCPA does not apply to transactions intended primarily for business or commercial, rather than personal, purposes.  *See, e.g.*, *Slobin*, 666 N.W. 2d at 634-35; *Computer Network, Inc. v. AM General Corp.*, 696 N.W. 2d 49, 59-60 (Mich. Ct. App. 2005); *Jackson Cty. Hog Producers v. Consumers Power Co.*, 592 N.W. 2d 112, 117-118 (Mich. Ct. App. 1999).  Federal courts have also followed the approach of *Zine* and *Robertson*.  *See, e.g.*, *German Free State of Bavaria*, 480 F. Supp. 2d at 968-69; *Watkins & Son Pet Supplies v. Iams Co.*, 107 F. Supp. 2d 883, 892-

129

93 (S.D. Ohio 1999); *Cosmetic Dermatology & Vein Centers of Downriver, P.C. v. New Faces Skin Care Ctrs., Ltd.*, 91 F. Supp. 2d 1045, 1060 (E.D. Mich. 2000); *see also, e.g.*, *McKay v. Thane Int'l, Inc.*, No. 06-11209, 2007 WL 4287552, at *2-*3 (E.D. Mich. Dec. 5, 2007).

This Court will adhere to the rulings of the Michigan state courts and the majority interpretation of the Michigan federal courts. Because Conant Avenue did not purchase the vehicle primarily for personal, family, or household purposes, it lacks standing to bring its MCPA claim. This Court will therefore grant summary judgment in Ford's favor on Conant Avenue's MCPA claim.

F.   Unjust Enrichment

In Michigan, "[t]he elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. In such instances, the law operates to imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter." *Barber v. SMH (US), Inc.*, 509 N.W. 2d 791, 796 (Mich. Ct. App. 1993). Ford argues that although the Retail Installment Contract for Conant Avenue's vehicle lists Riverside Ford as the seller, Conant Avenue concedes that it formed a direct contract with Ford through Ford Fleet Services, and that Riverside was only listed as the pickup location. Therefore, because Conant Avenue formed an express contract with Ford by its own admission pertaining to the purchase of the vehicle, it cannot maintain an action for unjust enrichment.[21] This Court agrees. Conant Avenue's claim for unjust

_____

[21]In its Responsive Statement of Material Facts, in one paragraph Conant Avenue disputes Ford's contentions that Conant Avenue had a direct contract with Ford, claiming that Conant Avenue purchased its vehicle from Riverside Ford. (Pls.' Responsive Statement of Material

enrichment arises from its purchase of its Ford E-350 van, and the sales contract governed this

purchase and covers the same subject matter as Conant Avenue's unjust enrichment claim.

Therefore, this Court may not imply a contract to prevent any unjust enrichment.[22]

 Conant Avenue dismisses Ford's argument based on a direct contract as "disingenuous"

because with regard to many other Plaintiffs who purchased their vehicles through Ford dealers,

Ford asks this Court to grant summary judgment on unjust enrichment and other claims for lack

of privity, and cannot now be heard to argue the opposite – a contractual relationship – for the

same result.  (Pls.' Omnibus Br. at 61 n.26.)  Yet Conant Avenue ignores the crucial difference

between it and the other Plaintiffs: Conant Avenue concedes that although its sales contract lists

a Ford dealer, it entered into a direct contract with Ford, not a dealer.  Other Plaintiffs have not

met their burden to point to evidence in the record establishing that Ford benefitted from the

sales by dealers.  Here, Plaintiffs have met their evidentiary burden but face a bar to recovery for

unjust enrichment by virtue of their contractual relationship.  These alternative results are not

mutually exclusive.

---

Facts for Conant Avenue ¶ 2.)  However, in the very next paragraph, Conant Avenue responds
"Undisputed" to Ford's statement that "Conant Avenue admits that the purchase agreement was a
direct contract with Ford."  (*Id.* ¶ 3.)  This Court concludes that no genuine issue of material fact
exists, as Conant Avenue conceded that it had a direct contract with Ford.  Conant Avenue's
dispute with itself as to the nature of its contract does not create a disputed fact; Totty clearly
testified at deposition that the church had a direct contract with Ford for the purchase of the van
(Totty Dep. at 119:2-9), and Conant Avenue does not dispute that this testimony amounts to an
admission that its contract was with Ford directly.

 [22]Indeed, while Conant Avenue may not maintain its breach of express warranty claim
because Ford did not expressly warrant the safety of the vehicle, this Court will deny summary
judgment to Ford as to Conant Avenue's breach of implied warranty claim.  Therefore, Conant
Avenue may effectively proceed with its claim of breach of an implied contract term, but not
under the guise of unjust enrichment.

G.      Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment

with respect to Conant Avenue's claims for breach of express warranty, violation of the MCPA,

and unjust enrichment.  This Court will deny Ford's motion as to Conant Avenue's claim for

breach of implied warranty.

**X.      New York**

New York Plaintiffs Bishop Winston R. Anderson and Gladstone Barrett were added to

this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for

summary judgment as to all of the New York Plaintiffs' claims: breach of express warranty;

breach of implied warranty; violation of New York General Business Law ("GBL") §§ 349 and

350; and unjust enrichment.

A.      Material Facts

1.      *Bishop Anderson*

Bishop Anderson purchased a used 1999 Ford E-350 van in the summer of 2002.  He

bought the vehicle from a motor vehicle dealership located on Flatbush Avenue in Brooklyn,

New York.  At deposition, Anderson recalled that the dealership sold new and used cars,

including Ford cars, but could not remember the name of the dealership, and could not recall

whether it was a Ford dealership.  (Anderson Dep. at 58:17-59:8.)  Anderson also could not

remember how much he paid for the vehicle.  (*Id.* at 62:2-3.)  Anderson stated that his records

relating to the vehicle's purchase and subsequent service were lost in a fire in the van.  (*Id.* at

27:3-5.)  Anderson told the salesperson at the dealership on Flatbush Avenue that he was

looking for a van that carried 15 passengers (*id.* at 59:13-16), and the salesperson told him that

132

the Ford E-350 was a 15-passenger van (*id.* at 62:4-7).  Anderson purchased the vehicle to transport members of his congregation to other churches.  (*Id.* at 63:6-25.)

