NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| _____ ) | Hon. Garrett E. Brown, Jr. |
| IN RE FORD MOTOR CO. E-350 ) | Civil Action No. 03-4558 (GEB) |
| VAN PRODUCTS LIABILITY ) | MDL No. 1687 |
| LITIGATION (NO. II) ) |  |
| _____ ) | **MEMORANDUM OPINION** |

**BROWN, Chief Judge:**

This matter comes before the Court on the Court's orders (Doc. Nos. 319, 328, 329, 331, 335, 336) that certain California, New Jersey, Pennsylvania, and Texas Plaintiffs show cause, in support of their respective unjust enrichment and statutory consumer fraud claims, demonstrating that they had conferred a benefit upon Defendant Ford Motor Company ("Ford"). The Court permitted limited supplemental discovery regarding these claims, and the parties filed supplemental submissions on November 22, 2010, December 15, 2010, and January 5, 2011. For the following reasons, the Court finds that the unjust enrichment claims of First United and Bethel may go forward, and the Court will grant summary judgment against the unjust enrichment claims of Macedonia, Bethany Baptist, Hickman Temple, and St. Luke's, as well as the remaining statutory consumer fraud claims of First United.

### Background

This multidistrict litigation commenced on June 16, 2005, when the Judicial Panel on Multidistrict Litigation transferred five actions to this Court for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 374 F. Supp. 2d 1353 (J.P.M.L. 2005). Following the transfer to this Court, Plaintiffs filed a

1

Consolidated Amended Class Action Complaint ("Complaint") alleging that their Ford E-350 "15-passenger" vans were defectively designed due to a high center of gravity that leads to an unusually high rollover rate and, consequently, an increased risk of death or injury. The Complaint asserts claims on behalf of Plaintiffs and a putative nationwide class that includes: "all persons and entities who purchased or otherwise lawfully acquired E350 '15-passenger' vans (a/k/a E350 Super Club Wagons, Econoline '15-passenger' vans, or E350 Super Duty Extended Length passenger vans) manufactured by Defendant Ford Motor Company . . . model years 1991-2005, and who reside in the fifty states and/or the District of Columbia." (Compl. ¶ 1.) No Plaintiffs or members of the proposed class have actually suffered a rollover, but Plaintiffs assert economic harm on the grounds that the alleged defect makes their E-350 vans unsuitable and unfit for transporting 15 passengers and, thus, has diminished the value of their vehicles and/or required Plaintiff's to incur out-of-pocket expenses to repair the defect.

Defendant Ford Motor Company (hereinafter "Ford") moved for summary judgment on all claims. By Opinion and Orders of July 9, 2010 ("July 9 Opinion"), this Court granted in part and denied in part Ford's motion with regard to specific Plaintiffs' claims. *See In re Ford Motor Co. E-350 Van Products Liability Litigation (No. II)*, Civ. No. 03-4558, 2010 WL 2813788, at *80 (D.N.J. July 9, 2010) (summarizing the Court's rulings as to each motion and party). With regard to the unjust enrichment claims of six Plaintiffs from four jurisdictions, as well as two state consumer fraud act claims for the California Plaintiffs, the Court granted Ford's motion without prejudice, on the ground that these Plaintiffs had not presented evidence that they conferred a benefit to Ford. *Id.* at *17–18, 33, 43–44, 56. These Plaintiffs—First United (CA), Macedonia (NJ), Bethany Baptist (NJ), Bethel (PA), Hickman Temple (PA), and St. Luke's

(TX)—had essentially relied on the fact that they purchased their van from an authorized Ford dealership to establish the requisite conferral of a benefit to Defendant Ford Motor Company. The Court permitted supplemental discovery on this issue and ordered these Plaintiffs' to show cause "to cure this evidentiary deficiency."

### *Responses to Order to Show Cause*

Plaintiffs responded with a proffer premised on, *inter alia*, the deposition testimony of Anthony Said, a dealer contract supervisor for Ford; Ford's standard Sales & Service Agreement (SSA) and  Vehicle Terms of Sales Bulletin (TSB); the Wholesale Financing and Security Agreement (WFSA) utilized by Ford's subsidiary Ford Motor Credit Company ("Ford Credit"); the affidavit of purported automotive industry expert Richard O. Neville; and Ford Credit's UCC filings with the New Jersey Department of Treasury.  In light of the parties' submissions, the following facts are largely undisputed.

Ford pre-approves all dealerships before they can be recognized as an authorized Ford dealership and sell new Ford vehicles.  As part of this approval process, dealerships execute the SSA, which provides the terms of the relationship between Ford and its authorized dealerships. (Pls.' Supp. 56.1 Statement ¶ 1; Def.'s Supp. 56.1 Resp. ¶ 1.)  Authorized dealerships may only keep Ford vehicles in stock, may not sell new Ford vehicles to unauthorized dealers, and may not change location without Ford's consent.  (Pls.' Supp. 56.1 Statement ¶¶ 3–4, 7; Def.'s Supp. 56.1 Resp. ¶¶ 3–4, 7.)  With the exception of Ford's supply for governmental and "fleet" services, consumers may only purchase Ford vehicles from authorized dealers.  (Pls.' Supp. 56.1 Statement ¶ 6; Def.'s Supp. 56.1 Resp. ¶ 6.)

