1    NOT FOR PUBLICATION

2

3               **UNITED STATES DISTRICT COURT**

4                **DISTRICT OF NEW JERSEY**

5   _____

6                         )    Hon. Esther Salas

7   IN RE FORD MOTOR CO. E-350     )    Civil Action No. 03-4558

8   VAN PRODUCTS LIABILITY        )    MDL No. 1687

9   LITIGATION (NO. II)            )

10  _____)    **OPINION**

11

12  **SALAS**, District Judge:

13

14       This matter comes before the Court on the renewed class certification motion (Doc. No.

15  375) filed by Plaintiffs, various owners of Ford's E-350 vans.  Also before the Court is Ford's

16  motion to amend (Doc. No. 393) its Answer to include an affirmative defense asserting that any

17  implied warranties were limited by the terms of the express warranties issued with its vehicles.

18  The Court has considered the parties' submissions and decided the matter without oral argument

19  pursuant to Federal Rule of Civil Procedure 78.  For the following reasons, the Court will grant

20  Ford's motion to amend and deny class certification.

21

22                         *Background*

23

24       On June 16, 2005, the Judicial Panel on Multidistrict Litigation transferred five actions to

25  this District for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  *In re Ford*

26  *Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 374 F. Supp. 2d 1353 (J.P.M.L. 2005).

27  Following the MDL transfer, Plaintiffs filed a Consolidated Amended Class Action Complaint

28  ("Complaint").  In the Complaint, Plaintiffs alleged that their Ford E-350 "15-passenger" vans

29  were defectively designed due to a high center of gravity that leads to an unusually high rollover

30  rate and, consequently, an increased risk of death or injury.  No Plaintiffs or members of the

31    proposed class have actually suffered a rollover; indeed, the proposed class specifically excluded

32    those who claim damages for personal injury as a result of purchasing or leasing a Ford E-350

33    van. (Compl. ¶ 63). Plaintiffs claim economic harm because the alleged defect purportedly

34    makes the E-350 vans unsuitable and unfit for transporting 15 passengers. The Complaint

35    purported to bring claims on behalf of Plaintiffs and a putative nationwide class that includes:

36    "all persons and entities who purchased or otherwise lawfully acquired E350 '15-passenger' vans

37    (a/k/a E350 Super Club Wagons, Econoline '15-passenger' vans, or E350 Super Duty Extended

38    Length passenger vans) manufactured by Defendant Ford Motor Company . . . model years 1991-

39    2005, and who reside in the fifty states and/or the District of Columbia." (Compl. ¶ 1).

40          The Complaint initially asserted claims on behalf of various named Plaintiffs from five

41    states: Alabama, Arkansas, California, Illinois, and New Jersey. Ford moved to dismiss the

42    entire Complaint. In an Opinion and Order dated September 2, 2008 (amended September 3,

43    2008), the Hon. Harold A. Ackerman, Senior District Judge, granted in part and denied in part

44    Ford's motion. *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, No. 03-4558, MDL

45    No. 1687, 2008 WL 4126264, at *29 (D.N.J. Sept. 2, 2008) ("MTD Opinion"). Judge Ackerman

46    applied the law of the Plaintiffs' home states to their respective claims, except where no material

47    difference existed between the various states' laws, and he dismissed the following claims: 1) the

48    Alabama, Arkansas, and Illinois Plaintiffs' express warranty claims; 2) the Alabama, Arkansas,

49    and Illinois Plaintiffs' implied warranty claims; 3) the Alabama and Arkansas Plaintiffs'

50    respective state consumer fraud statutory claims; and 4) one of the three state consumer fraud

51    statutory claims advanced by the California Plaintiff. *Id.* at *3, 29-30. After Judge Ackerman

52    resolved Ford's motion to dismiss, the parties in November 2008 agreed to the joinder of newly

2

53    named Plaintiffs from many new jurisdictions.  (Doc. No. 150).  Subsequently, this matter was

54    reassigned to the Hon. Garrett E. Brown, Jr., Chief District Judge, in August 2009.  Following

55    extensive discovery, Ford filed twenty-one separate motions for summary judgment seeking

56    judgment against all named Plaintiffs on all claims.  Chief Judge Brown resolved these motions

57    with three separate decisions, applying the law of the forum state to respective Plaintiffs' claims.

58    First, Chief Judge Brown granted two of Ford's motions and dismissed two named Plaintiffs by

59    Opinion and Order of November 18, 2009.  *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*

60    *(No. II)*, No. 03-4558, 2009 WL 4117359, at *1-2 (D.N.J. Nov. 18, 2009).  Subsequently, Chief

61    Judge Brown resolved the majority of the remaining motions with a second, omnibus Opinion

62    and Order filed July 9, 2010.  *See In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,

63    No. 03-4558, 2010 WL 2813788, at *80 (D.N.J. July 9, 2010) ("July 9 Opinion") (summarizing

64    the rulings as to each motion and party).  The July 9 Opinion permitted supplemental discovery

65    and ordered six Plaintiffs from four jurisdictions to present evidence that they had conferred a

66    benefit to Ford, in order to sustain their unjust enrichment and state consumer fraud act claims.

67    *Id.* at *17-18, 33, 43-44, 56.  These Plaintiffs responded to the orders to show cause, and Chief

68    Judge Brown issued a third opinion that granted in part and denied in part Ford's summary

69    judgment motions as to these claims.  *See In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*

70    *(No. II)*, No. 03-4558, 2011 WL 601279, at *11 (D.N.J. Feb. 16, 2011) ("February 16 Opinion").

71    As a result of these three summary judgment opinions, the following claims remain.

72

73

| State | Plaintiff | Express Warranty | Implied Warranty | Consumer Fraud Statute | Unjust Enrichment |
|-------|-----------|------------------|------------------|------------------------|-------------------|
| CA | First United | | | | √ |
| NJ | Macedonia | | √ | | |
| | Faith Tabernacle | | √ | | |
| | Social Clubhouse | | √ | | |
| | Bethany Baptist | | √ | | |
| GA | Allen Temple | √ | √ | | √ |
| PA | Bethel | | √ | | √ **(2001 van)** |
| | Hickman Temple | | √ | | |
| | Mt. Airy | | √ | | |
| FL | Diaz | | | √ | |
| | Mestre | | | √ | |
| MI | Conant Avenue | | √ | | |
| NY | Bishop Anderson | | √ | √ | |
| TX | St. Luke's | | | √ **(non-disclosure theory)** | |

The omnibus July 9 Opinion denied Plaintiffs' initial motion for class certification, but granted Plaintiffs leave to re-file in light of the court's summary judgment rulings. Following Chief Judge Brown's third and final summary judgment ruling, Plaintiffs renewed their motion for class certification. This matter was reassigned to the undersigned by Order of June 15, 2011.

### *Plaintiffs' Proposed Classes*

The renewed motion for class certification proposes the following claim-based classes ("claim classes"):

4

99          All persons or entities residing in the States of Georgia, Michigan, New
100        Jersey, New York and Pennsylvania, who purchased or otherwise
101        acquired and currently own a Ford E-350 van, new or used, model years
102        1991-2005, and assert BREACH OF IMPLIED WARRANTY claims
103        under their respective state laws and all persons or entities residing in the
104        State of Georgia who purchased the subject vehicles and assert a
105        BREACH OF EXPRESS WARRANTY claim.
106

107         All persons or entities residing in the States of Florida, New York and
108        Texas, who purchased or otherwise acquired and currently own a Ford E-
109        350 van, new or used, model years 1991-2005, and assert VIOLATION
110        OF CONSUMER PROTECTION ACTS in their respective states.
111

112         All persons or entities residing in the States of California, Georgia and
113        Pennsylvania, who purchased or otherwise acquired and currently own a
114        Ford E-350 van, new or used, model years 1991-2005 and assert
115        UNJUST ENRICHMENT under their respective state laws.
116

117  (Pls.' Br. at 11).  In response to Ford's opposition argument, Plaintiffs have limited their

118  proposed unjust enrichment class to "purchasers of *new* Ford E-350 vans *prior* to April 2004."

119  (Pls.' Reply Br. at 35 & n.22) (emphasis added).  As an alternative to these three classes,

120  Plaintiffs seek certification of eight, state-based classes ("state classes") consisting of:
121

122         All persons or entities residing in the State of [state] who purchased or
123        otherwise acquired and currently own a Ford E-350 van, new or used,
124        model years 1991-2005.
125

126  (*Id.*).  Plaintiffs contend these proposed classes satisfy the numerosity, commonality, typicality,

127  and adequacy requirements of Federal Rule of Civil Procedure 23(a), and that common questions

128  of law and fact predominate over individual considerations, rendering class litigation a superior

129  method of adjudication for purposes of Federal Rule 23(b)(3).  Alternatively, Plaintiffs seek class

130  certification pursuant to Federal Rule 23(b)(2), arguing that the "core of the relief sought by

131  Plaintiffs in this case is equitable in nature."  (Pls.' Br. at 61).  To assist the Court's review of

132  their proposed classes, Plaintiffs submit a proposed trial plan.  Ford objects to all of Plaintiffs

133   proposed classes.

134          The main thrust of Plaintiffs' certification argument is that Chief Judge Brown's

135   summary judgment rulings have pared down the initial proposed classes into manageable groups,

136   and that the new proposed classes satisfy the predominance requirement of Federal Rule

137   23(b)(3). For the remaining implied warranty claims, which derive from each state's version of

138   UCC § 2-314, Plaintiffs contend that they can present common proof of a design defect, the

139   existence of an implied warranty, causation, and a common injury measured by the difference in

140   value between the product as warranted and the product as received per UCC § 2-714. Although

141   Plaintiffs suggested measuring their common injury by the cost of retrofit in their initial motion

142   for class certification (*see* Doc. No. 254 at 47 n.15), Plaintiffs now set forth a uniform retrofit

143   cost of $2,100 as their common proof of injury. With regard to the remaining consumer fraud

144   claims, Plaintiffs assert that they can present common proof of Ford's alleged misrepresentations,

145   deception, ascertainable loss, and causation. Conversely, Plaintiffs argue that they do not need to

146   make individual showings of reliance in order to establish their consumer fraud claims. Finally,

147   with regard to the remaining unjust enrichment claims, Plaintiffs state that they can present

148   common proof of unjust benefit to Ford, stemming from the fact that Ford did not disclose the E-

149   350 van's defect (inability to carry fifteen passengers).

150          Ford contests Plaintiffs' assertion that they can establish their remaining claims with

151   common proof under the applicable law of the remaining jurisdictions. Ford argues that many of

152   the elements necessary to establish Plaintiffs' claims—such as deception and causation—will

153   require individualized inquiries into the circumstances of each class member's claims. In

154   addition to these individualized inquiries on the elements of Plaintiffs' claims, Ford argues that

155    its statute of limitations defenses will require additional individual inquiries to determine

156    whether specific class members' claims are time-barred.  The prevalence of individualized

157    inquiries, Ford argues, defeats the predominance requirement of Federal Rule 23(b)(3).

158
159                                    ***Motion to Amend***

160
161           During the briefing of the renewed class certification motion, Plaintiffs objected to Ford's

162    argument predicated on the factual contention that the express warranty issued with every new E-

163    350 van limited the duration of any implied warranty.  Plaintiffs argued that this line of implied

164    warranty defense was foreclosed, because Ford failed to raise it as an affirmative defense in its

165    Answer to the Complaint, or in any of the summary judgment motions.  (Pls.' Reply Br. at 13).

166    In response, Ford moved to amend its Answer to include this affirmative defense, which

167    Plaintiffs oppose on the ground of waiver.

168           Ford now seeks to include the following "durational limitation" implied warranty

169    affirmative defense to its Answer:

170                   All of the vehicles in the purported classes were sold to their initial
171                   purchaser with an express warranty provided by Ford that validly limited
172                   the duration of the implied warranty of merchantability to the period of
173                   the express warranty, i.e., 3 years or 36,000 miles, whichever comes first.
174                   Accordingly, the claims of Plaintiffs or some members of the purported
175                   classes are barred because they never suffered a legally cognizable injury,
176                   damages, and/or loss within 3 years or 36,000 miles of the initial
177                   purchase of the vehicle.

178
179    (Doc. No. 393, Ex. A).  Ford contends that this amendment is warranted, because the substance

180    of the proposed affirmative defense appeared in Ford's Answer as a response to an allegation in

181    Plaintiffs' Class Action Complaint.  Furthermore, Ford points out that it invoked this defense in

182    its original motion to dismiss before Judge Ackerman, and again in its opposition to Plaintiffs'

7

183   renewed class certification motion.  In light of these uses of the defense, Ford contends that it

184   would not prejudice Plaintiffs to allow Ford to redesignate the defense as an affirmative defense.

185        Plaintiffs respond that allowing the affirmative defense nearly three years after Ford's

186   Answer, and well after the close of discovery and summary judgment motions, would be

187   prejudicial.  Plaintiffs contend that Ford abandoned this "durational limitation" implied warranty

188   defense after Judge Ackerman decided the motion to dismiss in September 2008, and that Ford

189   has not shown grounds for excusing its undue delay in seeking the amendment.  As a result,

190   Plaintiffs state that they did not explore the factual issues pertinent to this "durational limitation"

191   defense in discovery.  Plaintiffs also argue that Ford's proposed amendment would be futile.  In

192   this regard, Plaintiffs note that Judge Ackerman rejected Ford's durational limitation argument at

193   the motion to dismiss stage, and claim that Ford's disclaimers are not sufficiently conspicuous to

194   be enforceable under UCC § 2-316(2).

195        The Federal Rules of Civil Procedure allow for flexibility when it comes to a party's

196   pleadings, placing greater emphasis on substance than technical form.  Federal Rule of Civil

197   Procedure 15(a)(2) provides that leave to amend a party's pleadings should be "freely give[n] . . .

198   when justice so requires."   Federal Rule 8(e) instructs that "[p]leadings must be construed so as

199   to do justice."  Similarly, "[i]f a party mistakenly designates a defense a counterclaim, or a

200   counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were

201   correctly designated, and may impose terms for doing so."  Fed. R. Civ. P. 8(c)(2).  The decision

202   regarding whether or not to grant leave to amend rests with the district court's sound discretion.

203   "[A]ffirmative defenses can be raised by motion, at any time (even after trial), if plaintiffs suffer

204   no prejudice."  *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006).  "A district

8

205    court may deny leave to amend a complaint if a plaintiff's delay in seeking amendment is undue,

206    motivated by bad faith, or prejudicial to the opposing party," but delay alone is an insufficient

207    ground for denying leave to amend. *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267,

208    272-73 (3d Cir. 2001). The Court will allow Ford's proposed amendment, because Plaintiffs'

209    assertion of undue delay and prejudice is overstated, and Plaintiffs' attack on the merits of the

210    warranty disclaimers is premature.

211          Plaintiffs cannot claim unfair surprise at this defense, because Plaintiffs opened the door

212    on the issue of the enforceability of Ford's implied warranty disclaimers in their Complaint. In

213    fact, Paragraph 85 of the Complaint aptly anticipated Ford's "durational limitation" defense and

214    preemptively countered that defense by stating that any such disclaimers were unconscionable

215    and unenforceable. That paragraph states:

216          Any express limitation or negation of Ford's implied warranties that the
217          E350 vans were fit to accommodate and safely transport 15 passengers,
218          when such was not the case, would be unreasonable and unconscionable
219          and, accordingly, is unenforceable pursuant to UCC § 2-316.
220

221    (Consolidated Am. Class Action Compl. ¶ 85). It is undisputed that Ford initially opposed this

222    contention in the motion to dismiss before Judge Ackerman (Ford's MTD Br. at 31), and then

223    subsequently denied this contention in its Answer. (Answer ¶ 85). In ruling on the motion to

224    dismiss, Judge Ackerman addressed both Ford's "durational limitation" defense and Plaintiffs'

225    anticipatory response that such disclaimers were unconscionable, concluding that it would be

226    inappropriate to rule on disclaimers and unconscionability at the motion to dismiss stage. MTD

227    Opinion, 2008 WL 4126264, at *20 (D.N.J. Sept. 2, 2008). This Court agrees that Ford's

228    "durational limitation" defense should have been affirmatively stated as an affirmative defense,

229  *see* Fed. R. Civ. P. 8(c), but Plaintiffs cannot claim unfair surprise.  Nor can Plaintiff claim

230  *undue* delay.  It appears that neither party addressed the warranty disclaimer or unconscionability

231  in the summary judgment motions.  However, when Plaintiffs objected to Ford's assertion of this

232  defense in its opposition to the renewed class certification, Ford promptly sought leave to amend

233  six days later.  (*See* Doc. Nos. 392-93).[1]

234     To the extent that Plaintiffs assert that Ford's implied warranty disclaimers are

235  inconspicuous and therefore unenforceable, Plaintiffs have not sufficiently addressed the

236  particulars of the various warranty disclaimers issued by Ford for different model years.

237  Typically, the futility of a motion to amend is determined by reference to the motion to dismiss

238  standard of Federal Rule of Civil Procedure 12(b)(6).  *See, e.g.*, *In re Burlington Coat Factory*

239  *Sec. Litig.*, 114 F.3d 1410, 1434-35 (3d Cir. 1997).  Thus, this Court must consider whether the

240  proposed amendment "contain[s] sufficient factual matter, accepted as true, to 'state a claim to

---

[1]  The Court is puzzled by Plaintiffs' suggestion that they did not investigate Ford's awareness of the alleged defect and each Plaintiff's relative bargaining power and ability to detect the defect (*see* Pls.' Opp'n to Mot. to Amend at 2-3), because those factual issues are constituent parts of Plaintiffs' claim that Ford failed to disclose the E-350 van's latent defect, and that this omission deceived Plaintiffs.  Indeed, as Plaintiffs recognize in their renewed class certification brief, the seller's awareness of the underlying defect and misrepresentation is a necessary element for many consumer fraud statutes.  (Pls.' Renewed Class Cert. Br. at 32) ("To prove 'unlawful conduct' in this case, Plaintiffs must 'prove that [defendant] knew or should have known' that the E-350 van, as designed, could not safely transport 15 passengers, and that Ford 'either affirmatively misrepresented or omitted that fact when marketing' the vehicle.") (citation omitted).; *see also Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 605 (1997) (explaining that non-disclosure liability under the consumer fraud statute required a showing that "the defendant acted with knowledge"); *Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1162 (N.D. Cal. 2011) (dismissing California UCL claim, because plaintiff failed to show that the defendant had knowledge of the defect, and thus defendant's representations could not have been deceptive).  Likewise, the purchaser's ability to detect the van's alleged defect factors into the deception and causation elements of Plaintiffs' consumer fraud and implied warranty claims, as well as Ford's statute of limitations defenses.

241  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell*

242  *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard requires that

243  "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that

244  the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility

245  that a defendant has acted unlawfully." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).  Plaintiffs

246  do not contest that Ford's "durational limitation" defense sets forth a plausible basis for denying

247  relief on some of Plaintiffs' claims, but instead generally argue that Ford's disclaimers are

248  unenforceable as a matter of law.  Such an argument, addressed to specific disclaimers issued

249  with particular model-year E-350 vans (as opposed to a generic attack on all of Ford's warranty

250  disclaimers), is properly raised in a motion for summary judgment.  It does not, however, show

251  futility.

252       Plaintiffs identified the same "durational limitation" defense now proposed by Ford and

253  preemptively countered the same in paragraph 85 of their Complaint.  Because Plaintiffs have not

254  shown unfair surprise, undue delay, prejudice, or futility, the Court will permit Ford to

255  redesignate its "durational limitation" defense as an affirmative defense.

256
257                          ***Class Certification***
258
259       Federal Rule of Civil Procedure 23 governs class certification.  The party seeking class

260  certification must satisfy both the conjunctive requirements of subpart (a) and one of

261  the requirements of subpart (b).  Fed. R. Civ. P. 23; *In re Schering Plough Corp. ERISA Litig.*,

262  589 F.3d 585, 596 (3d Cir. 2009).  The Supreme Court succinctly described the Rule

263  23(a) requirements applicable to all class actions in *Amchem Products, Inc. v. Windsor*: "(1)

264  numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality

265    ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses

266    'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and

267    adequately protect the interests of the class')."  521 U.S. 591, 613 (1997).  Under subpart (b),

268    Plaintiffs primarily seek certification pursuant to subpart (b)(3), which requires a finding that

269    "questions of law or fact common to class members predominate over any questions affecting

270    only individual members, and that a class action is superior to other available methods for fairly

271    and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Alternatively, Plaintiffs

272    seek certification pursuant to subpart (b)(2), which is appropriate when "the party opposing the

273    class has acted or refused to act on grounds that apply generally to the class, so that final

274    injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

275    whole."  Fed. R. Civ. P. 23(b)(2).