After a deacon in Bishop Anderson's church who drove the van reported in 2004 that the vehicle "swayed" to the right when fully loaded with 15 passengers, and Bishop Anderson later experienced this "swaying," Bishop Anderson took the van to Gordon Auto Service ("Gordon Auto") to address what Bishop Anderson thought was a mechanical problem.  Gordon Auto worked on the vehicle for two days, replaced some parts, and worked on the vehicle's "front end."  (*Id.* at 25:10-21.)  The mechanic at Gordon Auto advised Bishop Anderson that the van had a problem with swaying in the front end that he could not fix.  (*Id.* at 76:12-77:14.)  At deposition, Bishop Anderson agreed with the proposition that a mechanic at Gordon Auto advised him that driving with 15 passengers would "cause problems on the highway."  (*Id.* at 75:12-17.)  Bishop Anderson never raised these concerns with the dealer on Flatbush Avenue from whom he purchased the vehicle (*id.* at 122:6-8), or with Ford or any Ford dealer prior to this litigation (*id.* at 56:9-10; 99:13-18).  After the service on the front end proved unsuccessful, Bishop Anderson decided to drive the vehicle with less than 15 passengers.  (*Id.* at 79:7-8; 81:1-17.)  Bishop Anderson now drives the vehicle with less than 15 passengers, and "trie[s] to leave the back seat empty" so that only the van only contains 12 passengers (*id.* at 81:9-14), and stated that the church sometimes rents an additional van when it needs to transport more than 12 people (*id.* at 82:8-20).  However, Bishop Anderson sometimes carries more than 12 but less than 15 passengers on shorter trips.  (*Id.* at 117:6-25.)

2.    *Barrett*

Gladstone Barrett owns and operates Yours and Mine Transportation Service, Inc., a

133

company that provides transportation services to the subways in Queens, New York.  He has

owned this business for over 10 years, and has utilized Ford E-350 vans for this business the

entire time.  From 1995 to 1998, he used a 1995 Ford E-350 van leased by his wife, and he gave

the van to a junk yard after the lease expired.  He does not seek recovery based on this 1995 van.

In 1998, Barrett purchased a used 1997 Ford E-350 from Park Inn Ford for $18,000, negotiated

down from the asking price of $20,000.  The salesperson at Park Inn Ford assured Barrett that

the 1997 vehicle could be used to transport 15 people safely.  (Barrett Dep. at 106:16-23.)

Barrett himself expressly told the salesman that these vehicles should not be driven by an

inexperienced driver, and stated that a friend of his had a roll over with a Ford van.  (*Id.* at

48:11-49:13.)  Barrett testified that after the salesman assured him, he told the salesman that "I

said I had experience with the Ford van and it's not a problem to me in driving it but I would not

purchase it and give to the next man to drive unless they have the experience that I have."  (*Id.*

at 49:9-13.)

　　　After driving the 1997 van, Barrett felt that he did not pay a fair price for the vehicle

because of problems with the transmission and "a lot of noise in the rear end section."  (*Id.* at

44:19-45:5.)  He used the 1997 van until 2006 when he gave the vehicle to another driver.  In

October 2006, Barrett purchased a used 2001 Ford E-350 van for $5,500 from Start Up

Management Solutions, a rental car business.  (*Id.* at 17:1-22.)  Start Up Management Solutions

offered this 2001 van, which had 167,000 miles on it at the time of Barrett's purchase, for

$8,500 and Barrett decided to buy it when the price dropped to $5,500.  Barrett saw no Ford

advertisements and received no representations from Ford in connection with the purchase of

the 2001 vehicle.  (*Id.* at 25:9-26:6; 107:22-25; 127:24-128:25.)  According to Barrett, at the

time of the purchase of the 2001 vehicle, he had heard news of other accidents with Ford E-350 vans, but not about the "tendency to rollover."  (*Id.* at 33:14-34:4.)  He stated at deposition that he learned of the alleged defect in Ford E-350 vans just a few months before his deposition.  (*Id.* at 110:10-25.)

Barrett still owns and uses the 2001 Ford E-350 vehicle, has no plans to sell it, and continues to fill it to capacity when he has enough passengers to do so.  (*Id.* at 59:2-19; 84:19-25; 126:7-11.)  Barrett asserts losses from repairs to his vans for issues unrelated to this litigation, and also asserts that, based on conversations with his insurance broker, he paid higher insurance rates on his Ford E-350 vehicles.  (Pls.' Responsive Statement of Material Facts for Barrett ¶ 32; Ford SUMF No. 10 ¶ 32.)  Barrett never suffered a rollover in his vehicles and has never been unable to transport his passengers safely to their destination when the vans were filled to capacity.  (Barrett Dep. at 80:4-10.)

At deposition, Barrett testified that if he had heard the news reports regarding the Ford E-350 van's tendency to rollover before he purchased the used 2001 van in October 2006, he still would have bought the van because he and his customers like Ford vehicles and he trusted his driving abilities.  (*Id.* at 26:10-19; 35:2-14; 127:19-23.)  Barrett stated that "the public tend to like Ford vans.  Even with the risk I would go ahead and purchase the van because I would feel comfortable purchasing the van because I am the person driving the van."  (*Id.* at 35:18-22; *see also id.* at 120:6-11 ("I have some fantasy about the vans but regardless of the problem, I still would purchase the van because I alone drive the van.  I take extra caution in driving it.  I am aware of the problem and I didn't let it trouble me."); *id.* at 58:10-15 ("I didn't let that worry me.  Let the problem of the van be front worry.  I didn't worry about that.  I just like the van and

I was assured that they can carry fifteen passengers safely.").  Despite his testimony that he would have bought the vehicle even if he had full information about the rollover potential, Barrett also stated that "I put my [faith] in the van and what the dealer said to me about the van. I put me faith there."  (*Id.* at 59:10-12.)  Barrett said that the Ford van "is the van that I like.  All I like to see is improvement.  If Ford can improve on them to make them safer and make more comfortable as being a Ford addict to Ford van.  I will be more comfortable.  Tomorrow morning I would still by the next Ford van."  (*Id.* at 105:9-14.)

   B.   *Frank* as Applied to Bishop Anderson

   In *Frank v. Daimler Chrysler Corp.*, the Supreme Court of New York, Appellate Division, affirmed the dismissal of proposed class plaintiffs' claims based upon an alleged defect in certain vehicles' front seat backrests that were "susceptible to rearward collapse in the event of a rear-end collision."  741 N.Y.S. 2d 9, 11 (App. Div. 2002).  Like the New York Plaintiffs here, Plaintiffs in *Frank* did not suffer any rearward collapse or other personal injury from the alleged defect.  Two of plaintiffs' claims in *Frank* are asserted here: breach of implied warranty and violation of N.Y. GBL §§ 349 and 350.  The *Frank* plaintiffs also brought claims for negligence,  strict liability, negligent concealment and misrepresentation, and fraud.   The court concluded:

> In sum, plaintiffs have not been involved in any accidents and have not suffered any personal injuries or property damage.  Moreover, plaintiffs do not allege that any seat has failed, been retrofitted or repaired, nor have plaintiffs attempted to sell, or sold an automobile at a financial loss because of the alleged defect.  We find, therefore, that the motion court properly dismissed the first through sixth causes of action as the result of plaintiffs' failure to plead any actual injury.