On the supply side, Ford sets a "production allocation" for each authorized dealer, which is "based upon the dealer's reported sales activity and availability of vehicles within each line." (*See* Pls.' Supp. 56.1 Statement ¶ 11; Def.'s Supp. 56.1 Resp. ¶ 11; TSB § I.E.)  Each month, an authorized dealer makes a "basic Wholesale Order," or "wholesale commitment," to meet Ford's prospective production allocation.  (Pls.' Supp. 56.1 Statement ¶ 12; Def.'s Supp. 56.1 Resp. ¶ 12.)  The SSA requires authorized dealerships to maintain vehicle inventory "in accordance with company guides," or "adequate to meet the dealer's share of current and anticipated demand for vehicles in the dealer's locality."  (*See* Pls.' Supp. 56.1 Statement ¶ 15; Def.'s Supp. 56.1 Resp. ¶ 15; SSA § 2(d); Said Dep. at 41 (explaining that Ford and the dealers "come to an agreed upon number of what orders by vehicle line that they would commit to order," and that this agreement would reflect "the dealer's current inventory, anticipate[d] sales, and requirements for a projected month in the future").)  The TSB provides that Ford may place specific vehicle orders on behalf of the dealership "[i]f the dealer has not submitted buildable specific vehicle orders."  (TSB § I.E.)  Ford requires that its authorized dealers use Ford's accounting system, keep certain minimum levels of capital, and submit monthly financial reports to Ford showing the dealers' respective operating results.  (Pls.' Supp. 56.1 Statement ¶¶ 19–21; Def.'s Supp. 56.1 Resp. ¶¶ 19–21.)

On the demand side, authorized dealers must use wholesale financing, or "floor plan financing," to pay for all new Ford vehicles it orders from Ford.  (Pls.' Supp. 56.1 Statement ¶ 23; Def.'s Supp. 56.1 Resp. ¶ 23.)  These loans differ from the retail financing services that consumers use when they purchase the car from the dealer.  Dealers may use an independent lending source, but Ford Credit provides wholesale financing for most of Ford's dealers.  Dealers

may only use one wholesale lender at a time.  (*See* Pls.' Supp. 56.1 Statement ¶¶ 28, 30; Def.'s

Supp.56.1 Resp. ¶¶ 28, 30.)  Plaintiffs have presented evidence that they purchased their E-350

vans from authorized Ford dealers, and that Ford Credit provided wholesale financing for their

respective purchases.  (*See* Pls.' Supp. 56.1 Statement ¶¶ 42–43 (First United), 44–45

(Macedonia), 46–48 (Bethany Baptist), 49–50 (Bethel), 51–52 (Hickman Temple), 53–54 (St.

Luke's); Def.'s Supp.56.1 Resp. ¶¶ 42–55.)  Ford only objects to Plaintiffs' proofs that Ford

Credit floor plan financed the purchases of Bethel, Hickman Temple, and St. Luke's.  (*See* Def.'s

Br. at 12.)  The parties' characterizations of Ford Credit's role in the supply chain diverges, and

so the Court relies upon the evidentiary materials submitted by the parties.[1]  According to the

deposition testimony of Mr. Said, Ford Credit has a service contract with Ford to "take care of

the delivery and the insurance and handling of the vehicle until it gets to the dealer, at which

point it is transferred and delivered to the dealer and at that point the vehicle becomes in

possession of the dealership and the floor plan finance source takes over from them."  (Said Dep.

92:19–24.)  Ford Credit performs these services, regardless of whether an individual dealer uses

Ford Credit for floor plan financing.  (*See id.* at 93–94.)  Pursuant to the service agreement, Ford

Credit pays Ford for the vehicles and takes possession of the same when Ford Credit takes

---

[1]The Court notes that Plaintiffs present the affidavit of Richard O. Neville, whom they claim is an expert on the automotive industry.  In particular, Plaintiffs rely on Mr. Neville's conclusion that Ford "receives a financial benefit from the sale of each new vehicle that a Ford dealer sells to a retail customer."  Mr. Neville bases his opinions primarily on the deposition testimony of Mr. Said and various Ford documents.