276          The Third Circuit provided detailed guidance on litigation class certification analysis in

277    *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2009).  The *Hydrogen*

278    *Peroxide* court recognized that federal law vests district courts with "broad discretion to control

279    proceedings and frame issues for consideration under Rule 23," but noted that "proper discretion

280    does not soften the rule: a class may not be certified without a finding that each Rule 23

281    requirement is met."  552 F.3d at 310.  A federal court may only certify an action for class

282    litigation if it concludes, after a "rigorous analysis," that the party seeking class certification has

283    satisfied all of the prerequisites of Rule 23.  *Behrend v. Comcast Corp.*, 655 F.3d 182, 190 (3d

284    Cir. 2011) ("The district court must conduct a 'rigorous analysis' of the evidence and arguments

285    in making the class certification decision.");  *Hydrogen Peroxide*, 552 F.3d at 309 (citing *Gen.*

286    *Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982);  *Amchem*, 521 U.S. at 615;  *Beck v. Maximus,*

287    *Inc.*, 457 F.3d 291, 297 (3d Cir. 2006)).  "'A class certification decision requires a thorough

288    examination of the factual and legal allegations.'"  *Id.* (quoting *Newton v. Merrill Lynch, Pierce,*

289    *Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001)).  In this regard, "the requirements set

290    out in Rule 23 are not mere pleading rules"; "[t]he court may delve beyond the pleadings to

291    determine whether the requirements for class certification are satisfied."  *Id.* at 316 (internal

292    quotation marks and citations omitted).  The class certification decision "calls for findings by the

293    court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met," and

294    "the court must resolve all factual or legal disputes relevant to class certification, even if they

295    overlap with the merits—including disputes touching on elements of the cause of action."  *Id.* at

296    307; *see also Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 197 (3d Cir. 2009) (explaining

297    that "rigorous analysis" under *Hydrogen Peroxide* requires the district court to "determine what

298    elements plaintiffs would have to prove under [their] theory to reach a finding of liability and

299    relief, and then assess whether this proof can be made within the parameters of Rule 23").

300    "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of

301    the evidence."  *Hydrogen Peroxide*, 552 F.3d at 320.[2]

---

[2]More recently, the Third Circuit set forth a detailed analysis for class *settlement* certification, following and explaining its holding in *Hydrogen Peroxide.  See Sullivan v. DB Invs., Inc.*, No. 08-2784, 2011 U.S. App. LEXIS 25185, at *68-69 (3d Cir. Dec. 20, 2011) ("We explained in *Hydrogen Peroxide* that an examination of the elements of plaintiffs' claim  is sometimes necessary, not in order to determine whether each class member states a valid claim, but instead to determine whether the requirements of Rule 23—namely, that the elements of the claim can be proved 'through evidence common to the class rather than individual to its members'—are met.") (quoting *Hydrogen Peroxide*, 552 F.3d at 311-12).  Aware of the scope and importance of the Third Circuit's decision in *Sullivan*, and in light of the fact that the parties' briefs were submitted before the Third Circuit filed its decision in *Sullivan*, this Court held a telephone status conference with the parties on January 4, 2012 to ask whether they wanted to supplement their briefing.  The parties declined.  Counsel for Plaintiffs stated that *Sullivan* raises no new issues with respect to Plaintiffs' papers and supports Plaintiffs' current arguments.

302        Plaintiffs challenge the *Hydrogen Peroxide* standard on two fronts.  Plaintiffs first argue

303    that "*Hydrogen Peroxide* left intact . . . the rule in the Third Circuit that Rule 23 should receive a

304    liberal construction."  (Pls.' Br. at 12.)   Next, Plaintiffs contend that Ford's reading of *Hydrogen*

305    *Peroxide* is contrary to the Supreme Court's recognition that class certification analysis does not

306    involve an inquiry into whether individual plaintiffs will prevail on the merits (Pls.' Reply Br.

307    at 6 (citing *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 177-78 (1974)).  Both contentions lack

308    merit, because the Third Circuit rejected both of Plaintiffs' contentions in *Hydrogen Peroxide*,

309    552 F.3d at 316-17 & n.18, 321-22; *see also Merlo v. Federal Express Corp.*, No. 07-4311, 2010

310    WL 2326577, at *3-4 (D.N.J. May 7, 2010) (assessing and rejecting similar arguments under

311    *Hydrogen Peroxide*).

312        With regard to Plaintiffs' argument that this Court should apply a liberal construction that

313    favors class certification in close cases, the *Hydrogen Peroxide* court explained that this rule,

314    stemming from cases such as *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) and *Kahan*

315    *v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970), predated the 2003 amendments to Rule 23 that

316    "reject[ed] tentative decisions on certification and encourage[d] development of a

317    record sufficient for informed analysis."  *Hydrogen Peroxide*, 552 F.3d at 321 (citing Fed. R.

318    Civ. P. 23 advisory committee's note, 2003 Amendments ("A court that is not satisfied that the

319    requirements of Rule 23 have been met should refuse certification until they have been met.")).

320    As a result of these amendments, the Third Circuit has instructed that courts "should not suppress

---

Counsel for Defendants agreed that *Sullivan* raises no new issues and that the decision is
distinguishable because it relates to settlement certification and not litigation class certification.
The Court agrees, and therefore decides this motion on the papers before it, citing *Sullivan* where
appropriate.

321   'doubt' as to whether a Rule 23 requirement is met—no matter the area of substantive law." *Id.*;

322   *see also In re Schering Plough Corp. ERISA Litig.*, 589 F.3d at 600 n.14.  Plaintiffs cite the 2009

323   case *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774 (3d Cir. 2009) to suggest that *Hydrogen*

324   *Peroxide* "left intact" the prior "liberal construction" rule (Pls.' Br. at 12), but Plaintiffs

325   misrepresent what *Constar* held.  Far from an endorsement of the "liberal construction" rule

326   expressly repudiated by *Hydrogen Peroxide*, *Constar* considered whether the special master's

327   and district court's passing references to the "liberal construction" rule in their decisions that

328   predated *Hydrogen Peroxide* rendered the class certification analysis invalid after the Court of

329   Appeals decided *Hydrogen Peroxide*.  The *Constar* court found the error harmless, because the

330   district court did not actually apply the "liberal construction" rule and the substance of the district

331   court's analysis complied with the standard pronounced in *Hydrogen Peroxide*.  585 F.3d at 781-

332   82 (explaining that references to the "liberal construction" rule "were not conclusions, but rather

333   a preface to further analysis").

334          As for Plaintiffs' suggestion that the Supreme Court's decision in *Eisen* forbids merits

335   inquiries at the class certification stage, *Hydrogen Peroxide* explained that this reading of *Eisen*

336   is at odds with prior and subsequent Supreme Court decisions that recognized that "the class

337   determination generally involves considerations that are enmeshed in the factual and legal issues

338   comprising the plaintiff's cause of action."  *Hydrogen Peroxide*, 552 F.3d at 317 (quoting

339   *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978)) (internal quotation marks omitted);

340   *see also Falcon*, 457 U.S. at 160-61 (explaining that "actual, not presumed, conformance with

341   Rule 23(a) remains . . . indispensable," and instructing courts to conduct a "rigorous" Rule 23

342   analysis); *Behrend*, 655 F.3d at 199 ("[A] district court may inquire into the merits only insofar

15

343     as it is 'necessary' to determine whether a class certification requirement is met.").  Previously,

344     our Circuit explained in *Newton* that the circumstances of *Eisen* support a narrow reading of its

345     holding, because the preliminary merits inquiry encountered by the *Eisen* Court involved a

346     district court's decision to shift costs (notification of class members) to the defendant that was

347     based on that court's determination that the plaintiff was likely to succeed on the merits of his

348     claim.  *Newton*, 259 F.3d at 166. Accordingly, our Circuit has determined that "*Eisen* is best

349     understood to preclude only a merits inquiry that is not necessary to determine a Rule 23

350     requirement."  *Hydrogen Peroxide*, 552 F.3d at 317 (citing *Newton*, 259 F.3d at 166-69).  The

351     *Hydrogen Peroxide* court bolstered this portion of its ruling by noting that the Courts of Appeals

352     for the First, Second, Fourth, Fifth, and Seventh Circuits have similarly construed *Eisen* not to

353     preclude consideration of the merits to the extent necessary to make Rule 23 findings.  552 F.3d

354     at 317 n.17 (citing *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 24 (1st

355     Cir. 2008); *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *Gariety v.*

356     *Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *Oscar Private Equity Invs. v.*

357     *Allegiance Telecom, Inc.*, 487 F.3d 261, 268 (5th Cir. 2007); *Szabo v. Bridgeport Machs., Inc.*,

358     249 F.3d 672, 677 (7th Cir. 2001)).  Recently, the Third Circuit echoed its *Hydrogen Peroxide*

359     decision.  *See Sullivan v. DB Invs., Inc.*, 2011 U.S. App. LEXIS 25185, at *68 (3d Cir. Dec. 20,

360     2011) ("[A] district court may inquire into the merits of the claims presented in order to

361     determine whether the requirements of Rule 23 are met, but not in order to determine whether the

362     individual elements of each claim are satisfied.").

363          This Court sees nothing about *Hydrogen Peroxide* that contradicts specific Supreme

364     Court guidance.  In fact, the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.

365    Ct. 2541 (2011) is consistent with the *Hydrogen Peroxide* rule.  *See Behrend*, 655 F.3d at 190 n.6

366    ("The Supreme Court confirmed [the Third Circuit's] interpretation of the Rule 23 inquiry in

367    *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011).").  *Wal-Mart* begins

368    with a reminder that "[t]he class action is 'an exception to the usual rule that litigation is

369    conducted by and on behalf of the individual named parties only.'"  *Id.* at 2550 (quoting *Califano*

370    *v. Yamasaki*, 442 U.S. 682, 700-701 (1979)).  *Wal-Mart* further recognized that "rigorous

371    analysis" under Rule 23 "[f]requently . . . will entail some overlap with the merits of the

372    plaintiff's underlying claim.  That cannot be helped."  *Id.* at 2551.  The *Wal-Mart* Court also

373    addressed the limited scope of *Eisen*'s prohibition on merits inquiries, explaining that the

374    preliminary merits inquiry conducted by the trial judge in that case had no bearing on the class

375    certification analysis.  *Id.* at 2552 n.6.  "To the extent the [*Eisen*] statement goes beyond the

376    permissibility of a merits inquiry for any other pretrial purpose," the *Wal-Mart* Court stated, "it is

377    the purest dictum and is contradicted by our other cases."  *Id.*; *see also Sullivan*, 2011 U.S. App.

378    LEXIS 25185, at *49 ("[T]he focus is on whether the defendant's conduct was common as to all

379    of the class members, not on whether each plaintiff has a 'colorable' claim.") (quoting *Wal-Mart*,

380    131 S. Ct. at 2551).

381           Here, in order to conduct "rigorous analysis," this Court must necessarily consider the

382    substantive elements of Plaintiffs' causes of action in order to determine the relevant Rule 23

383    issue: whether common issues, susceptible to common proof, predominate over individualized

384    issues.  Unlike a summary judgment decision, this limited merits inquiry, as explained by

385    *Sullivan*, *Behrend*, and *Hydrogen Peroxide*, does not entail consideration of whether plaintiffs,

386    collectively or individually, actually have meritorious claims.  But this Court must resolve legal

387 disputes regarding the substantive elements of Plaintiffs' claims in order to make a qualitative

388 assessment of whether or not Plaintiffs can prove their claims with common evidence.

389         With the above considerations in mind, the Court turns to Ford's challenges to Plaintiffs'

390 proposed classes. Ford addresses its objections to Plaintiffs' showings under subparts (b)(2) and

391 (b)(3). First, Ford objects that Plaintiffs' proposed classes fail to exclude named class members

392 whose claims were previously dismissed on the merits by Chief Judge Brown's summary

393 judgment opinions. Second, Ford contests Plaintiffs' proposed classes for each jurisdiction on a

394 claim-by-claim basis, arguing that individualized fact issues defeat predominance under Rule

395 23(b)(3) with regard to each proposed class. Third, Ford argues that Plaintiffs cannot avail

396 themselves of Rule 23(b)(2), because Plaintiffs primarily seek monetary relief, and because the

397 same individual issues that defeat predominance under Rule 23(b)(3) preclude certification under

398 Rule 23(b)(2). The Court considers each argument in turn.

399 I.      CLASS DEFINITIONS & PREVIOUSLY DISMISSED CLAIMS

400         Ford points out that Plaintiffs' proposed classes fail to exclude the following named

401 Plaintiffs and claims, which were dismissed by Chief Judge Brown's summary judgment

402 opinions: (1) all claims by New York Plaintiff Barrett; (2) the misrepresentation-based consumer

403 fraud claim of Texas Plaintiff St. Luke's; (3) the unjust enrichment claims of Pennsylvania

404 Plaintiffs Hickman Temple and Mt. Airy; and (4) the consumer fraud claim of Florida Plaintiff

405 Blandon. Based on Chief Judge Brown's summary judgment opinions, the Court agrees that

406 these claims must be excluded from Plaintiffs' proposed classes.

407         With regard to New York Plaintiff Barrett, Chief Judge Brown granted summary

408 judgment in favor of Ford on all claims, concluding that Barrett had not presented evidence of

18

409   actual injury as required by *Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9 (App. Div. 2002).

410   July 9 Opinion, 2010 WL 2813788, at *71-72, 75.  Because Barrett has no remaining claims in

411   this case, he must necessarily be excluded from Plaintiffs' proposed classes.  The Court will

412   therefore consider Plaintiffs' proposed New York classes as if they had excluded Barrett.

413           Turning to the Texas consumer fraud claim under the Texas Deceptive Trade

414   Practices-Consumer Protection Act (DTPA), Tex. Bus. & Com. Code § 2.313 *et seq.*, Chief

415   Judge Brown granted summary judgment in favor of Ford on Texas Plaintiff St. Luke's claim

416   that Ford's description of the E-350 van as a "15-passenger van" misrepresented the van's ability

417   to safely carry 15 passengers.  July 9 Opinion, 2010 WL 2813788, at *54.  Chief Judge Brown

418   left intact, however, St. Luke's omission-based theory of a DTPA violation under § 17.46(b)(24).

419   *Id.* at *55.  Plaintiffs' proposed classes do not distinguish between class members having a

420   misrepresentation-based consumer fraud claim and an omission-based consumer fraud claim.

421   Yet, the July 9 Opinion differentiated between the underlying factual predicates for these claims,

422   and why omission was the only viable theory under the DTPA.  With regard to Plaintiffs' claim

423   that Ford implicitly represented that the E-350 van could safely carry 15 passengers by

424   describing, or "packaging" the E-350 van as a "15-passenger" van, Chief Judge Brown concluded

425   that this representation was too vague under Texas law to be actionable under DTPA

426   §§ 17.46(b)(5), (b)(7), and (b)(9).  *Id.* at *54 ("An imprecise or vague representation amounts to

427   mere opinion or puffing.  Here, under the particular undisputed facts of this case, Ford's

428   description of the E-350 van as a 15-passenger van did not include any representation of safety,

429   and does not rise to the level required for a violation of [DTPA] § 17.46(b)(5).") (citation

430   omitted).  Not only did this ruling eliminate the only named Texas Plaintiff's DTPA

19

431   misrepresentation claim, but it categorically rejected the contention that any Texas Plaintiff could

432   bring such a claim.  Conversely, as Plaintiffs' recognize in their reply brief (Pls.' Reply Br. at 27

433   n.18, 29) (citing Compl. ¶ 31), the surviving omission claim under DTPA § 17.46(b)(24) was

434   predicated on allegations that Ford failed to disclose to consumers that, due to stability issues, the

435   E-350 van should only be driven by "trained experienced drivers."  *See* July 9 Opinion, 2010 WL

436   2813788, at *55.  Plaintiffs recognize that they cannot proceed with a DTPA misrepresentation

437   claim in light of the July 9 Opinion.  (*See* Pls.' Reply Br. at 27-29).  Thus, to the extent that

438   Plaintiffs seek certification of a DTPA claim on behalf of Texas class members, the Court will

439   assess Rule 23(b)(3) predominance for Plaintiffs' proposed class through the lens of the

440   § 17.46(b)(24) omission claim permitted by the July 9 Opinion.[3]

441        As for the Pennsylvania unjust enrichment claim, Plaintiffs do not dispute that the July 9

442   and February 16 Opinions disposed of the unjust enrichment claims of Pennsylvania Plaintiffs

443   Mt. Airy and Hickman Temple.  Chief Judge Brown rejected these claims for different reasons.

444   Mt. Airy's claim failed because the record established that this Plaintiff purchased its E-350 van

445   in 2005, after Plaintiffs conceded that the artificial market for the van eroded.  Meanwhile,

446   Hickman Temple's claim failed because Plaintiffs did not show that Hickman Temple's purchase

447   of a used vehicle conferred a benefit upon Ford.  *See* July 9 Opinion, 2010 WL 2813788, at *44

448   (Mt. Airy); February 16 Opinion, 2011 WL 601279, at *6 (Hickman Temple).  In their reply

449   brief, Plaintiffs seek to bypass these problems by modifying their unjust enrichment class to

450   apply only to "purchasers of *new* Ford E-350 vans *prior to* April 2004."  (Pls.' Reply Br. at 35 &

---

[3]As noted in this Court's extensive discussion of "rigorous analysis" under Rule 23, the Court limits its merits analysis to whether Plaintiffs can satisfy the requirements of Rule 23 for the relevant claim, and does not presently consider whether Plaintiffs have meritorious claims.

451    n.22) (emphasis added).  Accordingly, the Court will conduct Rule 23 analysis on Plaintiffs'

452    modified unjust enrichment class, as proposed in the reply brief.

453            Finally, Plaintiffs do not deny that Florida Plaintiff Blandon's consumer fraud claim was

454    terminated in the July 9 Opinion.  *See* July 9 Opinion, 2010 WL 2813788, at *49.  Chief Judge

455    Brown reasoned that Blandon could not show actual deception, because the undisputed record

456    established "that Blandon assertedly knew that the vehicles were unsafe but nonetheless

457    purchased two vehicles."  *Id.*  Because Blandon has no remaining claims in this case, she must

458    necessarily be excluded from Plaintiffs' proposed classes.  The Court will therefore consider

459    Plaintiffs' proposed Florida class as if they had excluded Blandon.

460    II.      CERTIFICATION UNDER RULE 23(b)(3)

461            As noted above, class certification under Rule 23(b)(3) requires a finding that common

462    issues of law and fact predominate over issues affecting individual members, and that class

463    litigation is superior to other methods of adjudication.  In other words, subpart (b)(3) breaks

464    down into a predominance requirement and a superiority requirement, both of which must be met

465    in order for the district court to grant class certification.

466            The predominance requirement of subpart (b)(3) "'tests whether proposed classes are

467    sufficiently cohesive to warrant adjudication by representation,'" and is a "'far more

468    demanding'" requirement than the commonality requirement of subpart (a).  *Hydrogen Peroxide*,

469    552 F.3d at 311 (quoting *Amchem*, 521 U.S. at 623-24).  Predominance "requir[es] more than a

470    common claim," and "[i]ssues common to the class must predominate over individual issues[.]"

471    *Id.* (citation omitted).  "Because the nature of the evidence that will suffice to resolve a question

472    determines whether the question is common or individual, a district court must formulate some

21

473   prediction as to how specific issues will play out in order to determine whether common or

474   individual issues predominate in a given case[.]" *Id.* (internal quotation marks and citations

475   omitted).  Notably, "'[i]f proof of the essential elements of the cause of action requires individual

476   treatment, then class certification is unsuitable.'"  *Id.* at 311 (quoting *Newton*, 259 F.3d at 172).

477        Meanwhile, the superiority requirement of subpart (b)(3) is guided by the following

478   "pertinent" considerations: "(A) the class members' interests in individually controlling the

479   prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

480   the controversy already begun by or against class members; (C) the desirability or undesirability

481   of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties

482   in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).

483        Ford argues that Plaintiffs have not met the predominance requirement for any of their

484   proposed classes, because each suffers from a multitude of individualized issues.  Ford also

485   argues that the various jurisdictions' statutes of limitations, as well as plaintiff-specific equitable

486   tolling doctrines that Plaintiffs will invoke to counter such defenses, support denying class

487   certification of all proposed classes.  The Court addresses Ford's specific predominance

488   objections by jurisdiction and claim.  Consistent with Judge Ackerman's undisputed choice-of-

489   law determination, the Court will consider the law of the forum jurisdiction in evaluating

490   whether Plaintiffs' respective claims satisfy Rule 23(b)(3)'s predominance requirement.  The

491   Court addresses Ford's statute of limitations affirmative defenses separately in Part II.H, *infra*.[4]

492

---

[4]The Court notes that Plaintiffs sorted their arguments by claim and not by jurisdiction. The Court has endeavored to match Plaintiffs' opposition arguments to Ford's jurisdiction-specific objections.

493          *A.  New York*

494          After Chief Judge Brown's omnibus July 9 Opinion, Plaintiff Anderson is the sole

495   remaining representative of the proposed New York classes, and only his implied warranty and

496   consumer fraud claims remain.  July 9 Opinion, 2010 WL 2813788, at *75.  Ford objects to

497   Plaintiffs' proposed New York classes on the grounds that Plaintiffs cannot prove their New

498   York consumer fraud and implied warranty claims with common proof.  The Court agrees on

499   both counts.