*Id.* at 17.

Ford argues that *Frank* dictates that this Court should grant summary judgment in its favor on the New York Plaintiffs' implied warranty and statutory consumer fraud claims. The New York Plaintiffs seek to distinguish *Frank* by arguing generally that Plaintiffs have limited their use of their vehicles due to the handling problems and have incurred expenses in renting additional vehicles and other out-of-pocket costs. Bishop Anderson testified that he brought his vehicle to Gordon Auto to attempt to fix the "swaying" problem, that after the problem was not resolved by the service, he decided to limit his use of the van by carrying less than 15 passengers, and that on occasion, his church rents an additional van when it needs to carry more than 12 passengers. These asserted injuries suffice to remove Bishop Anderson's claims from the scope of *Frank*. With regard to his alleged out-of-pocket repair costs, Ford contends that he presents no evidence whatsoever that he paid for these repairs, or how much he might have paid. Yet for a claim under GBL § 349, any injured person may bring an action "to recover his actual damages or fifty dollars, whichever is greater." GBL § 349(h). GBL § 350 similarly allows any person injured by false advertising to bring "an action to recover his or her actual damages or five hundred dollars, whichever is greater." GBL § 350-e(3). Thus, a plaintiff asserting a claim for deceptive business practices under GBL §§ 349 and 350 may recover without proving a specific amount of damages. *See McDonald v. North Shore Yacht Sales, Inc.*, 513 N.Y.S. 2d 590, 593 (N.Y. Sup. Ct. 1987) (stating that under § 350, "[t]he dollar amount of injury involved in such a claim is not relevant"). Ford next argues that Bishop Anderson has not shown that the "swaying" issue that was the subject of the repairs was related to the alleged rollover propensity that forms the basis of this litigation because Gordon Auto replaced the "front end" of the

vehicle, while Plaintiffs generally allege that the handling problems stem from issues with the "rear axle" of the vans.  (Pls.' Omnibus Br. at 2, 4 n.4.)  While Gordon Auto might not have focused on the area of the van Plaintiffs later identified as the location of the alleged problem, this Court rejects Ford's attempt to parse the difference between "swaying" and "unsafe tendency to rollover."  A genuine dispute exists regarding the nature of the repairs and whether the issues addressed by Gordon Auto were related to the handling issues in this litigation.

In *Frank*, the court listed repair costs as one form of actual injury that plaintiffs did not allege.  741 N.Y.S. 2d at 17.  Here, Bishop Anderson has asserted cognizable injury based on his attempt to repair.  Similarly, Bishop Anderson's claim that he rents additional vehicles, while not supported by an actual dollar amount, presents a disputed issue of fact sufficient to withstand summary judgment and avoid the actual injury bar of *Frank*.  Ford contends that Bishop Anderson's claim of injury based on limitation of use does not suffice based on Judge Ackerman's reliance on the decision of the Arkansas Supreme Court in *Wallis* that actual injury for a consumer fraud statute claim may be found only where the alleged defect has manifested itself.  (MTD Opinion at *23 (citing *Wallis v. Ford Motor* Co., 208 S.W.3d 153 (Ark. 2005).)  As this Court has stated above, however, Judge Ackerman's rejection of the Arkansas consumer fraud statute claim pursuant to *Wallis* does not directly control here, even though *Wallis* relied upon *Frank* in reaching its conclusion.  *Wallis* not only concerns only Arkansas law, but expands upon *Frank* to require manifestation of the alleged defect.  The court in *Frank* did not limit actual injury to personal injury or property damage from malfunction or manifestation of defect, but expressly stated that plaintiffs in *Frank* also failed to allege any repair or sale at diminished value.  *Frank*, 741 N.Y.S. 2d at 17.  Thus, the court in *Frank* contemplated that

actual injury could be asserted under circumstances where the alleged defect might not have manifested itself to cause injury.  For these reasons, this Court concludes that *Frank* does not operate to preclude Bishop Anderson's claims for lack of actual injury.

C.    *Frank* as Applied to Barrett

While Bishop Anderson asserts limitation of use and repair costs as actual injury, New York Plaintiff Barrett 1) did not allege any out-of-pocket repair or rental costs; 2) fills his vehicle to capacity when he has sufficient passengers; and 3) stated that he has no plans to sell his van.  The only cognizable actual injury pursuant to *Frank* that this Court can locate stems from Barrett's assertion that his insurance carrier told him that his premiums were higher for the Ford E-350 than for other vans.  However, closer examination of Barrett's deposition testimony reveals that any higher rates, even if true, did not constitute actual injury.  Barrett stated that he never had any problem obtaining insurance coverage.  (Barrett Dep. at 96:6-8.)  He testified that his broker at Lincoln General Insurance Company told him that he paid higher insurance premiums on his Ford van than did those who own GMC or other vans.  (*Id.* at 97:15-98:2.)  Yet Barrett stated that this statement by his broker came in the context of Barrett telling the broker that "I [was] never interested in the GMC" (*id.* at 97:24-25), and when asked at deposition whether he ever contemplated buying other vans such as GMC, he responded "I don't like them. I never think about it" (*id.* at 26:16-19).  Furthermore, at deposition Barrett never linked the purported higher premiums with the rollover issues with Ford E-350 vans.  Indeed, Plaintiffs base their case on studies and reports that claim that Ford E-350 vans and other 15-passenger vans have an increased tendency to rollover.  (*See, e.g.*, Pls.' Supp. Statement at ¶¶ 17-37; 41-47.)  Barrett has not presented evidence that his broker's statements regarding increased

premium costs stemmed from the alleged higher rollover potential of Ford E-350 vans.  The court in *Frank* also did not explicitly recognize increased insurance premiums as a form of actual injury sufficient to allege a breach of implied warranty or consumer fraud statute claim.  This Court concludes that Barrett has not presented evidence of an actual injury under *Frank* and therefore cannot state a claim for breach of implied warranty or violation of GBL §§ 349 and 350.  This Court will grant summary judgment in Ford's favor on these claims brought by Barrett.