To the extent that Plaintiff's rely on Mr. Neville's conclusion to establish the benefit element of their unjust enrichment claim, this Court owes no deference to his legal conclusions. *See, e.g.*, *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991).  To the extent that Mr. Neville's factual assertions are predicated on record evidence as opposed to firsthand knowledge, the Court will refer to the original source of that information.

delivery from the manufacturing plant.  (*Id.* at 91–93 (explaining that Ford Credit makes payment

to Ford "upon release of the vehicles" from the manufacturing plant).)  Although he was not

certain as to the transfer-of-funds method used in the transaction, Mr. Said stated he was "sure"

the transaction between Ford Credit and Ford "[wa]s a type of wire or journal entry of some sort,

some type of a wire transfer of funds so [Ford] can recognize that."  (Said Dep. at 94:9–12.)

According to Mr. Said, it this transfer with Ford Credit, prior to the delivery of the vehicles by

Ford Credit to dealers, that registers as revenue to Ford.  (*See id.* at 94:22–25 ("[A]t that point

when [the new vehicles] are removed from our manufacturing facility, that is when [Ford]

recognize[s] the revenue and that is when the actual physical transfer of the vehicles occurs . . .

."); *id.* at 106:12–15 ("The payment to Ford in every instance of when a vehicle is released from

our manufacturing facility, we are paid in full at that point.").)  For dealers who use Ford Credit

for floor plan financing, the dealer must pay interest to Ford Credit for the period of time that

vehicles remain in the their inventory, and the dealer becomes obligated to pay Ford Credit the

amount the dealer owes for the vehicle when a consumer purchases the vehicle.[2]  (Pls.' Supp.

---

[2]By comparison, when a dealer uses a third-party lender to floor plan finance their inventory, the third-party lender is obliged to pay Ford Credit for the car at the point that Ford Credit delivers the vehicle to the dealership.  (*See* Said Dep. at 96–97; Def.'s Br. at 5.)

In their reply brief, Plaintiffs argue that Defendant conceded that the "dealer financing transaction is immaterial because 'no funds are actually transferred from one company to another,' *i.e.*, from Ford Credit to Ford."  (Pls.' Reply Br. at 6, 14 n.5 (citing Def.'s Resp. Br. at 5.)  However, Plaintiffs misrepresent Defendant's statement, which clearly referred to the transfer of funds between the dealership and the *lender* that wholesale finances the dealership's inventory.  (Def.'s Resp. Br. at 5 (explaining that "[w]hen the vehicle is delivered to the dealer, the dealer takes ownership of the vehicles from Ford Credit, and *Ford Credit* is paid by the dealer's wholesale *financing source*") (emphasis added).)  When read in context, Defendant's statement that "no funds are actually transferred from one company to another," refers to the situation when Ford Credit serves as the floor plan lender, and the dealership does not need a third-party lender to purchase the car from Ford Credit.  According to the record evidence, when Ford Credit provides floor plan financing for a dealership, the dealer must pay interest to Ford

56.1 Statement ¶ 34; Def.'s Supp.56.1 Resp. ¶ 34; WFSA ¶ 5 ("Any and all proceeds of any sale, lease or other disposition of the Merchandise by Dealer shall be received and held by Dealer in trust for Ford Credit and shall be fully, faithfully and promptly accounted for and remitted by Dealer to Ford Credit to the extent of Dealer's obligation to Ford Credit with respect to the Merchandise."); *see also* Said Dep. at 108:9–14.)  After delivery of the vehicle but prior to the consumer purchase—*i.e.*, while the vehicle is in the dealer's inventory—Ford considers the dealer to be the owner of the vehicle, subject to a security interest that Ford Credit (or the appropriate floor plan lender) maintains in the vehicle.  (*See* Said Dep. at 149:5–9.)  Although the sale of a vehicle to the consumer does not directly result in the dealership ordering a replacement vehicle from Ford, the Court understands that a dealership's aggregate sales factors into Ford's periodic review of the dealer's wholesale commitment, which may be adjusted up/or down on the basis of the dealership's projected sales and Ford's production capabilities.  (*See* Def.'s Br. at 15 ("[A]ny particular sale to any particular Plaintiff influences the number of vehicles a dealer will order only to the extent that it is one out of a much larger number of aggregate sales by the dealer."); Said Dep. at 62:10–19 ("Q: Would you agree that the more vehicles the dealer sells, the more vehicles that Ford is going to be able to sell to that dealer? . . . A: Subject to them committing per our wholesale commitment and projecting future anticipated sales of them submitting the orders, that would impact our profitability and ability to produce more product.").)

---

Credit for the period of time that vehicles remain in the their inventory, and the dealer becomes obligated to pay *Ford Credit* the amount the dealer owes for the vehicle when a consumer purchases the vehicle.  (*See* Pls.' Supp. 56.1 Statement ¶ 34; Def.'s Supp.56.1 Resp. ¶ 34; WFSA ¶ 5; Said Dep. at 108:9–14.)  Ford Credit, however, pays Ford for the vehicles when it takes delivery from the factory.  (*See* Said Dep. at 94, 106.)