500                    *1.  Consumer Fraud, N.Y. Gen. Bus. Law § 349*[5]

501          "To successfully assert a section 349(h) claim, a plaintiff must allege that a defendant has

502   engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff

503   suffered injury as a result of the allegedly deceptive act or practice."  *City of New York v.*

504   *Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009) (citation omitted).  Ford argues that

505   Plaintiffs cannot show predominance because Plaintiffs do not have common classwide proof for

506   any of these elements.

507          First, Ford argues that Plaintiffs have no common proof of a uniform misrepresentation.

508   Ford notes that different class members would present different proofs based on their individual

509   experiences: some class members claim to have seen representations that the E-350 was a "15-

510   passenger van" in sales brochures, others may have bought a model year van that included the

511   description "15-passenger" in the name of the vehicle, and some may have seen no representation

---

[5]The Court notes that Plaintiffs' Complaint asserted a claim under GBL § 350, but Plaintiffs' renewed class certification briefs and trial plan all appear to abandon that claim. Plaintiffs present no distinct arguments to support their claims under § 350, and the Court therefore concludes that Plaintiffs have not shown predominance for any remaining § 350 claim.

23

512    that the van would carry 15 passengers.  (Ford's Resp. Br. at 16) (citing Pls.' Br. at 33).  Second,

513    Ford argues that this individualized proof of the alleged representation will necessarily require

514    individualized determinations concerning whether certain class members were actually deceived.

515    Third, Ford argues that Plaintiffs disregard Chief Judge Brown's ruling that New York law

516    requires actual injury in the form of limitation on use or out-of-pocket expenses.  (Ford's Resp.

517    Br. at 24).  Under this standard, Ford contends that Plaintiffs cannot rely on a generalized

518    assertion of diminution in value, and, thus, the presiding court would need to conduct

519    individualized inquiries to determine if a particular class member incurred actual losses in the

520    form of out-of-pocket expenses or loss of use, and whether these losses were proximately caused

521    by the alleged defect in the van or other, unrelated causes.  (*Id.*).  Finally, with regard to

522    causation, Ford states that, while New York law does not require a showing of reliance, it does

523    require a showing of actual deception.  Toward this end, Ford notes that Chief Judge Brown

524    granted summary judgment against Pentecostal Temple's Illinois consumer fraud claim for lack

525    of actual deception and proximate causation, because the undisputed record revealed

526    that Pentecostal Temple never received or observed any misrepresentations from Ford.  (Ford's

527    Resp. Br. at 26) (citing July 9 Opinion, 2010 WL 2813788, at *23).

528          Plaintiffs respond that they do have common proof to address each of these requirements.

529    Plaintiffs contend that they have common proof of misrepresentations, by virtue of the fact that

530    Ford marketed the E-350 van as a "15 passenger" van and outfitting the van with 15 seats.

531    Plaintiffs assert that an objective standard applies to the alleged misrepresentations, and deduce

532    that "evidence in the form of the vehicle's name, number of seats and so forth can be submitted

533    to the jury for a determination whether *reasonable* consumers would understand it to mean *safe*

534   transportation."  (Pls.' Reply Br. at 27).  Plaintiffs further argue that deception is measured by an

535   objective standard, because New York law does not require a showing of reliance.  Citing Florida

536   case law, Plaintiffs state that "causation may be established with proof that Ford's conduct 'was

537   likely to deceive a consumer acting reasonably in the same circumstances.'"  (Pls.' Br. at 36;

538   Pls.' Reply Br. at 26) (citations omitted).  Finally, Plaintiffs contend that they have presented

539   common evidence of injury in the form of an inherent design defect that manifests on every

540   vehicle—an inability to "safely carry 15 passengers."  (Pls.' Br. at 36; *see also* Pls.' Reply Br. at

541   33).  Plaintiffs point to two decisions of the New York Court of Appeals that they claim enable

542   them to present common proof of deception and causation under GBL § 349.  First, Plaintiffs

543   argue that *Oswego Fund v. Marine Midland Bank* set an objective "reasonable consumer"

544   standard for determining whether or not an alleged representation was deceptive.  *See* 647 N.E.2d

545   741 (N.Y. 1995).  Second, Plaintiffs invoke *Stutman v. Chemical Bank* for the proposition that

546   they can show common proof of causation simply by showing that the alleged misrepresentations

547   were "material."  *See* 731 N.E.2d 608 (N.Y. 2000).  With regard to injury, Plaintiffs cite

548   *Ackerman v. Coca-Cola Co.*, No. 09-0395, 2010 WL 2925955 (E.D.N.Y. July 21, 2010) and *In*

549   *re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768

550   (3d Cir. 1995), for the proposition that they can claim a common, benefit-of-the-bargain, or

551   diminution in value, injury.

552          The Court agrees that Plaintiffs have not met the predominance requirement for its New

553   York consumer fraud claims under GBL § 349, because resolution of Plaintiffs and putative class

554   members' claims will require numerous individualized inquiries into the material

555   misrepresentation, deception and causation, and actual injury.

556                    *a.  Misrepresentation*

557            As is evident by Chief Judge Brown's summary judgment opinions, different Plaintiffs

558    were exposed to different representations at different times.  Some received sales brochures from

559    Ford describing the van as a "15-passenger van" (First United), others saw that description as

560    part of the vehicle packaging, such as the window sticker (First United), some were simply told

561    that the E-350 was a "15-passenger van" by a salesperson (Charles St. AME, Greater All Nation),

562    some were assured that the E-350 was the "best vehicle going" (Charles St. AME), and it appears

563    that some did not see or hear any representation regarding the van's passenger capacity or relative

564    safety (Pentecostal Temple).  *See* July 9 Opinion, 2010 WL 2813788, at *4-5, 19-20, 75.  The

565    Court further notes that Ford's safety disclaimers in the E-350 owner's guides evolved over time.

566    Whereas the 2000-2002 model-year owner's guides alerted consumers that they should take

567    "extra precautions" because "[l]oaded vehicles, with a higher center of gravity, may handle

568    differently," the 2003-2005 model-year owner's guides stated that "[t]he risk of a rollover crash

569    increases as the number of people and load in the vehicle increase," and specifically advised that

570    "[t]he van should be operated by an experienced driver."  (*See* Doc. No. 292, Smith Decl. Ex.

571    12).  Moreover, Plaintiffs recognize in their Complaint that Ford issued a safety advisory in

572    September 2002 instructing consumers to use trained drivers for the E-350 van.  (Compl. ¶ 31).

573    Given these variations among the named Plaintiffs and the evolving disclosures by Ford, the

574    Court may easily deduce that putative class members would rely on different theories of

575    misrepresentation.

576            Plaintiffs' only apparent response to these variations is that all consumers received an

577    implicit representation that the vans could safely carry 15 passengers by virtue of the fact that

578    each van was equipped with 15 seats.  (*See* Pls.' Reply Br. at 27) ("In a nutshell, that is Plaintiffs'

579    claim under the New York, Texas and Florida consumer protection statutes.").  This answer is

580    not satisfactory, because Plaintiffs have not shown that the mere presence of seats conveys a

581    common message about passenger capacity or relative safety.[6]  Preliminarily, the Court does not

582    understand Plaintiffs to assert that all E-350 vans in the proposed class had 15 individual seats,

583    but rather some combination of front seats and rearward benches that can accommodate 15

584    passengers.  (*See* Pls.' Br. at 7).   Absent other representations and presuming a two-front seat,

585    four-rearward bench layout (*see* Carr Report, Doc. No. 290, at 3/36), reasonable consumers could

586    draw differing inferential conclusions regarding passenger capacity and relative safety *vis-a-vis*

587    other multi-passenger vehicles.[7]  Such conclusions may reflect different consumers' individual

588    vehicle needs, which may be guided by such factors as the number and size of expected

589    passengers, as well as cargo needs.[8]

---

[6]Notably, Plaintiffs do not submit any evidence that individual Plaintiffs understood the number and layout of the E-350's seats to constitute a representation that the van could safely carry 15 passengers.

[7]Plaintiffs base much of their defect argument on the notion that the E-350 van was not *safe* to carry 15 passengers, but Plaintiffs do not attempt to delineate the contours of the safety threshold they assert.  Surely an extended passenger van, like a large SUV or truck, cannot be expected to have the same handling characteristics as a sedan or sports car.  Yet with the present motion, Plaintiffs do not present qualitative evidence comparing the handling, safety restraint, and crash characteristics of the E-350 to other extended passenger vans, or other large, multi-passenger vehicles.

[8]This Court *does not presently address the merits* of Plaintiffs' allegations of deceptive representations, but this Court recognizes that Chief Judge Brown has already ruled that some of these alleged misrepresentations were mere puffery or otherwise too vague to be actionable.  *See, e.g.*, July 9 Opinion, 2010 WL 2813788, at *40-41 (granting summary judgment against Hickman Temple's express warranty claim, because salesperson's statement that the van was "the vehicle that you want to do the job because it was safe and it would deliver" was puffery), 54 (granting summary judgment against St. Luke's misrepresentation theory of consumer fraud

590    This Court finds instructive the Appellate Division's ruling in *Solomon v. Bell Atlantic*

591    *Corp.*, which denied class certification because, *inter alia*, the plaintiff consumers had not

592    demonstrated that all class members had seen the allegedly deceptive advertisements.  777

593    N.Y.S.2d 50, 55 (App. Div. 2004).  Similar to this case, in *Solomon* "the record show[ed] that the

594    individual plaintiffs did not all see the same advertisements; some saw no advertisements at all

595    before deciding to [purchase the product]."  *Id.*  Also similar to this case, the content of the

596    seller's advertisements in *Solomon* "varied widely and not all the advertisements contained the

597    alleged misrepresentations."  *Id.*  The *Solomon* court explained that "[class certification] under

598    GBL §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the

599    class were exposed to the same misrepresentations," but emphasized that "class certification is

600    not appropriate where the plaintiffs do not point to any specific advertisement or public

601    pronouncement by the [defendants] which was undoubtedly seen by all class members."  *Id.*

602    (citations and internal quotation marks omitted).

603    This Court recognizes that a federal court in New York has suggested that a class of

604    consumers did not have to show common misrepresentations when the alleged deceptive act was

605    an omission.  *See Oscar v. BMW of N. Am., LLC*, No. 09-11, 274 F.R.D. 498, 512-13 (S.D.N.Y.

606    June 7, 2011) (denying class certification for consumer claiming that car manufacturer failed to

violation under the DTPA, because "15-passenger van" description, without more, was too vague
to be actionable under the DTPA), 73 (granting summary judgment against Barrett's express
warranty claim, because "15-passenger van" description, without more, was puffery), 79
(granting summary judgment against Charles St. AME's express warranty claim, because "Ford's
description of the E-350 as a 15-passenger van does not constitute an express warranty of safety
in transporting 15-passengers," and "best vehicle going" statement was puffery).  These rulings
not only revealed that different consumers were exposed to different representations about the E-
350 van, but that the nature of the alleged misrepresentation is material to whether or not the
consumer has a valid claim.

28

607   disclose defects and disadvantages of run-flat tires).  The import of this observation is difficult to

608   discern, because the *Oscar* court devoted little attention to the alleged omissions, and proceeded

609   to deny class certification for a number of other reasons.  *See id.*  It remains unclear whether New

610   York courts will adopt this lesser standard for claims based on omissions.  Regardless, the record

611   in this case reveals that there was not a common omission.  As noted above, Ford's owner's

612   guides for certain model years gave different advisories regarding the vehicle's handling

613   characteristics.  Further, Plaintiffs' individual purchase experiences reflect that there was not a

614   uniform omission.  Plaintiff Barrett, for instance, "expressly told the salesman that these vehicles

615   should not be driven by an inexperienced driver, and stated that a friend of his had a roll over

616   with a Ford van."  July 9 Opinion, 2010 WL 2813788, at *69 (citing Barrett Dep. at 106:16-23).

617   Such a consumer cannot claim that Ford failed to disclose material information about the van's

618   handling.  Thus, resolution of Plaintiffs' claims will require numerous individualized inquiries

619   into the alleged misrepresentation, whether it be an affirmative representation or omission.  *Cf.*

620   *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 747 (7th Cir. 2008) (decertifying class of

621   consumers claiming that distributor misrepresented the design of a clothes dryer, because

622   resolution of the claims would require individual inquiries regarding what each class member

623   "understands to be the meaning of a label or advertisement that identifies a clothes dryer as

624   containing a stainless steel drum"); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 75

625   (S.D.N.Y. 2006) (Report and Recommendation adopted by court) (denying certification of a class

626   of consumers claiming that an internet service provider misrepresented the speed of the internet

627   service, because resolution would require "an examination of each subscriber's understanding of

628   the [provider's] a la carte pricing system and whether that understanding was reasonable").

29

629    Plaintiffs' proposed class makes no attempt to limit the class to persons who saw or heard

630    a common misrepresentation, and the record reveals that various named Plaintiffs were exposed

631    to different representations, if at all, about the E-350 van's seating capacity and overall safety.

632    Distinguishing between the different representations made to putative class members would

633    require individualized inquiries not suitable for class litigation.  Accordingly, this element

634    supports denying class certification.

635                    *b. Deception & Causation*

636    The parties agree that, while New York's consumer fraud law does not require a showing

637    of reliance, it does require a showing of deception and causation.  *See, e.g.*, *Oswego*, 647 N.E.2d

638    at 745 ("[W]hile the statute does not require proof of justifiable reliance, a plaintiff seeking

639    compensatory damages must show that the defendant engaged in a material deceptive act or

640    practice that caused actual, although not necessarily pecuniary, harm.").  Plaintiffs argue that

641    they can show common proof of deception and causation, because *Oswego* adopted an objective

642    "reasonable consumer" standard for determining consumer deception under GBL § 349.  Yet, the

643    issue of deception is less clear than Plaintiffs would have this Court believe.  True, the *Oswego*

644    court stated that it was adopting "an objective definition of deceptive acts and practices," *id.* at

645    745, but in applying that standard, the court considered "whether a reasonable consumer *in*

646    *plaintiffs' circumstances* might have been misled," *id.* (emphasis added) (finding record

647    inconclusive).  Elsewhere, the court reasoned that "the [defendant] Bank's liability under the

648    statute will depend, in part, on whether plaintiffs possessed or could reasonably have obtained

649    the relevant information they now claim the Bank failed to provide." *Id.*  These statements

650    suggest that, while a reasonable consumer standard applies, some consideration of the plaintiff's

651   circumstances would inhere in that analysis.  Subsequent New York decisions have characterized

652   *Oswego*'s reasonable consumer standard in this manner.  *E.g.*, *Solomon v. Bell Atl. Corp.*, 777

653   N.Y.S.2d at 54 ("Deceptive or misleading representations or omissions are defined objectively as

654   those 'likely to mislead a reasonable consumer acting reasonably under the circumstances,' i.e.,

655   the plaintiff's circumstances.").  Regardless of whether *Oswego* sets a purely objective standard

656   or not, individualized circumstances will necessarily seep into the deception analysis in this case,

657   because there is no uniform misrepresentation.

658            Assuming *arguendo* that Plaintiffs could present common proof of a misrepresentation

659   and deception, Plaintiffs do not have common proof of causation.  For purposes of causation,

660   "[t]he plaintiff . . . must show that the defendant's 'material deceptive act' caused the injury."

661   *Stutman*, 731 N.E.2d at 612 (citation omitted).  Courts in New York have recognized that a

662   consumer cannot show causation when he or she was not exposed to the alleged

663   misrepresentation.  *E.g.*, *Gale v. Int'l Bus. Machs. Corp.*, 781 N.Y.S.2d 45, 47 (App. Div. 2004)

664   (rejecting GBL §§ 349 and 350 claims for lack of causation where the consumer did not claim to

665   have seen the alleged misrepresentations); *see also Newman*, 238 F.R.D. at 75 (denying class

666   certification of GBL §§ 349 and 350 claims, noting numerous issues of causation, including

667   whether each class member saw the alleged misrepresentations).  As noted above, Chief Judge

668   Brown's summary judgment decisions revealed that named Plaintiffs approached their E-350

669   purchases with differing amounts of information: some purchased their vans with knowledge of

670   the van's unique handling problems from personal experience (Barrett, Blandon), and some

671   discerned no representations about the van's passenger capacity or safety at the time of purchase

31

672    (Pentecostal Temple).  *See* July 9 Opinion, 2010 WL 2813788, at *19-20, 45, 68-69.[9]  It cannot

673    be denied that these Plaintiffs' injuries were caused by any representation or omission by Ford,

674    and, accordingly, these Plaintiffs' claims have been dismissed.  For remaining Plaintiffs and

675    putative class members, the presiding court would need to conduct individualized inquiries to

676    determine if their claims similarly lacked causation, and Plaintiffs offer no common proof to

677    overcome this hurdle.  *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303,

678    310-11 (S.D.N.Y. 2004) (denying certification of class of consumers claiming that credit card

679    provider misrepresented and/or failed to disclose its policy for charging currency conversion fees

680    on international transactions, because each plaintiff had to show causation, and "[s]uch a

681    showing entails individual inquiries, including an examination of each cardholder's

682    understanding [of the credit terms]"); *Newman*, 238 F.R.D. at 75 (same, noting numerous issues

683    of causation, including whether each class member saw the alleged misrepresentations, was

684    influenced by the same, and the availability of alternative information).

685          The Court further notes that the numerous public reports, articles, and broadcasts

686    concerning the handling problems of the E-350 van identified by Plaintiffs' Complaint support

687    this Court's conclusion that Plaintiffs do not have common proof of causation.  In their

688    Complaint, Plaintiffs note, *inter alia*, that the National Highway Traffic Safety Administration

---

[9]Most telling was New York Plaintiff Barrett, who negotiated down the price of his used 1997 E-350 van after telling the sales agent that the van should not be driven by an inexperienced driver, and that he knew of a prior instance where an E-350 van had experienced a rollover.  July 9 Opinion, 2010 WL 2813788, at *69 (citing Barrett Dep. at 48:11-49:13, 106:16-23).  Barrett further "testified that if he had heard the news reports regarding the Ford E-350 van's tendency to rollover before he purchased the used 2001 van in October 2006, he still would have bought the van because he and his customers like Ford vehicles and he trusted his driving abilities."  *Id.* (citing Barrett Dep. at 26:10-19; 35:2-14).

689   released a study concerning the rollover propensity of 15-passenger vans (including the E-350

690   van) in April 2001, that Ford issued a safety advisory in September 2002 instructing consumers

691   to use trained drivers for the E-350 van, and that CBS aired a news segment about the dangers of

692   the E-350 van in an episode of "Sixty Minutes II" in September 2002.  (Compl. ¶¶ 28, 31, 38,

693   61(e)).  Considering that Plaintiffs' primary theory of damages at the class certification stage is a

694   common benefit-of-the-bargain injury, it stands to reason that the consumers who saw these

695   reports and understood the E-350 van to have significant handling problems will have a difficult

696   time proving causation, and in doing so, they would not rely on common proof.  This observation

697   is not mere speculation; the record reflects that a number of Plaintiffs reported seeing different

698   news releases at different times.  *See, e.g.*, July 9 Opinion, 2010 WL 2813788, at *5 (First

699   United), 34 (Allen Temple).  Moreover, Plaintiffs' concede in their reply brief that the various

700   government reports and news articles about the E-350 van "may have disclosed (on a classwide

701   basis no less) 'rollover issues associated with [Extended Passenger Vans.]'" (Pls.' Reply Br. at

702   31).[10]  Plaintiffs' proposed class makes no effort to exclude persons having knowledge of the

703   van's handling problems at the time of purchase.  Given the vastly different experiences of

704   named Plaintiffs, it would take individualized causation inquiries to determine which putative

705   class members saw such news reports prior to their purchase of an E-350 and understood the van

_____

[10]Plaintiffs argue that these reports did not "advise consumers of the specific, inherent design defect that manifests in handling and stability issues in ***all*** E-350s when loaded with 10 or more passengers." (Pls.' Reply Br. at 31).  Yet, even if the news reports did not identify the *exact* design defect that caused the E-350's handling problems, consumers may have had sufficient knowledge of the handling defect at the time of purchase to defeat causation.  *See* July 9 Opinion, 2010 WL 2813788, at *49 (rejecting Florida Plaintiff Blandon's argument that she did not know that the handling problems stemmed from a factory defect, because "[t]his attempt to create a dispute of material fact does not negate the undisputed fact that Blandon assertedly knew that the vehicles were unsafe but nonetheless purchased two vehicles").

33

706    to have handling problems.