Ford asks this court to extend the reasoning of *Frank* to bar the New York Plaintiffs' express warranty and unjust enrichment claims even though those claims were not presented in *Frank*.  According to Ford, the court in *Frank* 1) affirmed the dismissal of all of plaintiffs' claims for lack of actual injury without distinction or separate analysis of each individual claim, and 2) relied on cases, such as the Eighth Circuit's decision in *Briehl*, that used the same reasoning to dismiss express warranty and other claims.  The court in *Frank* did not assess each claim separately, but the court began its analysis by stating that "plaintiffs must plead actual injuries or damages, resulting from defendants' conduct, as an essential element of each of the first six causes of action" and cited cases supporting an actual injury requirement for each of the claims.  *Id.* at 12-13.  Barrett's claim for breach of express warranty requires proof of actual injuries or damages.  *See Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (citing *CBS, Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E. 2d 997, 1000-01 (N.Y. 1990); *Ainger v. Michigan Gen. Corp.*, 476 F.Supp. 1209, 1220-21 (S.D.N.Y. 1979)); *Gusmao v. GMT Group, Inc.*, No. 06-5113, 2008 WL 2980039, at *4 (S.D.N.Y. Aug. 1, 2008).  "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2)

140

at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citing *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)).  As one court has held, to prevail on an unjust enrichment claim, a plaintiff must establish that the benefit received was less than what that purchaser bargained for. *In re Canon Cameras*, 237 F.R.D. 357, 359-60 (S.D.N.Y. 2006) (quotations and citations omitted).  Where a plaintiff purchases a product that "never malfunctions over its ordinary period of use," that plaintiff "cannot be said to have received less than what he bargained for when he made the purchase."  *Id.* at 360.  This reasoning reflects the analysis in *Frank* where, after reviewing cases that rejected claims regarding products that never manifested an alleged defect, the court concluded a plaintiff has not pled actual injury where the product never failed or no personal injury or property damage has been alleged.  *Frank*, 741 N.Y.S. 2d at 13-17. This Court concludes that the actual injury requirement as articulated in *Frank* applies to Barrett's claims for breach of express warranty and unjust enrichment.  Because Barrett has not presented evidence of cognizable actual injury, this Court will grant summary judgment in Ford's favor on all of Barrett's claims.[23]

### D.     Bishop Anderson's Express and Implied Warranty Claims: Notice

In addition to arguing that *Frank* dictates that all of Bishop Anderson's claims must fail, Ford presents several additional grounds for why summary judgment should be granted in its favor on these claims.  Ford contends that Bishop Anderson's express and implied warranty

---

[23]With regard to unjust enrichment, even if Barrett has sufficient cognizable actual injury, this Court would grant Ford's motion for summary judgment as to that claim without prejudice. As with other Plaintiffs who purchased their vehicles from Ford dealers, Barrett has not met his evidentiary burden to establish that Ford benefitted from his purchase of the used van.

141

claims must fail for lack of notice, based on New York's codification of the familiar UCC standard for notice: "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  N.Y. UCC 2-607(3)(a).  Bishop Anderson contends that the notice requirement may be satisfied by the filing of a complaint or, as here, the joining of litigation.  This Court agrees that under New York law, the filing of a complaint could constitute sufficient notice.  *See Panda Capital Corp. v. Kopo Int'l, Inc.*, 662 N.Y.S. 2d 584, 586 (App. Div. 1997) ("This argument overlooks the fact that the complaint and subsequent amended complaint in this action themselves constituted such notice . . . ."); *Silverstein v. R.H. Macy & Co.*, 40 N.Y.S. 2d 916, 920 (App. Div. 1943) ("[T]he commencement of this action would seem to afford sufficient notice of breach of warranty.").  Whether notice was given within a reasonable time constitutes a question of fact.  *Panda Capital*, 662 N.Y.S. 2d at 587.   This Court rejects Ford's lack of notice argument with regard to Bishop Anderson's warranty claims.

> E.   Bishop Anderson's Express Warranty Claim

For the same reasons the Court expressed with regard to the express warranty claims presented by other Plaintiffs, this Court concludes that Bishop Anderson's claim for breach of express warranty must fail because Ford's description of the vehicle as a 15-passenger van does not constitute an express warranty of safety.  Anderson did not view any other representations or materials issued by Ford; indeed, he testified at deposition that he could not remember whether the dealership from which he purchased his vehicle was even a Ford dealership at all. (Anderson Dep. at 58:17-59:8.)  Under New York's version of the UCC, "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a

142

warranty."  N.Y. U.C.C. § 2-313(2).  The description of the vehicle as a 15-passenger van, while

a description of a particular characteristic, makes no reference to safety or quality.  *See Hubbard

v. General Motors Corp.*, No. 95-4362, 1996 WL 274018, at *7 (S.D.N.Y. May 22, 1996)

(dismissing express warranty claim because purported warranty statements "ma[de] no reference

whatsoever to the type or quality of the vehicles' braking system"); *cf. Anderson v. Bungee Int'l

Mfg. Corp.*, 44 F. Supp. 2d 534, 541 (S.D.N.Y. 1999) (granting summary judgment to

defendants on express warranty claim because purported warranty statements were "generalized

statements of salesmanship" and not "descriptions of particular characteristics of the goods").

Under New York law, "[a]ny description of the goods which is made part of the basis of the

bargain creates an express warranty that the goods shall conform to the description."  N.Y.

U.C.C. § 2-313(1)(b).  Here, Ford expressly described the vehicle as a 15-passenger van, but

made no explicit representation regarding safety in carrying 15 passengers that rose above the

level of mere puffery.  This Court will grant Ford's motion for summary judgment as to

Barrett's claim for breach of express warranty.

     F.     Bishop Anderson's Implied Warranty Claim

     Ford asserts that Bishop Anderson cannot maintain his claim for breach of implied

warranty because he lacks contractual privity with Ford.  Based on his deposition testimony, it is

undisputed that Bishop Anderson did not purchase his used vehicle from Ford, and it is not clear

whether he even purchased it from a Ford dealer.  Under New York law, "[i]t is now settled that

no implied warranty will extend from a manufacturer to a remote purchaser not in privity with

the manufacturer where only economic loss and not personal injury is alleged."  *Lexow &

Jenkins, P.C. v. Hertz Commercial Leasing Corp.*, 504 N.Y.S. 2d 192, 193-94 (App. Div. 1986).

143

However, an exception to the privity requirement for economic loss exists under New York law

where the product is a "thing of danger."  As one federal court in New York explained,

> "However, New York recognizes an exception to this principle
> where the product in question is a 'thing of danger.' " *Hubbard v.*
> *Gen. Motors Corp.*, 95-CV-4362, 1996 WL 274018, at *5 (S.D.N.Y.
> May 22, 1996); *Goldberg v. Kollsman Instr. Corp.*, 12 N.Y.2d 432,
> 436, 240 N.Y.S.2d 592, 191 N.E.2d 81 (N.Y. 1963).   More
> specifically, "where an article is of such a character that when used
> for the purpose for which it is made it is likely to be a source of
> danger to several or many people if not properly designed and
> fashioned, the manufacturer as well as the vendor is liable, for
> breach of law-implied warranties, to the persons whose use is
> contemplated." *Hubbard*, 1996 WL 274018, at *5 (quoting
> *Goldberg*, 12 N.Y.2d at 436, 240 N.Y.S.2d 592, 191 N.E.2d 81)
> (other citation omitted).