In addition to these facts, Plaintiffs submit that Ford directly advertises to consumers, offers incentives directly to consumers (*i.e.*, manufacturer's rebates), gathers extensive information on consumers, and otherwise views the consumer as its "customer." (*See* Pls.' Supp. 56.1 Statement ¶¶ 63–65; Def.'s 56.1 Resp. ¶¶ 63–65; Said Dep. at 141; Berger Decl. Ex. T.)

On the basis of this evidence, Plaintiffs argue they conferred a benefit upon Ford when they purchased their E-350 vans from Ford-authorized dealerships that used Ford Credit for floor plan financing.[3] This benefit is realized, Plaintiffs argue, when dealers order replacement product for the vehicles they sell. Furthermore, Plaintiffs argue that Ford's direct solicitation of consumers demonstrates Ford's interest in, and inherent benefit from, the sale of Ford vehicles to consumers. Ford responds that Plaintiffs have not shown Ford Credit to be an agent of Ford, that Plaintiffs have not shown grounds for piercing Ford Credit's corporate veil, that Plaintiffs have not shown that they conferred a direct benefit upon Ford, and that Plaintiffs have not shown that Ford Credit floor plan financed the purchases made by Bethel, Hickman Temple, and St. Luke's.

### *Analysis*

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably

---

[3]Significantly, Plaintiffs do not present evidence or argue that Ford Credit provided retail financing, or consumer financing, for their purchases, and thus the Court understands Plaintiffs to assert that they conferred an indirect benefit upon Ford Credit, realized when their consumer purchase obligated the dealer to remit funds owed on the vehicle to its floor plan lender, Ford Credit.

be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

Plaintiffs argue that their new submissions satisfy their burden, for both their unjust enrichment and California consumer fraud claims, of showing that they conveyed a benefit to Defendant Ford Motor Company. Plaintiffs do not make jurisdiction-specific arguments, nor do Plaintiffs contend that Ford Credit or their respective Ford dealerships served as agents for Defendant Ford Motor Company. (*See* Pls.' Reply Br. at 2, 5 n.2 (arguing that they were not required to show agency).) Instead, Plaintiffs collectively advance the following points: (1) that they conferred a direct benefit upon Ford when they purchased their respective E-350 vans, because their purchase obligated the dealers to remit funds to Ford via Ford Credit; (2) that a benefit is conferred because consumer sales affect dealers' replacement orders, and because Ford directly advertises its products to consumers; and, in their reply brief, (3) that Ford reports Ford Credit's income as its own income in its annual financial report to the Securities and Exchange Commission. (*See* Berger Supp. Decl. Ex. B.)[4]

Both parties cite cases supporting their respective arguments regarding whether a consumer purchase of goods from a retailer satisfies the benefit requirement of an unjust enrichment claim. *Compare In re ConAgra Peanut Butter Prods. Liab. Litig.*, Civ. No.

---

[4]The Court notes that Plaintiffs' presentation of this argument and these exhibits for the first time in a reply brief is improper. *See, e.g., Am. Home Mortgage Corp. v. First Am. Title Ins. Co.*, Civ. No. 07-01257, 2007 WL 3349320, at *3 n.8 (D.N.J. Nov. 9, 2007). Nevertheless, out of an abundance of caution, the Court will consider the impact of these materials.

1:07-MD-1845-TWT, 2008 WL 2132233, at *2–3 (N.D. Ga. May 21, 2008) (noting jurisdictional differences on the requirement of a direct benefit, but concluding that the "benefit is sufficiently direct" where the defendant, a manufacturer of peanut butter, "markets its product directly to consumers; though it sells its product through retailers, it directly profits from the individual demand of consumers"), *with Bower v. International Business Machs., Inc.*, 495 F. Supp. 2d 837, 844 (S.D. Ohio 2007) (dismissing unjust enrichment claim brought by consumers of computer hard drives against manufacturer, where consumers purchased hard drives from third-party retailer).  These cases reveal what the Court noted in the July 9 Opinion: that different jurisdictions set different standards for consumer fraud and unjust enrichment claims.  In order to resolve the parties' arguments, the Court must consult the law of Plaintiffs' respective jurisdictions.

### I. California & Pennsylvania

Both California and Pennsylvania law have viewed unjust enrichment as an equitable remedy predicated on the law of restitution.  *See, e.g., Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006); *Lauriedale Assocs., Ltd. v. Wilson*, 9 Cal. Rptr. 2d 774, 780 (Cal. Ct. App. 1992); *Mitchell v. Moore*, 729 A.2d 1200, 1203–04 (Pa. Super. Ct. 1999); *Powers v. Lycoming Engines*, 328 F. App'x 121, 125 (3d Cir. 2009) (collecting Pennsylvania cases).  "Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another.  A person is enriched if he receives a benefit at another's expense.  The term 'benefit' 'denotes any form of advantage.'  Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss."  *Ghirardo v. Antonioli*, 924 P.2d 996, 1003 (Cal. 1996) (citing Restatement of