707            Plaintiffs cannot bypass the causation ramp under the auspices of *Stutman*. *Stutman*

708    involved homeowners' claim that their lender charged an improper "attorney fee" when they

709    attempted to refinance their homeowners' loan, despite the loan's guarantee that they would not

710    be assessed a prepayment charge. 731 N.E.2d at 612. The Appellate Division dismissed the

711    claim, concluding that the homeowners had not shown "justifiable reliance: that is, that the note's

712    failure to disclose the $275 attorney's fee had any effect on plaintiffs' decision to borrow from

713    defendant in the first place." *Id.* (internal quotation marks omitted). The Court of Appeals

714    affirmed on other grounds, but rejected the Appellate Division's analysis of "justifiable reliance."

715    *Id.* In doing so, the court distinguished between causation, which is required by GBL § 349, and

716    reliance, which is not. The court concluded that the homeowners did not need to allege that they

717    would not have borrowed from the lender if they had known the truth about the fee; rather, the

718    causation requirement had been met, because "plaintiffs allege that because of defendant's

719    deceptive act, they were forced to pay a $275 fee that they had been led to believe was not

720    required." *Id.* at 612. As this Court reads *Stutman*'s causation analysis, Plaintiffs in this case

721    need not show that they would not have purchased the E-350 van if they had known of the

722    handling problems, but only that they incurred a loss as a result of the deceptive act. If Plaintiffs

723    have no knowledge of the allegedly deceptive act (the alleged misrepresentation), or if Plaintiffs

724    have actual knowledge of the handling defect prior to the purchase (and, for instance,

725    simultaneously negotiate a lower price), *Stutman* is inapposite, and these Plaintiffs have not

726    shown causation. Identifying which putative class members purchased under similar

727    circumstances will require individualized inquiries that are impracticable in class litigation.

728                          *c. Injury*

729            Chief Judge Brown ruled in the July 9 Opinion that the actual injury requirement

730    recognized in *Frank v. Daimler Chrysler Corp.* applied to Plaintiffs' GBL § 349 claim.   July 9

731    Opinion, 2010 WL 2813788, at *70-72.   Under *Frank*, a party does not meet the injury

732    requirement of GBL § 349 unless the allegedly defective product fails and causes personal injury

733    or property damage, *or* the person incurs repair costs or diminished value as a result of the defect.

734    741 N.Y.S.2d at 17 (affirming dismissal of § 349 claim where the "plaintiffs have not been

735    involved in any accidents and have not suffered any personal injuries or property damage," and

736    "plaintiffs d[id] not allege that any seat has failed, been retrofitted or repaired, nor have plaintiffs

737    attempted to sell, or sold an automobile at a financial loss because of the alleged defect").   In

738    their opposition to summary judgment, Plaintiffs did not argue that they had a common

739    diminution in value injury under New York law that would be measured by the cost of a retrofit.

740    (*See* Doc. No. 247 at 36-37).   Instead, Plaintiffs asserted that they had presented some evidence

741    of out-of-pocket repair costs (for Bishop Anderson), and that they would otherwise "rely on

742    expert testimony to determine if, and how much, prices of the new and used vans reflected their

743    publicized problems."   (*Id.* at 37).   Applying the *Frank* standard to the individual New York

744    Plaintiffs' respective proofs, Chief Judge Brown concluded that Bishop Anderson had shown

745    sufficient proofs of actual injury under *Frank* to create a genuine dispute of fact, but that Barrett

746    had not, because he "1) did not allege any out-of-pocket repair or rental costs; 2) fills his vehicle

747    to capacity when he has sufficient passengers; and 3) stated that he has no plans to sell his van."

748    *Id.* at *71.   Chief Judge Brown therefore granted summary judgment against Barrett on all of his

749    claims.

35

750        Nevertheless, Plaintiffs now argue that they can present common proof of a uniform

751    retrofit injury, because they have expert testimony reflecting that the handling defects are

752    inherent in the E-350 design.  In other words, Plaintiffs contend that they can use the uniform

753    cost of a retrofit ($2,100) as a proxy for the inflated value named Plaintiffs and putative class

754    members paid as a result of Ford's packaging of the E-350 as a "15-passenger van."  Plaintiffs'

755    argument runs flat, because Plaintiffs have not sought reconsideration of Chief Judge Brown's

756    *Frank* rulings, which are now law of the case, and because the record reveals that Plaintiffs do

757    not have common proof of actual injuries.

758        Plaintiffs make no attempt to show that Chief Judge Brown's *Frank* rulings were

759    erroneous applications of New York law, or that they have common proof of actual injury under

760    *Frank*.  Instead, Plaintiffs just disregard *Frank* in their opening brief, and it appears that Plaintiffs

761    want this Court to disregard *Frank* as well.[11]  This Court cannot do so; the law of the case

762    doctrine prevents this Court from arbitrarily choosing which prior decisions in this case remain in

763    effect.  Similar to a motion for reconsideration, courts will only depart from the law of the case

764    when "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the

765    earlier decision was clearly erroneous and would create manifest injustice."  *In re City of Phila.*

766    *Litig.*, 158 F.3d 711, 718 (3d Cir. 1998) (citation omitted); *see also Falor v. G & S Billboard*,

767    No. 04-2373, 2008 WL 5190860, at *2 (D.N.J. Dec. 10, 2008) (characterizing law of the case

768    issues as "the opposite side of the motion for reconsideration coin").  Plaintiffs have not

---

[11]Plaintiffs' strategy of disregarding *Frank* appears to have changed by the reply brief, where Plaintiffs appear to suggest that Chief Judge Brown concluded that *Frank* did not apply to Plaintiffs' claims.  (*See* Pls.' Reply Br. at 33) ("As discussed herein, and as this Court previously found in adjudicating Ford's summary judgment motions, [citations omitted], [sic] does not control here.").  But, as noted above, Chief Judge Brown reached the exact opposite conclusion.

36

769    presented grounds for departing from the law of the case, and thus this Court must apply *Frank*.

770    This Court is persuaded that, under *Frank*, the presiding court would need to conduct the sort of

771    detailed analysis employed by Chief Judge Brown to resolve the claims of Barrett and Bishop

772    Anderson for each of the thousands of putative class members.  Such individualized inquiries are

773    impracticable in class litigation.

774         However, even if this Court had reason to consider the *Frank* issue *de novo*, Plaintiffs do

775    not present persuasive reasons to disregard *Frank*.  Plaintiffs attempt to distinguish *Frank* by

776    claiming that *Frank* was a product risk-of-failure case.  Not so in the present case, claim

777    Plaintiffs, because the product defect in this case—the van's design geometry and resultant

778    handling issues when filled with ten or more passengers—was inherent in *every* E-350 van in the

779    proposed classes.  Citing the Declaration of Mark Arndt, president of Transportation Safety

780    Technologies, Inc., Plaintiffs argue that "[t]his malfunction is one that . . . would, as a matter of

781    physics, necessarily occur in all E-350's when driven at speed loaded with 15 passengers."  (Pls.'

782    Br. at 16-17) (emphasis omitted).  Plaintiffs' argument in this regard is not persuasive.

783         First, this Court is not persuaded by Plaintiff's argument that this case fundamentally

784    differs from a risk-of-failure case.  The summary judgment record revealed that some Plaintiffs

785    did not experience any handling problems and/or continued to fill their vans to capacity

786    whenever suitable to their transportation needs.  *See* July 9 Opinion, 2010 WL 2813788, at *4

787    (Greater All Nation: some handling problems, fills van to capacity of 12, based on seat size), 46

788    (Mestre: some handling problems with one van, filled both vans to capacity during ownership),

789    51 (St. Luke's: no handling problems, voluntarily limited capacity to 12), 56 (St. James: no

790    handling problems, voluntarily limited capacity to 12), 62 (Conant Avenue: some minor handling

37

791       problems, filled to capacity from 2000-2008, voluntarily limited capacity to 12 after reading

792       government safety report in 2008), 69 (Barrett: no handling problems, continues to fill to

793       capacity).   Plaintiffs' only claim to injury for consumers that did not experience handling

794       problems and/or continued to fill their vans to capacity is a speculative diminution in value,

795       arising from the fact that the vans have an inherent design defect that manifests with handling

796       problems on all vehicles.  Plaintiffs approximate this diminution in value with the cost of a dual-

797       wheel retrofit.  Yet, the portions of the Arndt Declaration cited by Plaintiffs do not support the

798       contention that handling defects manifest in every E-350 van under normal driving conditions.[12]

799       In light of the summary judgment record, where some Plaintiffs reported handling problems

800       under full load and others did not, and some have voluntarily limited capacity and others have

801       not, it appears that Plaintiffs are now asserting a "common injury" of a design defect that has

802       increased the likelihood of the van losing stability under normal driving conditions, and that this

803       likelihood has caused a reputational injury to the vehicle in terms of diminished resale value.  Yet

804       there are two flaws with this reputational injury, beyond the fact that Plaintiffs did not rely on

805       this injury in opposing Ford's motion for summary judgment: (1) it does not apply to Plaintiffs,

---

[12]The portions of the Arndt Declaration cited by Plaintiffs assert the following facts: (i) the putative class vans had a rear weight bias; (ii) dynamic testing of the vans in 1992 revealed some oversteer tendencies on the applicable model tires; (iii) that oversteer conditions are dangerous to normal drivers; and (iv) that a Ford engineer issued a report in 1995 stating that Ford vans had a reputation for handling complaints, and that Ford should make suspension and steering changes to better address consumer needs and better compete against a competitor's new extended passenger van.  (*See* Arndt Decl. ¶¶ 13-17).  While the Arndt Declaration provides an assessment of the E-350's general handling characteristics and a Ford engineer's recommendation that these handling characteristics be addressed, it does not support the contention that unsafe handling defects manifest in every loaded vehicle under normal driving conditions, or compare the E-350 van's handling characteristics with other large vehicles, including competitors' 15-passenger vans.

806    like Barrett, who have no intention of selling their van; and (2) it is unclear that a dual-wheel

807    retrofit, that would add two additional wheels to the vans' rear axles and affect the vehicle's

808    overall dimensions and handling, will adequately address this reputational injury.

809            Viewed in light of the summary judgment record, Plaintiffs' asserted "common injury" is

810    not wholly dissimilar from the risk-of-failure claim at issue in *Frank*.  *Frank* involved

811    consumers' claims that vehicle seat backrests and their reclining mechanism were inherently

812    defective, such that the seats were subject to a dangerous collapse in the event of a substantial

813    rear-end collision.  *Frank*, 741 N.Y.S.2d at 11.  The court rejected this latent defect theory of

814    injury, reasoning *inter alia*:

815            it would be manifestly unfair to require a manufacturer to become, in
816            essence, an indemnifier for a loss that may never occur. Plaintiffs'
817            argument, basically, is that as an accident becomes foreseeably possible,
818            upon the occurrence of certain contingencies, due to a design aspect of a
819            product, the manufacturer must retrofit the product or otherwise make the
820            consumer whole.  However, under such a schematic, as soon as it can be
821            demonstrated, or alleged, that a better design exists, a suit can be brought
822            to force the manufacturer to upgrade the product or pay an amount to
823            every purchaser equal to the alteration cost.  Such "no injury" or "peace
824            of mind" actions would undoubtedly have a profound effect on the
825            marketplace, as they would increase the cost of manufacturing, and
826            therefore the price of everyday goods to compensate those consumers
827            who claim to have a better design, or a fear certain products might fail.
828

829    *Id.* at 16-17.  In reaching its decision, *Frank* cited with approval a number of appellate decisions

830    that rejected consumer claims for inherent automobile part defects where the consumer did not

831    claim manifestation of the defect.  *Id.* at 15 (citing *Carlson v. Gen. Motors Corp.*, 883 F.2d 287

832    (4th Cir. 1989) (claims of inherently defective diesel engines); *Briehl v. Gen. Motors Corp.*, 172

833    F.3d 623 (8th Cir. 1999) (claims of inherently defective anti-lock brake systems)).  Chief Judge

834    Brown properly recognized that *Frank* stopped short of requiring manifestation of the defect; yet,

39

835    in the absence of such manifestation, *Frank* still required the plaintiff to present evidence of an

836    actual injury, in the form of out-of-pocket repair costs or sale at a loss.  July 9 Opinion, 2010 WL

837    2813788, at *71 (distinguishing *Frank* from Arkansas case law).  Here, some Plaintiffs did not

838    report detectable handling difficulties[13] or repair costs, and it appears that no Plaintiffs claim to

839    have sold an E-350 van at a loss as a result of the van's handling reputation.  *Cf. id.* at *57

840    (applying *Briehl*, 172 F.3d at 626-29, and granting summary judgment against St. James's claims

841    because "St. James has not sold its vehicles, has no specific plan to do so, and has not identified

842    any reduced resale value").  The speculative nature of the asserted "common injury" is revealed

843    by the fact that Plaintiffs do not offer any evidence of how the E-350's handling compares to its

844    contemporary competitors or industry standards for extended passenger vans.  Indeed, Plaintiffs'

845    summary judgment brief stated that it would "rely on expert testimony to determine *if*, and how

846    much, prices of the new and used vans reflected their publicized problems."  (Doc. No. 247 at

847    37) (emphasis added).  Under these circumstances, the Court fails to see how Plaintiffs can assert

848    a common, actual injury under *Frank*, without resorting to the sort of speculation that *Frank* was

849    concerned about.  Ultimately, this Court does not decide the merits of Plaintiffs' proofs of injury.

---

[13]This Court does not suggest that the slightest handling discomfort that can be experienced in any vehicle—*i.e.*, light steering feel, light/strong pedal feel, turning radius, torque steer—is sufficient to state an actual injury.  At the same time, the Court does not suggest that a consumer had to actually experience a rollover before he or she experiences an actual injury.  Further, the Court does not presently weigh consumers' varying claims of handling problems.  Rather, this Court relies on the summary judgment record, wherein some Plaintiffs reported detectable handling problems that gave them concern about the van's actual stability under their normal driving circumstances, and others did not.  However, the Court suspects that the actual injury and causation analyses would require individualized inquiries into each consumer's driving experience.  *See, e.g., Wolin v. Jaguar Land Rover N. Am.*, 617 F.3d 1168, 1174 (9th Cir. 2010) (remanding issue of certification under Land Rover's Tire Warranty, suggesting that individualized inquiries would be necessary to determine whether tire wear was caused by a vehicle defect or individual driving conditions).

850       *See Sullivan*, 2011 U.S. App. LEXIS 25185, at *66 ("The question is not what valid claims can

851       plaintiffs assert; rather, it is simply whether common issues of fact or law predominate."); .  For

852       present purposes, the Court finds that Plaintiffs' newfound assertion of a common injury under

853       *Frank* lacks merit.  In the absence of a common injury susceptible to common proof, class

854       treatment would be inappropriate.

855           Second, the Court notes that Chief Judge Brown bolstered his *Frank* analysis with the

856       benefit-of-the-bargain analysis provided by a decision from the Southern District of New York

857       that rejected unjust enrichment claims where the product had not malfunctioned.  July 9 Opinion,

858       2010 WL 2813788, at *72 (quoting *In re Canon Cameras*, 237 F.R.D. 357, 359-60 (S.D.N.Y.

859       2006)).  The *Canon Cameras* court reasoned that "[a] plaintiff who purchases a digital camera

860       that never malfunctions over its ordinary period of use cannot be said to have received less than

861       what he bargained for when he made the purchase." 237 F.R.D. at 360.  Chief Judge Brown

862       likened this reasoning to the actual injury requirement of *Frank*, and concluded that New York

863       Plaintiff Barrett could not show he was deprived of the benefit-of-the-bargain, because he had

864       not shown that his van malfunctioned, or that he had suffered actual injury.  July 9 Opinion, 2010

865       WL 2813788, at *72.[14]  Plaintiffs' primary damages theory is a benefit-of-the-bargain theory,

866       predicated on UCC § 2-714, but Plaintiffs do not address this adverse ruling, and Plaintiffs do

867       not suggest that GBL § 349 has a lower benefit-of-the-bargain threshold than an unjust

868       enrichment claim.  Further, Plaintiffs offer no explanation for how class members like

---

    [14]Chief Judge Brown similarly granted summary judgment against Plaintiff St. James' benefit-of-the-bargain theory of injury under Missouri law, reasoning: "St. James has elected to limit its use of its vehicles by limiting capacity, but the defect has not manifested itself and therefore they have received the benefit of their bargain."  July 9 Opinion, 2010 WL 2813788, at *58.

41

869    Barrett—who negotiated a lower price on his van after expressing concerns about the van's

870    handling characteristics, continues to fill his van to capacity, and has no intention of selling his

871    van—have been deprived of the benefit of their bargain.  Or how class members like Blandon,

872    who had personal knowledge of the van's handling problems prior to purchase, were deprived of

873    the benefit of their bargain.  Against this authority, the Court fails to see how Plaintiffs can show

874    that they suffered the same benefit-of-the-bargain injury with common proof when some

875    Plaintiffs (and certainly some putative class members) did not experience a handling defect.

876          Third, this Court notes that Plaintiffs' proposed classes do not reflect the fact that the

877    bubble market on E-350 vans ended, by their own account, in April 2004.  *See* July 9 Opinion,

878    2010 WL 2813788, at *44 ("[A]ll Plaintiffs admitted in their Responses and Objections to Ford's

879    Second Set of Written Interrogatories that '[t]he artificial demand for the E-350 15 passenger

880    vans, as referred to in the Complaint, is believed to have eroded fully by April, 2004, when the

881    [National Highway Traffic Safety Administration] reissued a safety warning concerning

882    15-passenger vans.'").  Further, as previously noted, Plaintiffs' proposed classes do not take into

883    account the numerous public reports about the E-350's handling problems that they concede were

884    issued between 2000 and 2004.  (*See* Compl. ¶¶ 25-47, 61(e)) (identifying numerous public

885    reports and broadcasts that were released between 2000 and 2004).  Plaintiffs have modified their

886    proposed unjust enrichment class to exclude vans purchased after April 2004, consistent with

887    their position on the van's bubble market, but Plaintiffs have not modified their other classes in

888    the same way, and Plaintiffs' proposed classes still do not account for the consumers who viewed

889    the news releases prior to purchase.  To the extent that Plaintiffs assert that class members who

890    purchased their vans after the first of these public reports (circa 2000) have a common benefit-of-

891    the-bargain injury with the rest of the class, regardless of whether these class members viewed

892    reports regarding the van's handling problems, Plaintiffs' argument is foreclosed by their

893    concession that some of these class members did not pay a premium for the van because of

894    market knowledge.  Ford would be entitled to examine which class members had knowledge of

895    the E-350's handling characteristics at the time of purchase, and the extent of such knowledge,

896    whether the knowledge was derived from personal use or public reports.[15]  Thus, the presiding

897    court would need to conduct individual inquiries into putative class members' respective

898    consumer experiences.

899         *Ackerman*, 2010 WL 2925955, and *General Motors Corp. Pick-Up Truck Fuel Tank*, 55

900    F.3d 768, cited by Plaintiffs, do not compel a different conclusion.  With regard to *Ackerman*,

901    that court held on a motion to dismiss that "[i]njury is adequately alleged under GBL §§ 349 or

902    350 by a claim that a plaintiff paid a premium for a product based on defendants' inaccurate

903    representations."  2010 WL 2925955, at *23.  The plaintiffs in *Ackerman* alleged that they paid a

904    premium for a beverage marketed "as a fortified beverage, a dietary supplement in liquid form."

905    *Id.*  Here, Plaintiffs state they have common proof of an inherent design defect that prevented the

906    E-350 van from being the 15-passenger van they were promised.  But as noted above, different

907    Plaintiffs were exposed to different representations, if at all, regarding the van's capabilities, and

908    not all Plaintiffs experienced the alleged handling problems in their use of the van.  Further,

909    Plaintiffs concede that post-April 2004 purchasers did not pay a premium on the van.  *Ackerman*

___

[15]This Court's consideration of the news reports issued between 2000 and 2004 should not be construed as a ruling that every consumer who was aware of such an article had actual knowledge of E-350's handling problems.  Rather, this Court merely recognizes that a consumer who had seen such a report *may* have had actual knowledge of the E-350's handling defects at the time of purchase, depending on, *inter alia*, the information contained in the article.

910   did not address the issue of GBL § 349 injury in the context of a motion for class certification

911   and cannot be read to support Plaintiffs' contention that they have common proof of a uniform

912   injury by virtue of their claim of an inherent design defect.  The Court further notes that

913   *Ackerman* does not cite *Frank* or any case recognizing New York's actual injury requirement,

914   and that *Ackerman* was decided shortly after Chief Judge Brown's omnibus summary judgment

915   decision of July 9, 2010.  To the extent that *Ackerman* departs from the actual injury requirement,

916   this Court remains bound by Chief Judge Brown's *Frank* rulings.