*Wade v. Tiffin Motorhomes, Inc.*, 686 F. Supp. 2d 174, 191 (N.D.N.Y. 2009).  Distinguishing

other cases involving transportation vehicles where implied warranty claims were dismissed for

lack of privity, the court in *Hubbard* concluded that "plaintiff's claim alleging a defective

braking system is qualitatively different from claims against an automobile manufacturer

alleging the use of inferior transmissions or the design of defective air conditioners, in that a

vehicle with defective brakes is a thing of danger."  1996 WL 274018, at *5 n.7.  Here, a vehicle

with an alleged increased propensity to rollover is likely to be a thing of danger to foreseeable

drivers and passengers.  *See Wade*, 686 F. Supp. 2d at 191.  Ford points out that some courts

have not always invoked this exception even where arguably applicable.  *See, e.g.*, *Fanok v.*

*Carver Boat Corp.*, 576 F. Supp. 2d 404, 413 (E.D.N.Y. 2008) (alleged defect in yacht where

yacht caught fire).  However, under the facts of this case, this Court concludes that the exception

to the privity requirement applies, and this Court will not grant summary judgment on Bishop

Anderson's implied warranty claim for lack of privity.  Because Ford presents no additional

arguments with regard to Barrett's implied warranty claim, this Court will deny Ford's motion for summary judgment as to Barrett's claim for breach of implied warranty.

> G.    Bishop Anderson's GBL Claims

With regard to Bishop Anderson's New York consumer fraud statute claims, Ford contends that these claims must fail because Bishop Anderson did not prove that he suffered actual injury based on out-of-pocket loss. Ford relies upon an Appellate Division decision stating that "[i]n order to state a cause of action pursuant to General Business Law §§ 349 and 350, the plaintiffs were required to plead and prove that the deceptive act caused actual injury." *Canario v. Gunn*, 751 N.Y.S. 2d 310, 312 (App. Div. 2002) (citing *Hazelhurst v. Brita Prods. Co.*, 744 N.Y.S. 2d 31, 33 (App. Div. 2002); *Frank*, 741 N.Y.S. 2d at 12-13). In *Canario*, plaintiffs sought damages based on allegedly false advertising by real estate agents regarding property purchased by plaintiffs. Plaintiffs alleged that their downpayment on the property was the proper measure of damages, but the court concluded that because the property was worth "many times that amount" and plaintiffs retained the property, plaintiffs' "claim of actual harm is without merit on its face." *Canario*, 751 N.Y.S. 2d at 312. Here, Ford observes that Bishop Anderson cannot even establish his original purchase price for the van, let alone any injury, and therefore cannot show that the van is now worth less than what he paid for it. However, the court's reasoning regarding the nature of actual injury in *Canario* appears to have been dicta, as the court first held that plaintiffs could not maintain their GBL claims because they were private transactions regarding a unique piece of property and without impact on consumers or the public at large. *Id.* at 311-12. Moreover, *Canario* is distinguishable, because plaintiffs' sole measure of damages for their injury in that case was their downpayment. Here, Bishop Anderson alleges

out-of-pocket costs based on his limitation on use of the vehicle and alleged repair costs.  These

asserted injuries suffice to remove his claims from the ambit of *Frank*, and *Canario* similarly

does not preclude his GBL claims.  Ford presents no other argument against Bishop Anderson's

statutory claims.  Therefore, this Court will deny Ford's motion for summary judgment as to

Bishop Anderson's GBL claims.

> H.  Bishop Anderson's Unjust Enrichment Claim

To prove an unjust enrichment claim under New York law, a plaintiff must show "1) that

the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience'

require restitution."  *Kaye*, 202 F.3d at 616 (2d Cir. 2000) (citing *Dolmetta*, 712 F.2d at 20.

Here, Bishop Anderson purchased a used van from an unknown dealer.  He has not presented

any evidence that Ford benefitted at his expense from the purchase of the vehicle; he cannot

even recall whether the unknown dealer was a Ford dealer.  In any event, even if he could do so,

he could not recover for unjust enrichment based on the diminution in value of his vehicle

because, as discussed above with regard to *Frank*, he would have to show that any benefit he

received was less than that for which he bargained.  Because his vehicle did not malfunction, he

"cannot be said to have received less than what he bargained for when he made the purchase."

*In re Canon*, 237 F.R.D. at 360.  Bishop Anderson cannot show what he paid for the vehicle, let

alone that he received less value than what he paid.  Bishop Anderson also cannot maintain an

unjust enrichment action based on his asserted out-of-pocket costs.  He brought his vehicle to a

private mechanic at Gordon Auto for service; no evidence in the record suggests any affiliation

or connection between Gordon Auto and Ford.  This Court will grant Ford's motion for

summary judgment on Bishop Anderson's claim for unjust enrichment.

I.    Summary

For the foregoing reasons, this Court will grant Ford's motion for summary judgment with respect to all of Barrett's claims.  With regard to Bishop Anderson, this Court will grant Ford's motion for summary judgment as to his claims for breach of express warranty and for unjust enrichment.  This Court will deny Ford's motion with regard to Bishop Anderson's claims for breach of implied warranty and for violation of GBL §§ 349 and 350.

XI.   **Massachusetts**

Massachusetts Plaintiff Charles St. AME Church ("Charles St. AME") was added to this litigation after Judge Ackerman decided Ford's motion to dismiss.  Ford now moves for summary judgment as to all of Charles St. AME's claims: breach of express warranty; breach of implied warranty; violation of Massachusetts's consumer protection act, Mass. Gen. Laws ch. 93A, § 9 *et seq.*; and unjust enrichment.

A.    Material Facts

In 2005, Charles St. AME entered into a contract with Salem Ford Hyundai to purchase a new 2005 Ford E-350 van for approximately $28,000.  Charles St. AME still owns the vehicle, has not attempted to sell the vehicle, and according to its representative at deposition, church trustee Albert Kinnitt, Jr., has no intention to sell the van.  (Kinnitt Dep. at 132:15-17; 152:8-11.)  While no one at Charles St. AME viewed any Ford advertisements prior to purchasing the van (*id.* at 139:6-8; 144:24-145:10), Kinnitt testified that he specifically asked the salesman at Salem Ford Hyundai for a 15-passenger van and told him about the church's need for a vehicle to transport seniors and youth for church purposes (*id.* at 48:14-17; 50:22-53:4).  Kinnitt, who had responsibility for purchasing the van and supervising its drivers, stated that the salesman

147

told him that the van was "capable of servicing 15 passengers in it." (*Id.* at 51:3-13.) According to Kinnitt, the salesman told him that the vehicle was a 15-passenger van, but when asked at deposition whether the salesman told him that the van "was safe to carry 15 passengers," Kinnitt responded, "He say it was a 15-passenger van." (*Id.* at 176:15-22.) Earlier at deposition, Kinnitt stated that when the church purchased the vehicle, he thought that Ford represented that it would be safe because Ford repeatedly stated that the van was "the best vehicle going." (*Id.* at 135:1-23.)