10

Restitution § 1); *see also County of Solano v. Vallejo Redevelopment Agency*, 90 Cal. Rptr. 2d 41, 52 (Cal. Ct. App. 1999); *see accord Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (applying Pennsylvania law); *Serafini v. Mariani*, Civ. No. 3:CV-08-0469, 2010 WL 1342926, at *9 n.15 (M.D. Pa. Mar. 31, 2010); *Zvonik v. Zvonik*, 435 A.2d 1236, 1241 (Pa. Super. Ct. 1981) (citing Restatement for proposition that "any form of advantage" constitutes a benefit).  "For a benefit to be conferred, it is not essential that money be paid directly to the recipient by the party seeking restitution."  *County of Solano*, 90 Cal. Rptr. 2d at 52 (quoting *Cal. Fed. Bank v. Matreyek*, 10 Cal. Rptr. 2d 58, 62 (Cal. Ct. App. 1992)); *see accord Powers v. Lycoming Engines*, 245 F.R.D. 226, 232–33 (E.D. Pa. 2007) (observing that Pennsylvania law permits "indirect purchasers to establish claims for unjust enrichment so long as they can prove that the defendant benefitted at the plaintiff's expense, even if the benefit flowed indirectly from the plaintiff to the defendant), *vacated on other grounds by* 328 F. App'x 121; *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. Ct. 1973) ("To sustain the claim, appellant must show that [a non-party to a contract] wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.").

Applying the California and Pennsylvania restitution standards, the Court agrees that Bethel and First United have shown evidence of a sufficient indirect benefit to sustain a claim for restitution against Ford.  The Court is satisfied that both parties have presented evidence that Ford Credit floor plan financed their vehicle purchases.[5]  Based on the record evidence, these

---

[5]In response to Ford's objection about Bethel's proofs about its dealership's lender, Plaintiffs submitted additional materials showing that Ford Credit served as Parkway East Ford's floor plan lender during the relevant time period.  (Berger Supp. Decl. Ex. C.)  However, even if another lender floor plan financed the dealership's purchase, the Court's conclusion regarding a benefit would apply with equal force, because the Court's conclusion does not rest on Ford

Plaintiffs  indirectly conferred a benefit upon Ford, because their new vehicle purchase factored into the calculus whereby their dealership and Ford made orders for replacement vehicles.  Ford argues that such a benefit is *de minimis*, because a dealership's replacement orders are governed by the wholesale commitment, aggregate sales, and Ford's supply, rather than individual vehicle sales.  (*See* Def.'s Br. at 15.)  But Ford does not deny that the individual vehicle sale positively affects this determination to the benefit of the manufacturer.  (*See id.*; *see also* Said Dep. at 62:10–19 ("Q: Would you agree that the more vehicles the dealer sells, the more vehicles that Ford is going to be able to sell to that dealer? . . . A: Subject to them committing per our wholesale commitment and projecting future anticipated sales of them submitting the orders, that would impact our profitability and ability to produce more product.").)  Mr. Said testified during his deposition that although Ford retains the discretion to place vehicle orders on the behalf of an underperforming dealership, he was not aware of any instance where Ford had exercised such discretion.  (Said Dep. at 50, 52.)  This testimony reflects the symbiotic relationship between dealerships and the manufacturer, whereby a dealership's poor performance indirectly affects the manufacturer's bottom line.  Although Ford technically retains the discretion to force more inventory on a given dealership, more often than not sound business judgment would lead the manufacturer to make adjustments on the supply side.  Each new vehicle purchase decreases the likelihood that a dealership will not meet the next wholesale commitment, and consequently decreases the likelihood that Ford will need to decrease product allocation for that dealership. Ford has not convinced the Court that this benefit is too remote to be actionable.  Under California's and Pennsylvania's law of restitution, benefit refers to "any form of advantage," and

Credit's role as a floor plan lender.

the plaintiff need not directly make payment to defendant in order to raise a claim for unjust

enrichment.  Thus, although the direct benefits—*i.e.*, payment for vehicle delivery—took place

upstream, the Court cannot say that Bethel and First United have conveyed no benefit on Ford,

and the Court will permit their unjust enrichment claims to go forward.[6]

　　　　As for Plaintiff Hickman Temple, the Court notes that this party differs from the rest, in

that it purchased a used E-350 van from a Ford dealership.  In their reply brief, Plaintiffs argue

that the purchase of a used vehicle has as much impact on Ford as the purchase of a new vehicle,

because Ford Credit "financed and assumed a corresponding security interest in all

'merchandise,' including 'new [and] used' vehicles."  (*See* Pls.' Reply Br. at 11 (citations

omitted).)  Yet this contention only establishes a link between the consumer and Ford Credit, not

Ford.  Unlike the purchase of a new vehicle, which indirectly impacts the manufacturer's product

allocation for a given dealership, it is unclear whether the purchase of a used vehicle—which the