917          As for *In re General Motors*, that court suggested that "[t]he cost of a retrofit . . . may

918   constitute an alternative measure of the damages arising from [a] breach of warranty."  55 F.3d at

919   816.  At first blush, this case appears to provide strong support for Plaintiffs' argument in this

920   case, because that case involved similar consumer claims of an inherent vehicle design defect

921   (certain GM trucks contained dangerously defective fuel tanks) that affected the resale value of

922   those trucks.  However, the court's decision arose in the context of assessing the adequacy of a

923   class settlement.  Thus, *In re General Motors* did not address whether the cost of a retrofit

924   constituted sufficient injury under a particular state's law (New York GBL § 349 or otherwise) to

925   state a claim, and, in fact, the court recognized that other jurisdictions have rejected warranty

926   claims asserting diminution in value for damages.  *See id.*  This Court therefore does not read *In

927   re General Motors*' discussion of using the cost of a retrofit as an alternative measure of damages

928   to displace New York's substantive requirement of actual injury.  Indeed, a Maryland decision

929   cited favorably by Plaintiffs, *Lloyd v. General Motors Corp.*, recognized that New York law

930   differed from more lenient jurisdictions by requiring an actual injury showing.  916 A.2d 257,

931   292-93 (Md. 2007) (citing *Frank* and *Weaver v. Chrysler Corp.*, 172 F.R.D. 96 (S.D.N.Y. 1997)

44

932    as examples of cases from "other jurisdictions that have found, in automobile product defects

933    cases, that an allegation of economic loss is not sufficient to articulate an injury").

934          This Court's conclusion reflects the fact that New York law requires a showing of actual

935    injury, in the form of personal or property damage incurred by the defect, out-of-pocket repair

936    costs, or sale at a loss.  The undisputed record in this case reveals that some Plaintiffs

937    experienced handling issues under normal driving conditions with more than 10 passengers

938    and/or incurred repair costs, and others did not.  Under New York law, sorting through those that

939    had an actual injury and those that did not would require individualized inquiries.

940                    *2. Implied Warranty*

941          In New York, an implied warranty claim requires proof of the following elements: "(1)

942    that the product was defectively designed or manufactured; (2) that the defect existed when the

943    manufacturer delivered it to the purchaser or user; and (3) that the defect is the proximate cause

944    of the accident." *Plemmons v. Steelcase Inc.*, No. 04-4023, 2007 WL 950137, at *3 (S.D.N.Y.

945    Mar. 29, 2007) (internal quotation marks and citations omitted).  The implied warranty has been

946    breached when the product is not "fit for the ordinary purposes for which such goods are used."

947    *See* N.Y. U.C.C. § 2-314(2)(c); *Plemmons*, 2007 WL 950137, at *3.  Ford argues that Plaintiffs

948    do not have common proof of the existence of an implied warranty, or common proof of any of

949    the above elements.

950          First, Ford contends that all E-350 vans were sold with an express warranty that limited

951    the duration of the implied warranty of merchantability to the period of the express warranty,

952    three years or 36,000 miles, whichever comes first.  Because of this durational limitation

953    disclaimer, Ford contends that class members will have to present individualized proofs

45

954  concerning whether the implied warranty existed at the time of purchase, in the case of used E-

955  350 vans, or expired prior to the point when a given class member suffered an actual injury.

956  (Ford Resp. Br. at 28-29).  Next, Ford submits that Plaintiffs do not have classwide proof of a

957  design defect, which Ford claims must be determined by reference to a risk-utility balancing test.

958  (*Id.* at 30).  Third, Ford contends that Chief Judge Brown's *Frank* rulings demonstrate that

959  Plaintiffs do not have common proof of actual injury, for the same reason that Plaintiffs did not

960  have common proof of actual injury under GBL § 349.  (*Id.* at 32-33).  Finally, Ford argues that

961  Plaintiffs do not have common proof of causation.  (*Id.* at 35-36).

962        Plaintiffs respond that their implied warranties arose by operation of law, that any

963  disclaimer by Ford is too inconspicuous to be enforceable, and that, in any event, Ford's

964  disclaimers would be subject to common proof.  (Pls.' Reply Br. at 12-14).  Speaking to defect,

965  Plaintiffs note that the New York Court of Appeals, responding to a certified question by the

966  Second Circuit, expressly rejected the risk-utility analysis advocated by Ford in *Denny v. Ford*

967  *Motor Company*, 662 N.E.2d 730 (N.Y. 1995).  Instead, Plaintiffs argue that *Denny* adopted an

968  objective standard measured by "the expectations for the performance of the product when used

969  in the customary, usual and reasonably foreseeable manners."  *Id.* at 736.  Under this objective

970  standard, Plaintiffs maintain that they have common proof addressing whether the E-350 van can

971  safely transport 15 passengers when used in the customary, usual, and reasonably foreseeable

972  manner.  (Pls.' Reply Br. at 11-12).  Last, Plaintiffs respond that issues of causation[16] support

---

[16]Plaintiffs also appear to assert that Ford should have raised a causation argument as an affirmative defense to Plaintiffs' implied warranty claims or in its prior motions. (Pls.' Reply Br. at 19). Yet this argument is perplexing, considering that causation is an essential element of Plaintiffs' implied warranty claims. *See, e.g.*, N.Y. U.C.C. §§ 2-314 Cmt. 13, 2-316(3)(b); *Androme Leather Co., Inc. v. Consol. Color Co.*, 569 N.Y.S.2d 514, 515 (App. Div. 1991) (citing

973   class certification, because class treatment would prevent the necessity for hundreds of trials

974   featuring the same expert witnesses, and because Ford has not shown that any class members

975   knew of the defect at the time of purchase.  (*Id.* at 19-20).

976         The Court agrees with Plaintiffs that *Denny* rejected the risk-utility standard sought by

977   Ford, 662 N.E.2d at 736, and it appears that Plaintiffs may be able to satisfy the defect

978   requirement with common proof.  The Court further declines to decide the degree to which

979   Ford's implied warranty disclaimers apply to Plaintiffs' claims.[17]  Yet, the Court agrees with

980   Ford that individual issues of actual injury and causation predominate, and thus defeat class

981   certification.

982         Chief Judge Brown's July 9 Opinion recognized that *Frank*'s actual injury analysis

983   applied to implied warranty claims.  2010 WL 2813788, at *70.  This Court rejects Plaintiffs'

984   attempt to distinguish *Frank* for the reasons stated above.  Plaintiffs cannot invoke more lenient

985   injury requirements from other jurisdictions to save their New York claims.  In light of *Frank*'s

986   actual injury requirement—personal or property damage, out-of-pocket repair costs, or sale at a

---

1 White and Summers, Uniform Commercial Code § 9-1, at 436 (3d ed.)).  Plaintiffs do not
suggest that Ford has ever admitted causation.  (*See* Compl. ¶¶ 84-86; Answer ¶¶ 84-86).  Indeed,
Ford advanced causation-based arguments in support of its motions for summary judgment as to
a number of Plaintiffs' other claims.

   [17]Although the parties offer generalized arguments about the enforceability of Ford's
disclaimers, the parties do not engage in a detailed analysis of the language and context of the
specific disclaimers, which varied depending on the model year.  In fact, Ford submitted 15
different warranty booklets for the relevant model years (*see* Taylor Decl. Exs. A-O), and even a
cursory review reveals that different warranty periods applied for different warranties in different
years, and that such warranties appeared with varying degrees of prominence from year to year.
Although the Court suspects that individual issues will arise if any of Ford's disclaimers are
enforceable, the Court is not prepared to make such a merits judgment on the basis of the parties'
limited briefing, and need not do so to rule on the class certification motion.

987    loss—Plaintiffs' general assertion of an *inherent* defect cannot overcome the disparate

988    experiences of actual Plaintiffs, wherein some experienced handling difficulties and/or repair

989    costs, others did not, and none claim to have sold their vehicles at a loss due to the defect.  The

990    presiding court would need to unearth the viable claims via individual inquiries.[18]

991         Moreover, numerous causation issues preclude certification of the New York implied

992    warranty claim.  Like other jurisdictions, New York requires a plaintiff to show that the defect

993    proximately caused the injury in order to state a claim for warranty liability.  *See, e.g.*, *Androme*

994    *Leather Co., Inc. v. Consol. Color Co.*, 569 N.Y.S.2d 514, 515 (App. Div. 1991) (explaining that

---

[18]By letter of July 14, 2011, Plaintiffs presented supplemental authority for their implied warranty claims: the Eighth Circuit's recent decision in *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604 (8th Cir. 2011).  Plaintiffs argue, *inter alia*, that *Zurn Pex Plumbing* found that class members had sufficient actual injury, despite the fact that their plumbing had not leaked, because the plumbing contained the defect at the point of installation.  (*See* Doc. No. 398).  Indeed, a split panel in *Zurn Pex Plumbing* affirmed the district court's certification of a class of homeowners asserting that the defendants' brass plumbing fittings were defective because they were susceptible to stress corrosion cracking ("SCC").  *Id.* 608-09.  This class included a group of plaintiffs whose plumbing had not leaked, which the court referred to as "dry plaintiffs."  *Id.* at 616.  *Zurn Pex Plumbing* is distinguishable, however, because the plaintiffs in that case had presented expert testimony that the plumbing defect begins to develop as soon as the fittings were exposed to water and thus, "is already manifest in all systems."  *Id.* at 617.  The plaintiffs further alleged that SCC "afflicts all of the fittings upon use, regardless of water conditions or installation practices," *id.*, and the plaintiffs' expert had further opined that 99% of homes would experience a plumbing leak in one of the fittings within the product's 25-year warranty, *id.* at 609-10.  Similarly, Plaintiffs in this case argue that their defect manifests in all vehicles under normal driving conditions, but the expert opinion they cite and the summary judgment record does not support this contention.  Indeed, some Plaintiffs have filled the van to capacity for many years and reported no discernable handling problems.  *See supra* Part II.A.1.c ("Injury").  Whereas the dry plaintiffs in *Zurn Pex Plumbing* presented evidence that the fittings were practically certain to fail within the warranty period, the Plaintiffs in this case have presented evidence that the E-350 is likely to experience dangerous handling conditions under normal driving conditions.  In this case, as in *Frank*, "it would be manifestly unfair to require a manufacturer to become . . . an indemnifier for a loss that may never occur."  741 N.Y.S. 2d at 16.

995        a plaintiff must "prove cause in fact and proximate causation on the part of a specific defendant")

996        (quoting 1 White and Summers, Uniform Commercial Code § 9-1, at 436 [3d ed.]); *Complaint of*

997        *Am. Export Lines, Inc.*, 620 F. Supp. 490, 518 (S.D.N.Y. 1985).  The varied experiences of

998        named Plaintiffs reveal that some had actual knowledge of the van's handling problems, if not

999        the exact design defect that caused those handling characteristics.  For instance, Florida Plaintiff

1000       Blandon, prior to purchasing her used 2000 E-350 van in 2006, had lost control while driving

1001       another E-350 van and had participated in numerous discussions with co-workers regarding the

1002       van's handling characteristics and relative safety.  July 9 Opinion, 2010 WL 2813788, at *49-50

1003       (granting summary judgment against Blandon's claims, because of Blandon's actual knowledge

1004       of the alleged defect).  Similarly, New York Plaintiff Barrett told his E-350 salesman that a friend

1005       of his had experienced a rollover, and that the van should not be driven by inexperienced drivers.

1006       *Id.* at *69.  Class members with similar knowledge of the handling problems—whether from

1007       personal experience or from viewing the numerous public reports identified in Plaintiffs'

1008       Complaint—would not be able to prove causation under New York law and, more importantly

1009       for purposes of this class certification decision, would not share common proof of causation.

1010       The proof would consist of their unique, individual consumer experiences.

1011            This Court finds instructive the Second Circuit's decision in *Sobiech v. International*

1012       *Staple & Machine Co.*, which held, under New York law, that the plaintiff could not maintain

1013       action for breach of implied warranty because he knew of a product's (vegetable packaging

1014       machine) defects from personally using the product on a trial basis prior to purchase.  867 F.2d

1015       778, 782-83 (2d Cir. 1989).  In doing so, the *Sobiech* court relied on N.Y. U.C.C. § 2-316(3)(b),

1016       which states that there are no implied warranties "with regard to defects which an examination

49

1017    ought in the circumstances to have [been] revealed" when the buyer has an opportunity to inspect

1018    the goods prior to purchase.  *See also* N.Y. U.C.C. §§ 2-314 Cmt. 13 ("In an action based on

1019    breach of warranty, it is of course necessary to show not only the existence of the warranty but

1020    the fact that the warranty was broken and that the breach of the warranty was the proximate cause

1021    of the loss sustained."); 2-316 Cmt. 8 ("Of course if the buyer discovers the defect and uses the

1022    goods anyway, or if he unreasonably fails to examine the goods before he uses them, resulting

1023    injuries may be found to result from his own action rather than proximately from a breach of

1024    warranty. . . . The particular buyer's skill and the normal method of examining goods in the

1025    circumstances determine what defects are excluded by the examination.  A failure to notice

1026    defects which are obvious cannot excuse the buyer.").  These principles apply with equal force

1027    here, where some Plaintiffs knew of the handling issues from personal experience (Barrett,

1028    Blandon), and others no doubt knew of the handling issues from the numerous public reports,

1029    articles, and broadcast announcements about the E-350 van's rollover propensity that Plaintiffs

1030    identified in the Complaint.  (*See* Compl. ¶¶ 25-47) (identifying numerous public reports and

1031    broadcasts that were released between 2000 and 2004).  Plaintiffs argue that Ford has not made a

1032    showing that any class members had "actual knowledge" of the defect prior to purchase (Pls.'

1033    Reply Br. at 20 n.13), but Plaintiffs' assessment is wholly contradicted by the summary judgment

1034    record.[19]

---

[19]*Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006), cited by Plaintiffs, does not support certification of Plaintiffs' implied warranty classes.  In *Daffin*, the court approved certification of the express warranty claims of consumers asserting damages stemming from a defective throttle body assembly that caused the accelerator to stick.  *Id.* at 550.  Ford had argued that consumers who did not experience a sticky accelerator or sought repair of the problem "cannot 'prove' an express warranty claim under [Ford's] 'repair or replace' warranty."  *Id.* at 553.  The *Daffin* court rejected this argument, explaining that "[t]he question that forms the basis

1035        In light of this record, the Court concludes that it is likely that a fair number of the

1036        putative class members had actual knowledge of the E-350's handling difficulties at the time of

1037        purchase, whether from personal experience or from public announcements.  These class

1038        members would not be able to show causation to support their implied warranty claims.[20]

1039        Sorting out those who knew of the defect from personal use from those who learned from public

1040        reports, as well as from those having no knowledge, will require numerous individual inquiries.

1041        Because of the individual variations in proof for both actual injury and causation, the Court will

---

for Ford's argument is one of contract interpretation: whether Ford's express warranty promises to cover the alleged defect in the throttle body assembly even if no sticking occurs during the warranty period." *Id.*  Depending on how the district court interpreted the warranty provision on remand, the Court of Appeals recognized that "the district court may consider at that point whether to modify or decertify the class." *Id.* at 554.  With regard to predominance, the *Daffin* court found that the following common issues predominated: "(1) whether the throttle body assembly is defective, (2) whether the defect reduces the value of the car, and (3) whether Ford's express "repair or replace" warranty covers the latent defect at issue in this case." *Id.*  The court further reasoned that *Daffin* was "not a case . . . in which different class members were exposed to different products such that the uncommon issue of causation predominated over the lesser shared issues." *Id.*

        Here, by contrast, Plaintiffs do not assert an express warranty claim on the basis of any written warranty issued by Ford to replace defective parts.  Rather, Plaintiffs have based their sole express warranty claim (Georgia, *see infra* Part II.G) and their several implied warranty claims on Ford's "core description" and/or packaging of the E-350 van as a "15-passenger van."  Thus, Plaintiffs' warranty claims do not present a common issue of contract interpretation.  Rather, Plaintiffs' warranty claims rest on the various representations of Ford representatives to individual class members.  Moreover, this case presents additional issues requiring individual treatment that were not present in *Daffin*: actual injury (New York law), causation, and statutes of limitations.

        [20]Plaintiffs argue that Ford's causation argument improperly asks this Court to consider the merits of Plaintiffs' claims. Yet, this Court presently makes no determination regarding whether an individual Plaintiff or class member failed to show causation in fact and proximate causation, with regard to specific consumer transactions.  This Court's ruling only recognizes the disparate consumer experiences detailed in Chief Judge Brown's summary judgment opinions, which lead this Court to conclude that Plaintiffs' implied warranty claims are not susceptible to common proof.

1042    deny certification of the New York implied warranty claim.

1043        *B. Texas*

1044        The sole remaining Texas claim is St. Luke's omission claim under DTPA

1045    § 17.46(b)(24). *See* July 9 Opinion, 2010 WL 2813788, at *55. Ford objects that Plaintiffs

1046    cannot prove their Texas consumer fraud claims with common proof, because there is no

1047    classwide evidence of the elements of the DTPA claim: (1) a uniform omission; (2) deception;

1048    (3) actual injury; and (4) causation.   The parties generally rely on the same consumer fraud

1049    arguments that this Court addressed in the New York section, *supra* Part II.A.1. The Court

1050    agrees with Ford that common issues of law and fact do not predominate.

1051        Texas Plaintiffs' omission claim is predicated on allegations that Ford failed to disclose

1052    to consumers that, due to stability issues, the E-350 van should only be driven by trained

1053    experienced drivers.   (*See* Compl. ¶ 31; Pls.' Reply Br. at 27 n.18, 29).  As detailed above, the

1054    undisputed record in this case reveals that the safety instructions in E-350 owner's manuals

1055    changed throughout the proposed class period.  For instance, whereas the owner's guides for

1056    model-year 2000-2002 E-350 vans included general notices about the vehicle's handling

1057    capabilities and urged "[e]xtra precautions, such as slower speeds and increased stopping

1058    distance, . . . when driving a heavily loaded vehicle," the owner's guides for model-year 2003-

1059    2005 E-350 vans added a "Vehicle Stability and Handling" section, which stated that "[t]he risk

1060    of a rollover crash increases as the number of people and load in the vehicle increase," and

1061    advised that "[t]he van should be operated by an experienced driver."  (*See* Doc. No. 292, Smith

1062    Decl. Ex. 12).  Naturally, then, Plaintiffs cannot assert a uniform alleged omission, because

1063    differing amounts of information were disclosed at different times.

1064          The Court is less sanguine about Ford's deception argument, which primarily relies on

1065   case law from other jurisdictions.  (*See* Ford's Br. at 42-43).  As noted in the discussion of New

1066   York law, it is unclear whether New York applies a purely objective or quasi-subjective standard

1067   for determining deception.  In the absence of clear guidance from Texas cases or statutes, the

1068   Court will not weigh this factor against Plaintiffs.

1069          The Court is also hesitant to accept Ford's argument that Texas Plaintiffs cannot show

1070   actual injury with common proof under the Texas Supreme Court's ruling in *DaimlerChrysler*

1071   *Corp. v. Inman*, 252 S.W.3d 299 (Tex. 2008).  St. Luke's and, presumably, Texas class members

1072   seek damages based on diminution in value of the van.  St. Luke's also asserts loss of use.  Chief

1073   Judge Brown distinguished the deficient pleadings in *Inman* from St. Luke's pleadings in this

1074   case, explaining "[a]s the Supreme Court of Texas noted, the *Inman* plaintiffs did *not* contend

1075   that the allegedly defective 'buckles made their vehicles worth less than they paid for them.'"

1076   July 9 Opinion, 2010 WL 2813788, at *52 (quoting *Inman*, 252 S.W.3d at 302).  Here, all

1077   Plaintiffs, including St. Luke's and putative class members, assert that the defective design of the

1078   E-350 van made their vehicles worth less than they paid for them.  (*See, e.g.*, Pls.' Br. at 35-36)

1079   (stating that Plaintiffs paid for more than they received, in an amount of $2,100).  Ford asks for

1080   this Court to recognize that the Texas Supreme Court has adopted an actual injury requirement

1081   similar to the one articulated in *Frank* (New York).  Yet, Chief Judge Brown's ruling did not

1082   make this connection, and Ford does not identify Texas authority to support this point.  Under

1083   these circumstances, the Court will presume that Texas Plaintiffs can present common proof of

1084   an injury, sufficient to have standing under *Inman*.

1085          However, the Court agrees with Ford that Plaintiffs cannot present classwide proof of

1086    reliance or causation.  As Chief Judge Brown recognized in the July 9 Opinion, "[r]eliance is an

1087    essential element of a DTPA claim . . . ."  2010 WL 2813788, at *53 (citing Tex. Bus. & Com.