According to Kinnitt, Charles St. AME decided to limit the capacity of its van to approximately 9 passengers for out-of-state trips after learning from articles about the van's rollover propensity. (*Id.* at 31:2-24; 114:3-23; 117:20-118:24.) Such long trips occur approximately once per year. (*Id.* at 101:13-17.) Kinnitt testified that the church has had to make double trips for these long journeys to make up for the limited capacity or ask members to use their own vehicles (*id.* at 122:1-22; 147:20-24), and he mentioned at deposition, without elaboration, that "[w]e had to rent buses" (*id.* at 34:20-21). For trips within the Boston area, however, the church still fills the vehicle to capacity with 15 passengers (*id.* at 31:11-19), and the church has continued to make such trips on a weekly basis since the church learned of the van's rollover propensity (*id.* at 101:4-102:15; 104:6-13). The van has never suffered a rollover, and has been involved in only two minor accidents, neither of which involved handling or stability issues. Various drivers, including Kinnitt, reported some issues with swaying and shifting. (*Id.* at 25:13-27:21.) Charles St. AME does not seek damages related to its procurement of insurance for the van. (Kinnitt at 153:2-10.)

148

B.    *Iannacchino*

Ford argues that the decision of the Supreme Judicial Court in *Iannacchino v. Ford*

*Motor Co.*, 888 N.E. 2d 879 (Mass. 2008), compels that summary judgment be granted in Ford's

favor on Charles St. AME's claims for breach of implied warranty and violation of ch. 93A, § 9,

and further contends that the rationale of *Iannacchino* should apply to Charles St. AME's

express warranty and unjust enrichment claims as well.  This Court agrees that under

*Iannacchino*, Charles St. AME's implied warranty and ch. 93A claims must fail.  The Court

need not decide whether the Massachusetts courts would extend *Iannacchino* to encompass

Charles St. AME's express warranty and unjust enrichment claims because those claims fail for

independent reasons.

Plaintiffs in *Iannacchino* brought a purported class action in which they alleged that

certain Ford vehicles had outside door handle systems that did not comply with federal safety

standards and were defective and unsafe.  Plaintiffs alleged that due to noncompliance and

defect, the doors on the vehicles could open accidentally in certain kinds of collisions, putting

the occupants at risk of serious injury or death.  *Id.* at 883.  At issue in the appeal in *Iannacchino*

were plaintiffs' claims for breach of implied warranty and violation of ch. 93A, § 9, and

"whether the plaintiffs . . . have adequately alleged an 'injury' or 'loss' for purposes of stating a

claim under § 9."  *Id.* at 885.  As here, the class in *Iannacchino* did not include those who had

suffered personal injury, but only encompassed those who suffered economic loss by owning

vehicles worth less than a vehicle that complied with all relevant safety standards.  Plaintiffs

alleged that Ford knew the outside door latches were defective because they failed to comply

with Federal Motor Vehicle Safety Standard 206 ("FMVSS 206"), a standard promulgated by

149

the National Highway Traffic Safety Administration (NHTSA), and Ford's internal safety guidelines.  The Supreme Judicial Court of Massachusetts concluded that plaintiff's theory of regulatory noncompliance failed because they conceded that the door latches complied with NHTSA standards.  *Iannacchino*, 888 N.E. 2d at 887.  The court therefore affirmed the dismissal of plaintiff's ch. 93A claims for failure to plead adequate "injury" or "loss" under ch. 93A, § 9.[24]  With regard to the implied warranty claim, the court observed that such a claim requires the same showing of injury as does a ch. 93A claim, and stated that "[a]n implied warranty claim and a c. 93A claim are based on the same economic theory of injury and the same set of alleged facts, they should survive or fail under the same analysis."  *Id.* at 889.  Because the two claims were "interconnected . . . the reasons that call for the dismissal of the c. 93A claim also warrant dismissal of the breach of implied warranty claim."  *Id.*

Charles St. AME here seeks to limit *Iannacchino* to this context of allegations of non-compliance with federal standards, and claims that the court in *Iannacchino* recognized that a ch. 93A claim could lie where not premised on noncompliance with government standards.  Indeed, the court did not erect a total bar on claims asserting economic loss from an allegedly defective product; the court stated at the outset that it did "not consider the lack of accident-related injury or manifested defect a bar to recovery under G.L. c. 93A, § 9, in this case."  *Id.* at 882.[25]  Charles St. AME points out that no explicit federal safety standard applied

---

[24]Ch. 93A, § 9 requires that a consumer "must have 'been injured by another person's use or employment of' an unfair or deceptive act or practice."  *Iannacchino*, 888 N.E. 2d at 885 (quoting Mass. Gen. Laws Ch. 93A, § 9).

[25]Rather, according to the court, if plaintiffs had adequately pled noncompliance with a federal standard, and that after learning of the noncompliance, defendant failed to initiate a recall and pay for remediation, "the plaintiffs would have paid for more (viz., safety

to Ford E-350 vans.  Despite citing many NHTSA reports, Plaintiffs have not alleged that the

NHTSA made an explicit determination that the vans fail to comply with a federal standard or

that they contain a defect.  Instead, Charles St. AME appears to argue that Ford represented the

vans to meet the unspecified standard of transporting 15 passengers safely, all the while

knowing that the vehicles did not comply with that standard.  (Pls.' Omnibus Br. at 26.)

However, the court in *Iannacchino* also addressed plaintiffs' claims to the extent they

did not rely on regulatory noncompliance, and imposed a requirement of some allegation of

violation of a legally required standard for diminution in value claims.  The court stated:

> But to the extent the plaintiffs have attempted to allege that the door
> handles are defective independently of any issue with FMVSS 206,
> we add the following.
>
> Because the term "defect" is conclusory and can be subjective as
> well, a bare assertion that a defendant, while representing the
> opposite, has knowingly manufactured and sold a product that is
> "defective," or suffers from "safety-related defects," does not suffice
> to state a viable claim.  *Where, as in this case, there is no allegation
> that the plaintiffs – or indeed anyone else – have suffered personal
> injury or property damage, the complaint must identify a legally
> required standard that the vehicles were at least implicitly
> represented as meeting, but allegedly did not.*  When the standard
> that a product allegedly fails to meet is not one legally required by
> and enforced by the government, a claim of economic injury based
> on overpayment lacks the premise that the purchase price entitled the
> plaintiffs to a product that met that standard.