Court presumes was acquired by the dealership from a downstream consumer—has any effect on

the manufacturer.  As noted above, the joint SEC filing does not establish a sufficient link

between the consumer and the manufacturer.  Plaintiffs have not presented evidence or explained

---

　　　　[6]Today's ruling with regard to the unjust enrichment claims of Bethel and First United is
limited by the following caveats, made explicit in the July 9 Opinion.  First, this Court's ruling
on Bethel's unjust enrichment claim only extends to the 2001 van purchased by Bethel, and does
not disturb this Court's entry of judgment against the portion of Bethel's unjust enrichment claim
predicated on the purchase of a model year 2000 E-350 via a third-party.  *See In re Ford Motor
Co. E-350 Van Products Liability Litigation (No. II)*, 2010 WL 2813788, at *43.  Second, in
concluding that First United has presented sufficient evidence of a benefit to support an unjust
enrichment claim, this Court does not resolve the dispute of fact, recognized in the July 9
Opinion, regarding whether First United actually purchased the E-350 van from the Ford
dealership or from a third party.  *See id.* at *16 (observing that "[t]he record contains evidence
supporting either that Troop 1 purchased the van from the Mel Clayton Ford dealership and sold
the vehicle to First United for $1.00, or that First United purchased the van directly from Mel
Clayton Ford").

13

how Hickman Temple's purchase of a used vehicle conferred a benefit upon Ford. Consequently, the Court will grant Ford's motion and enter summary judgment against Hickman Temple on its unjust enrichment claim.

Also before the Court is First United's claims under the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, et seq., and the California False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500, et seq.  Like Plaintiffs' unjust enrichment claims, the UCL and FAL claims sound in restitution.  *See* Cal. Bus. & Prof. Code §§ 17203 (authorizing "such orders or judgments" that "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute), 17535 (same)); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144, 1152 (2003); *Buckland v. Threshold Enterps., Ltd.*, 66 Cal. Rptr. 3d 543, 558 (Cal. Ct. App. 2007), *abrogated on other grounds by Kwikset Corp. v. Superior Court*, --- Cal. Rptr. 3d ----, 2011 WL 240278 (Cal. 2011); *Trew v. Volvo Cars of N. Am., LLC*, No. 05-1379, 2006 WL 306904, at *2 (E.D. Cal. Feb. 8, 2006).  This limited remedy does not extend to disgorgement of profits.  *See, e.g.*, *Korea Supply*, 29 Cal. 4th at 1144; *Trew*, 2006 WL 306904, at *2.  Rather, "[a]n order for restitution is one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply*, 29 Cal. 4th at 1149 (citation omitted).  Thus, restitution in this context serves "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.*

Previously, Ford argued that *Korea Supply* imposed a direct-relationship requirement for

a plaintiff to claim restitution under the UCL, because that court rejected the plaintiff's claim in that case by reasoning that "[a]ny award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took *directly* from plaintiff." 29 Cal. 4th at 1149 (emphasis added). However, as this Court explained in the July 9 Opinion, subsequent courts have construed *Korea Supply* narrowly, noting that the issue of whether indirect payment would sustain a claim for restitution was not before that court, because "it was clear in Korea Supply that the plaintiff did not pay any money, even indirectly, to the defendant." *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1103 (N.D. Cal. 2007); *see also Trew v. Volvo Cars of N. Am.*, LLC, Civ. No. CIV-S-051379DFLPAN, 2006 WL 306904, at *2–3 (E.D. Cal. Feb. 8, 2006) (permitting UCL restitution claim by consumer against automobile manufacturer, where consumers paid money to dealership or mechanic, and that money could be indirectly traced to the manufacturer via the ordering of replacement parts). Following the lead of these courts, this Court concluded that a plaintiff may only recover restitution under the UCL and FAL if it can "trace" its lost money or property to the defendant. *In re Ford Motor Co. E-350 Van Products Liability Litigation (No. II)*, 2010 WL 2813788, at *15 ; *see also Ditropan*, 529 F. Supp. 2d at 1105; *Trew*, 2006 WL 306904, at *2–3.

The Court is not persuaded that First United has demonstrated the requisite traceability for its UCL and FAL claims, because it has not shown that its money can be traced to the manufacturer. Although Plaintiffs argue that the consumer's money goes to Ford, because Ford concedes that it has been paid for all vehicles that are ultimately sold, this fact does not link the consumer purchase to the manufacturer. Indeed, the record evidence relied on by Plaintiff demonstrates that Ford was paid upstream by Ford Credit when Ford Credit took delivery of the