1088    Code § 17.50(a)(1)(B); *Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of S.E. Texas*, 249 S.W.3d

1089    480, 490 (Tex. App. 2008)).  Applied to St. Luke's claim, "to satisfy the reliance element for an

1090    omission, a plaintiff must show that defendant had intent to induce a transaction through failure

1091    to disclose, and that plaintiff would not have entered into the transaction if the information had

1092    been disclosed."  July 9 Opinion, 2010 WL 2813788, at *55.  Ford correctly points out that Texas

1093    courts have acknowledged that claims requiring a showing of reliance—including the

1094    DTPA—involve many individualized inquiries that usually cannot be resolved through class

1095    litigation.  Texas courts have reached this conclusion in the aftermath of the Texas Supreme

1096    Court's decertification decision in *Henry Schein, Inc. v. Stromboe*, which recognized that class

1097    members "are held to the same standards of proof of reliance—and for that matter all the other

1098    elements of their claims—that they would be required to meet if each sued individually."  102

1099    S.W.3d 675, 693 (Tex. 2002) (decertifying a class of contract, warranty, and DTPA claims for,

1100    *inter alia*, failure to present classwide proof of reliance).  In other words, *Schein* held that "[t]he

1101    burden on plaintiffs to prove reliance in order to recover on any of these theories is in no way

1102    altered by the assertion of claims on behalf of a class."  *Id.*  After *Schein*, multiple appellate

1103    courts in Texas rejected class certification of consumer fraud claims, explaining that "[p]roof of

1104    reliance or lack of reliance necessarily requires an *individualized* determination because, under

1105    all the same facts and circumstances, one person may have relied on the misrepresentation in

1106    reaching a decision while another did not rely on it in reaching the same decision."  *Texas South*

1107    *Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 237 (Tex. App. 2008) (quoting *Fid. & Guar. Life Ins.*

54

1108    *Co. v. Pina*, 165 S.W.3d 416, 423 (Tex. App. 2005); *Grant Thornton, L.L.P. v. Suntrust Bank*,

1109    133 S.W.3d 342, 355 (Tex. App. 2004)).  As of 2008, no Texas appellate court since *Schein* had

1110    found evidence of classwide reliance.  *Gomez*, 267 S.W.3d at 237 (noting that the courts of

1111    appeals had "questioned whether given the individualized nature of reliance, any class action

1112    could ever be certifiable under *Schein*").  Ford concedes, however, that the Texas Supreme Court

1113    did find classwide proof of reliance last year in *Southwestern Bell Telephone Company v.*

1114    *Marketing On Hold Inc.*, 308 S.W.3d 909 (Tex. 2010).  *Southwestern Bell* recognized that

1115    "Texas courts have been reluctant to certify a class when proof of reliance is required as an

1116    element of a claim" since *Schein*, and restated that class certification is improper "[w]hen

1117    evidence existed that individual class members' experiences reasonably could have varied . . . ."

1118    *Sw. Bell*, 308 S.W.3d at 921-22.  Nevertheless, the *Southwestern Bell* court concluded that the

1119    phone service consumers before it had common proof of reliance, because the consumers had no

1120    choice but to rely on the phone company's representations by paying the allegedly improper

1121    municipal fees on their phone bills.  *Id.* at 922.  The court reasoned that the phone company

1122    would have discontinued phone service if a consumer objected to the fee.  *Id.* at 922-23.

1123        In their reply, Plaintiffs make no attempt to place their proposed class within the limited

1124    contours of *Schein* and *Southwestern Bell*, nor do Plaintiffs assert that they have common

1125    evidence of reliance.  Rather, Plaintiffs contend that Chief Judge Brown's July 9 Opinion held

1126    that "there is no 'reliance' requirement under the relevant . . . Texas consumer protection laws."

1127    (Pls.' Reply Br. at 26).  Plaintiffs' argument in this regard is disingenuous, because it flatly

1128    contradicts both Texas law and Chief Judge Brown's decision.  As noted above, reliance is an

1129    essential element of a DTPA claim.  July 9 Opinion, 2010 WL 2813788, at *53 (citing Tex. Bus.

55

1130   & Com. Code § 17.50(a)(1)(B); *Morgan Bldgs.*, 249 S.W.3d at 490).  Further, Chief Judge

1131   Brown explained how Plaintiffs could satisfy the reliance requirement for their omission claim:

1132   "to satisfy the reliance element for an omission, a plaintiff must show that defendant had intent to

1133   induce a transaction through failure to disclose, *and* that plaintiff would not have entered into the

1134   transaction if the information had been disclosed."  July 9 Opinion, 2010 WL 2813788, at *55

1135   (emphasis added).  In other words, Plaintiffs must have common proof that class members would

1136   not have purchased the E-350 van if Ford had fully disclosed the E-350 van's handling problems

1137   to consumers.  Not only do Plaintiffs not attempt to make this showing, but Ford correctly notes

1138   that the record indicates that some named Plaintiffs would have bought their E-350 vans despite

1139   the handling problems.  (*See, e.g.*, Barrett 56.1 Statement, Doc. No. 206, Ex. 2, ¶¶ 22-29)

1140   (explaining that he would have bought the E-350 van despite the handling issues); (Blandon 56.1

1141   Statement, Doc. No. 190, Ex. 2, ¶¶ 3-6) (explaining that she purchased an E-350 van, despite

1142   knowing of its handling problems).  No doubt, unidentified members of the proposed Texas class

1143   would have similar variations that would be material to whether or not they could state a DTPA

1144   claim.  Plaintiffs have no answer for how these individual variations can be resolved without

1145   individual inquiries.

1146            Plaintiffs have not shown common proof of omission or reliance, and, therefore, common

1147   issues of fact and law do not predominate over individual issues.  Consequently, the Court will

1148   deny certification of Plaintiffs' proposed Texas class.

1149       *C.  Pennsylvania*

1150            The only remaining Pennsylvania claims are the implied warranty claims of Bethel,

1151   Hickman Temple, and Mt. Airy, as well Bethel's unjust enrichment claim on its 2001 van.  *See*

56

1152    July 9 Opinion, 2010 WL 2813788, at *44; February 16 Opinion, 2011 WL 601279, at *6.  Ford

1153    objects to Plaintiffs' proposed Pennsylvania classes on the grounds that Plaintiffs cannot prove

1154    their implied warranty and unjust enrichment claims with common proof.  The Court agrees on

1155    both counts.

1156                    *1.  Implied Warranty*

1157           Ford advances essentially the same objections to the proposed Pennsylvania implied

1158    warranty class that it presented in opposition to the proposed New York implied warranty class,

1159    and Plaintiffs offer essentially the same responses.  Accordingly, one would presuppose that the

1160    same class certification analysis the Court conducted with regard to the New York implied

1161    warranty class would be applicable to the other jurisdictions' implied warranty classes.

1162    However, as Chief Judge Brown recognized in the omnibus July 9 Opinion, 2010 WL 2813788,

1163    at *41-42, Pennsylvania courts have not yet adopted actual injury requirements akin to *Frank*.

1164    The question remains whether Plaintiffs' implied warranty classes survive in jurisdictions

1165    with less stringent injury requirements than New York.  This Court concludes that the

1166    Pennsylvania implied warranty class still suffers from individual issues of causation that render

1167    class treatment impracticable.

1168           Like other states, Pennsylvania imposes an implied warranty of merchantability on all

1169    contracts for the sale of goods if the seller is a merchant.  13 Pa. Cons. Stat. § 2314(a).  The UCC

1170    as codified in Pennsylvania states that, in order to be merchantable, the goods must "pass

1171    without objection in the trade under the contract description" and be "fit for the ordinary

1172    purposes for which such goods are used."  *Id.* § 2314(b).  The Pennsylvania Supreme Court has

1173    held that "[t]he concept of merchantability does not require that the goods be the best quality or

57

1174    the best obtainable but it does require that they have an inherent soundness which makes them

1175    suitable for the purpose for which they are designed, that they be free from significant defects,

1176    that they perform in the way that goods of that kind should perform, and that they be of

1177    reasonable quality within expected variations and for the ordinary purpose for which they are

1178    used." *Gall v. Allegheny Cty., Health Dep't*, 555 A.2d 786, 789-90 (Pa. 1989) (internal citations

1179    omitted). Like other jurisdictions, Pennsylvania's UCC requires a showing of causation that can

1180    be overcome by knowledge of the defect at the time of purchase. "When the buyer before

1181    entering into the contract has examined the goods or the sample or model as fully as he desired or

1182    has refused to examine the goods there is no implied warranty with regard to defects which an

1183    examination ought in the circumstances to have revealed to him." 13 Pa. Cons. Stat.

1184    § 2316(c)(2); *see also id.* Cmt. 8 ("The particular buyer's skill and the normal method of

1185    examining goods in the circumstances determine what defects are excluded by the examination.

1186    A failure to notice defects which are obvious cannot excuse the buyer."); *id.* § 2314 Cmt. 13

1187    ("Action by the buyer following an examination of the goods which ought to have indicated the

1188    defect complained of can be shown as matter bearing on whether the breach itself was the cause

1189    of the injury."); *Nufeeds, Inc. v. Westmin Corp.*, No. 04-1071, 2006 WL 1000021, at *18 (M.D.

1190    Pa. Apr. 17, 2006). Consequently, this Court's causation reasoning with regard to the New York

1191    implied warranty class applies equally to the Pennsylvania implied warranty class. Resolution of

1192    these claims will require individualized inquiries into each consumer experience, so as to identify

1193    and exclude those consumers who purchased E-350 vans with actual knowledge of its handling

1194    problems, whether from personal use or from a variety of reports that were published between

1195    2000 and 2004.

1196

### 2. *Unjust Enrichment*

1197         To assert a claim of unjust enrichment under Pennsylvania law, a plaintiff must show

1198     that: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by

1199     defendant; and (3) acceptance and retention of such benefits under such circumstances that it

1200     would be inequitable for defendant to retain the benefit without payment of value." *Williams*

1201     *Twp. Bd. of Supervisors v. Williams Twp. Emergency Co.*, 986 A.2d 914, 923-24 (Pa. Commw.

1202     Ct. 2009) (citations omitted). Pennsylvania law views unjust enrichment as an equitable remedy

1203     based on the law of restitution. *See, e.g.*, *Mitchell v. Moore*, 729 A.2d 1200, 1203-04

1204     (Pa. Super. Ct. 1999); *Powers v. Lycoming Engines*, 328 F. App'x 121, 125 (3d Cir. 2009)

1205     (collecting Pennsylvania cases).

1206         Ford argues that Plaintiffs do not have common proof of a benefit conferred upon Ford,

1207     that the benefit exceeded the value of the vehicle, or that retention of the benefit by Ford would

1208     be unjust. Plaintiffs respond by limiting their proposed unjust enrichment class "to consumer

1209     purchases of new vehicles during the time period prior to April 2004," so as to limit the class to

1210     consumers who conveyed a benefit upon Ford, and argue that they have common proof of Ford's

1211     misconduct, in the form of evidence that Ford disregarded and failed to disclose to consumers an

1212     engineering recommendation that Ford should redesign their 15-passenger vans to improve van

1213     stability and handling. (Pls.' Reply Br. at 37).

1214         While it appears that the modifications to Plaintiffs' proposed unjust enrichment classes

1215     address the first objection raised by Ford (common benefit), the Court agrees with Ford that

1216     Plaintiffs cannot satisfy the remaining elements of their unjust enrichment claims with common

1217     proof.

1218        As this Court has explained with regard to other proposed classes, the summary judgment

1219    record in this case established that different named Plaintiffs had different consumer experiences

1220    vis-a-vis their E-350 van.  Some were not exposed to any representations about the van's

1221    capacity or relative safety, some experienced no discernable handling problems with their vans,

1222    some continue to fill their van to capacity, and some incurred no injury whatsoever.  At the same

1223    time, the E-350 owners' manuals issued by Ford progressively alerted consumers to the van's

1224    unique handling characteristics and the need to drive with caution.  This Court finds illustrative

1225    Chief Judge Brown's rulings with regard to the unjust enrichment claims of Illinois Plaintiff

1226    Pentecostal Temple, New York Plaintiff Barrett, and Florida Plaintiff Blandon.

1227        Addressing the former, Chief Judge Brown granted summary judgment against

1228    Pentecostal Temple's unjust enrichment claim, reasoning as follows:

1229                It is undisputed, based on Pastor Edwards's deposition testimony, that no
1230                one at Pentecostal Temple received any representations from Ford, saw
1231                any Ford marketing materials, or even observed that the E-350 purported
1232                to be a 15-passenger van. Pentecostal Temple sold its first E-350 van for
1233                reasons unrelated to the handling issues giving rise to this litigation, and
1234                it purchased the 1998 van based on the desire for "something that would
1235                take more than four or five members at a time" and that would have ease
1236                of access for seniors and young people.  (Edwards Dep. at 56:16-17;
1237                57:1-19).  While other Plaintiffs in this action might have acquired their
1238                E-350 vans based on Ford's representations or labeling of the vehicles
1239                as 15-passenger vans, the undisputed record shows that Pentecostal
1240                Temple did not.

1241

1242    July 9 Opinion, 2010 WL 2813788, at *25.  Chief Judge Brown explained that Pentecostal

1243    Temple's "unjust enrichment claim fails for the same substantive flaw that dooms its [consumer

1244    fraud act] claim: it cannot show deception or other wrongful conduct directed at Pentecostal

1245    Temple." *Id.* at *24.  Similarly, Chief Judge Brown granted summary judgment against New

1246 York Plaintiff Barrett's unjust enrichment claim, because the undisputed record revealed that

1247 Barrett: (i) knew of the handling defects prior to purchase and told his salesman of the same

1248 (simultaneously negotiating a lower price that Barrett deemed fair); (ii) did not experience

1249 handling problems and continued to fill his van to capacity; (iii) still would have bought the van

1250 if he had all the knowledge that he had at the time of his deposition; and (iv) had no intention of

1251 selling the van.  *Id.* at *71-72 (citing the benefit-of-the-bargain principles of *Canon Cameras* and

1252 the actual injury requirement of *Frank*).  As this Court observed, *supra*, it cannot be denied that

1253 such a class member has been deprived of the benefit of his or her bargain.  Chief Judge Brown

1254 further granted summary judgment against Florida Plaintiff Blandon's unjust enrichment claim

1255 because she purchased her van in 2008 from a private individual after the point in time (April

1256 2004) that Plaintiffs concede that the bubble market for E-350 vans had ended.  *Id.* at *50.

1257 Beyond the April 2004 end-point conceded by Plaintiffs, it is undisputed that a number of public

1258 reports concerning the E-350's handling problems were published and/or broadcast between

1259 2000 and 2004.  Such reports would necessarily factor into consideration of the equities for the

1260 unjust enrichment claims of those consumers that viewed the reports.

1261   Where individual consumers bargained with varying degrees of knowledge regarding the

1262 alleged defect, were exposed to varying representations, if at all, about the van's capacity and

1263 relative safety, and filled their vans at varying capacities with varying handling problems, if any,

1264 Plaintiffs cannot overcome these individual consumer experiences with the claim that they have

1265 common proof that Ford failed to disclose information about the vehicle's handling.  The

1266 presiding court would need to conduct separate inquiries into the equities of each class member's

1267 consumer experience to resolve these claims.  *See, e.g.*, *Vega v. T-Mobile USA, Inc.*, 564 F.3d

1268    1256, 1274 (11th Cir. 2009) (explaining that unjust enrichment claims require the reviewing

1269    court to "examine the particular circumstances of an individual case and assure itself that,

1270    without a remedy, inequity would result or persist," and therefore "courts . . . have found unjust

1271    enrichment claims inappropriate for class action treatment").  Common issues of law and fact

1272    thus do not predominate over individualized inquiries, and this Court will deny class certification

1273    of the Pennsylvania unjust enrichment classes.

1274        *D.  Florida*

1275        The only remaining Florida claims are the Florida Deceptive and Unfair Trade Practices

1276    Act (FDUPTA) claims of Diaz and Mestre.  *See* July 9 Opinion, 2010 WL 2813788, at *51.  Ford

1277    argues that Plaintiffs ignore the "central" issue of consumer knowledge, which led to the

1278    dismissal of Florida Plaintiff Blandon's FDUPTA claim.  Ford also argues that the proposed

1279    Florida class fails for the same reasons that the New York and Texas consumer fraud claims fail,

1280    because the law of the three jurisdictions are relatively similar.  (Ford Resp. Br. at 61).  Plaintiffs

1281    respond with the essentially the same arguments that they advanced in support of their New York

1282    and Texas consumer fraud claims, and emphasize that they do not need to show reliance under

1283    Florida law.  (Pls.' Reply Br. at 25-35).  Although the Court agrees with Plaintiffs that the

1284    prevailing Florida authority holds that Plaintiffs do not need to show reliance, the Court agrees

1285    with Ford that individualized issues of deception and causation predominate and defeat

1286    Plaintiffs' motion for class certification.

1287        "[U]nder FDUTPA, a litigant must demonstrate three elements: (1) a deceptive act or

1288    unfair practice; (2) causation; and (3) actual damages."  *Pop's Pancakes, Inc. v. NuCO2, Inc.*,

1289    251 F.R.D. 677, 685 (S.D. Fla. 2008) (citing *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d

1290    Dist. Ct. App. 2006)).  Plaintiffs cite *Fitzpatrick v. General Mills*, 263 F.R.D. 687, 695 (S.D. Fla.

1291    2010) and *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st Dist. Ct. App. 2000), two cases

1292    that approved certification of FDUTPA classes, for the proposition that FDUTPA does not

1293    require a showing of reliance.  The Eleventh Circuit has since vacated the class definition

1294    certified in *Fitzpatrick*, but in doing so approved of the district court's predominance analysis,

1295    which relied on *Davis*.  *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1282-83 (11th Cir. 2011).

1296    However, the appellate court's decision in *Davis* has since been criticized by multiple appellate

1297    decisions and a federal district court for its failure to account for FDUTPA's causation

1298    requirement.  *Pop's Pancakes*, 251 F.R.D. at 687; *Black Diamond Props., Inc. v. Haines*, 940

1299    So. 2d 1176, 1179 n.1 (Fla. 5th Dist. Ct. App. 2006); *Philip Morris USA, Inc. v. Hines*, 883

1300    So.2d 292, 294 (Fla. 4th Dist. Ct. App. 2003).  *Pop's Pancakes* further cited *Egwuatu v. South*

1301    *Lubes, Inc.*, 976 So. 2d 50, 53 (Fla. 1st Dist. Ct. App. 2008), as evidence that the appellate court

1302    that issued *Davis* had limited its holding.  *Pop's Pancakes*, 251 F.R.D. at 687.  The Eleventh

1303    Circuit in *Fitzgerald* did not address these developments in Florida law,[21] and it appears that the

1304    FDUTPA issue of causation was not raised on appeal.

1305        This Court finds persuasive the deception and causation analysis in *Pop's Pancakes* and

1306    *Black Diamond*.  Both courts denied class certification of the plaintiffs' respective FDUTPA

1307    claims, because resolution of the claims would require individualized deceptive act and causation

1308    inquiries.  In *Pop's Pancakes*, for instance, the plaintiffs, lessees of beverage equipment, alleged

1309    that the defendant lessor had included an illicit administrative fee in its property tax invoices.

___

[21]Similarly, *Wolin v. Jaguar Land Rover North America*, 617 F.3d 1168 (9th Cir. 2010), which Plaintiffs correctly note approved an FDUTPA class, does not appear to contain any discussion of how Florida courts have interpreted the state's consumer fraud law.

1310   The court ruled that the proposed FDUTPA class "fail[ed] to account for those customers who

1311   fall within the class description, who either were told, prior to receiving the property tax invoice,

1312   that the invoice included an administrative fee, or, those customers who read the back of the

1313   invoice and understood, based upon that reading, that the 'property tax' fee on the front of the

1314   invoice included an administrative fee." 251 F.R.D. at 685.  Although the plaintiffs in that case

1315   characterized the invoice as a uniform misrepresentation, the court disagreed, stating "Plaintiffs

1316   fail to acknowledge that whether the invoice was deceptive depends, in part, on the knowledge

1317   and/or understanding of each NUCO customer." *Id.* at 686.  Meanwhile, in *Black Diamond*,

1318   plaintiffs, homeowners in a residential golf community and members of the golf course, alleged

1319   that the community developer misrepresented the ownership interest attendant to their golf

1320   memberships.  940 So. 2d at 1178.  The district court of appeals rejected the homeowners'

1321   FDUPTA class, explaining that the class claims:

1322   alleg[ed] that oral and written misrepresentations took place in 500
1323   separate oral contract transactions spanning many years and involving
1324   numerous sales personnel.  To prove these allegations, it will be
1325   necessary that each plaintiff testify.  Additionally, it will be necessary for
1326   each plaintiff to offer proof that he or she was damaged as a result of the
1327   purported misrepresentations.  Finally, given the varied circumstances
1328   and span of time over which the transactions occurred, defenses
1329   applicable to some plaintiffs will not be applicable to others.
1330
1331   *Id.* at 1178-79.

1332   Chief Judge Brown found this reasoning persuasive; he cited *Pop's Pancakes* with

1333   approval in granting summary judgment against Florida Plaintiff Blandon's FDUTPA claim.