*Iannacchino*, 888 N.E. 2d at 888 (footnote and citations omitted) (emphasis added).

*Iannacchino* requires that where no personal injury has been alleged, a claim for

economic loss based on diminution in value must depend upon noncompliance with some

---

regulation-compliant vehicles) than they received.  Such an overpayment would represent an
economic loss – measurable by the cost to bring the vehicles into compliance – for which the
plaintiffs could seek redress under G.L. c. 93A, § 9."  *Iannacchino*, 888 N.E. 2d at 886-87.

legally required standard.  The court further rejected injury based on noncompliance with non-specific internal safety standards akin to the vague "standard" of safety alleged by Charles St. AME: "In any event, in the absence of any allegation of personal injury or even injury to property, we decline to adopt a rule that would expose a company to liability for failing to meet self-imposed standards that may in fact be aspirational goals conducive to the development and implementation of improved safety measures that exceed regulatory requirements."  *Id.* at 888.

Charles St. AME cites pages 886-887 of *Ianncchino* as "contemplat[ing] that a plaintiff *may* maintain a cause of action under Ch. 93 § 9, independent of government standards, despite the fact that its plaintiffs had not."  (Pls.' Omnibus Br. at 26 (citing *Iannacchino*, 888 N.E. 2d at 886-87 & n.13).)  Yet as Ford emphasizes, these very pages of the decision in *Iannacchino* reject any claim for purely economic injury independent of a violation of some governmental, legally required standard.  Under Massachusetts law as propounded in *Iannacchino*, mere allegations of a "defect" unmoored to a violation of a legally required standard does not suffice to state a claim for injury based on purely economic loss under ch. 93A, § 9.  Here, *Iannacchino* compels this Court to conclude that Charles St. AME's implied warranty and Massachusetts state consumer fraud statute claims must fail for failure to show cognizable injury.[26]  Therefore, this Court will grant summary judgment in Ford's favor on these claims.

The *Iannacchino* court did not expressly address the viability of claims for breach of

---

[26]*Iannacchino* arose in the context of a motion to dismiss, and the court in *Iannacchino* allowed plaintiffs to amend their complaint to cure their pleading defects on the nature of their injury. 888 N.E. 2d at 889.  Here, after extensive discovery, Charles St. AME has not identified any cognizable, legally required standard that Ford represented its E-350 vans as meeting but knew that they did not.  Therefore, *Iannacchino* applies with equal force at the summary judgment stage.

express warranty and unjust enrichment under the court's analysis of cognizable injury. Plaintiffs in *Iannacchino* had initially brought claims for breach of express warranty and unjust enrichment.  The court noted that the trial judge "dismissed the plaintiffs' breach of express warranty claim, finding that they had not alleged that they had seen or relied on the labels certifying compliance with Federal safety regulations, as well as their unjust enrichment claim, concluding that '[t]he alleged facts in this case do not lend themselves to such a cause of action.'" *Id.* at 885.  Plaintiffs did not challenge the dismissal of these counts on appeal to the Supreme Judicial Court.  *Id.* at 885 n.11.  To this Court's knowledge, no court has extended the principles of *Iannacchino* regarding injury to claims for breach of express warranty or unjust enrichment.  But this Court need not predict whether the Supreme Judicial Court would extend *Iannacchino* beyond ch. 93A and implied warranty claims because Charles St. AME's express warranty and unjust enrichment claims fail for reasons independent of the rationale of *Iannacchino*.

    C.    <u>Express Warranty</u>

        *1.    Notice*

Ford additionally contends that Charles St. AME's express warranty claim is barred because it did not give sufficient notice under Massachusetts's version of U.C.C. § 2-607(3)(a), which states that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Mass. Gen. Laws. ch. 106, § 2-607(3)(a).  Charles St. AME did not provide any pre-litigation notice to Ford, and Plaintiffs generally contend that by joining this litigation, it provided sufficient notice.

To the court's knowledge, no Massachusetts court has explicitly held that notice by way

of filing a complaint or joining litigation is insufficient.  Courts have focused on the purposes

behind the notice requirement and reasoned that notice would be sufficient if it allows for

settlement through negotiation and "allows the seller to infer that the buyer is asserting its legal

rights."  *Delano Growers' Co-op. Winery v. Supreme Wine Co.*, 473 N.E. 2d 1066, 1072 (Mass.

1985).  Regardless of whether notice by litigation could or could not constitute adequate notice

under this standard, Massachusetts law dictates that "[f]ailure to give notice shall not bar

recovery under this section unless the defendant proves that he was prejudiced thereby."  Mass.

Gen. Laws ch. 106, § 2-318; *see also Swartz v. General Motors Corp.*, 378 N.E. 2d 61, 63

(Mass. 1978) (stating that under Massachusetts law, "the defense of failure to give notice [has

been] limited to cases where the defendant proved prejudice").  One court in Massachusetts

implicitly recognized that notice by commencement of an action might not suffice but any lack

of notice would not bar recovery unless the defendant proves prejudice: "General Laws c. 106, §

2-318, is explicit that the burden is on the defendant to prove prejudice in cases such as the

present, in which there was no notice of any breach of warranty prior to the commencement of

the action."  *Henrick v. Coats Co.*, 458 N.E. 2d 773, 775 (Mass. App. Ct. 1984) (citing *Swartz*,

378 N.E. 2d at 63).  In most cases, prejudice arises where "evidence which may reasonably have

been developed by prompt investigation has been lost."  *Castro v. Stanley Works*, 864 F.2d 961,

964 (1st Cir. 1989) (quotation and citations omitted).  Massachusetts law treats the defense of

lack of notice as a jury issue, *Sacramona v. Bridgestone/Firestone, Inc.*, 106 F.3d 444, 449 (1st

Cir. 1997), and summary judgment may only be appropriate on the issue if "a reasonable jury

would . . . have been compelled to find prejudice," *Smith v. Robertshaw Controls Co.*, 410 F.3d

29, 36 (1st Cir. 2005) (quoting *Sacramona*, 106 F.3d at 449).

154

Ford has not met its burden to prove prejudice based on undisputed facts such that a reasonable jury would have been compelled to find prejudice. It notes that Charles St. AME's failure to give pre-litigation notice deprived Ford of the chance to negotiate settlement (Ford Reply Br. at 37), but does not address the form of evidence-based prejudice discussed in the Massachusetts caselaw. This Court rejects Ford's lack of notice argument with regard to Charles St. AME's breach of express warranty claim.