vehicle from the manufacturing plant.  (*See* Said Dep. at 94:22–2,106:12–15; *see also supra* note 2.)  The Court is not convinced that Ford's financial statements in its SEC filings establish this link, because the filing purports to reflect the revenues of "Ford Motor Company and Subsidiaries" (Berger Supp. Decl. Ex. B), and Plaintiffs concede that Ford Credit makes separate SEC filings (*see id.* Ex. A).  Taking Plaintiffs' argument to its natural conclusion, if the joint parent-subsidiary SEC filing alone established a traceable link between the consumer and the parent company, then a dissatisfied consumer who rented a car from Hertz, also a Ford subsidiary (*see id.* Ex. B), would also have a sufficient relationship with Ford to sue it for restitution under UCL and FAL.  Furthermore, the Court will not presume such a link on the basis of Ford's direct advertisement to consumers.  Although it is possible that money received by Ford Credit redounds to the benefit of Ford, Plaintiffs have not presented evidence establishing this link.  *Cf. Ditropan*, 529 F. Supp. 2d at 1105 (explaining that money is traceable for purposes of the UCL if it was paid to the defendant via an intermediary).  This case thus differs from *Trew*, wherein the court concluded that the consumers' alleged injuries were traceable to the automobile manufacturer, who sold the replacement parts (electronic throttle modules) to the dealerships and mechanics that repaired the consumers' defective cars.  *See Trew*, 2006 WL 306904, at *3 (denying manufacturer's motion to strike consumers' UCL claim for restitution).  Consequently, the Court will grant Ford's motion and enter summary judgment against First United on its UCL and FAL claims.

## II.  New Jersey

Unlike California and Pennsylvania law, courts in New Jersey have consistently required the showing of a direct benefit to establish a claim for unjust enrichment.  As this Court

explained in the July 9 Opinion, New Jersey law requires a plaintiff to "'show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 110 (2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). "That quasi-contract doctrine also 'requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" *Id.* (quoting *VRG Corp.*, 135 N.J. at 554). In order to meet this standard, numerous courts have recognized that the plaintiff must demonstrate a direct relationship with the defendant to support the claim. *See*, *e.g.*, *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div. 1966) (noting that "quasi-contract cases involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit," and rejecting unjust enrichment claim where the plaintiff "had no dealings with defendant"); *Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 505–06 (D.N.J. 2009) (dismissing unjust enrichment claims brought by purchasers of multipurpose photocopy machines against manufacturer, because the plaintiffs purchased the printers from a third-party retail chain); *Cooper v. Samsung Elecs. Am., Inc.*, Civ. No. 07-3853, 2008 WL 4513924, at *10 (D.N.J. Sept. 30, 2008) (same, involving allegedly defective televisions); *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496 (D.N.J. 1998) ("[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim.").

Just this past year, two courts in this District applied the direct relationship requirement in rejecting consumers' unjust enrichment claims against automobile manufacturers. In *Henderson v. Volvo Cars of North America*, *LLC*, plaintiffs/consumers raised numerous claims against the

17

automobile manufacturer stemming from the allegedly defective transmission utilized in their

SUVs.  Civ. No. 09-4146, 2010 WL 2925913, at *1 (D.N.J. July 21, 2010).  The *Volvo* plaintiffs

had argued that the manufacturer "benefitted from collecting funds from Plaintiffs and other

customers for vehicle repairs related to the transmission problem when in fact Volvo knew the

true cause of the problem was the defective vehicle design."  *Id.*  Nevertheless, the court

dismissed the plaintiffs' unjust enrichment claim, agreeing with the manufacturer that the

consumers had no direct relationship with the manufacturer.  *Id.* at *11.  Similarly, in *Alin v.*

*American Honda Motor Co.*, the court rejected an unjust enrichment claim brought by a

plaintiff/consumer who alleged that the automobile manufacturer had benefitted from leasing him

a vehicle with a defective air-conditioning unit.  Civ. No. 08-4825, 2010 WL 1372308, at *14–15

(D.N.J. Mar. 31, 2010).  Although the consumer alleged he had leased the vehicle from an

authorized Honda dealership, the court found the plaintiff's pleadings deficient because he failed

to alleged that the "dealer[ship] gave, or was required to give, its profits from the purchase to

Honda."  *Id.* at *15.  Notably, the *Honda* court rejected the consumer's "direct benefit" and

agency theories predicated on the replacement parts that are ordered from the manufacturer when

the consumer takes a defective vehicle to the dealership for repairs.  *See id.* at *15.