1334   July 9 Opinion, 2010 WL 2813788, at *49 (reasoning under FDUTPA, per *Pop's Pancakes*, "a

1335   defendant's deceptive practice must cause a plaintiff's injury, and if a plaintiff knew of the safety

64

1336  issues that Ford's allegedly deceptive sales practices attempted to conceal, her injuries could not

1337  have been caused by those practices").  Plaintiffs have not sought reconsideration of this ruling,

1338  and it is now law of the case.  This Court agrees that the deception and causation analysis of

1339  *Pop's Pancakes* and *Black Diamond* controls for the circumstances presented in this case.  In

1340  light of the varied consumer experiences of Plaintiffs in this case—in terms of exposure to

1341  representations of capacity and safety, pre-existing knowledge of the alleged defect from

1342  personal use and/or public reports, and manifestation of handling problems at different

1343  occupancy levels, *see generally* discussion of New York GBL § 349 class, *supra* Part

1344  II.A.1—resolution of Plaintiffs' FDUTPA claims will require individualized deception and

1345  causation inquiries.  Accordingly, common issues do not predominate, and this Court will deny

1346  certification of the Florida class.

1347       *E.  Michigan & New Jersey*

1348       The only remaining Michigan and New Jersey claims are for breach of the implied

1349  warranty of merchantability.  July 9 Opinion, 2010 WL 2813788, at *33, 67; February 16

1350  Opinion, 2011 WL 601279, at *10.  Ford and Plaintiffs present essentially the same class

1351  certification arguments as to these proposed classes as they did with regard to the proposed New

1352  York and Pennsylvania implied warranty classes.  Plaintiffs further rely on *In re Mercedes-Benz*

1353  *Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), which certified a class of vehicle

1354  owners who brought consumer fraud and unjust enrichment claims against the manufacturer for

1355  failing to tell them that the Tele Aid emergency response systems they purchased with their

1356  vehicles and paid for with subscription fees would become obsolete.

1357       This Court detects no material differences between Michigan's and New Jersey's implied

65

1358   warranty law and Pennsylvania's implied warranty law that would compel a different conclusion,

1359   and therefore the Court discusses them together.  Like Pennsylvania, Michigan and New Jersey

1360   require a showing of causation that can be overcome by proof that the consumer had actual

1361   knowledge of the defect at the time of purchase.  *See, e.g.*, Mich. Comp. Laws §§ 440.2314

1362   Cmt.13, 440.2316(3)(b) & Cmt. 8; *Jodway v. Kennametal, Inc.*, 525 N.W.2d 883, 890 (Mich. Ct.

1363   App. 1994) ("A purchaser who has extensive knowledge of a product's inherently dangerous

1364   propensities should not be allowed to claim that an implied warranty of merchantability exists as

1365   a guaranty against such characteristics."); N.J. Stat. Ann. §§ 12A:2-314 Cmt. 13, 12A:2-

1366   316(3)(b) & Cmt. 8; *Henry Heide, Inc. v. WRH Prods. Co.*, 766 F.2d 105, 110 (3d Cir. 1985)

1367   (applying New Jersey law and stating that "if a buyer undertakes a reasonable examination of the

1368   goods, he is precluded from asserting a claim for breach of implied warranty against anyone who

1369   was responsible for a defect that the buyer ought, in the circumstances, to have noticed").

1370   Accordingly, the Court's causation analysis of the New York and Pennsylvania implied warranty

1371   classes applies equally here.  *See* Parts II.A.2 and II.C.1, *supra*.  In light of the summary

1372   judgment record, individual issues of causation predominate, and this Court will deny

1373   certification of these classes.

1374        *In re Mercedes-Benz*, cited by Plaintiffs, does not suggest otherwise, because the

1375   plaintiffs in that case voluntarily dismissed their implied warranty claims prior to class

1376   certification.  257 F.R.D. at 50 n.5.  Nor is that case persuasive, because, unlike the present case,

1377   the consumer fraud and unjust enrichment allegations in that case were not undercut by differing

1378   accounts of misrepresentation, record evidence that some consumers knew of the alleged defect

1379   at the time of purchase (both from personal knowledge and from public reports), and there was

66

1380   no doubt that the defect—the obsolescence of the analog network utilized by the vehicles'

1381   emergency response systems—manifested in all class vehicles.  *See id.* at 73 ("Each member of

1382   the proposed class demonstrated his or her intention to utilize the system by continuing to

1383   subscribe until being informed that analog service would be discontinued at the end of 2007, and

1384   some Plaintiffs went so far as to purchase a digital upgrade in order to assure that they could

1385   continue to use Tele Aid.  Thus, each class member got something less than he or she was

1386   promised: a vehicle that was meant to last up to 20 years, but contained a Tele Aid system that

1387   would become useless at the end of 2007.").

1388        *F.  California*

1389        The only remaining California claim is First United's unjust enrichment claim.  July 9

1390   Opinion, 2010 WL 2813788, at *19; February 16 Opinion, 2011 WL 601279, at *6-8.  Ford and

1391   Plaintiffs generally present the same class certification arguments as to the proposed California

1392   class as they did with regard to the proposed Pennsylvania class.  This Court detects no

1393   distinguishing features of California's law of unjust enrichment that would compel a different

1394   conclusion.  *See, e.g.*, *Ghirardo v. Antonioli*, 924 P.2d 996, 1003 (Cal. 1996) ("Under the law of

1395   restitution, an individual may be required to make restitution if he is unjustly enriched at the

1396   expense of another.  A person is enriched if he receives a benefit at another's expense.  The term

1397   'benefit' 'denotes any form of advantage.' Thus, a benefit is conferred not only when one adds to

1398   the property of another, but also when one saves the other from expense or loss.") (citing

1399   Restatement of Restitution § 1); February 16 Opinion, 2011 WL 601279, at *5 (recognizing

1400   similarities between law of unjust enrichment in Pennsylvania and California).  Accordingly, the

1401   Court will deny certification of Plaintiffs' proposed California unjust enrichment class for the

67

1402    same reasons that the Court rejected Plaintiffs' proposed Pennsylvania unjust enrichment class.

1403    *See* Part II.C.2, *supra*.[22]

1404    *G.  Georgia*

1405    Georgia Plaintiff Allen Temple seeks certification of its remaining express warranty,

1406    implied warranty, and unjust enrichment claims.  *See* July 9 Opinion, 2010 WL 2813788, at *38.

1407    Allen Temple is the only Plaintiff that still has an active express warranty claim after the

1408    summary judgment rulings.  The parties present essentially the same arguments in support of the

1409    implied warranty and unjust enrichment claims.  In addition, the parties dispute whether

1410    purchasers of used vans can be included in a warranty class under Georgia law.[23]  With regard to

1411    the express warranty class, Ford argues that Chief Judge Brown's summary judgment  rulings as

---

[22]Two Ninth Circuit decisions cited by Plaintiffs, *Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), do not support certification of Plaintiffs' California unjust enrichment class.  *Chamberlan* denied interlocutory review of the district court's certification of a class under the California Consumers Legal Remedies Act.  402 F.3d at 962.  The common issues in that case were: "(1) whether the design of the plastic intake manifold was defective; (2) whether Ford was aware of alleged design defects; (3) whether Ford had a duty to disclose its knowledge; (4) whether it failed to do so; (5) whether the facts that Ford allegedly failed to disclose were material; and (6) whether the alleged failure to disclose violated the CLRA."  *Id.  Chamberlan* did not involve an unjust enrichment class under California law, and its analysis of common issues under California's consumer fraud statute is not applicable to the remaining consumer fraud claims (Florida, New York, Texas) in this MDL action.  Likewise, *Hanlon*, which approved a class settlement of product defect claims against a minivan manufacturer, did not address certification of an unjust enrichment claim under California law, and the court's scant predominance analysis did not address any material factual variations among consumers that would require individualized treatment of class members' claims.  Thus, *Hanlon* provides minimal support for Plaintiffs' position in this case, where the summary judgment record revealed numerous, material differences from Plaintiffs' respective consumer experiences.

[23]Plaintiffs' reply brief modified the proposed unjust enrichment classes to extend only to purchasers of new E-350 vans, but Plaintiffs have not sought to modify their implied warranty classes in the same vein.

1412     to other named Plaintiffs reveal that different consumers were exposed to different

1413     representations about the E-350's seating capacity and relative safety.  Consequently, Ford

1414     reasons that the presiding court would have to undertake individualized inquiries of putative

1415     class members' respective consumer experiences to see if any affirmative representations by Ford

1416     became the "basis of the bargain."  (Ford Resp. Br. at 65).  Plaintiffs do not appear to address

1417     Ford's express warranty argument in their reply brief, but in their class certification brief

1418     Plaintiffs generally argued that "[w]hether Ford's marketing of the E-350 as a 15-passenger

1419     vehicle, its '15 Passenger' name, and 15 installed [sic] seats, constitutes a description and

1420     warranty of safe 15-passenger travel turns wholly on how Ford sold the vans, not on any

1421     particulars in respect of consumers."  (Pls.' Br. at 43).  The Court agrees with Ford on all counts.

1422         This Court detects no material differences between Georgia's implied warranty law and

1423     Pennsylvania's implied warranty law that would compel a different conclusion.  Like

1424     Pennsylvania, Georgia's implied warranty law requires a showing of causation that can be

1425     overcome by proof that the consumer had actual knowledge of the defect at the time of purchase.

1426     *See, e.g.*, Ga. Code Ann. §§ 11-2-314 Cmt. 13, 11-2-316(3)(b) & Cmt. 8; *W.M. Hobbs, Ltd. v.*

1427     *Accusystems of Ga., Inc.*, 339 S.E.2d 646, 647 (Ga. Ct. App. 1986) (rejecting implied warranty

1428     claim where consumer had the opportunity to use the copier machine on a trial basis prior to

1429     purchase).  Accordingly, the Court's causation analysis of the New York and Pennsylvania

1430     implied warranty classes applies equally here.  *See* Parts II.A.2 and II.C.1, *supra*.  Likewise, the

1431     Court discerns no material difference between Georgia's law of unjust enrichment and that of

1432     Pennsylvania.  *See, e.g.*, *Tuvim v. United Jewish Cmtys., Inc.*, 680 S.E. 2d 827, 829-30 (Ga.

1433     2009) ("Unjust enrichment applies when as a matter of fact there is no legal contract, but when

1434   the party sought to be charged has been conferred a benefit by the party contending an unjust

1435   enrichment which the benefitted party equitably ought to return or compensate for.") (citation

1436   omitted).  Accordingly, the Court will deny certification of Plaintiffs' proposed Georgia unjust

1437   enrichment class for the same reasons that the Court rejected Plaintiffs' proposed Pennsylvania

1438   unjust enrichment class.  *See* Part II.C.2, *supra*.

1439          With regard to the proposed express warranty class, the Court agrees with Ford that

1440   common issues do not predominate.  Like other jurisdictions, Georgia law recognizes express

1441   warranties in the following circumstances:

1442          (a) Any affirmation of fact or promise made by the seller to the buyer
1443          which relates to the goods and becomes part of the basis of the bargain
1444          creates an express warranty that the goods shall conform to the
1445          affirmation or promise.
1446
1447          (b) Any description of the goods which is made part of the basis of the
1448          bargain creates an express warranty that the goods shall conform to the
1449          description.
1450
1451   Ga. Code Ann. § 11-2-313(1).  "It is not necessary to the creation of an express warranty that the

1452   seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to

1453   make a warranty, but an affirmation merely of the value of the goods or a statement purporting to

1454   be merely the seller's opinion or commendation of the goods does not create a warranty."

1455   *Id.* § 11-2-313(2).

1456          The decisive test, in determining whether language used is a mere
1457          expression of opinion or a warranty, is whether it purported to state a fact
1458          upon which it may fairly be presumed the seller expected the buyer to
1459          rely, and upon which a buyer would ordinarily rely.  If the language used
1460          is of that character, the fact of reliance on the part of the buyer and the
1461          presumption of intent on the part of the seller which the law would raise
1462          in such a case would operate to create a warranty.
1463

1464    *Smith v. Frazer*, 86 S.E. 225, 226 (Ga. 1915) (quoting 30 Am. & Eng. Enc. Law at 142).  Chief

1465    Judge Brown's omnibus July 9 Opinion rejected other Plaintiffs' contention that Ford's "core

1466    description" of the E-350 as a "15-passenger" van created an express warranty of safety under the

1467    respective jurisdictions' UCC provisions.  *E.g.*, July 9 Opinion, 2010 WL 2813788, at *9

1468    (California Plaintiffs), 31 (New Jersey Plaintiffs), 41 (Pennsylvania Plaintiffs), 73 (Bishop

1469    Anderson), 79 (Massachusetts Plaintiff).[24]  Plaintiffs have not sought reconsideration of these

1470    rulings, and Plaintiffs do not suggest that Georgia law would require a different conclusion.  The

1471    summary judgment record in this case further revealed that different consumers were exposed to

1472    different representations, if at all, at the time of purchase.  *See* Part II.A.1.a ("Misrepresentation")

1473    & n.7, *supra*.  Individual inquiries will be necessary to determine whether Ford representatives

1474    made affirmative representations about the E-350's relative safety as a 15-passenger van to

1475    specific consumers.  Consumers who were not exposed to such representations cannot assert that

1476    such representations were a basis for their bargains.  *See, e.g.*, *Am. Coach Lines of Orlando, Inc.*

1477    *v. N. Am. Bus Indus., Inc.*, No. 09-999, 2011 WL 653524, at *18 (M.D. Fla. Feb. 14, 2011)

1478    (applying Florida and Georgia law, and concluding that statements made after delivery of the

1479    product could not have been the basis of the bargain).  Plaintiffs have not shown that they can

1480    establish their express warranty claim with common proof.  Therefore, the Court concludes that

1481    common issues of fact do not predominate, and the Court will deny certification of Georgia

---

[24]Unlike it did with regard to Plaintiffs' other express warranty claims, Ford did not seek summary judgment against Allen Temple's express warranty claim on the ground that Ford's alleged representations were too vague to be actionable as an express warranty.  Consequently, Chief Judge Brown did not have occasion to rule on whether Allen Temple had presented colorable evidence that Ford made specific representations about the E-350 van that were actionable as express warranties under Georgia law.  July 9 Opinion, 2010 WL 2813788, at *35.

1482        Plaintiff's express warranty class.

1483              In addition to these reasons, the Court agrees with Ford that Plaintiffs' proposed warranty

1484        class fails to account for Georgia's treatment of purchasers of used goods.  Plaintiffs cite *Georgia*

1485        *Timberlands, Inc. v. S. Airways, Co.*, 188 S.E.2d 108 (Ga. Ct. App. 1972) for the proposition that

1486        an implied warranty of merchantability inheres when the used goods are sold by merchants who

1487        deal in the subject goods.  (Pls.' Reply Br. at 21).  Yet, Plaintiffs fail to explain how this rule

1488        would apply to consumers that bought used E-350 vans from third-parties, such as private

1489        individuals or independent car dealerships.  The Court is aware of no Georgia authority that

1490        would permit express or implied warranty claims to lie against the manufacturer where the

1491        consumer purchased used goods (even a vehicle) from an unrelated third party.  *See Gen. Motors*

1492        *Corp. v. Halco Instruments, Inc.*, 185 S.E. 2d 619, 622 (Ga. Ct. App. 1971) (collecting cases for

1493        the proposition that there is no implied warranty of merchantability against the manufacturer

1494        "[w]hen goods are sold by an original purchaser to a third party as used or second-hand goods");

1495        *Stewart v. Gainesville Glass Co.*, 212 S.E. 2d 377, 377 (Ga. 1975) (stating that, with few

1496        exceptions, express warranty claims require privity); *Jones v. Cranman's Sporting Goods*,

1497        237 S.E. 2d 402, 405 (Ga. Ct. App. 1977) (recognizing that privity exists "(W)here an

1498        automobile manufacturer, through its authorized dealer issues to a purchaser of one of its

1499        automobiles from such dealer"); *see also Cole v. Gen. Motors Corp.*, 484 F.3d 717, 730 (5th Cir.

1500        2007) (citing Georgia as a jurisdiction that does not allow implied warranty claims for used

1501        goods against a remote manufacturer).  Plaintiffs' proposed warranty class does not exclude

1502        consumers who purchased their used vans from third parties, and thus are over-inclusive.

1503

72

1504        *H. Statute of Limitations Defenses*

1505            In addition to the jurisdiction- and claim-specific objections discussed above, Ford

1506    contends that the individual issues surrounding its statute-of-limitations affirmative defenses, as

1507    well as any tolling doctrine advanced by Plaintiffs to counter these defenses, weighs against a

1508    finding of predominance.  Although the above predominance determinations stand on their own,

1509    the Court agrees that the individualized inquiries attendant to Ford's statute-of-limitations

1510    defenses as to each jurisdiction-based sub-class support the denial of class certification.[25]

1511            Before the Court can assess the effect of Ford's statute-of-limitations defenses on the

1512    predominance inquiry as to each jurisdiction-based sub-class, the Court must determine whether

1513    such inquiry is even relevant to the predominance inquiry.  The Third Circuit in *Barnes v.*

1514    *American Tobacco Co.* squarely held that affirmative defenses, including statute-of-limitations

1515    defenses, are properly considered in determining predominance and cohesion for purposes of

1516    class certification under subsections (b)(2) and (b)(3).  161 F.3d 127, 147-49 (3d Cir. 1998)

1517    (affirming denial of class certification for putative class of smokers).  Indeed, the *Barnes* court

1518    cited the individual issues arising under those defenses as part of its reasoning for denying class

---

[25]Additionally, the Court notes that the individualized inquiries necessary to evaluate Ford's statute-of-limitations defenses in light of the variations in state law across multi-jurisdiction claim-based classes would pose significant administrative difficulty in the trial context.  *Sullivan*, 2011 U.S. App. LEXIS 25185, at *62 n.28 ("We are aware that there may still be circumstances, as we and other Courts of Appeals have noted, where '[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance.'") (citations omitted).  In its recent decision, the Third Circuit noted that litigation class certification—as opposed to settlement class certification, which was at issue in *Sullivan*—potentially implicates "'intractable management problems'" and "'insuperable obstacles' that could render class litigation unmanageable."  *Id.* at *59-60 (citations omitted).  In this case, the Court need not decide whether variations in state law would make class litigation unmanageable, because the Court is persuaded that predominance has been defeated for the independent reasons explained above.

1519    certification.  *Id.* at 143 ("We believe that addiction, causation, the defenses of comparative and

1520    contributory negligence, the need for medical monitoring and the statute of limitations present

1521    too many individual issues to permit certification."), 146-47 (discussing individual issues related

1522    to comparative and/or contributory negligence), 149 (citing individual issues attendant to the

1523    statute of limitations defense as grounds for denying class certification).  However, four years

1524    later in *In re Linerboard Antitrust Litigation*, the court affirmed certification of an antitrust class

1525    against manufacturers of linerboard, despite the manufacturers' contention that their statute of

1526    limitations defenses and consumers' fraudulent concealment tolling theories presented individual

1527    issues that defeated predominance.  305 F.3d 145, 160-64 (3d Cir. 2002).  In doing so, the

1528    *Linerboard* court cited with approval case law and a treatise that suggested that such individual

1529    issues did not defeat class certification, but could be dealt with at a subsequent damages stage.

1530    *Id.* at 163.  Quoting the treatise, the *Linerboard* court explained:

1531            Challenges based on the statute of limitations, fraudulent concealment,
1532            releases, causation, or reliance have usually been rejected and will not bar
1533            predominance satisfaction because those issues go to the right of a class
1534            member to recover, in contrast to underlying common issues of the
1535            defendant's liability.
1536
1537    *Id.* (quoting Newberg & Conti, Newberg on Class Actions § 4.26 (3d ed.)).  Speaking to the

1538    federal antitrust claims before it, the *Linerboard* court recognized that individual issues

1539    pertaining to fraudulent concealment would arise, but reasoned that "common issues of

1540    concealment predominate here because 'the inquiry necessarily focuses on defendants' conduct,

1541    that is, what defendants did rather than what plaintiffs did.'"  *Id.* (citation omitted).  The court

1542    further reasoned:

1543            Key questions will not revolve around whether [the consumers] knew that

74

1544            the prices paid were higher than they should have been or whether [they]
1545            knew of the alleged conspiracy among Appellants.  Instead, the critical
1546            inquiry will be whether "defendants successfully concealed the existence
1547            of the alleged conspiracy, which proof will be common among the class
1548            members in each class."

1549

1550 *Id.* (citation omitted).

1551        While at first blush *Linerboard* appears inconsistent with *Barnes*, Plaintiffs acknowledge

1552 (Pls.' Reply Br. at 23) that *Linerboard* endorsed the First Circuit's reasoning in *Waste Mgmt.*

1553 *Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000):

1554            Although a necessity for individualized statute-of-limitations
1555            determinations invariably weighs against class certification under Rule
1556            23(b)(3), we reject any per se rule that treats the presence of such issues
1557            as an automatic disqualifier. In other words, the mere fact that such
1558            concerns may arise and may affect different class members differently
1559            does not compel a finding that individual issues predominate over
1560            common ones. As long as a sufficient constellation of common issues
1561            binds class members together, variations in the sources and application
1562            of statutes of limitations will not automatically foreclose class
1563            certification under Rule 23(b)(3).  Predominance under Rule 23(b)(3)
1564            cannot be reduced to a mechanical, single-issue test.