### 2.    No Express Warranty

Under Massachusetts's version of the UCC, an express warranty may be created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." Mass. Gen. Laws ch. 106, § 2-313(1)(a), (b). Puffing or other sales talk does not create an express warranty. Mass. Gen. Laws ch. 106, § 2-313(2); *Hannon v. Original Gunite Aquatech Pools, Inc.*, 434 N.E. 2d 611, 617 (Mass. 1982). To maintain a breach of express warranty claim, "the plaintiff must demonstrate that the defendant promised a specific result." *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc.*, 489 N.E. 2d 172, 175 (Mass. 1986). Under the UCC's general principles of express warranty discussed previously, and under Massachusetts law, Ford's description of the E-350 as a 15-passenger van does not constitute an express warranty of safety in transporting 15-passengers. The description does not promise a specific result of safety, and any warranty of safety is merely implied. *Cf. Roth v. Ray-Stel's Hair Stylists, Inc.*, 470 N.E. 2d 137, 138 (Mass. App. Ct. 1984) (affirming jury's verdict of breach of express warranty where hair bleach package stated "Doesn't creep or swell," plaintiff relied on representation, and product "swell[ed] rapidly"). The statement of the

155

Salem Ford Hyundai salesman to Kinnitt that the van was the "best vehicle going" was puffery that does not create an express warranty.  Mass. Gen. Laws ch. 106, § 2-313(2).  This Court will grant Ford's motion for summary judgment on Charles St. AME's claim for breach of express warranty.

D.    Unjust Enrichment

As in many other states, to prove a claim for unjust enrichment under Massachusetts law, "a plaintiff must prove (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable."  *Stevens v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2008); *see also Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st. Cir. 2009).

Plaintiffs assert unjust enrichment based on 1) Ford's extraction of payments from Plaintiffs who would not have purchased the vehicles, or would have done so at reduced prices; and 2) Ford's revenues on repairs outside Ford's 90-day limited warranty.  (Compl. ¶¶ 88-89.) Charles St. AME does not allege that it paid any money to Ford for repairs, and its unjust enrichment claim depends solely upon the inflated value Ford allegedly received for Charles St. AME's vehicle.  Setting aside the evidentiary problems common to many Plaintiffs in this action regarding purchases from a Ford dealer (here, Salem Ford Hyundai), Charles St. AME cannot maintain its unjust enrichment claim because it purchased its vehicle in 2005, after the April 2004 period in which Plaintiffs concede that the claimed artificial demand for Ford E-350 vans fully eroded.  (Andresen Certif No. 14, Ex. 3 at 22; Pls.' Responsive Statement of Material

156

Facts for Charles St. AME ¶ 25.)  As discussed previously, a defendant enjoys the appreciation of the benefits conferred upon it if the value of that benefit exceeds the value of the consideration given for that benefit.  As Plaintiffs concede, the purported "artificial demand" for Ford E-350 vehicles fully eroded by April 2004, the market value of van purchased after April 2004 similarly eroded, and the price paid for a van after this date could not reflect unjust gain based on inflated value for a defective vehicle.  Here, even if Charles St. AME could show that it has conferred a benefit upon Ford, its unjust enrichment claim fails for the same reason that claims of certain Pennsylvania and Florida Plaintiffs failed: it did not pay an unjustly inflated price for the vehicle because it purchased the vehicle after the claimed artificial demand had eroded.  Therefore, this Court will grant Ford's motion for summary judgment as to Charles St. AME's unjust enrichment claim.

    E.    <u>Summary</u>

For the foregoing reasons, this Court will grant Ford's motion for summary judgment on all of Charles St. AME's claims.  Charles St. AME shall be dismissed from this matter.

### *Conclusion*

For the foregoing reasons, this Court will grant Ford's motions for summary judgment in part, grant them without prejudice in part, and deny them in part, as follows:

| State | Plaintiff | Doc. No. | Express Warranty | Implied Warranty | Consumer Fraud Statute(s) | Unjust Enrichment |
|---|---|---|---|---|---|---|
| CA | Greater All Nation | 188 | Grant. | Grant. | Grant. | Grant. |
| | First United | 188 | Grant. | Grant. | California CLRA: Grant. California UCL and California FAL: Grant without prejudice. | Grant without prejudice. |
| IL | Pentecostal Temple | 226 | Previously dismissed. | Previously dismissed. | Grant. | Grant. |
| NJ | Macedonia | 214 | Grant. | Deny. | Grant. | Grant without prejudice. |
| | Faith Tabernacle | 210 | Grant. | Deny. | Grant. | Grant. |
| | Social Clubhouse | 216 | Grant. | Deny. | Grant. | Grant. |
| | Bethany Baptist | 212 | Grant. | Deny. | Grant. | Grant as to 1993 and 1994 vans. Grant without prejudice as to 2001 and 2003 vans. |
| GA | Allen Temple | 221 | Deny. | Deny. | Grant. | Deny. |

| | | | | | | |
|---|---|---|---|---|---|---|
| PA | Bethel | 230 | Grant. | Deny. | Grant. | Grant as to 2000 van. Grant without prejudice as to 2001 van. |
| | Hickman Temple | 228 | Grant. | Deny. | Grant. | Grant without prejudice. |
| | Mt. Airy | 232 | Grant. | Deny. | Grant. | Grant. |
| FL | Blandon | 190 | Grant. | Grant. | Grant. | Grant. |
| | Diaz | 194 | Grant. | Grant. | Deny. | Grant. |
| | Mestre | 197 | Grant. | Grant. | Deny. | Grant. |
| TX | St. Luke's | 219 | Grant. | Grant. | Grant as to misrepresentation theory. Deny as to non-disclosure theory. | Grant without prejudice. |
| MO | St. James | 202 | Grant. | Grant. | Grant. | Grant. |
| MI | Conant Avenue | 223 | Grant. | Deny. | Grant. | Grant. |
| NY | Bishop Anderson | 204 | Grant. | Deny. | Deny. | Grant. |
| | Barrett | 206 | Grant. | Grant. | Grant. | Grant. |
| MA | Charles St. AME | 208 | Grant. | Grant. | Grant. | Grant. |

For the claims on which summary judgment will be granted without prejudice, Plaintiffs shall have until August 13, 2010 to show cause to cure the evidentiary deficiencies identified by the Court and demonstrate that summary judgment should not be granted in Ford's favor. Ford shall have until September 13, 2010 to file a response.

159

This Court will also grant Ford's motion (Doc. No. 172) to strike Plaintiffs' August 7, 2009 letter and affidavit.  Appropriate forms of order accompany this Memorandum Opinion.


Dated: July 9, 2010


                                                 ___S/Garrett E. Brown, Jr.___
                                                 Garrett E. Brown, Jr., Chief Judge
                                                 United States District Court