Applying New Jersey's law of unjust enrichment, the Court is not persuaded that

Macedonia and Bethany Baptist conferred a sufficiently direct benefit upon Ford to sustain a

claim of unjust enrichment.  As noted above in the discussion of First United's statutory claims,

the Court is not persuaded that the SEC filings establish a link between Ford and Ford Credit,

such that the consumer's vehicle purchase confers a direct benefit upon Ford.  As for the vehicle

purchase, it is undisputed that these Plaintiffs—Bethany Baptist and Macedonia—purchased their

18

E-350 vans from Ford dealerships that utilized Ford Credit for floor plan financing, and thus these Plaintiffs indirectly conferred a benefit upon Ford Credit, the dealer's wholesale lender. Plaintiffs have presented no evidence that their consumer vehicle purchase triggered Ford Credit to remit funds to Ford.  Rather, the evidence presented by the parties' supplemental submissions reflect that Ford realized its profit prior to the consumer purchase, when Ford Credit pays for the vehicles and takes possession of them prior to the delivery of vehicles at individual dealerships. (Said Dep. at 94:22–25, 106:12–15.)  Even though Mr. Said did not recall the exact nature of this transaction (*see* Said Dep. at 92:13–15 (referring to the transaction as "some kind of a cash revenue exchange")), Plaintiffs have not presented any evidence that the consumer purchase triggered Ford Credit's obligation to pay Ford, or that Ford Credit was otherwise required to share its profits with Ford.  Based on the guidance of *Volvo* and *Honda*, the Court concludes that the mere fact Ford Credit had paid Ford for the vehicle upstream when it accepted delivery at the manufacturing plant does not establish a direct relationship between the consumer and the manufacturer.  Nor is the Court persuaded that Ford's generic solicitation of customers suffices to establish that these Plaintiffs conferred a direct benefit on Ford that would sustain a claim for unjust enrichment.

As noted above, Plaintiffs do not argue that Ford Credit or the dealerships are agents of Ford, and this Court may not presume so.  Plaintiffs have had two opportunities to present evidence that they directly conveyed a benefit upon Ford and have not done so.  Consistent with the New Jersey rule applied in *Volvo* and *Honda*, and in the absence of evidence presenting a question of fact, the Court will grant summary judgment against the New Jersey Plaintiffs, Bethany Baptist and Macedonia.

### III. Texas

Texas courts have provided limited guidance regarding the doctrine of unjust enrichment. As this Court noted in the July 9 Opinion, Texas courts have described unjust enrichment as "not an independent cause of action," but as an equitable remedy that "'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay.'" *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App. 2008) (quoting *Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 832 (Tex. App. 2006)).  To recover under a theory of unjust enrichment in Texas, a party must prove that "one person has obtained a benefit from another by fraud, duress, or the other taking of an undue advantage." *City of The Colony v. N. Tx. Mun. Water Dist.*, 272 S.W. 3d 699, 731 (Tex. App. 2008).  Yet, unjust enrichment is a "narrow" remedy, *see Singer v. City of Waco, Tex.*, 324 F.3d 813, 826 (5th Cir. 2003) (collecting cases), and it "is not a proper remedy merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' . . . or because the benefits to the person sought to be charged amount to a windfall," *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998) (quoting *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 42 (Tex. 1992); *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App. 1987)).  "The purpose of restitution is to place an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant.  This purpose is accomplished by requiring the defendant to return to the plaintiff any rendered performance to which the defendant is not entitled." *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 96–97 (Tex. App. 1996) (citations omitted).

20

The Court notes that Ford objects to St. Luke's proof that Ford Credit floor plan financed Village Ford's inventory.  (*See* Berger Decl. Ex. S (UCC filing dated six months after St. Luke's purchase).)  However, presuming this fact in Plaintiff's favor, the Court agrees with Ford that St. Luke's has not presented evidence that it conferred a benefit on Ford.  Neither party has presented Texas authority, and the Court has not found any, dealing with the issues presented by this case: a consumer's purchase of a vehicle from a dealership, where the manufacturer's benefits are primarily felt upstream.  Plaintiffs in this case based St. Luke's injury on loss of use, stemming from the fact that it removed the back seat and, on occasion, had to rent additional vehicles for transportation purposes.  (*See* Pls.' Omnibus SJ Br. at 43.)  St. Luke's did not report experiencing a manifestation of the E-350 handling problems.  As noted above, Plaintiffs have abandoned their agency argument, and they have presented no evidence that the consumer purchase triggered Ford Credit's obligation to pay Ford, or that Ford Credit was otherwise required to share its profits with Ford.  In light of Texas courts' reluctance to expand the "narrow" remedy of restitution, this Court predicts that Texas courts would not find that St. Luke's conferred a sufficiently direct benefit upon Ford to sustain a claim for unjust enrichment.  Consequently, the Court will grant Ford's motion and enter summary judgment against St. Luke's unjust enrichment claim.

### *Conclusion*

For the aforementioned reasons, the Court finds that the unjust enrichment claims of First United and Bethel may go forward, and the Court will grant summary judgment against the unjust enrichment claims of Macedonia, Bethany Baptist, Hickman Temple, and St. Luke's, as well as the remaining statutory consumer fraud claims of First United.  This Court's previous

Orders (Doc. Nos. 319, 328, 329, 331, 335, 336) will be amended to reflect these dispositions.

An appropriate form of Order accompanies this Memorandum Opinion.

Dated: February 16, 2011

                                 S/Garrett E. Brown, Jr.       
                                Garrett E. Brown, Jr., Chief Judge
                                United States District Court