1565

1566 *Linerboard*, 305 F.3d at 162-63 (internal citations from *Waste Management Holdings* omitted).

1567 Thus, *Linerboard* cannot be read to prohibit *consideration of the individualized issues* arising

1568 from statute-of-limitations defenses for purposes of determining predominance under Rule

1569 23(b)(3).  This reading of *Linerboard* is consistent with *Barnes*, which recognized that "the

1570 existence of affirmative defenses as to some class members may not by itself [be] enough

1571 warrant the denial of certification." *Barnes*, 161 F.3d at 147 n.25.[26]  Thus, this Court finds that

1572 Ford's statute-of-limitations defenses and Plaintiffs' equitable tolling rejoinders are relevant to

---

[26]The Court further notes that this interpretation is consistent with *Sullivan*, in which the Third Circuit held that variations in state law do not defeat predominance in the class *settlement* certification context.  *See Sullivan*, 2011 U.S. App. LEXIS 25185, at *58-59.

1573 this Court's consideration of predominance with respect to jurisdiction-based sub-classes.

1574   Ford's statute-of-limitations defenses and any applicable discovery rule and/or other

1575 equitable tolling doctrine would require inquiries into the individual circumstances of each

1576 Plaintiff.  As noted above, Chief Judge Brown's summary judgment decisions revealed that

1577 named Plaintiffs had widely divergent experiences *vis-a-vis* their E-350 vans; some purchased

1578 their vans with knowledge of the van's unique handling problems (Barrett,[27] Blandon), some saw

1579 news releases or government reports about the rollover problems (Bishop Anderson, Charles St.

1580 AME, Conant Avenue), some experienced handling issues while driving (Charles St. AME,

1581 Conant Avenue), others removed seats or limited the van to less than 15 passengers (Bishop

1582 Anderson, St. Luke's), and some did not appear to have experienced any handling problems

1583 whatsoever (Barrett, St. James, St. Luke's).  *See* July 9 Opinion, 2010 WL 2813788, at *45, 51,

1584 57, 62, 68-69, 76.  At the same time, the summary judgment opinions revealed that different

1585 consumers learned of the E-350 van's handling problems, if at all, in differing degrees, from

1586 different sources, and at different times.  These individual experiences would be relevant to a

1587 determination of accrual in a jurisdiction with the discovery rule, and thus the presiding court

1588 would have to conduct countless individualized inquiries.  Moreover, for jurisdictions that follow

1589 New York's equitable tolling requirement of a subsequent affirmative act, Plaintiffs cannot

1590 invoke *Linerboard*'s common proof of fraudulent concealment finding, because each Plaintiff

1591 would have to show that Ford committed some act, other than the underlying misrepresentation

---

   [27]Indeed, it is undisputed that Barrett negotiated down the price of his used 1997 E-350 van in the same conversation that he told the sales agent that the van should not be driven by an inexperienced driver, and that he knew of a prior instance where an E-350 van had experienced a rollover.  July 9 Opinion, 2010 WL 2813788, at *69 (citing Barrett Dep. at 48:11-49:13, 106:16-23).

1592   of the van's handling abilities, to conceal the original tort.  *Ross*, 868 N.E.2d at 198.  Contrary to

1593   Plaintiffs' suggestion, these nuanced, fact-specific inquiries will require careful examination, and

1594   thus cannot be supplemented with concise questionnaire forms.  Such inquiries are not amenable

1595   to class litigation.

1596        The Court further notes that Plaintiffs' proposed classes appear to include a large number

1597   of consumers whose claims would be time-barred under the relevant statute of limitations.  Ford

1598   argues that the statute of limitations will bar the vast majority of proposed New York,

1599   Pennsylvania, and Georgia warranty-claim class members, because the named Plaintiffs from

1600   these jurisdictions did not join this MDL until November 2008 (*see* Consent Order of November

1601   5, 2008, Doc. No. 150), and these jurisdictions do not allow cross-jurisdictional tolling.  (*See,*

1602   *e.g.*, Ford's Resp. Br. at 38).  Ford reasons that, courtesy of the four-year limitations period and

1603   the UCC's strict accrual rule for warranty claims (tender of delivery), *see, e.g.*, Ga. Code Ann.

1604   § 11-2-725, putative class members for these claims must have purchased and received their

1605   qualifying E-350 vans no later than November 2004.  Ford further reasons that some of these

1606   classes would be deprived of their class representatives, because certain named Plaintiffs

1607   purchased their E-350 vans before this date.  These arguments fail to account for the class tolling

1608   doctrine recognized by the Supreme Court in *American Pipe & Construction Co. v. Utah*, 414

1609   U.S. 538 (1974) and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983).  This tolling

1610   doctrine recognizes that "the commencement of a class action suspends the applicable statute of

1611   limitations as to all asserted members of the class who would have been parties had the suit been

1612   permitted to continue as a class action," and that the action "remains tolled for all members of the

1613   putative class until class certification is denied."  *Crown, Cork & Seal*, 462 U.S. at 353-54.

1614    Because the original action in this MDL, filed in August 2003, sought a nationwide class (*see*

1615    Doc. No. 1 ¶ 7), it would appear that this doctrine tolled the limitations periods for other named

1616    Plaintiffs who were putative class members under the original class.  Neither party addressed this

1617    class tolling doctrine, and this Court has no occasion to make tolling determinations at the

1618    present time.  Yet, Ford's argument does carry some weight.  Presuming that the limitations

1619    periods were tolled for the subsequent actions that joined this MDL, the cut-off line for the

1620    warranty classes, courtesy of the first-filed action (New Jersey), would be August 1999.  In other

1621    words, class members would have needed to have taken delivery of their E-350 vans no later than

1622    August 1999 in order to have a timely warranty claim.  Such a cut-off line would shrink the

1623    warranty classes by approximately 1/3 of the proposed model years (2000-2005 would be

1624    excluded),[28] unless individual consumers of earlier models presented grounds for equitable

1625    tolling.

1626        This Court has no occasion to rule on the merits of Ford's statute of limitations defenses

1627    and Plaintiffs' respective equitable tolling counter-defenses with the present motion.  However,

1628    the Court agrees that Plaintiffs' proposed warranty classes for these jurisdictions fail to account

1629    for the relatively straightforward effect of the respective UCC statute of limitations on the

1630    warranty claims.  This Court is left to conclude that either a large portion of these proposed

1631    classes will not have viable warranty claims, or alternatively, that many putative class members

1632    will require individualized inquiries into issues of equitable tolling.

---

[28]This Court recognizes that some new vehicles are released before their designated model year (*i.e.*, a 2012 model can be released in 2011).  However, the Court only addresses the flaws of Plaintiffs' proposed classes for present purposes, and does not address the merits of these statute-of-limitations defenses.

1633    *I. Summary*

1634        The Court's decision to deny class certification should not be read to suggest that

1635    Plaintiffs' remaining claims lack merit, or as tacit approval for Ford's design and marketing of

1636    the E-350 van.  Indeed, this Court is aware that a number of fatal automobile accidents have been

1637    linked to occurrences of rollovers in this van, and that these accidents are the subject of other

1638    litigation.  Rather, this Court's ruling reflects the unique and highly individualistic experiences of

1639    consumers, many of whom were not actually deceived and many of whom have suffered no

1640    actual injury as a result of Ford's conduct.  This Court's conclusions do not address the merits of

1641    Plaintiffs' consumer fraud, warranty, and unjust enrichment claims, but draws upon the summary

1642    judgment record to assess the nature of the evidence—common or idiosyncratic—that Plaintiffs

1643    state they will present to support their class claims.

1644        While a narrowly tailored class limited to particular misrepresentations, excluding

1645    persons with knowledge at the time of purchase, cognizant of the respective statute of limitations,

1646    and brought in a jurisdiction that did not require actual injury may have been a better candidate

1647    for class certification, Plaintiffs have not proposed such a class.  As it stands, the massive claim-

1648    and jurisdiction-specific classes proposed by Plaintiffs are rife with issues that will require

1649    individualized determinations.  Common issues of fact and law do not predominate over

1650    individualized inquiries, as required by Rule 23(b)(3), and thus Plaintiffs' proposed classes do

1651    not withstand "rigorous analysis" under *Hydrogen Peroxide*.  Consequently, the Court will deny

1652    Plaintiffs' renewed motion for class certification under Rule 23(b)(3) in its entirety.

1653    III.    CERTIFICATION UNDER RULE 23(b)(2)

1654        Lastly, the Court addresses Plaintiffs' alternative theory for class certification under

79

1655    Federal Rule 23(b)(2).  As noted above, certification pursuant to subpart (b)(2) is appropriate

1656    when "the party opposing the class has acted or refused to act on grounds that apply generally to

1657    the class, so that final injunctive relief or corresponding declaratory relief is appropriate

1658    respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Supreme Court recently

1659    explained in *Wal-Mart v. Dukes*[29] that "[t]he key to the (b)(2) class is 'the indivisible nature of

1660    the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be

1661    enjoined or declared unlawful only as to all of the class members or as to none of them."  131 S.

1662    Ct. 2541, 2557 (2011).  Conversely, subsection (b)(2) "does not authorize class certification

1663    when each individual class member would be entitled to a different injunction or declaratory

1664    judgment against the defendant," or "an individualized award of monetary damages."  *Id.*  Class

1665    certification is inappropriate where "the monetary relief is not incidental to the injunctive or

1666    declaratory relief."  *Id.*; *cf. Barnes*, 161 F.3d at 142 ("Subsection (b)(2) class actions are 'limited

1667    to those class actions seeking primarily injunctive or corresponding declaratory relief.'") (citation

1668    omitted); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 186 (D.N.J. 2003) ("[C]ourts

1669    have certified 23(b)(2) classes despite a claim for money damages where the damages were

1670    incidental or ancillary to a primary claim for an injunction.").

1671            In addition to a primary focus on injunctive or declaratory relief, the Third Circuit has

1672    recognized that class claims under Rule 23(b)(2) must be cohesive.  *See, e.g., Gates v. Rohm &*

---

[29] *Wal-Mart* involved female employees' Title VII sex discrimination claims against their retail store employer, seeking injunctive and declaratory relief, back pay, and punitive damages. 131 S. Ct. at 2547-48, 2561.  The Supreme Court, by a 5-4 vote, decertified the class on the grounds that the class-respondents had not met the commonality requirement of Rule 23(a)(2). *Id.* at 2550-57.  Yet, the Court ruled unanimously that the class-respondents had not met the requirements for certification under Rule 23(b)(2).

1673    *Haas Co.*, 655 F.3d 255, 263-64 (3d Cir. 2011); *Barnes*, 161 F.3d at 143; *Geraghty v. U.S.*

1674    *Parole Comm'n*, 719 F.2d 1199, 1205-06 (3d Cir. 1983).  Although, unlike subsection (b)(3),

1675    (b)(2) does not impose distinct predominance and superiority requirements, our Circuit has

1676    reasoned that "a (b)(2) class may require more cohesiveness than a (b)(3) class. . . . because in a

1677    (b)(2) action, unnamed members are bound by the action without the opportunity to opt out."

1678    *Barnes*, 161 F.3d at 142-43; *see also Gates*, 655 F.3d at 265 ("The 'disparate factual

1679    circumstances of class members' may prevent a class from being cohesive and, therefore, make

1680    the class unable to be certified under Rule 23(b)(2)).") (citing *Carter v. Butz*, 479 F.2d 1084,

1681    1089 (3d Cir. 1973)).  Accordingly, our Circuit has held that district courts have the discretion to

1682    deny certification under (b)(2) when a given case presents "disparate factual circumstances," or a

1683    prevalence of individualized issues.  *Barnes*, 161 F.3d at 143 (citation omitted).

1684            In their opening brief, Plaintiffs argue that certification under this Rule is proper because

1685    "the core of the relief sought by Plaintiffs in this case is equitable in nature."  (Pls.' Br. at 61).

1686    Toward this end, Plaintiffs cite a paragraph from the Complaint's Prayer for Relief that seeks

1687    an order:

1688            [r]equiring Ford to correct the design defect so the E-350 vans c[e]ase to
1689            be a safety hazard, enjoining Ford from distributing the vehicles without
1690            their being so corrected, and requiring Ford to warn all potential
1691            purchasers of the unsafe nature of the E-350 through its own dealers and
1692            through used car dealers and by such means as the Court determines to be
1693            effective and appropriate.
1694
1695    (Complaint, Prayer for Relief ¶ B).  From this equitable "core," Plaintiffs contend that "the Court

1696    may award Class members a uniform stipend of $2,100.00 each"—the cost of retrofitting the E-

1697    350 vans with dual rear wheels—as incidental damages.  (Pls.' Br. at 62).

81

1698          Ford objects that Plaintiffs do not seek primarily injunctive or declaratory relief, and that

1699    the individual issues that defeated predominance demonstrate that Plaintiffs' claims are not

1700    sufficiently cohesive to warrant (b)(2) certification.  Plaintiffs offer no further argument in

1701    support of certification under Rule 23(b)(2) in reply.

1702          The Court notes at the onset that the Supreme Court's recent decision in *Wal-Mart* casts a

1703    cloud over the continued application of the Third Circuit's cohesion requirement for (b)(2)

1704    certification.  The *Wal-Mart* Court explained that the (b)(3) "procedural protections" of

1705    predominance, superiority, mandatory notice, and the right to opt out did not appear in (b)(2)

1706    because they "[are] unnecessary to *a (b)(2) class*."  131 S. Ct. at 2558.  According to the Court,

1707    "[w]hen a class seeks an indivisible injunction benefitting all its members at once, there is no

1708    reason to undertake a case-specific inquiry into whether class issues predominate or whether

1709    class action is a superior method of adjudicating the dispute.  Predominance and superiority are

1710    self-evident."  *Id.*; *cf. id.* at 2566 (Ginsburg, J., joined by Breyer, Sotomayor, and Kagan, JJ.,

1711    concurring in part and dissenting in part) (suggesting that "[i]ndividual [factual] differences

1712    should not bar a . . . Rule 23(b)(2) class, so long as the Rule 23(a) threshold is met").  At the

1713    same time, the *Wal-Mart* Court expressed doubt regarding whether a class seeking monetary

1714    damages could *ever* be certified under Rule 23(b)(2), but declined to answer this question.  *See*

1715    *id.* at 2557.  While this logic suggests that predominance and superiority are unnecessary

1716    considerations for *proper* (b)(2) classes, it is unclear whether a predominance-derived

1717    consideration of cohesion may be relevant in determining whether a proposed class presents a

1718    proper (b)(2) class.  To the extent that cohesion remains a relevant consideration post-*Wal-Mart*,

1719    this Court agrees with Ford that the myriad individual issues of fact and law identified in this

1720      Court's (b)(3) predominance analysis *supra—i.e.*, exposure to differing representations,

1721      deception, causation, and Ford's statutes of limitations affirmative defenses—reveal that

1722      Plaintiffs' proposed classes are not sufficiently cohesive to permit (b)(2) class certification.  *See,*

1723      *e.g.*, *Gates*, 655 F.3d at 265, 269 (denying (b)(2) certification of vinyl chloride exposure case,

1724      where individualized issues of "members' . . . characteristics and medical histories" made

1725      certification inappropriate); *Barnes*, 161 F.3d at 143 (denying (b)(2) certification of tobacco case,

1726      where individualized issues of addiction, causation, and affirmative defenses (comparative

1727      negligence, statute of limitations) made certification inappropriate).  However, to the extent that

1728      *Wal-Mart* abrogates the existing Circuit rule regarding cohesion, this Court concludes that (b)(2)

1729      certification is nevertheless inappropriate, simply because the monetary damages sought by

1730      Plaintiffs are not incidental to a claim for injunctive relief.

1731            Here, the "'core' equitable relief" sought by Plaintiff is an order: (1) requiring Ford to

1732      correct the design defect for existing consumers; (2) enjoining Ford from distributing vehicles

1733      with the defect; and (3) requiring Ford to warn all potential purchasers of the unsafe nature of the

1734      E-350 van through its own dealers and through used car dealers and other means determined by

1735      the Court.  (*See* Pls.' Br. at 61 & n.27; Complaint, Prayer for Relief ¶ B).  Of this proposed

1736      equitable relief, only the first remedy compensates the injuries of putative class members, who,

1737      according to Plaintiffs' proposed classes, have already purchased or acquired a model-year 1991-

1738      2005 E-350 van.[30]  Furthermore, Plaintiffs make no attempt to explain how their claims regarding

---

[30]Presuming that putative class members opted to purchase an additional E-350 van going forward, they would already have knowledge of the defect by virtue of the repairs to their existing van.  Thus, the second and third equitable remedies sought by Plaintiffs do not address the injuries of putative class members.

83

1739   model-year 1991-2005 E-350 vans could justify the broad, perpetual injunctions sought in the

1740   Complaint, which would appear to extend to subsequent model years for which no defect has

1741   been alleged.  Thus, the Court is left to consider Plaintiffs' proposed affirmative injunction

1742   requiring Ford to correct the design defect.  At the same time that Plaintiffs classify this relief as

1743   "equitable" in nature, Plaintiffs concede that "there must be a source of money to pay for the

1744   repair or retrofit of the vans" if class members "wish" to have their vehicles repaired.  (*Id.* at 59).

1745   Elsewhere, Plaintiffs suggest that the Court can simply "award Class members a uniform stipend

1746   of $2,100.00 each."  (*Id.* at 62).  These statements reveal that Plaintiffs primarily seek monetary

1747   damages,[31] and even suggests that some class members may choose to receive the costs of repairs

1748   instead of the actual repairs.  As Ford correctly notes, Plaintiffs cannot simultaneously seek an

1749   affirmative injunction requiring the repairs to be made *and* the monetary costs of those repairs.

1750   (Ford's Resp. Br. at 69).  Plaintiffs present nothing in their reply brief to bolster their (b)(2)

1751   claim.

1752        The Supreme Court in *Wal-Mart* emphasized that subpart (b)(2) applies to injunctions

1753   and declaratory judgments, not "'equitable' remedies generally."  131 S. Ct. at 2560.  The Court

1754   further expressed its dissatisfaction with the class-Respondents' argument that (b)(2) certification

1755   was appropriate, simply because their claims for injunctive and declaratory relief predominated

---

[31]This Court's conclusion that Plaintiffs primarily seek monetary damages is supported by
the numerous damages theories Plaintiffs have put forth during the course of the motions for
summary judgment, ranging from diminution in value to repair costs and incidental costs related
to loss of use.  Given this procedural history, Plaintiffs saw fit to characterize the "core trial
issue[]" of damages in their renewed class certification brief's introductory section as "whether
the $2,100 cost of retrofitting the vans with dual rear wheels is an appropriate measure of
damages and/or an appropriate measure of restitution to remedy Ford's unjust enrichment."
(Pls.' Br. at 4).

1756    over their claims for monetary relief (backpay).  The Court responded to this argument as

1757    follows:

1758                    [t]he mere "predominance" of a proper (b)(2) injunctive claim does
1759                    nothing to justify elimination of Rule 23(b)(3)'s procedural protections:
1760                    It neither establishes the superiority of class adjudication over individual
1761                    adjudication nor cures the notice and opt-out problems.  We fail to see
1762                    why the Rule should be read to nullify these protections whenever a
1763                    plaintiff class, at its option, combines its monetary claims with a
1764                    request—even a "predominating request"—for an injunction.

1765

1766    *Id.* at 2559.  Despite Plaintiffs' argument that "the core of the relief sought by Plaintiffs in this

1767    case is equitable in nature" (Pls.' Br. at 61), the record and Plaintiffs' arguments reveal that

1768    Plaintiffs do not seek predominantly injunctive or declaratory relief, and that the monetary

1769    damages they seek are anything but incidental.  In light of the guidance provided by *Wal-Mart*,

1770    this Court concludes that it would be inappropriate to permit Plaintiffs to sidestep the (b)(3)

1771    requirements under the guise of a (b)(2) class.[32]

1772

1773

1774

1775

1776

1777

1778

1779

1780

1781

1782

1783

1784

---

[32]The Court notes that Plaintiffs' further propose a "hybrid" (b)(2)/(b)(3) class in their opening brief, but appears to abandon this idea in their reply brief.  Plaintiffs present no authority for the proposition that such a "hybrid" class can be certified when the proposed class could not be certified under either subsection (b)(2) or (b)(3).  Here, this Court has concluded that certification would be improper under both (b)(2) and (b)(3).  Accordingly, the Court will decline to certify a hybrid class under a canopy of both provisions.

85

1785                               ***Conclusion***
1786
1787         For the aforementioned reasons, the Court will grant Ford's motion to amend (Doc. No.

1788   393) and deny Plaintiffs' renewed class certification motion (Doc. No. 375).  An appropriate

1789   form of order accompanies this Opinion.

1790
1791
1792   Dated: February 6, 2012
1793
1794                                          <u>s/*Esther Salas*</u>
1795                                          Esther Salas, U.S.D.J.